## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

LITTLE ROCK FAMILY PLANNING SERVICES,
PLANNED PARENTHOOD OF ARKANSAS &
EASTERN OKLAHOMA, D/B/A PLANNED
PARENTHOOD GREAT PLAINS, STEPHANIE HO,
M.D., and THOMAS TVEDTEN, M.D., on behalf
of themselves and their patients,

        Plaintiffs,

    v.

LESLIE RUTLEDGE, in her official capacity as
Attorney General of the State of Arkansas;
LARRY JEGLEY, in his official capacity as
Prosecuting Attorney of Pulaski County; MATT
DURRETT, in his official capacity as Prosecuting
Attorney of Washington County; SYLVIA D.
SIMON, M.D., in her official capacity as
Chairman of Arkansas State Medical Board;
ROBERT BREVING JR., M.D., VERYL D. HODGES,
D.O., JOHN H. SCRIBNER, M.D., OMAR T. ATIQ,
M.D., RHYS L. BRANMAN, M.D., RODNEY
GRIFFIN, M.D., MRS. MARIE HOLDER, BRIAN T.
HYATT, M.D., MR. LARRY D. "BUDDY" LOVELL,
TIMOTHY C. PADEN, M.D., DON R. PHILLIPS,
M.D., WILLIAM L. RUTLEDGE, and M.D., DAVID
L. STAGGS, M.D., in their official capacities as
officers and members of the Arkansas State
Medical Board, and NATHANIEL SMITH, M.D.,
M.P.H., in his official capacity as Director and
State Health Officer of the Arkansas Department
of Health,

        Defendants.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 6 2019

JAMES W. McCORMACK, CLERK
By:_____
        DEP CLERK

CIVIL ACTION

Case No. 4:19cv449-BRW

**COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

This case assigned to District Judge _Wilson_
and to Magistrate Judge _Ray_

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE .................................................................................. 3

PLAINTIFFS ............................................................................................................... 4

DEFENDANTS ........................................................................................................... 5

THE CHALLENGED RESTRICTIONS .................................................................... 7

FACTUAL ALLEGATIONS ...................................................................................... 11

CLAIMS FOR RELIEF ............................................................................................. 33

INJUNCTIVE RELIEF .............................................................................................. 35

REQUEST FOR RELIEF .......................................................................................... 35

Plaintiffs Little Rock Family Planning Services ("LRFP"), Planned Parenthood of Arkansas & Eastern Oklahoma, d/b/a Planned Parenthood Great Plains ("PPAEO"), Dr. Stephanie Ho, and Dr. Thomas Tvedten, on behalf of themselves and their patients, by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.      In recent years, Arkansas has engaged in a targeted campaign against abortion, enacting more than 25 laws aimed at obstructing and interfering with women's access to abortion care in the State, including at least 12 enacted in 2019 alone.

2.      Plaintiffs in this case challenge three recently enacted abortion restrictions (together, "the Restrictions"), which fly directly in the face of longstanding Supreme Court precedent and are the latest in Arkansas's unrelenting campaign to deny women the health care they seek and to which they are entitled.

3.      Plaintiffs seek declaratory and injunctive relief from these three Restrictions on behalf of themselves and their patients under the United States Constitution and 42 U.S.C. § 1983. Without this relief, the Restrictions will have a devastating effect on women seeking to access abortion in the state.

4.      The Restrictions are:

   a.   Arkansas Act 493 of 2019, to be codified at Ark. Code Ann. §§ 20-16-2003(9) to 2004(b) (the "18-Week Ban"), attached as Exhibit 1;

   b.   Arkansas Act 619 of 2019, to be codified at Ark. Code Ann. § 20-16-2003 (the "Reason Ban"), attached as Exhibit 2; and

   c.   Arkansas Act 700 of 2019, to be codified at Ark. Code Ann. § 20-16-605 (the

"OBGYN Requirement"), attached as Exhibit 3.

5.     All Restrictions are set to take effect 90 days after sine die adjournment of the

General Assembly, which was April 24, 2019. They are all therefore scheduled to take effect on

July 24, 2019.[1]

6.     In direct conflict with the Supreme Court's ruling in *Roe v. Wade*, 410 U.S. 113

(1973), and more than four decades of precedent affirming *Roe*'s central holding, the 18-Week Ban

and the Reason Ban (together, the "Bans") criminalize pre-viability abortions. Specifically, the 18-

Week Ban makes it a crime to perform an abortion after 18 weeks of pregnancy, as measured from

the first day of a woman's last menstrual period ("LMP"), despite the fact that viability does not

occur until well after 18 weeks. And the Reason Ban criminalizes the provision of pre-viability

abortion, if the provider has "knowledge" that the woman's decision to terminate her pregnancy

is based on a test result, prenatal diagnosis, or "any other reason to believe" that the embryo or

fetus has Down syndrome. The Bans therefore outright forbid women from exercising their

constitutionally protected right to a pre-viability abortion in Arkansas, in violation of the Fourteenth

Amendment to the United States Constitution, under a long line of unbroken, binding precedent,

and will inflict irreparable harm on Arkansas women if they are allowed to take effect.

7.     Similarly, in forbidding highly qualified, trained physicians from providing

abortion care in Arkansas simply because they are not board-certified or board-eligible in

obstetrics/gynecology ("OBGYN"), the OBGYN Requirement provides absolutely no medical or

safety benefits, and instead substantially burdens access to abortion in blatant violation of the

Supreme Court's ruling in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310–14

(2016). The OBGYN Requirement also violates Plaintiffs' and their patients' rights to equal

---

[1] *See* Ark. Att'y Gen. Op. No. 2019-034 (May 15, 2019), https://www.arkansasag.gov/assets/
opinions/2019-034.pdf.

2

protection of the laws, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, because it treats providers and patients differently than it treats providers of comparable procedures and patients seeking comparable procedures, without adequate justification. The OBGYN Requirement, too, is therefore unconstitutional.

8.     All three Restrictions threaten Plaintiffs with stiff criminal penalties.

9.     Unless this Court grants Plaintiffs the relief they seek, all three Restrictions will require Plaintiffs to turn away women seeking abortion care. As a result, some women will be forced to delay their access to abortion (increasing risk to their health and wellbeing); others will have to travel hundreds of miles to obtain care (and incur all the associated economic and logistical burdens); others will attempt to seek abortions outside the medical system; and still others will be prevented from obtaining abortion care entirely, forced to carry their pregnancies to term against their will.

10.     Accordingly, to protect themselves and their patients from these constitutional violations and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of these three Restrictions.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3).

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

13.     Venue is appropriate under 28 U.S.C § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occur in this judicial district and the majority of the Defendants, who are sued in their official capacity, carry out their official duties at offices

located in this district.

## PLAINTIFFS

14.     Plaintiff LRFP is a professional limited liability corporation that is licensed to do business in Arkansas. It has provided high quality reproductive health care in Arkansas since 1973. LRFP offers miscarriage care and basic gynecological care, including pap smears, sexually-transmitted-disease testing, contraceptive counseling and services, and abortion services. It operates a clinic in Little Rock that provides both medication and surgical abortion care. Medication abortions are offered up to 10 weeks LMP and surgical abortions are offered until twenty-one weeks and six days ("21.6") LMP, a point in pregnancy at which a fetus is never viable. LRFP brings this action on behalf of itself, its patients, and the physicians and staff it employs to provide services to its patients.

15.     Plaintiff PPAEO is an Oklahoma not-for-profit corporation licensed to do business in Arkansas. The health-care services provided by PPAEO at its two Arkansas health centers include well-woman exams, testing and treatment for sexually transmitted infections, provision of birth control and emergency contraception, HIV testing and care, pregnancy testing, screening for vaginal infections, human papillomavirus ("HPV") vaccinations, transgender health services, and menopausal services. It operates two of the three abortion-providing health centers in the state, located in Little Rock and Fayetteville. PPAEO provides medication abortions in Arkansas to women up to 10 weeks LMP. PPAEO or predecessor organizations have provided high quality reproductive health care in Arkansas for more than thirty years, and have offered medication abortion since 2008. PPAEO brings this action on behalf of itself, its patients, and the physicians and staff it employs to provide services to its patients.

4

16.     Plaintiff Stephanie Ho, M.D., is a board-certified family-medicine physician licensed to practice medicine in Arkansas. She has been providing health care in Arkansas since 2008, and medical services, including medication abortion, at PPAEO's Fayetteville health center since 2013. Dr. Ho provides medication abortions up to 10 weeks LMP. Dr. Ho is not board-eligible or board-certified in OBGYN. Dr. Ho sues on her own behalf and on behalf of her patients.

17.     Plaintiff Thomas Tvetden, M.D., is a physician licensed to practice medicine in Arkansas and is the part owner and Medical Director of LRFP. He has provided medical care in Arkansas for more than four decades, and abortion care for more than three decades. He currently provides medication abortion up to 10 weeks LMP and surgical abortion up to 21.6 weeks LMP. Dr. Tvedten is not board-eligible or board-certified in OBGYN. Dr. Tvedten sues on his own behalf and on behalf of his patients.

## DEFENDANTS

18.     Defendant Leslie Rutledge is the Attorney General of Arkansas. She is responsible for bringing an action for injunctive relief against any abortion provider who purposely, knowingly, or recklessly violates the Bans, so as to prevent the abortion provider from performing or inducing or attempting to perform or induce further abortions in violation of the Bans. *See* Act 493 (Ark. Code § 20-16-2006(e)(1)-(2)); Act 619 (Ark. Code § 20-16-2006(d)(1)-(2)). She and her agents and successors are sued in their official capacities.

19.     Defendants Larry Jegley and Matt Durrett are the Prosecuting Attorneys for Pulaski and Washington Counties, respectively, located at 224 South Spring Street, Little Rock, AR 72201 and 280 N. College Ave., Suite 301, Fayetteville, AR 72701. Prosecuting attorneys "shall commence and prosecute all criminal actions in which the state or any county in his

district may be concerned." Ark. Code § 16-21-103 (2019). Defendants Jegley and Durrett are

therefore responsible for criminal enforcement of Act 493, Act 619, and Act 700 in Pulaski and

Washington Counties. Plaintiff LRFP's health center is located in Pulaski County and Plaintiff

PPAEO's health centers are located in Pulaski and Washington Counties. Defendants Jegley and

Durrett are also responsible for bringing a cause of action for injunctive relief against abortion

providers who purposely, knowingly, or recklessly violate the 18-Week Ban so as to prevent

them from performing or inducing and from attempting to perform or induce further abortions in

violation of the Ban. *See* Act 493 (Ark. Code § 20-16-2006(e)(1)-(2)). Defendants Jegley and

Durrett and their agents and successors are sued in their official capacities.

      20.     Defendant Sylvia D. Simon, M.D. is Chair of the Arkansas State Medical Board.

Defendants Robert Breving Jr., M.D., Veryl D. Hodges, D.O., John H. Scribner, M.D., Omar T.

Atiq, M.D., Rhys L. Branman, M.D., Rodney Griffin, M.D., Mrs. Marie Holder, Brian T. Hyatt,

M.D., Mr. Larry D. "Buddy" Lovell, Timothy C. Paden, M.D., Don R. Phillips, M.D., William

L. Rutledge, M.D., and David L. Staggs, M.D. are members of the Arkansas State Medical

Board. The State Medical Board is responsible for licensing medical professionals under

Arkansas law. *See* Ark. Code § 17-95-410 (2019). The Board and its members are responsible

for imposing licensing penalties under the Bans and the OBGYN Requirement and imposing

licensing penalties for unprofessional conduct, which includes criminal conviction under statutes

such as the Bans and the OBGYN Requirement. *See* Ark. Code § 17-95-409(a)(2)(A), (D)

(2019). Defendants and their successors in office are sued in their official capacity.

      21.     Defendant Nathanial Smith, M.D., M.P.H., is the Director and State Health

Officer of the Arkansas Department of Health, the agency charged with enforcing the 18-Week

Ban and the license revocation part of the OBGYN Requirement. *See* Ark. Act 493 (2019) (Ark.

Code Ann. § 20-16-2006(c)) (tasking Arkansas Department of Health with levying civil penalties for violation). Defendant Smith is sued in his official capacity.

**THE CHALLENGED RESTRICTIONS**

**The 18-Week Ban**

22.     The 18-Week Ban criminalizes the provision of abortion care after 18 weeks LMP (i.e., beginning at 18.1 weeks LMP)[2] in almost all cases. *See* Ark. Act 493, § 20-16-2004(b) (2019). Specifically, the Ban prohibits a person from "intentionally or knowingly" performing, inducing, or attempting to perform or induce an abortion if the "probable gestational age" is determined "to be greater than eighteen (18) weeks[]," as measured "from the first day of the last menstrual period of the pregnant woman." *Id.* § 20-16-2004(b); *id.* § 20-16-2003(9).

23.     The Ban is subject only to two extremely limited exceptions that permit abortions after 18 weeks LMP:  (1) in the case of a "medical emergency," narrowly defined as "a condition that . . . necessitates an abortion to preserve the life of the pregnant woman . . . or when the continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function," *id.* § 20-16-2004(b); *id.* § 20-16-2003(6), (7); and (2) where the pregnancy is the result of rape or incest, as defined by Arkansas code, *id.* § 20-16-2004(b).

24.     The 18-Week Ban also imposes new reporting mandates to ensure compliance. It requires physicians who perform abortions where the "gestational age is greater than eighteen (18) weeks" to file a report with the Department of Health "within fifteen (15) days of the abortion," detailing (among other things) the date on which the abortion was performed; the abortion method; the "probable gestational age" of the embryo/fetus and the method used to calculate it; a statement declaring that the abortion was necessitated by a medical emergency; the

---

[2] Hereinafter referred to as "after 18 weeks."

specific medical indications supporting the abortion and medical emergency; and the probable health consequences of the abortion and specific method used. *See id.* § 20-16-2004(c)(1)–(2).[3]

25.     These reporting requirements are enforceable 10 days after either the effective date of the 18-Week Ban or the date that the reporting forms the Department of Health must create within 30 days of the 18-Week Ban's effective date become available, whichever occurs later. *See id.* § 20-16-2005(a)–(b).

26.     A violation of the 18-Week Ban is a Class D felony, which is punishable by up to six years in prison and a fine of up to $10,000. *See id.* § 20-16-2006(a)(1); Ark. Code §§ 5-4-201, -401. "A woman upon whom an abortion has been performed, induced, or attempted in violation of" the Ban may also may bring a civil action for violation of the 18-Week Ban. *See id.* § 20-16-2006(d).

27.     Any physician who violates the prohibition is subject to mandatory license suspension or revocation by the Arkansas State Medical Board, *see id.* § 20-16-2006(b), and may be sued by a prosecuting attorney with appropriate jurisdiction or the Attorney General to enjoin the physician from performing or attempting to perform any further abortions in violation of the 18-Week Ban. *See id.* § 20-16-2006(e)(1)–(2).

### The Reason Ban

28.     The Reason Ban makes it a crime for a physician to intentionally perform or attempt to perform an abortion if the clinician has "knowledge" that a pregnant woman is seeking an abortion "solely on the basis" of: (1) a test "indicating" Down syndrome; (2) a

---

[3] The Ban does not make clear whether or how abortions performed after 18 weeks LMP under the rape or incest exception must be reported.

8

prenatal diagnosis of Down syndrome; or (3) "[a]ny other reason to believe" the fetus has Down syndrome. Ark. Act 619, § 20-16-2003 (2019).[4]

29.     In addition, the Reason Ban mandates that, before providing abortion care, the physician who is providing the abortion ask the pregnant woman if she is aware of any test results, prenatal diagnosis, or any other evidence that the fetus may have Down syndrome. *See id.* § 20-16-2003(b)(1). If the woman answers in the affirmative, the physician must: (1) inform the woman that Arkansas law prohibits abortion solely on the basis of an indication or belief that the fetus has Down syndrome, *see id.* § 20-16-2003(b)(2)(A), and (2) delay the abortion by at least fourteen days while he/she requests and waits to receive the woman's medical records, to be used to determine whether she has previously had an abortion "after she became aware of test results, prenatal diagnosis, or any other evidence that the unborn child may have had Down syndrome," *id.* § 20-16-2003(b)(2)(B), (3).

30.     The Ban exempts a clinician from its rigid requirements in only very narrow cases, namely: (1) when performance of an abortion is necessary to save the life or preserve the health of the pregnant woman, *see id.* § 20-16-2002(1)(B)(i); and (2) when a pregnancy resulted from rape or incest, *see id.* § 20-16-2003(d).

31.     Violation of the Ban constitutes a Class D felony, which is punishable by up to six years in prison and a fine of up to $10,000. *See id.* § 20-16-2004; Ark. Code §§ 5-4-201, -401 (2019). In addition, the Ban requires the Arkansas State Medical Board to revoke the license of a physician who violates its mandate, *see id.* § 20-16-2005(c), and makes that physician liable in a civil action for actual and punitive damages to any "woman who receives an abortion in

---

[4] Act 619 defines "Down syndrome" as "a chromosome disorder associated with either: (A) An extra copy of chromosome 21, in whole or in part; or (B) An effective trisomy for chromosome 21." *Id.* § 20-16-2002(2).

9

violation of [the Ban] without being informed of the prohibition" imposed by the Act, or "the parent or legal guardian of the woman if the woman is [an unemancipated] minor, or the legal guardian of the woman if the woman has been adjudicated incompetent," *id*. § 20-16-2005(b)(1)–(2).

32.     A physician who knowingly violates the Reason Ban may also be subject to a cause of action for injunctive relief, brought by either the Attorney General or "the spouse, parent, guardian, or current or former licensed health provider of the woman who received or attempts to receive an abortion in violation of [the Ban]," so as to prevent the physician from performing further abortions in violation of the Reason Ban. *Id.* § 20-16-2005(d)(1)–(2).

### The OBGYN Requirement

33.     The OBGYN Requirement makes it a crime for a person to perform or induce an abortion, if that person is not board-certified or board-eligible in OBGYN. *See* Ark. Code § 20-16-605(a).

34.     Under current law, a "physician licensed to practice medicine in the State of Arkansas" can provide abortion care. Ark. Code § 5-61-101(a) (2019).

35.     Providing an abortion in violation of the OBGYN Requirement is a Class D felony, punishable by up to six years in prison and a fine of up to $10,000. *See* Ark. Code Ann. §§ 5-4-201, -401. It may also result in the revocation, suspension, or nonrenewal of the professional license of the physician or abortion facility. *See* Ark. Act 700, § 20-16-605(b) (2019).

36.     Arkansas has never before enacted a comparable board-certification or medical-specialty requirement specific to doctors providing abortion care.

## FACTUAL ALLEGATIONS

### Abortion Practice and Safety

37.     Legal abortion is one of the safest medical procedures in the United States, and is far safer than continuing a pregnancy through to childbirth. Abortion-related mortality is also lower than that for colonoscopies, plastic surgery, and adult tonsillectomies. Abortion is safe and effective (and complications are very rare) regardless of the method of abortion used.

38.     Less than 1% of women obtaining abortions experience a serious complication. The risk of a woman experiencing a complication that requires hospitalization is even lower, approximately 0.3%. Like the risk of mortality, the risk of a serious complication increases as a woman's pregnancy advances.

39.     Legal abortion is not only extremely safe but also common; approximately one in four women in this country will have an abortion by age forty-five.

40.     Women seek abortion for a multitude of complicated and personal reasons that are closely tied to each individual woman's values, culture and religion, health and reproductive history, family situation and support system, educational or career goals, and resources and financial stability.

41.     Some women have abortions because they conclude that it is not the right time to become a parent given their age, desire to pursue their education or career, or because they feel they lack the necessary financial resources or level of partner or familial support or stability.

42.     Other women are already mothers; indeed, a majority of women having abortions in the United States already have at least one child, and among 2017 abortion patients in Arkansas, approximately 65% had one or more previous live births. These women may already

11

be struggling to adequately provide for their existing children and may be concerned about their ability to make ends meet if they add another child to their family.

43.     Indeed, the vast majority—approximately 75%—of abortion patients are poor or low-income. Poverty is a significant problem in Arkansas, the country's fifth-poorest state.

44.     Other women seek abortions because continuing with the pregnancy could pose a risk to their health, and still others because of an indication or diagnosis of a fetal medical condition or anomaly. Some families simply do not feel that they have financial, medical, educational, or emotional resources to care for a child with special needs or to do so alongside providing for the children they already have.

45.     In states across the country, such as Colorado, Illinois, and Montana, a variety of medical providers, including midwives, nurse practitioners, and physician assistants, may legally provide both medication and surgical abortion.

### Abortion Care in Arkansas

46.     The vast majority of women who seek abortion care in Arkansas (as in the nation as a whole) do so in the first trimester of pregnancy, when the pregnancy is at or less than 14 weeks LMP.

47.     There are two methods of abortion:  medication abortion and surgical abortion. Medication abortions, which are provided in the first trimester, typically through approximately 10 weeks LMP, involve the ingestion of two types of medications (pills) at least one day apart to induce an early miscarriage. Medication abortion requires no anesthesia or sedation; the patient simply takes the pills. LRFP and PPAEO provide medication abortion up to 10 weeks LMP, which is a pre-viability point in pregnancy.

12

48.     Medication abortion is extremely safe. One recent, comprehensive report by the National Academies of Sciences, Engineering, and Medicine ("National Academies") (which was established by Congress to provide objective advice on matters related to science and technology) found that "[t]he risks of medication abortion are similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications such as antibiotics and NSAIDs [nonsteroidal anti-inflammatory drugs]," such as ibuprofen. In the rare case where complications do arise, a clinician trained in providing abortion care can safely and effectively handle them, either by providing care themselves on an outpatient basis or, where necessary, referring the patient to a tertiary care facility for additional treatment.

49.     LRFP and PPAEO have policies and practices in place to ensure safe administration of medication abortion. For example, a woman who has taken mifepristone at a health center is given a 24-hour hotline number that she can call with any questions or concerns, and patients are also provided with the name and phone number of a contracted OBGYN physician who has agreed to serve as the collaborative medical doctor for purposes of compliance with Arkansas Code § 20-16-1504. If patients call the hotline, a registered nurse or physician is always available. In most cases where a patient calls the hotline, her questions and concerns can be addressed over the phone. In the exceedingly rare case that the nurse or physician determines that a patient should be evaluated or treated immediately, she or he will refer the patient to the nearest emergency room.

50.     Surgical abortions, which are provided in both the first and second trimesters, are performed by dilating (opening) the uterine cervix and then using gentle suction and/or instruments to empty the contents of the uterus. Despite being characterized as "surgical," these procedures are not surgical in the usual sense: they do not involve any incision into the woman's

13

skin and in many cases can be performed with only local anesthesia.  Surgical abortion is only available in Arkansas at LRFP up to 21.6 weeks LMP, which is a pre-viability point in pregnancy.

51.     Surgical abortion, like medication abortion, is extremely safe.  Its mortality rates are lower than those of colonoscopies, adult tonsillectomies, and childbirth.  As with medication abortion, complications are extremely rare and may be handled safely and effectively by any clinician with adequate training in abortion care, either on an outpatient basis or (where necessary) via a referral.

52.     It is common for a woman who can choose between a medication and surgical abortion (i.e., a women who is less than 10 weeks LMP) to have a preference for a surgical procedure.  Although there are many reasons for this (and other women have a preference for medication abortion), many women prefer the surgical option because it requires fewer visits to the clinic, and thus is associated with a lower burden in terms of funding and time.  Other women choose a surgical abortion because the procedure itself is shorter in duration, and women are generally able to return to work and other responsibilities shortly after the procedure.  Some women have pre-existing medical conditions that eliminate medication abortion as a viable option.

53.     Although most abortions in Arkansas occur during the first trimester, women also seek abortions in the second trimester, including after 18 weeks LMP, for a number of reasons.  For example, some patients (especially those with irregular menstrual cycles) may not realize they are pregnant for weeks or months.  A woman may then be further delayed while she confirms the pregnancy, researches her options, makes the decision to have an abortion, contacts a provider, and schedules an appointment.  Patients often are also delayed in obtaining funds

necessary for the procedure and related expenses (travel and childcare), as well as by difficulties in making the necessary logistical arrangements (e.g., obtaining time off work and arranging transporting and childcare). In 2018, approximately 170 of LRFP's patients obtained abortions after 18 weeks LMP.

54. These delays are exacerbated by the fact that Arkansas law requires any woman who wishes to have an abortion to visit the abortion provider at least 48 hours (soon to be 72 hours) before the procedure will be performed.[5] During the initial visit, the State mandates that the patient receive certain information. The patient must then wait at least 48 hours before returning for the second visit, when she can receive the abortion. Accordingly, each of Plaintiffs' patients must make at least two separate visits to a clinic, at least two (soon to be three) full days apart. In the case of medication abortions and certain surgical abortions, the patient will have to make a third visit to the clinic for pre- or post-procedure care.

55. These barriers are particularly problematic for patients living in or near poverty or without insurance, as well as for patients who cannot take multiple days off from work in close proximity without jeopardizing their jobs or the confidentiality of their pregnancy and abortion decision. Other patients cannot arrange childcare for multiple days, or cannot do so without compromising the confidentiality of their decision. These individual circumstances all can lead to further delays.

56. Accordingly, even some of LRFP's patients who begin the process of scheduling their first visit before 18 weeks LMP may be past the 18-week mark by the time of their scheduled

_____

[5] On April 20, 2019, Arkansas enacted a new law that will increase the mandated delay from 48 to 72 hours. Like the current, 48-hour mandated delay, the new law allows one narrow exception: immediate termination of the pregnancy is allowed where necessary "to avert [the pregnant woman's] death" or where "delay will cause substantial and irreversible impairment of a major bodily function." 2019 Ark. Act 801, § 20-16-1109, -1703(b), -1706. This law goes into effect on July 24, 2019. *See* Ark. Att'y Gen. Op. No. 2019-034 (May 15, 2019), https://www.arkansasag.gov/assets/opinions/2019-034.pdf.

15

procedure. And some of LRFP's and PPAEO's patients who would prefer to obtain medication abortion (which is available only up to 10 weeks LMP) may be unable to do so, given the practical complications of obtaining this care in time.

57.     As a result of Plaintiffs' patients' work and family obligations and other scheduling constraints, Arkansas's mandatory delay and minimum-two-trip requirement forces many patients to delay their abortions by several days or more. Although abortion is safer than carrying a pregnancy to term, delay increases the risks associated with the procedure.

58.     Before providing any abortion care, Plaintiffs provide non-directive patient counseling, which means they listen to, support, and inform the patient, without directing her course of action. That process is designed to ensure that patients are well-informed with respect to all their options, including terminating the pregnancy, carrying the pregnancy to term and parenting, and carrying the pregnancy to term and placing the baby for adoption. In addition, the process is designed to ensure that the woman's choice is voluntary and not coerced.

59.     Although some of Plaintiffs' patients disclose information about their reasons for seeking an abortion during these non-directive discussions, Plaintiffs do not require that patients disclose any or all of their reasons for seeking an abortion, consistent with best medical practices.

### Arkansas Already Extensively Regulates Abortion

60.     Extensive regulations relating to abortion care are also currently enforced. For example:

a.     Any woman seeking an abortion must be evaluated via a medical history, a physical examination, counseling, and laboratory tests. *See* Ark. Admin. Code. 007.05.2-8.

16

b. Facilities providing abortions must have various medical tools available to assist

in the event of complications. *See id.*

c. Arkansas regulations require abortion facilities to have a certain number of

qualified personnel available to provide direct patient care. *See id.* 007.05.2-7.

d. Arkansas abortion facilities must also satisfy a variety of ongoing obligations to

educate staff about best practices and to assess their own services. *See id.* 007.05.1-10, 2-5, 2-

6(G), 2-7(D).

61.    In recent years, Arkansas has engaged in a targeted campaign to restrict access to

abortion care. It enacted more than 25 laws obstructing and interfering with women's access to

abortion care in the State,[6] including at least 12 enacted in 2019 alone.[7]

---

[6] *See, e.g.*, 2018 Ark. Act 234, § 19 (prohibiting expenditure of state funds for abortion referrals in public schools and for abortion services); 2018 Ark. Act 243, § 24 (same); 2018 Ark. Act 244, § 25 (same); ARK. CODE ANN. §§ 20-16-1801 to 1807 (2019) (banning most common method of second-trimester abortion); *id.* § 20-16-1801 (requiring physicians to delay a woman's abortion while they request and wait for a woman's medical records); *id.* § 20-16-108(a)(1) (requiring disclosure of abortion and preservation of fetal tissue for abortion patients under the age of 17); *id.* §§ 20-17-801, 802 (imposing burdensome and confusing requirements regarding disposal of fetal tissue); *id.* § 20-9-302 (mandating the imposition of extreme penalties, such as license revocation, for violation of the many requirements imposed on abortion providers); *id.* §§ 20-16-801 to 817 (mandating parental consent for a minor's abortion); *id.* § 20-16-1504 (banning off-label use of abortion inducing drugs, and requiring any facility providing medication abortion to "have a signed contract with a physician who agrees to handle complications" who has "active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug"); *id.* § 20-16-1703 (mandating 48-hour delay before an abortion and two, in-person trips to facility); *id.* § 20-16-1602 (banning public funding to any individual or entity that provides, counsels in favor of, or refers for abortion); *id.* §§ 20-16-1301 to 1307 (banning abortion at 12 weeks, requiring abdominal ultrasound to detect fetal cardiac activity, and mandating disclosure of cardiac activity if present) (ban at 12 weeks struck down by *Edwards v. Beck,* 786 F.3d 1113 (8th Cir. 2015)); *id.* §§ 20-16-1401 to 1410 (banning abortion after 20 weeks post-fertilization); *id.* § 23-79-156 (banning abortion coverage in state insurance exchange plans).

[7] In addition to the three laws Plaintiff has challenged here: ARK. CODE ANN. § 20-16-605 (2019) (imposing additional abortion-related reporting requirements on physicians and facilities); *id.* § 5-61-301 to 304 (asking the Supreme Court to overturn *Roe v. Wade* and providing that, upon reversal, state law will prohibit abortions except to save the life of a pregnant woman); *id.* § 20-9-203(b)(1) (imposing additional requirements on abortion facilities); *id.* § 20-16-604, -811, -1109 (imposing additional reporting requirements and penalties on doctors providing abortions); *id.* § 20-16-1703, -1706 (extending waiting period between doctor providing required disclosures to woman seeking abortion and provision of

17

**The 18-Week Ban Prohibits Abortion Before Viability**

62.    If it takes effect, the 18-Week Ban would ban all pre-viability abortions after 18 weeks LMP, except those that fall within the stringently narrow exceptions. The 18-Week Ban will therefore prohibit LRFP, Arkansas's only provider of abortions after 18 weeks LMP, from providing pre-viability abortions to its patients.

63.    Many of LRFP's patients who seek care after 18 weeks LMP are facing very difficult circumstances, yet the vast majority of those patients would fall outside the Ban's narrow exceptions. Some of these patients may have health conditions that are caused or exacerbated by their pregnancies, but that do not fit within the 18-Week Ban's exception for a "medical emergency . . . necessitat[ing] an abortion" to save their life or prevent substantial and irreversible impairment of a major bodily function, Ark. Act 493, § 20-16-2004(b); *id.* § 20-16-2003(6), (7); others may learn only shortly before or after 18 weeks LMP that their fetus has a severe anomaly that would make life extremely difficult and painful; others are in violent or abusive relationships and may be concerned that carrying to term will tether them to their abuser; still others may, as a result of the trauma they have endured, be unable to raise the fact that they were raped or survivors of incest and thus unable to avail themselves of the exception allowing abortion in those circumstances.

64.    Absent an injunction, LRFP will have no choice but to turn away patients in need of abortion care after 18 weeks LMP.

65.    This will seriously and irreparably harm LRFP's patients by outright denying them access to pre-viability abortion in Arkansas and violating their constitutional rights.

---

abortion from 48 to 72 hours, and increasing information doctor must provide); *id.* § 20-16-1703(b)(9), -1704(b)(6) (imposing additional disclosure requirements on doctors providing abortion-inducing drugs); 2019 Ark. Act 877, § 23 (prohibiting expenditure of state funds for abortion referrals in public schools and for abortion services); 2019 Ark. Act 752, § 18 (same); 2019 Ark. Act 727, § 24 (same).

**The Reason Ban Prohibits Abortion Before Viability And Is Unconstitutionally Vague**

66.     Down syndrome is the common name for a genetic anomaly, known as Trisomy 21, which results from an extra copy (full or partial) of the twenty-first chromosome. The medical conditions and abilities of people with Down syndrome varies considerably, and the specific manifestation of Down syndrome cannot be known before birth. Many people with Down syndrome require significant care, sometimes stretching through adulthood.

67.     A variety of "screens" and more accurate diagnostic tests can help detect genetic, chromosomal, or structural anomalies like Down syndrome. But no screens are available before 10 weeks LMP, and most women do not receive a confirmed Down syndrome diagnosis until the second trimester.

68.     The American College of Obstetricians and Gynecologists ("ACOG"), the preeminent professional association for OBGYNs, recommends that all women be counseled about prenatal genetic screening and diagnostic testing options as early as possible in the pregnancy, ideally at the first prenatal visit. ACOG further recommends that all women, regardless of age, be offered the option of screening or diagnostic testing for fetal genetic disorders, and that women with positive screening test results be offered counseling and diagnostic testing.

69.     Women who receive a positive Down syndrome test result or diagnosis are typically referred by a high-risk OBGYN to a genetic counselor for significant counseling. Counseling is intended to provide comprehensive, objective, and individualized counseling that addresses both the scientific aspect of any test result or diagnosis (e.g., the reliability of specific test results) and the psychological effects of the results on the woman and any family members involved in her decision making. A woman grappling with a Down syndrome diagnosis or

19

another fetal anomaly is facing an extraordinarily complex decision that she should be able to make through self-reflection and discussion with anyone whom she chooses to involve in the process (such as her spouse, partner, friend, or family member). It is critically important that women have the information and support they need to make this serious decision, and also the ability to terminate a pregnancy safely, if that is what they decide is best for them.

70.     LRFP is aware that some of its patients seek abortions based solely or in part on a prenatal diagnosis of Down syndrome. These patients typically come to the clinic only after having already undergone extensive counseling with genetic counselors and/or maternal-fetal medicine physicians, as well as engaged in extensive reflection and conversation with the most important people in their lives.

71.     The Reason Ban prohibits LRFP and its physicians and staff from intentionally performing or attempting to perform an abortion with "knowledge" that a pregnant woman is seeking an abortion "solely on the basis of" a Down syndrome diagnosis, indication, or "[a]ny other reason to believe that an unborn child has Down [s]yndrome." Act 619, § 20-16-2003. It bans abortions in these circumstances at any point in pregnancy, including the pre-viability period in which LRFP provides care.

72.     The Reason Ban fails to define what constitutes "knowledge" sufficient to give rise to the Reason Ban's severe criminal, civil, and licensure penalties. Similarly, the Reason Ban fails to define when an abortion is sought "solely on the basis of" a Down syndrome diagnosis, indication, or other reason to believe the fetus has Down syndrome. Without further definition of this terminology, LFRP cannot know the standard by which Defendants will judge its conduct.

73.     The Reason Ban also mandates that, before providing an abortion, the clinician ask the pregnant woman if she is aware of any test results, prenatal diagnosis, or any other

20

evidence that the fetus may have Down syndrome. *See* Act 619, § 20-16-2003(b)(1). If the woman answers in the affirmative, the physician must: (1) inform the woman that Arkansas law prohibits abortion solely on the basis of an indication, diagnosis or belief that the fetus has Down syndrome, *id.* § 20-16-2003(b)(2)(A), and (2) request the medical records of the pregnant woman relevant to determining whether she has previously obtained an abortion after she became aware of any indication that the fetus might have Down syndrome, *id.* § 20-16-2003(b)(2)(B). When the law requires the clinician providing the abortion to request these records, the clinician "shall not perform an abortion until the physician spends at least fourteen (14) days to obtain the medical records." *Id.* § 20-16-2003(b)(3).

74. Because of the Reason Ban's severe penalties, and because of its ambiguities, LRFP cannot be certain that even good-faith efforts to comply with the Reason Ban will satisfy its requirements. Accordingly, if the Reason Ban takes effect, LRFP will be unable to provide an abortion for a woman if they have "knowledge" that Down syndrome is a woman's "sole" reason for terminating the pregnancy. LRFP will cease providing care in these circumstances solely to avoid the Reason Ban's significant civil, criminal, and disciplinary sanctions. Accordingly, the Reason Ban will outright deny women access to pre-viability abortion in Arkansas based on the reason they seek abortion care, thereby violating their constitutional rights. LRFP wishes to continue providing safe and compassionate abortion care to patients who have knowingly and voluntarily decided to terminate their pregnancies, regardless of their reason for doing so.

**The OBGYN Requirement Unconstitutionally Burdens Women While Providing No Benefits**

75. Under current law, a "physician licensed to practice medicine in the State of Arkansas" may provide abortion care. *See* Ark. Code § 5-61-101(a) (2019).

76. But under the OBGYN Requirement, a clinician is prohibited from providing

abortions unless she is "a physician licensed to practice medicine in the state of Arkansas" who is "board-certified or board-eligible in obstetrics and gynecology." Ark. Act 700, § 20-16-605(a). The Requirement will accordingly prohibit LRFP's and PPAEO's qualified physicians from continuing to provide abortion care, which they have done safely and effectively in Arkansas for years. It will also unreasonably deprives women of their choice of provider and unnecessarily narrow the type of qualified and skilled provider that an abortion clinic can employ.

77. Arkansas does not impose a limit like the OBGYN Requirement on any other comparable medical procedure. It does not require board-certification or board-eligibility (much less board-certification or -eligibility in a specific specialty) for prescription of oral medication, except medications used to provide abortions. Nor does Arkansas impose these requirements for outpatient procedures of comparable or greater medical risk, such as colonoscopies or tonsillectomies. Arkansas law contains no requirement of a particular specialty, board-certification, or board-eligibility for physicians offering pregnancy or birthing care at a birthing center, even though carrying to term, labor, and delivery pose significantly greater risk to women than abortion. And Arkansas law is bereft of any such qualification requirements for providers of miscarriage management, even though that care is near identical to abortion care from a technical perspective. In short, it subjects abortion providers and patients receiving abortion care to unequal treatment, without adequate justification.

### LRFP

78. Dr. Tvedten is the primary provider at LRFP. He has been practicing medicine in Arkansas since the late 1970s, and was first trained to provide abortion care more than 30 years ago by an experienced Arkansas abortion provider and family physician. Dr. Tvedten has safely

22

provided abortion care up to 21.6 weeks LMP for more than 15 years, and has trained numerous physicians to provide abortion care. He currently provides medication abortion up to 10 weeks LMP and surgical abortion up to 21.6 weeks LMP.

79.     Dr. Horton also provides abortion care at LRFP. Dr. Horton has more than two decades of experience providing abortion care to thousands of women in Tennessee and Arkansas. He completed four years of residency in OBGYN and passed the written examination for the American Board of Obstetrics and Gynecology in June 2002 and June 2013. Because he lives and mostly practices in Tennessee, he provides abortion care at LRFP only approximately one week per month.

80.     Board-certified OBGYN Dr. Fred Hopkins assists LRFP by providing abortions at the clinic, but lives in California and can fly in to provide care only approximately once every other month. He is able to provide abortion care up to 24 weeks LMP, and has done so (to the extent permitted by state law) for the past twenty years. Dr. Hopkins is not able to assist at LRFP on a more permanent, or even more frequent, basis because of his personal and professional responsibilities in California.

81.     Dr. Charlie Browne is a board-certified OBGYN licensed to provide care at LRFP who lives and works in Seattle, Washington. Although he has not worked at LRFP since 2012, he recently agreed to provide care during one week in July 2019, if the OBGYN Requirement goes into effect. He will not be able to provide care at LRFP after that time, given his professional and personal obligations in Seattle and the burden and strain that traveling to Arkansas would impose on him and his practice in Washington.

**PPAEO**

82.     Dr. Ho is currently the only abortion provider at PPAEO's Fayetteville clinic.  She

completed her family-planning residency at the University of Arkansas in 2011, and has been

providing medical care in the State since 2008.  During her residency, she was trained to provide

surgical and medication abortion care by an experienced family-medicine physician who was on

the faculty at the University of Colorado Health Sciences Center.  In the course of her medical

career, she has provided thousands of abortions.  Because Dr. Ho cannot provide such care under

the OBGYN Requirement, her employment contract with PPAEO will be substantially and

negatively affected.

83.     Earlier this year, and in response to PPAEO's extensive effort to identify a board-

certified or board-eligible OBGYN who can provide care at the Fayetteville health center, a

board-certified OBGYN, Dr. Kathleen Paulson, agreed to provide medication abortion at the

Fayetteville health center on a volunteer basis, if the OBGYN Requirement takes effect.  Dr.

Paulson has a full-time job and therefore can provide care for only three hours a week, and only

in the evening.  She is unsure whether and how frequently she can provide abortion care at the

Fayetteville health center in the future.

84.     Dr. Janet Cathey and Dr. Dudley Rodgers are board-certified OBGYNs who provide

medical services at PPAEO's Little Rock clinic.  Due to personal and professional obligations and

limitations, they cannot provide care to more patients or travel to Fayetteville.

**There is No Medical Justification for the OBGYN Requirement**

85.     Drs. Tvedten, Horton, and Ho have been providing safe abortion care for decades.

They are extremely well qualified and experienced in doing so.  Indeed, Drs. Tvedten and Horton

have trained numerous physicians to provide safe abortion care.  And Dr. Ho will be responsible

24

for training her replacement who will provide medication abortion care if the OBGYN
Requirement goes into effect.

86.     If Act 700 takes effect, it will prohibit Dr. Ho, the sole provider of medication
abortion at PPAEO's Fayetteville health center, and LRFP's two primary providers, Dr. Thomas
Tvedten and Dr. Thomas Horton, as well as other health-care providers who already possess, or
could acquire, the necessary education and training to safely and effectively provide abortion
services, from providing such care solely because they are not board-certified or board-eligible
OBGYNs. Dr. Tvedten is not an OBGYN and cannot become a board-certified or board-eligible
OBGYN without the enormous outlay of time and expense required to restart medical training
after decades of safely providing care to patients in Arkansas. Dr. Horton completed his
residency in OBGYN, but he is neither board-eligible nor board-certified because he did not
become board-certified within eight years of finishing his residency (which he completed in
2002) and thus is no longer considered an Active Candidate under the Arkansas Board of
OBGYN's rules. In order to regain eligibility for certification, he would have to complete a
minimum of six months of supervised training, which would provide no medical benefit to his
patients and which he cannot do given his personal and financial obligations, as well as his
professional obligations to his practice and his patients. Dr. Ho is a family-medicine doctor; as
such, she is neither a board-certified OBGYN, nor eligible for such certification. She could not
become such without abandoning her patients and practice to begin her medical training anew—
which, as an established physician who has provided high quality medical services for many
years, she cannot do.

87.     Moreover, the OBGYN Requirement interferes with Dr. Ho's contract with
PPAEO, under which she has agreed to provide medical care, including medication abortion. If

25

the OBGYN Requirement takes effect, it will substantively and negatively affect Dr. Ho's employment contract because Dr. Ho will no longer be able to provide abortion care.

88. Board-certification or -eligibility in OBGYN is not relevant to the safe provision of abortion care. Training, rather than specialty, determines competence to provide abortion care, and a wide variety of clinicians can and do safely and routinely provide abortion services. In fact, across the nation, abortion care is safely provided around the country up to at least 22 weeks LMP by non-OBGYN providers, and roughly one third of abortion providers come from specialties other than OBGYN. Medical schools and teaching hospitals around the country routinely use non-OBGYN faculty members to train residents and fellows in the provision of abortion care. Moreover, competence in abortion care is not a prerequisite for becoming a board-certified or eligible OBGYN. OBGYN residents can opt out of any abortion training, and many board-certified OBGYNs have never even observed an abortion.

89. Prominent medical professional organizations agree that laws like the OBGYN Requirement are unjustified and unjustifiable. For example, ACOG has recognized that clinicians from many medical specialties can provide safe abortion care and that requiring board-certification in OBGYN is "medically unnecessary" and "designed to reduce access to abortion." The President of the American College of Physicians has likewise opined that "[t]here is no evidence that these requirements improve patient safety; they just serve to reduce patient access to care."[8] Professional medical organizations and organizations such as the National Academies

---

[8] *See* Press Release, American College of Obstetricians and Gynecologists, ACOG Leads Coalition of Major Medical Organizations in Submitting Amicus Brief in June Medical Services L.L.C. v. Gee (May 21, 2019), https://www.acog.org/About-ACOG/News-Room/News-Releases/2019/Amicus-Brief-in-June-Medical-Services-LLC-v-Gee?IsMobileSet=false (quoting from amicus brief).

have also specifically endorsed the provision of abortion care by clinicians other than board-certified OBGYNs.[9]

90.     There is no need for a clinician to be a board-certified or -eligible OBGYN to provide abortion care in general, but the OBGYN Requirement is especially unwarranted with respect to medication abortion. A variety of health professionals, including non-physicians, routinely prescribe medications to their patients for a variety of conditions—including medications that have significantly higher complication rates than medication abortion—and, in other states, regularly prescribe medication abortion. Moreover, in Arkansas, medication-abortion providers are already required to have a contract with a back-up OBGYN provider. *See* Ark. Code §§ 20-16-1504 (2016) (requiring medication-abortion providers to contract with physician with certain hospital admitting privileges).

## Impact of the OBGYN Requirement

91.     LRFP and PPAEO cannot feasibly replace Drs. Tvedten, Horton, and Ho. Both have worked diligently to do so, with no success. Neither Dr. Hopkins (at LRFP) nor Drs. Cathey and Rodgers (at PPAEO Little Rock) are able to increase the hours they spend at these health centers if the Requirement takes effect, given their substantial personal and professional commitments and limitations. Accordingly, LRFP and PPAEO both began attempting to recruit board-certified or -eligible OBGYNs shortly after the OBGYN Requirement was signed into law. LRFP and PPAEO each sent a letter to all identified OBGYNs in the State, explaining that the OBGYN Requirement had passed, explaining its impact, and soliciting interest in joining their

---

[9] *See* AM. ACADEMY OF FAMILY PHYSICIANS, RECOMMENDED CURRICULUM GUIDELINES FOR FAMILY MEDICINE RESIDENTS: WOMEN'S HEALTH AND GYNECOLOGIC CARE 9 (Aug. 2018); AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE OP. NO. 612 (Nov. 2014); National Academy of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States*, 163-165 (The National Academies Press 2018).

respective staffs. LRFP and PPAEO also attempted to identify board-certified or board-eligible OBGYNs through repeated professional-network outreach and word of mouth

92.     To date, LRFP has received no responses to its letter, and its efforts to identify through professional networks a physician licensed to practice in Arkansas who could satisfy the requirement have been unsuccessful.

93.     Through its extensive outreach efforts, PPAEO Fayetteville was able to secure the limited services of one board-certified OBGYN, Dr. Kathleen Paulson, who agreed to provide medication abortion one night a week on a volunteer basis for a three-hour window of time, if the OBGYN Requirement goes into effect. She is uncertain, however, for how long she will be able to provide this limited volunteer service.

94.     This lack of response is no aberration. This is not the first time that LRFP and PPAEO have been forced to engage in extensive efforts seeking physicians with specific, medically irrelevant qualifications to ensure they can keep providing abortion care or to attempt to expand access, and received few responses.

95.     The lack of response to PPAEO and LRFP's outreach makes sense. Abortion providers face bombings and death threats, and some have been murdered. Dr. Horton was the victim of a bomb threat that prompted a hospital evacuation. So, too, was Dr. Tvedten. Dr. Tvedten also faced anti-abortion activists distributing flyers on the grounds of his children's school that provided Dr. Tvedten's name, picture, and home address, and labeled him and his family as complicit in murder. LRFP's Clinical Director suffered anti-abortion activists mailing her photograph and a letter impugning her as an abortion provider to 800 of her neighbors. And one of the doctors who trained Dr. Hopkins to provide abortion care was murdered in his church by an anti-choice extremist in 2009; he had previously been shot in both arms in 1993 by another anti-

choice extremist. Another provider and friend of Dr. Hopkins was shot and nearly killed in 1994 and stabbed in 2000 by anti-abortion extremists.

96.      Even when they do not face violence, abortion providers face profound stigma and harassment. The stigma and harassment abortion is particularly strong in Arkansas and surrounding areas. Anti-abortion activists crowd outside LRFP nearly every day that its doors are open to patients, shouting at the physicians. Dr. Tvedten reports past problems renewing leases for his clinic, faced with a landlord who refused to be associated with abortion care. Many providers who would otherwise be willing to provide abortions do not do so because of the immense personal and professional stigmatization that would result.

97.      One way this stigma manifests is that working as an abortion provider can make it difficult (or impossible) to maintain or find a job in private practice. Dr. Horton was rejected from two jobs for which he applied in 2004 and 2005 after he informed his interviewers that he provided abortion care. Dr. Ho faced a similar incident. And in 2005, Dr. Horton was fired from a hospital job after he provided abortion care that one of his colleagues requested for a patient. Dr. Tvedten reports that physicians in Arkansas who provide abortion care generally jeopardize their ability to retain positions or admitting privileges at hospitals. In fact, Dr. Tvetden gave up his family practice in 1999 because he knew it would be extremely difficult, if not impossible, to attract potential partners and patients while he was continuing to provide abortion care in Arkansas. And one of the Arkansas physicians who trained Dr. Tvedten to provide abortion care was forced to abandon his provision of abortion care because of the harassment he and his family practice partners faced at their offices and homes, which negatively affected their ability to continue their family practice and attract patients, as well as the physician's ability to maintain positive, collaborative relationships with his practice partners.

29

98. In short, despite their best efforts to comply with the OBGYN Requirement, Plaintiffs' capacity to provide abortions will be enormously reduced if it goes into effect.

99. Based on data from the last three years, an average of 3,167 women have obtained abortions from Arkansas providers annually, with nearly 90% of those abortions provided by Drs. Tvedten, Horton, and Ho, whom the OBGYN Requirement would force to cease providing care. Approximately 70% of Arkansas abortion procedures over the last three years were surgical abortions at LRFP (2,212), and nearly half (45%) of those patients terminated their pregnancies at or after 10 weeks LMP, meaning that medication abortion was not an option for them.

100. If the OBGYN Requirement takes effect, at least 62-70% of women who seek abortion care in Arkansas will be unable to obtain the care that they otherwise would in the State. Said differently, at most 955-1,207 of the 3,167 women who currently obtain abortion care in Arkansas each year would be able to obtain the same abortion care in Arkansas that they would absent the OBGYN Requirement.

101. LRFP will almost certainly be forced to close because it will not be economically feasible to continue operating while providing no services other than abortions provided by Dr. Hopkins three days every-other month. If LRFP closes, even if the remaining PPAEO providers continue providing medication abortions, zero surgical abortions would be available in Arkansas. Thus, at least 70% of the women who seek abortion care in Arkansas annually would be unable to obtain the care that they otherwise would, but-for the OBGYN Requirement. Although there would theoretically be sufficient capacity in this scenario for women seeking medication abortion, it would be available for women in the Fayetteville area only during a single, three-hour window each week that may be logistically impossible for many women.

102.    If LRFP closes and Dr. Paulson is no longer able to provide medication abortions, PPAEO Little Rock will be the State's sole provider, where a maximum of 956 medication (i.e., pre-10 week LMP) abortions could be provided annually.  Although PPAEO would theoretically have sufficient capacity to provide all the medication abortions sought in the State, women in and around Fayetteville who otherwise would have sought care at PPAEO Fayetteville will need to overcome a substantial travel distance from Fayetteville to Little Rock to receive care.  And 100% of Arkansas' 2,212 annual surgical abortion patients would still be left without the care that they would otherwise seek, absent the OBGYN Requirement.  Thus, even under the highly unrealistic assumption that all medication-abortions patients could overcome the burdens associated with traveling to a distant provider, approximately 70% of the 3,167 women who would otherwise obtain abortion care in Arkansas would still be unable to do so.

103.    Even under the best-case scenario (i.e., LRFP somehow manages to continue operations and Dr. Paulson continues providing care at PPAEO Fayetteville), women's ability to access abortion in the State would be nearly as bleak.  In that scenario, LRFP's annual capacity would be only approximately 252 women—a mere 11.4% of the women who seek surgical abortion care in Arkansas each year.[10]  Thus, even this overly optimistic scenario would leave approximately 62% of women unable to obtain in Arkansas the care that they otherwise would.

104.    If the OBGYN Requirement takes effect, women seeking medication and surgical abortion in Arkansas will be forced to travel much greater distances to access the care they desire and need.  For example, if LRFP is forced to cease or severely restrict its provision of abortion care, women in and around Little Rock who cannot obtain care at PPAEO Little Rock will be

---

[10] Even assuming some surgical-abortion patients could obtain medication-abortion care because they are less than 10 weeks LMP, at least approximately 42% of women in this scenario would still be unable to obtain *any* type of abortion care in Arkansas, given the capacity constraints of the medication-abortion providers in the State.

forced to travel either (i) approximately 380 miles round trip to PPAEO Fayetteville (assuming they are seeking medication abortion up to 10 weeks LMP and PPAEO Fayetteville can provide the requisite care, given Dr. Paulson's limited availability), or (ii) out of state, such as the approximately 300-mile round-trip journey to Memphis, Tennessee (the next-nearest provider from Little Rock). Similarly, if PPAEO Fayetteville is forced to reduce its provision of medication abortion because Dr. Paulson cannot continue providing care, women in and around Fayetteville seeking medication abortions will be forced to either travel approximately 380 miles round trip to PPAEO Little Rock or out of state (such as the approximately 220-mile roundtrip journey to Tulsa, Oklahoma).

105.    Increases in travel distance are associated with substantial impacts on women's ability to access care. Even a 25-mile increase in travel distance can reduce abortion rates by 10%, with those women forced to carry to term against their will. That is because traveling increased distances to access health-care services is associated with substantial economic, logistical, and emotional burdens. These burdens are particularly devastating to the poor and low-income women who comprise a large portion of LRFP's and PPAEO's patient populations.

106.    Across the United States, most women who obtain abortion care are poor or low income, and it is no different in Arkansas. Between 2016 and 2018, for example, 61% of PPAEO Fayetteville's medication-abortion patients were at or below 110% of the federal poverty level. One third of LRFP's patient population receives financial assistance that is available only to women who are at or below 110% of the federal poverty guidelines.

107.    The OBGYN Requirement's enforcement would impose significant logistical and financial obstacles that harm poor and low-income women seeking abortions in Arkansas. Specifically, the OBGYN Requirement will prevent some women from obtaining an abortion,

32

delay other women's access to that care, jeopardize women's confidentiality and employment, increase the risk that victims of domestic violence will experience physical violence or other abuse, and put women and their families at risk of deepening poverty, hunger, or eviction. The financial burdens and logistical obstacles associated with increased travel can be insurmountable for many poor and low-income women.

108.    Moreover, the delay caused by these burdens will (i) increase the risks associated with the procedure itself; (ii) push a woman past the point at which medication abortion is an option; (iii) push a woman into the second trimester, requiring a more complex procedure; and (iv) push a woman past Arkansas's legal limit for abortion—whether the current limit at 21.6 weeks LMP, or the new limit the State seeks to impose after 18 weeks LMP.

## CLAIMS FOR RELIEF

### COUNT I

### (Substantive Due Process)

109.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 109.

110.    By imposing a ban on abortion prior to viability, the 18-Week Ban violates Plaintiffs' patients' right to privacy guaranteed by the Fourteenth Amendment to the United States Constitution.

111.    By imposing a ban on abortion prior to viability, the Reason Ban violates Plaintiffs' patients' right to privacy guaranteed by the Fourteenth Amendment to the United States Constitution.

112.    Similarly, because the OBGYN Requirement has no medical or safety benefit and imposes significant burdens on women seeking abortion in Arkansas, it violates Arkansas women's

33

right to privacy guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (Equal Protection)

113.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 109.

114.    The OBGYN Requirement violates Plaintiffs' right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by imposing—without adequate justification—professional qualification requirements on abortion providers that Arkansas law does not impose on medical-care providers who perform comparable (or riskier) procedures.

115.    The OBGYN Requirement violates the equal protection of Plaintiffs' patients by treating patients who seek abortion services differently than patients who seek comparable health care services, without adequate justification.

## COUNT III

### (Contracts Clause)

116.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 109.

117.    The OBGYN Requirement, as applied to Dr. Ho and PPAEO, violates the Contracts Clause of the U.S. Constitution. If the Requirement goes into effect, Dr. Ho will not be able to provide abortion care. Her provision of such care was the essence of her employment contract with PPAEO. Thus, if the Requirement goes into effect, Dr. Ho's employment contract with PPAEO will be substantially and negatively affected.

## COUNT IV

### (Unconstitutional Vagueness)

118.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 109.

119.    The Reason Ban is unconstitutionally vague because it fails to give fair notice of the conduct prohibited, in violation of the Due Process Clause of the Fourteenth Amendment. It is impossible to determine what the Ban requires when it criminalizes performing an abortion with "knowledge" that a pregnant woman is seeking abortion "solely on the basis" of: (1) a test indicating Down syndrome; (2) a prenatal diagnosis of Down syndrome; or (3) any other reason to believe the fetus has Down syndrome. Act 619, § 20-16-2003. As a result, Plaintiffs are left to guess at the meaning of these provisions—specifically, what constitutes "knowledge" and "solely on the basis of"—and what actions they may take without facing criminal prosecution. Because of the lack of precise standards to judge compliance, Defendants will be free to interpret these provisions in a discriminatory and inconsistent basis.

### INJUNCTIVE RELIEF

120.    If the Acts are allowed to take effect, Plaintiffs and their patients will be subject to irreparable harm for which no adequate remedy at law exists.

121.    Enforcement of the Acts will cause irreparable harm by threatening Plaintiffs and their staff with substantial criminal penalties for providing abortion services; and by substantially burdening—or preventing altogether—Plaintiffs' patients' access to abortion in Arkansas.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A.     To immediately issue preliminary and permanent injunctive relief, restraining

Defendants, their employees, agents, and successors in office from enforcing Acts 493, 619, and 700;

      B.     To enter a judgment declaring that Acts 493, 619, and 700 violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

      C.     To enter a judgment declaring that Act 700 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

      D.     To enter a judgment declaring that Act 700, as applied to PPAEO and Dr. Ho, violates the Contracts Clause of the U.S. Constitution;

      E.     To enter a judgment declaring that Act 619 is invalid because it is unconstitutionally vague;

      F.     To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

      G.     To grant such other and further relief as the Court deems just and proper.

Dated:  June 26, 2019

Respectfully submitted,

Rebecca Rhodes Jackson
(AR Bar No. 2017079)
904 West 2nd Street
Little Rock, AR 72201
 (314) 440-6265
beckywesth@gmail.com

*On Behalf of the Arkansas Civil Liberties Union
Foundation, Inc.
Attorney for Plaintiff LFRP and Dr. Thomas
Tveden*

Bettina Brownstein (AR Bar No. 85019)
Bettina E. Brownstein Law Firm
904 West 2nd Street, Suite 2
Little Rock, AR  72201
(501) 920-1764
bettinabrownstein@gmail.com

*On Behalf of the Arkansas Civil Liberties Union
Foundation, Inc.
Attorney for Plaintiff*

Meagan Burrows*
Susan Talcott Camp*
American Civil Liberties Union Foundation
125 Broad St, 18th Floor
New York, NY 10001
mburrows@aclu.org
tcamp@aclu.org
(212) 549-2633
*Attorneys for Plaintiffs LRFP and Dr.
Thomas Tvedten*

Maithreyi Ratakonda*
Planned Parenthood Federation of America
123 William St., 9th Fl.
New York, NY 10038
mai.ratakonda@ppfa.org
(212) 261-4405

*Attorney for Plaintiffs PPAEO and Dr.
Stephanie Ho*

* *Motion for admission pro hac vice
forthcoming*

O'MELVENY & MYERS LLP
Leah Godesky*
Kelly Scavone*
Times Square Tower
7 Times Square
New York, New York 10036
lgodesky@omm.com
kscavone@omm.com
Tel: (212) 326-2254
Fax: (212) 326-2061

Kendall Turner*
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300
kendallturner@omm.com

Taylor Simeone*
1999 Avenue of the Stars
Los Angeles, CA 90067
tsimeone@omm.com
(310) 553-6700

*Attorneys for Plaintiffs*

# EXHIBIT 1

**Stricken language would be deleted from and underlined language would be added to present law.**
**Act 493 of the Regular Session**

| | |
|---|---|
| 1 | State of Arkansas       *As Engrossed: H2/19/19 S3/7/19* |
| 2 | 92nd General Assembly     **A Bill** |
| 3 | Regular Session, 2019                        HOUSE BILL 1439 |

4

5   By: Representatives Lundstrum, *Barker, Bentley, Cavenaugh, Cloud, Crawford, Dotson, M. Gray,*

6   *Ladyman, McCollum, Petty, Richmond, Slape, Penzo, B. Smith, C. Cooper, Sullivan, Christiansen*

7   By: Senators Rapert, *J. Cooper, B. Davis, Hester*

8

9                      **For An Act To Be Entitled**

10             AN ACT TO CREATE THE CHERISH ACT; TO PROHIBIT

11             ABORTIONS AFTER EIGHTEEN (18) WEEKS' GESTATION EXCEPT

12             IN A MEDICAL EMERGENCY; AND FOR OTHER PURPOSES.

13

14

15                             **Subtitle**

16             TO CREATE THE CHERISH ACT; AND TO

17             PROHIBIT ABORTIONS AFTER EIGHTEEN (18)

18             WEEKS' GESTATION EXCEPT IN A MEDICAL

19             EMERGENCY.

20

21

22   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

23

24       SECTION 1.  Arkansas Code Title 20, Chapter 16, is amended to add an

25   additional subchapter to read as follows:

26                  <u>Subchapter 20 — Cherish Act</u>

27

28      <u>20-16-2001.  Title.</u>

29      <u>This subchapter shall be known and may be cited as the "Cherish Act".</u>

30

31      <u>20-16-2002.  Legislative findings and intent.</u>

32      <u>(a)  The General Assembly finds that:</u>

33           <u>(1)(A)  The United States is one (1) of only seven (7) nations in</u>

34   <u>the world that permits nontherapeutic or elective abortion on request after</u>

35   <u>the twentieth week of gestation.</u>

36           <u>(B)  Fully seventy-five percent (75%) of all nations do not</u>



1   permit abortion after twelve (12) weeks' gestation, except to save the life
2   and preserve the physical health of the mother;
3        (2)  Medical and other authorities now know more about human
4   prenatal development than ever before, including without limitation:
5        (A)  Between five (5) and six (6) weeks' gestation, an
6   unborn human being's heart begins to beat;
7        (B)  An unborn human being begins to move about in the womb
8   at approximately eight (8) weeks' gestation;
9        (C)  At nine (9) weeks' gestation, all basic physiological
10  functions, buds for teeth, eyes, and external genitalia are present;
11       (D)(i)  An unborn human being's vital organs begin to
12  function at ten (10) weeks' gestation.
13       (ii)  Hair, fingernails, and toenails begin to form
14  at ten (10) weeks' gestation;
15       (E)(i)  At eleven (11) weeks' gestation, an unborn human
16  being's diaphragm develops, which can result in hiccups.
17       (ii)  In addition, an unborn human being begins to
18  move about freely in the womb; and
19       (F)(i)  At twelve (12) weeks' gestation, an unborn human
20  being can open and close his or her fingers, make sucking motions, and sense
21  stimulation from outside the womb.
22       (ii)  At this stage, the unborn human being takes on
23  "the human form" in all relevant aspects as stated in Gonzales v. Carhart,
24  550 U.S. 124, 160 (2007);
25       (3)  The United States Supreme Court has recognized that a state
26  has an "important and legitimate interest in protecting the potentiality of
27  human life" in Roe v. Wade, 410 U.S. 113, 162 (1973), and, specifically, that
28  "the state has an interest in protecting the life of the unborn" as discussed
29  in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833,
30  873 (1992);
31       (4)(A)  The majority of abortion procedures performed after
32  fifteen (15) weeks' gestation are dismemberment abortions as defined by § 20-
33  16-1802, which are prohibited under the Arkansas Unborn Child Protection from
34  Dismemberment Abortion Act, § 20-16-1801 et seq.
35       (B)  The performance of these types of abortions for
36  nontherapeutic or elective reasons is a barbaric practice that is dangerous

1   for the pregnant woman and demeaning to the medical profession;

2          (5)  Most obstetricians and gynecologists practicing in this

3   state do not offer or perform nontherapeutic or elective abortions;

4          (6)(A)  According to a 2004 article, abortion can cause

5   significant physical and psychological risks to the pregnant woman that

6   increase with gestational age.

7               (B)  Specifically, the relative physical and psychological

8   risks escalate exponentially as gestational age increases in abortions

9   performed after eight (8) weeks' gestation;

10         (7)  In the vast majority of uncomplicated pregnancies, the

11  maternal health risks of undergoing an abortion become greater than the risks

12  of carrying a pregnancy to term as the second trimester progresses;

13         (8)  In abortions performed after fifteen (15) weeks' gestation,

14  there is a higher risk that a pregnant woman will require a hysterectomy,

15  other reparative surgery, or blood transfusions; and

16         (9)  The state has "legitimate interests from the outset of

17  pregnancy in protecting the health of women" as determined by Planned

18  Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 847 (1992),

19  as the "medical, emotional, and psychological consequences of abortion are

20  serious and can be lasting" as stated in H.L. v. Matheson, 450 U.S. 398, 411

21  (1981).

22      (b)  It is the intent of the General Assembly to restrict the practice

23  of nontherapeutic or elective abortions to the period up to the eighteenth

24  week of gestation.

25

26      20-16-2003.  Definitions.

27      As used in this subchapter:

28         (1)  "Abortion" means the use or prescription of any instrument,

29  medicine, drug, or any other substance or device:

30               (A)  To terminate the pregnancy of a woman known to be

31  pregnant with an intention other than to:

32                    (i)  Increase the probability of a live birth;

33                    (ii)  Preserve the life or health of the unborn

34  child;

35                    (iii)  Terminate an ectopic pregnancy; or

36                    (iv)  Remove a dead unborn child who died in utero as

1   the result of natural causes, accidental trauma, or a criminal assault on the

2   pregnant woman or her unborn child; and

3                   (B)  That causes the premature termination of the

4   pregnancy;

5               (2)  "Attempt to perform or induce an abortion" means an act or

6   an omission of a statutorily required act that, under the circumstances as

7   the actor believes them to be, constitutes a substantial step in a course of

8   conduct planned to culminate in the performance or induction of an abortion

9   in this state in violation of this subchapter;

10              (3)  "Conception" means the fusion of human spermatozoon with a

11  human ovum;

12              (4)  "Gestation" means the time that has elapsed since the first

13  day of the woman's last menstrual period;

14              (5)  "Human being" means an individual member of the species Homo

15  sapiens from and after the point of conception;

16              (6)  "Major bodily function" means the functions of the body,

17  including without limitation functions of the immune system, normal cell

18  growth, and digestive, bowel, bladder, neurological, brain, respiratory,

19  circulatory, endocrine, and reproductive functions;

20              (7)  "Medical emergency" means a condition that, on the basis of

21  the physician's good-faith clinical judgment, necessitates an abortion to

22  preserve the life of a pregnant woman whose life is endangered by a physical

23  disorder, physical illness, or physical injury, including a life endangering

24  physical condition arising from the pregnancy itself, or when the

25  continuation of the pregnancy will create a serious risk of substantial and

26  irreversible impairment of a major bodily function;

27              (8)  "Physician" means a person licensed to practice medicine in

28  this state, including a medical doctor; and

29              (9)  "Probable gestational age" means the age of an unborn human

30  being as calculated from the first day of the last menstrual period of the

31  pregnant woman.

32

33      20-16-2004.  Abortion limited to eighteen (18) weeks' gestation.

34      (a)  *Except in a medical emergency or if the pregnancy results from a*

35  *rape under § 5-14-103 or incest under § 5-26-202,* a person shall not perform,

36  induce, or attempt to perform or induce an abortion unless the physician or

1   referring physician has:

2   　　　　(1)  Made a determination of the probable gestational age of the

3   unborn human being according to standard medical practices and techniques

4   used in the medical community; and

5   　　　　(2)  Documented the probable gestational age in the medical

6   records of the pregnant woman and, if required, in a report with the

7   Department of Health as described in subsection (c) of this section.

8   　　(b) *Except in a medical emergency or if the pregnancy results from a*

9   *rape under § 5-14-103 or incest under § 5-26-202,* a person shall not

10  intentionally or knowingly perform, induce, or attempt to perform or induce

11  an abortion of an unborn human being if the probable gestational age of the

12  unborn human being is determined to be greater than eighteen (18) weeks'

13  gestation.

14  　　　　(c)(1)  If a physician performs or induces an abortion on an unborn

15  human being whose gestational age is greater than eighteen (18) weeks, the

16  physician shall file a report with the department within fifteen (15) days of

17  the abortion.

18  　　　　(2)  The report described in subdivision (c)(1) of this section

19  shall contain:

20  　　　　　　　(A)  The date that the abortion was performed;

21  　　　　　　　(B)  The specific method used for the abortion;

22  　　　　　　　(C)  The probable gestational age of the unborn human being

23  and the method used to calculate gestational age;

24  　　　　　　　(D)  A statement declaring that the abortion was

25  necessitated by a medical emergency;

26  　　　　　　　(E)  The specific medical indications supporting the

27  abortion and medical emergency;

28  　　　　　　　(F)  The probable health consequences of the abortion and

29  of the specific method used; and

30  　　　　　　　(G)  The signature of the physician attesting that the

31  information stated is true and correct to the best of his or her knowledge.

32  　　　　　　(3)  A report made under subsection (c) of this section shall not

33  contain the name of the pregnant woman upon whom the abortion was performed

34  or any other information or identifiers that would make it possible to

35  identify, in any manner or under any circumstances, a woman who obtained or

36  sought to obtain an abortion.

1
2          20-16-2005.  Reporting forms.
3          (a)  Within thirty (30) days of the effective date of this subchapter,
4     the Department of Health shall create forms required by this subchapter.
5          (b)  The reporting requirements shall be enforceable ten (10) days
6     after either the effective date of this subchapter or the date that the forms
7     described in subsection (a) of this section become available, whichever
8     occurs later.
9
10         20-16-2006.  Penalties — Additional enforcement.
11         (a)(1)  A person who purposely or knowingly violates this subchapter is
12    guilty of a Class D felony.
13              (2)  A woman upon whom an abortion is performed, induced, or
14    attempted in violation of this subchapter shall not be prosecuted for
15    conspiracy to commit a violation of this subchapter.
16         (b)  A physician who purposely or knowingly violates this subchapter
17    commits an act of unprofessional conduct that shall result in the Arkansas
18    State Medical Board suspending or revoking his or her license.
19         (c)  A physician who purposely or knowingly delivers to the Department
20    of Health any report required under this subchapter that he or she knows is
21    false is subject to a civil penalty or fine up to two thousand dollars
22    ($2,000) per violation imposed by the department.
23         (d)  A woman upon whom an abortion has been performed, induced, or
24    attempted in violation of this subchapter may bring an action against the
25    person who purposely, knowingly, or recklessly performed, induced, or
26    attempted the abortion in violation of this subchapter for actual and
27    punitive damages.
28         (e)(1)  A cause of action for injunctive relief against a person who
29    has purposely, knowingly, or recklessly violated this subchapter may be
30    maintained by:
31              (A)  A prosecuting attorney with appropriate jurisdiction;
32    or
33              (B)  The Attorney General.
34              (2)  The injunction shall prevent the abortion provider from
35    performing or inducing and from attempting to perform or induce further
36    abortions in violation of this subchapter.

1      (f)  If judgment is rendered in favor of the plaintiff in an action
2  described in this section, the court shall also render judgment for a
3  reasonable attorney's fee in favor of the plaintiff against the defendant.
4      (g)  If judgment is rendered in favor of the defendant and the court
5  finds that the plaintiff's suit was frivolous and brought in bad faith, the
6  court shall render judgment for a reasonable attorney's fees in favor of the
7  defendant against the plaintiff.
8      (h)  Damages or attorney's fee shall not be assessed against the woman
9  upon whom an abortion was performed or induced or attempted to be performed
10  or induced except under subsection (d) of this section.
11
12      20-16-2007.  Construction.
13      This subchapter does not:
14          (1)  Create or recognize a right to abortion;
15          (2)  Create or recognize a right to a particular method of
16  abortion; or
17          (3)  Make lawful an abortion that is currently unlawful under any
18  law of this state.
19
20      20-16-2008.  Right of intervention.
21      (a)  The General Assembly by joint resolution may appoint one (1) or
22  more of its members who sponsored or cosponsored this subchapter in his or
23  her official capacity to intervene as a matter of right in any case in which
24  the constitutionality of this law is challenged.
25      (b)  The Governor may also intervene as a matter of right in any case
26  in which the constitutionality of this law is challenged.
27
28                          */s/Lundstrum*
29
30
31                      **APPROVED: 3/15/19**
32
33
34
35
36

# EXHIBIT 2

Stricken language would be deleted from and underlined language would be added to present law.
Act 619 of the Regular Session

1    State of Arkansas          *As Engrossed:  S2/28/19 S3/14/19*
2    92nd General Assembly            A Bill
3    Regular Session, 2019                                    SENATE BILL 2
4
5    By: Senators T. Garner, *B. Ballinger, Bledsoe, A. Clark, J. Cooper, B. Davis, L. Eads, J. English, Flippo,*
6    *K. Hammer, Hester, Hill, Irvin, B. Johnson, M. Johnson, Rapert, Rice, G. Stubblefield, J. Sturch, D.*
7    *Wallace*
8    By: Representatives *Barker, Beck, Bentley, Breaux, Brown, Capp, Christiansen, Cloud, C. Cooper,*
9    *Crawford, Della Rosa, Evans, C. Fite, M. Gray, Hawks, Kelly, Lundstrum, Maddox, Penzo, Petty, Rye, B.*
10   *Smith, S. Smith, Speaks, Vaught*
11
12                          **For An Act To Be Entitled**
13              AN ACT TO CREATE THE DOWN SYNDROME DISCRIMINATION BY
14              ABORTION PROHIBITION ACT; TO PROHIBIT ABORTION
15              *BECAUSE THE UNBORN* CHILD HAS OR MAY HAVE DOWN
16              SYNDROME; AND FOR OTHER PURPOSES.
17
18
19                              **Subtitle**
20                   TO CREATE THE DOWN SYNDROME
21                   DISCRIMINATION BY ABORTION PROHIBITION
22                   ACT.
23
24
25   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
26
27       SECTION 1.  Arkansas Code Title 20, Chapter 16, is amended to add an
28   additional subchapter to read as follows:
29       Subchapter 20 — Down Syndrome Discrimination by Abortion Prohibition Act
30
31       20-16-2001.  Title.
32       This subchapter shall be known and may be cited as the "Down Syndrome
33   Discrimination by Abortion Prohibition Act".
34
35       20-16-2002.  Definitions.
36       As used in this subchapter:



EXHIBIT 2

1       (1)(A)  "Abortion" means the act of using or prescribing any
2  instrument, medicine, drug, or any other substance, device, or means with the
3  intent to terminate the clinically diagnosable pregnancy of a woman, with
4  knowledge that the termination by any of those means will with reasonable
5  likelihood cause the death of the unborn child.
6            (B)  An act under subdivision (1)(A) of this section is not
7  an abortion if the act is performed with the intent to:
8                  (i)  Save the life or preserve the health of the
9  unborn child or the pregnant woman;
10                 (ii)  Remove a dead unborn child caused by
11 spontaneous abortion; or
12                 (iii)  Remove an ectopic pregnancy;
13      (2)  "Down Syndrome" means a chromosome disorder associated with
14 either:
15           (A)  An extra copy of the chromosome 21, in whole or in
16 part; or
17           (B)  An effective trisomy for chromosome 21;
18      (3)  "Physician" means a person licensed to practice medicine in
19 this state, including a medical doctor and a doctor of osteopathy; and
20      (4)  "Unborn child" means the offspring of human beings from
21 conception until birth.
22
23      20-16-2003.  Prohibition — *Down Syndrome.*
24      (a)  A physician shall not intentionally perform or attempt to perform
25 an abortion with the knowledge that a pregnant woman is seeking an abortion
26 solely on the basis of:
27           (1)  A test result indicating Down Syndrome in an unborn child;
28           (2)  A prenatal diagnosis of Down Syndrome in an unborn child; or
29           (3)  Any other reason to believe that an unborn child has Down
30 Syndrome.
31      *(b)(1)  Before performing an abortion, the physician performing the*
32 *abortion shall ask the pregnant woman if she is aware of any test results,*
33 *prenatal diagnosis, or any other evidence that the unborn child may have Down*
34 *Syndrome.*
35           *(2)  If the pregnant woman knows of any test results, prenatal*
36 *diagnosis, or any other evidence that the unborn child may have Down*

1    *Syndrome, the physician who is performing the abortion shall:*
2                    *(A)  Inform the pregnant woman of the prohibition of*
3    *abortion contained in subsection (a) of this section; and*
4                    *(B)  Request the medical records of the pregnant woman*
5    *relevant to determining whether she has previously aborted an unborn child or*
6    *children after she became aware of any test results, prenatal diagnosis, or*
7    *any other evidence that the unborn child may have had Down Syndrome.*
8                    *(3)  When the physician performing the abortion is required to*
9    *request the medical records of the pregnant women under subdivision (b)(2)(B)*
10   *of this section, the physician shall not perform an abortion until the*
11   *physician spends at least fourteen (14) days to obtain the medical records*
12   *described in subdivision (b)(2)(B) of this section.*
13       *(c)  If this section is held invalid as applied to the period of*
14   *pregnancy prior to viability, then this section shall remain applicable to*
15   *the period of pregnancy subsequent to viability.*
16       *(d)  This section does not apply to an abortion performed on a pregnant*
17   *woman if the pregnancy is the result of rape or incest.*
18
19       *20-16-2004.  Criminal penalties.*
20       *A physician or other person who knowingly performs or attempts to*
21   *perform an abortion prohibited by this subchapter is guilty of a Class D*
22   *felony.*
23
24       *20-16-2005.  Civil penalties and professional sanctions.*
25       *(a)(1)  A physician who knowingly violates this subchapter is liable*
26   *for damages and shall have his or her medical license revoked as applicable.*
27                    *(2)  The physician may also be enjoined from future acts*
28   *prohibited by this subchapter.*
29       *(b)(1)  A woman who receives an abortion in violation of this*
30   *subchapter without being informed of the prohibition of abortion for the*
31   *purposes of aborting an unborn child diagnosed with Down Syndrome, the parent*
32   *or legal guardian of the woman if the woman is a minor who is not*
33   *emancipated, or the legal guardian of the woman if the woman has been*
34   *adjudicated incompetent, may commence a civil action for any reckless*
35   *violation of this subchapter and may seek both actual and punitive damages.*
36                    *(2)  Damages may include without limitation:*

1          (A)  Money damages for any psychological and physical
2    injuries occasioned by the violation of this subchapter; and
3          (B)  Statutory damages equal to ten (10) times the cost of
4    the abortion performed in violation of this subchapter.
5      (c)  A physician or other person who performs an abortion in violation
6    of this subchapter shall be considered to have engaged in unprofessional
7    conduct and his or her license to provide healthcare services in this state
8    shall be revoked by the Arkansas State Medical Board.
9      (d)(1)  A cause of action for injunctive relief against any physician
10   or other person who has knowingly violated this subchapter may be maintained
11   by:
12          (A)  A person who is the spouse, parent, guardian, or
13   current or former licensed healthcare provider of the woman who receives or
14   attempts to receive an abortion in violation of this subchapter; or
15          (B)  The Attorney General.
16      (2)  The injunction shall prevent the physician or other person
17   from performing further abortions in violation of this subchapter.
18
19   20-16-2006.  Exclusion of liability for a woman who undergoes
20   prohibited abortion.
21      (a)  A woman who receives or attempts to receive an abortion in
22   violation of this subchapter shall not be prosecuted under this subchapter
23   for conspiracy to violate this subchapter or otherwise be held criminally or
24   civilly liable for any violation of this subchapter.
25      (b)  In a criminal proceeding or action brought under this subchapter,
26   a woman who receives or attempts to receive an abortion in violation of this
27   subchapter is entitled to all rights, protections, and notifications afforded
28   to crime victims.
29      (c)(1)  In a civil proceeding or action brought under this subchapter,
30   the anonymity of the woman who receives or attempts to receive the abortion
31   in violation of this subchapter shall be preserved from public disclosure
32   unless she gives her consent to disclosure.
33      (2)  A court of competent jurisdiction, upon motion or sua
34   sponte, shall issue orders to the parties, witnesses, and counsel and direct
35   the sealing of the record and exclusion of individuals from the courtroom or
36   hearing room to the extent necessary to safeguard the identity of the woman

1  from public disclosure.

2

3     20-16-2007.  Right of intervention.

4     The General Assembly by joint resolution may appoint one (1) or more of

5  its members who sponsored or cosponsored this subchapter in his or her

6  official capacity to intervene as a matter of right in any case in which the

7  constitutionality of this law is challenged.

8

9

10                    /s/T. Garner

11

12

13                 APPROVED: 4/1/19

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36

# EXHIBIT 3

Stricken language would be deleted from and underlined language would be added to present law.
Act 700 of the Regular Session

| | |
|---|---|
| 1 | State of Arkansas |
| 2 | 92nd General Assembly |
| 3 | Regular Session, 2019 |

# A Bill

SENATE BILL 448

4
5   By: Senator G. Stubblefield
6   By: Representative Barker
7
8                        **For An Act To Be Entitled**
9               AN ACT TO REQUIRE PHYSICIANS TO HAVE CERTAIN
10              QUALIFICATIONS IN ORDER TO PERFORM ABORTIONS; TO
11              REPEAL THE PRESUMPTION OF VIABILITY OF A FETUS AT THE
12              TWENTY-FIFTH WEEK OF PREGNANCY; AND FOR OTHER
13              PURPOSES.
14
15
16                             **Subtitle**
17              TO REQUIRE PHYSICIANS TO HAVE CERTAIN
18              QUALIFICATIONS TO PERFORM ABORTIONS; AND
19              TO REPEAL THE PRESUMPTION OF VIABILITY OF
20              A FETUS AT THE TWENTY-FIFTH WEEK OF
21              PREGNANCY.
22
23
24   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
25
26       SECTION 1.  Arkansas Code Title 20, Chapter 16, Subchapter 6, is
27   amended to add an additional section to read as follows:
28       20-16-605.  Qualifications to perform an abortion.
29       (a)  A person shall not perform or induce an abortion unless that
30   person is a physician licensed to practice medicine in the state of Arkansas
31   and is board-certified or board-eligible in obstetrics and gynecology.
32       (b)  A violation of this section is a Class D felony and may result in
33   the revocation, suspension, or nonrenewal of the professional license of an
34   abortion facility or physician.
35
36       SECTION 2.  Arkansas Code § 20-16-702(3), concerning the definition of



EXHIBIT 3                    02/26/2019 2:10:22 PM JMB295

1   "viable fetus" regarding abortions, is amended to read as follows:

2          (3)  ~~"Viable fetus" means a fetus which can live outside the womb~~

3   <u>"Viability" means the state of fetal development when, in the judgment of the</u>

4   <u>physician based on the particular facts of the case before him or her and in</u>

5   <u>light of the most advanced medical technology and information available to</u>

6   <u>him or her, there is a reasonable likelihood of sustained survival of the</u>

7   <u>unborn child outside the body of the mother, with or without artificial life</u>

8   <u>support.</u>

9

10        SECTION 3.   Arkansas Code § 20-16-703 is repealed.

11   ~~20-16-703.   Presumption of viability.~~

12   ~~For the purpose of this subchapter, a fetus shall be presumed not to be~~

13   ~~viable prior to the end of the twenty-fifth week of the pregnancy.~~

14

15

16                      **APPROVED: 4/4/19**

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36