**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

LITTLE ROCK FAMILY PLANNING SERVICES, *et al.*,                    PLAINTIFFS,

v.                            **Case No. 4:19-cv-00449-KGB**

LESLIE RUTLEDGE, in her official capacity as
Attorney General of the State of Arkansas, *et al.*,                    DEFENDANTS.

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER**

This case concerns three commonsense abortion regulations. The first requires abortion

practitioners—like other specialized physicians—to meet minimal competency standards. The

second prohibits the horrifying eugenic practice of killing unborn children merely because of an

indication of Down Syndrome. And the third regulates violent late-term abortion practices. Each

regulation benefits society, mothers, and the medical profession in a myriad of ways while

imposing no real (or legally cognizable) burden on abortion access. Nor do Plaintiffs even

attempt to demonstrate that the various phantom burdens conjured in their declarations and

purportedly backed by creative accounting outweigh—let alone substantially—the challenged

regulations' undisputed benefits. Moreover, it is particularly revealing that it is neither mothers

nor prospective mothers who bring this challenge. Rather, it is abortion practitioners dedicated to

ensuring their industry remains the least regulated in America that seek extraordinary

preliminary relief.

Abortion is a dangerous business. Since 1999, there have been at least 64 calls for an

ambulance to Little Rock Family Planning Services—an average of 3.2 calls a year.  Silfies Decl.

(Exh. G5). During the 2019 calendar year alone, there have already been three ambulance calls.

*Id.* These ambulance calls were on February 1, March 29, and April 5, 2019—all Fridays when

Plaintiff Thomas Twedten was working at that facility. *Id.* Yet Twedten—who is neither an

OB/GYN nor eligible for board certification—insists that Arkansas has no interest in regulating his practice or requiring him to demonstrate basic competency. Instead, he and his fellow Plaintiffs insist that any physician—no matter his or her specialty or training—should be permitted to perform an abortion. Indeed, as they see it, nothing should keep a radiologist, an ophthalmologist, or a proctologist from performing specialized abortion procedures. *See June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 799 (5th Cir. 2018) (noting abortion practitioners who were radiologists and ophthalmologists).

This lack of a competency requirement has led to gruesome results in other states. A Pennsylvania grand jury found that Kermit Gosnell "regularly and illegally delivered live, viable, babies in the third trimester of pregnancy—and then murdered these newborns by severing their spinal cords with scissors." Gosnell Grand Jury Report , at 1(Exh. A21). "The medical practice by which [Gosnell] carried out this business was a filthy fraud in which he overdosed his patients with dangerous drugs, spread venereal disease among them with infected instruments, perforated their wombs and bowels – and, on at least two occasions, caused their deaths." *Id.* And Kermit Gosnell is only the most notorious abortion practitioner to have regularly harmed women seeking an abortion.

The State of Kansas reportedly revoked Ann Kristin Neuhaus's medical license *three times*. It was reported that she violated the standard of care in performing mental health exams of young patients and jeopardized patients' future care by failing to maintain patient records. John Hanna, *Kansas board revokes doctor's license again in abortion case*, Topeka Capital-Journal (July 17, 2017), available at https://www.cjonline.com/news/2017-07-17/kansas-board-revokes-doctor-s-license-again-abortion-case (accessed July 16, 2019) (Exh. A23).

The New Yorker has reported horror stories concerning Steven Brigham, the owner of abortion facilities in Virginia, Maryland, Pennsylvania, and New Jersey. Eyal Press, *A Botched Operation*, The New Yorker (January 26, 2014), available at https://www.newyorker.com/ magazine/2014/02/03/a-botched-operation (accessed July 16, 2019) (Exh. A24). According to the New Yorker, "There were stories of abortions being done without a registered nurse on hand, of blood on the floor, and of drugs being administered by untrained personnel. There was a report of plastic instruments being washed with Dial soap and reused." *Id.* Further, "[i]n 2002, a former employee of Brigham's . . . described being 'witness to a suction machine accident, in which a second trimester procedure was sprayed all over me and got in my eyes and mouth.'" *Id.*

Randall Whitney in Florida was reportedly fined $7,500 for slapping a patient during an abortion. *Abortionist that Slapped Patient only Fined, Reprimanded Despite History of Abuse*, Operation Rescue (September 9, 2013), available at https://www.operationrescue.org/archives/ abortionist-that-slapped-patient-only-fined-reprimanded-despite-history-of-abuse/ (accessed July 16, 2019) (Exh. A22).

And most relevant here, past conduct by PPAEO's former affiliate—Planned Parenthood of the Heartland—uniquely underscores the value of Arkansas's competency requirement. For instance, sworn congressional testimony from a former affiliate manager demonstrated that entity's established practice for addressing complications was to "tell women who experience complications at home to report to their local ER" and "say they were experiencing a miscarriage, not that they had undergone a chemical abortion." *Planned Parenthood Exposed: Hearing of H. Comm. on the Judiciary, 114th Cong*. 18 (2015) (testimony of Susan Thayer), available at https://www.govinfo.gov/content/pkg/CHRG-114hhrg96905/html/CHRG-114hhrg96905.htm (accessed July 16, 2019). That deceptive policy, as the manager explained,

enabled Planned Parenthood to continue "outsourcing complications to others." *Id.* at 20. The Eighth Circuit subsequently upheld Arkansas's termination of its Medicaid provider agreement with PPAEO as a result. *Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017).

Similar examples could be multiplied.  But even when unqualified abortion practitioners do not commit such egregious offenses, the abortion procedure itself still leaves scars and can destroy lives.  Indeed, attached as an exhibit here are 17 affidavits and declarations from Arkansas mothers describing the harm they have suffered as a result of abortion, including the unique harm associated with eugenic and violent later-term abortions like those at issue here. Parker Decl. (Exh. G1) (attaching 15 affidavits of Arkansas women hurt by abortion); McGruder Decl. (Exh. H2); Lace Decl. (Exh. G2).

### BACKGROUND

The claim that abortion is safer than pregnancy is false. *See* Aultman Decl.; David C. Reardon & Priscilla K. Coleman, *Short and long term mortality rates associated with first pregnancy outcome: Population register based study for Denmark 1980-2004*, 18 Med. Sci. Mon. 71 (2012) (Exh. A27) (finding that the mortality rate for women who obtained abortions was significantly higher than that for women who gave birth and that women who had later abortions had significantly-higher mortality rates than women who had earlier abortions); *see also* David Reardon, Comment to *Abstract: The comparative safety of legal induced abortion and childbirth in the United States* (Exh. A28) (highlighting the fatal shortcomings of a study purporting to show that abortion is safer than childbirth).

Plaintiffs claim that "approximately one in four women in this country will have an abortion by age forty-five." Compl., ¶ 39. No explanation is given for the discrepancy with their claim in *Planned Parenthood Ark. & E. Okla. v. Jegley*, Case No. 4:15CV00784, Compl., ECF 1

at ¶ 11 ("Approximately one in *three* women in the United States will have an abortion by age 45." (emphasis added)).

## I.     Board certification is now standard and serves a crucial role in the medical profession.

The abortion provider competency requirement set forth in Arkansas Act 700 of 2019, provides, in pertinent part, "A person shall not perform or induce an abortion unless that person is a physician licensed to practice medicine in the state of Arkansas and is board-certified or board-eligible in obstetrics and gynecology." Exh. A1 at 1 (to be codified at Ark. Code Ann. § 20-16-605(a)). Board certification is now standard in the medical profession, and it serves a critical role in safeguarding both the medical profession and the patients that it serves.

### A.     Board certification began by distinguishing qualified physicians from "snake oil salesmen," and is now the standard of good medical practice.

Board certification began in 1917. Christine K. Cassel, M.D., and Eric S. Holmboe, M.D., *Professionalism and Accountability: The Role of Specialty Board Certification*, Transactions of the American Clinical and Climatological Association, vol. 119, at 295 (2008) (Exh. A8). Specialty medical boards were created in the first part of the twentieth century as medical science advanced and physicians began to gain specialized knowledge. *Id.* At that time, "American medicine was beginning to distinguish itself from the proprietary physicians trained by apprenticeship, many of whom had little science base and were often considered 'snake oil salesmen.'" *Id.* (quoting P. Starr, *The social transformation of American medicine* (1949)). During the latter half of the twentieth century, board certification began to be considered "a highly desired and sometimes required credential." *Id.* at 296. This was especially the case "in the surgical specialties." *Id.* Managed-care plans began to prefer board certified physicians for their networks. *Id.* In the late 1980s and early 1990s, a large number of previously uncertified physicians began to seek board certification. *Id.*

"[B]oard certification is no longer discretionary as it once was." *Id.* at 301. Board certification is now generally accepted in the medical community as a proxy for competence in a given specialty. Aultman Decl. (Exh. G6). In the modern era, board certification is considered to be standard. *Id.* Even the Plaintiffs' own expert, Linda Prine, has testified that she became board certified "[b]ecause it's become standard." Prine Depo. at 29 (Exh. A9). She acknowledged that board certification is "expected in the modern era." *Id.* "For many in the surgical specialties, hospital privileges depend on certification standards; and increasingly, hospitals are looking to board certification even in non-surgical areas." Cassel and Holmboe (Exh. A8) at 301. "Widely accepted quality measures for health plans in the US include a percentage of doctors with board certification as one of their quality measures." *Id.* Hospitals rely on board certification in the credentialing process, insurance companies—which rely on actuarial data—require doctors to be board certified in order to receive reimbursement for services, Prine Depo. at 32 (Exh. A9), and malpractice insurers require abortion doctors to maintain OB/GYN coverage. Aultman Decl. (Exh. G6). About 87% of American physicians are board certified. Cassel and Holmboe (Exh. A8) at 297.

The American Board of Medical Specialties 2017-2018 report explains that board certification "is a key component of the patient-physician relationship. Patients trust the medical profession to establish and maintain the standards of practice by which physicians are certified and assessed." Aultman Decl. (Exh. G6); *ABMS Board Certification Report 2017-2018*, American Board of Medical Specialties, at 4, available at https://www.abms.org/media/194885/ abms-board-certification-report-2017-2018.pdf (accessed July 1, 2019) (Exh. A11). "By being board certified, physicians promise to uphold those standards and demonstrate that they have the specialized knowledge and clinical judgment to provide safe, quality patient care." *ABMS Board*

*Certification Report 2017-2018*, at 4. Further, "[e]vidence shows that board certified physicians who continue to develop their knowledge and skills through continuing certification better adhere to practice guidelines, improve care processes, and have lower likelihood of disciplinary actions by state medical licensing boards." *Id.* "Board certification raises the bar of excellence in patient care." *Id.* at 5 (contrasting state licensure to board certification).

The American Board of Medical Specialties has 24 specialty member boards, including the American Board of Obstetrics and Gynecology, Cassel and Holmboe (Exh. A8) at 296-97, which was approved as a member 83 years ago, in 1933. *ABMS Board Certification Report 2017-2018* (Exh. A11), at 6.There are currently over 51,673 board-certified physicians in Obstetrics and Gynecology, *id.* at 31, with 1,000 to 1,500 new physicians gaining board certification every year. *Id.* at 32. Arkansas alone has 294 board-certified physicians in Obstetrics and Gynecology. *Id.* at 37.

In order to become a board-eligible OB/GYN, a physician must successfully complete a four-year specialized residency in obstetrics and gynecology. Aultman Decl. (Exh. G6). A physician must then successfully complete additional requirements to demonstrate expertise and depth of knowledge in this area of medical specialty. *Id.* Specifically, after completing their four-year residency, OB/GYNs take and pass a written examination. *Id.* Then, they devote time to demonstrating clinical competence and submit a case list to the American Board of Obstetricians and Gynecologists (ABOG). *Id.* After submitting a case list, OB/GYNs are eligible to take an oral examination before a panel of ABOG examiners, which they must pass to become board certified. *Id.* Board-certified OB/GYNs must also pass a written examination each year to maintain their certification, *id.*, among other requirements.

Completion of an OB/GYN residency requires a doctor to be trained to perform procedures which are functionally identical to surgical abortions, such as suction dilatation and curettage.[1]  The only difference is that those procedures have other medical uses and are not carried out specifically to terminate a pregnancy. *Id.* Miscarriage care requires the same technical skills as abortion, *id.*, and gynecologists routinely do suction dilation and curettage even on nonpregnant women for other purposes. *Id.*

Peer-reviewed studies demonstrate that board certified physicians are better doctors. For example, one study showed that board certified internal-medicine physicians are *five times* less likely than non-certified physicians to have state medical-licensure disciplinary actions. Rebecca S. Lipner, Ph.D, *Specialty Certification Status, Performance Ratings, and Disciplinary Actions of Internal Medicine Residents*, Academic Medicine vol. 91 (2016) (Exh. A13). A second peer-reviewed study showed that board certified family physicians were less likely overall to receive disciplinary action and that physicians who received the most severe discipline were less likely to hold board certification at the time of the action. Michael R. Peabody, Ph.D., *The Relationship Between Board Certification and Disciplinary Actions Against Board-Eligible Family Physicians*, Academic Medicine, vol. 94, no. 6 (June 2019) (Exh. A12). Indeed, research consistently shows that board-certified physicians are less likely to be disciplined by state medical boards. *See* Neal D. Kohatsu, et al., *Characteristics Associated With Physician Discipline: A Case-Control Study*, reprinted from Archives of Internal Medicine, vol. 164 (March 22, 2004) (Exh. A4) (disciplined physicians were less likely to be board certified); Steven W. Clay, D.O. and Robert R. Conatser, M.S., Characteristics of Physicians Disciplined by the State Medical Board of Ohio, *Journal of the American Osteopathic Association*, vol. 103, no.

---

[1] The Plaintiffs concede that miscarriage care requires performing a procedure that is functionally identical to a surgical abortion. *See, e.g.*, Hopkins Decl., ¶ 40 (Doc. 2 at 132); Twedten Decl., ¶ 15 (Doc. 2 at 374).

2 (February 2003) (Exh. A5) ("[O]ffenders were significantly less likely to be board certified."); James Morrison, M.D. and Peter Wickersham, M.S., *Physicians Disiplined by a State Medical Board*, Journal of the American Medical Association, vol. 279, no. 23 (June 17, 1998) (Exh. A6) (physicians disciplined by a state medical board were less likely to be board certified).

In addition, the requirement that physicians maintain their board certification ensures that their skills do not decline and that they remain abreast of the latest medical developments in medical practice.

### B.   Board certification ensures abortion providers are—and remain—competent to treat patients.

"A comprehensive meta-analysis of the literature on physician capability over the course of a career found a dramatic and significant decline in physician knowledge and compliance with national guidelines for diagnosis and treatment, and in some cases, with actual patient outcomes." Cassel and Holmboe (Exh. A8) at 298 (discussing N. Choudry, et al., *Systematic review: The relationship between clinical experience and quality of health care*, Annals of Internal Medicine, vol. 142, no. 4, at 261 (February 15, 2005) (Exh. A10)). The study reviewed 62 published studies that measured physician knowledge or quality of care in relation to time since medical-school graduation or age.  N. Choudry, et al. (Exh. A10) at 261. It noted that "[p]hysicians with more experience are generally believed to have accumulated knowledge and skills during years in practice and therefore to deliver high-quality care." *Id.* at 260. But the study actually found "an *inverse relationship* between the number of years that a physician has been in practice and the quality of care that the physician provides." *Id.* (emphasis added).  It concluded, "physicians who have been in practice for more years and older physicians possess less factual knowledge, are less likely to adhere to appropriate standards of care, and may also have poorer patient outcomes." *Id.* at 269. Further, "[t]hese effects seem to persist in those studies that

adjusted for other known predictors of quality, such as patient comorbidity and physician volume or specialization." *Id.* This comprehensive meta-analysis concluded that its findings directly *contradict* the unexamined notion "that clinical experience enhances knowledge and skill and, therefore, leads to better patient care." *Id.* In fact, "[p]hysicians who have been in practice longer may be at risk for providing lower-quality care." *Id.* at 260.

The study noted that ordinary continuing medical education is "largely ineffective" in addressing these issues. *Id.* at 270. As the authors concluded, these "results are troubling," and "do suggest that older physicians may need quality improvement interventions." *Id.* The studies suggest that it is appropriate for requirements to "imposed on physicians to keep up to date and to demonstrate continuing competence." *Id.*

Once board-certified status is obtained, physicians are required to participate in a process called "Maintenance of Certification" or MOC. Cassel and Holmboe (Exh. A8) at 297. Maintenance of certification "marked a new era in the importance of specialty boards for public accountability and the potential for the boards to strengthen public trust in physicians as leaders with a strong ethical responsibility for maintaining their competence and standards of patient care." *Id.* Maintenance of certification recognizes "the goal that physicians should be continuously engaged in self-evaluation and improvement of knowledge and practice performance over the course of a career." *Id.*

As set forth in the *2019 Specialty Maintenance of Certification Bulletin*, published by the American Board of Obstetrics and Gynecology (ABOG or "the Board"), the OB/GYN maintenance-of-certification process must be completed once every six years. *2019 Specialty Maintenance of Certification Bulletin*, American Board of Obstetrics and Gynecology, at 8, available at https://www.abog.org/docs/default-source/abog-bulletins/2019-moc-specialty-

bulletin-(v011)-4-16-19---final-14476.pdf?sfvrsn=4f300b8a_0 (accessed July 15, 2019) (Exh.

A2). Each applicant must:

> 1. Hold an active, unrestricted license to practice medicine in any and all states or territories of the United States or Province of Canada in which the physician holds a current medical license.

> 2. Hold unsupervised, unrestricted hospital privileges in each hospital in which patient care had been conducted since his/her last application.

> 3. Represent their Board certification and MOC status in a professional manner.

*Id.* at 8. Each MOC applicant must attest that since his or her last application, there have been no

actions taken against them by a medical board on any medical license held in any state, no

criminal actions, no drug or alcohol offenses, and no restrictions or loss of hospital privileges. *Id.*

at 9. In addition, the applicant must attest that since his or her last application there has been no

disciplinary action taken against them by a hospital, institution or agency, no evidence of mental

or physical impairment, and no proctoring program mandated by a hospital. *Id.* at 9.

The American Board of Obstetrics and Gynecology's maintenance-of-certification

process has four parts that are designed to improve professionalism, patient care, and medical

practice. *Id.* at 11-24. Part I addresses professionalism and professional standing. Part II

addresses lifelong learning and self-assessment. Part III addresses the assessment of knowledge,

judgment, and skills. And Part IV addresses meaningful quality improvement in medical

practice.

Part I addresses professionalism and professional standing. The *Bulletin* notes that "[o]ur

accountability is both to our profession and to the communities we serve." *Id.* at 11. A diplomate,

or board-certified physician, will have "demonstrated a commitment to patients' best interests,

professional behavior, and adherence to certification requirements." *Id.* Accordingly, "[a]

physician's professionalism and professional standing contribute to better patient care and

improved medical practice by helping to assure the public that Diplomates exhibit professionalism in their medical practice." *Id.* This includes acting in patients' interests, behaving professionally, taking care of themselves, and representing their certification in a professional manner. *Id.* "Each physician must maintain a good moral and ethical character and an untarnished professional reputation." *Id.*

The Board "requires an active, unrestricted license in any and all states or territories of the United States and Canada in which a Diplomate is licensed." *Id.* It will query each state licensing board and will be informed by the American Board of Medical Specialties concerning any medical-board actions taken against a physician's license to practice. "ABOG requires documented evidence concerning the applicant's professional standing, moral and ethical character, and hospital privileges (if applicable)." *Id.*

Part II of the Board's maintenance-of-certification process addresses lifelong learning and self-assessment. This component "contributes to better patient care by requiring ongoing participation in high-quality learning activities on current knowledge in Obstetrics and Gynecology and its subspecialties." *Id.* at 14. This requires a review of "peer-reviewed literature on critically relevant patient-management information, best-practice guidelines, and important research and studies." *Id.* Physicians are required to review 30 articles and correctly respond to article-specific assessment questions. A physician "must score 80% or higher on their assessment questions (96 or more correct out of 120) to maintain certification." *Id.*

Part III of the process addresses the assessment of knowledge, judgment, and skills. This component "builds upon and links to the continuous learning and self-assessment requirements" of Part II. *Id.* at 17. "These standards contribute to better patient care by incorporating an external objective assessment to provide assurance that there has been the necessary commitment

12

to lifelong learning and to remain current in core content of Obstetrics and Gynecology and its subspecialties." *Id.* Physicians must either pass an examination of their knowledge, judgment, and skills or else complete a "performance pathway" assessment. *Id.*

Part IV addresses meaningful quality improvement in medical practice. This final component "contributes to improved patient care through ongoing assessment and improvement in the quality of care in practices, hospitals, health systems, and/or community settings." *Id.* at 19. "This may include activities that result in improved patient or population health outcomes, improved access to health care, improved patient experience (including patient satisfaction), and increased value in the health care system." *Id.* Physicians choose to complete a module that is most relevant to their practice and practice setting. Each module has two phases. The first phase "includes an evidence-based review, review of up to 10 of the Diplomate's patient records and answering pertinent questions." *Id.* The second phase requires responding to a set of reflection questions regarding the activity. Among other requirements, quality improvement efforts in Obstetrics and Gynecology must have "a specific, measurable, specialty-relevant, and time-appropriate aim for improvement," and it must use "appropriate, relevant, and evidence-based performance measures that include measurement related to patient care." *Id.* at 20. Further, a physician's participation in a quality-improvement (QI) activity must be *meaningful*—it must be "intended to provide clear benefit to the physician's patients and [be] directly related to the physician's clinical practice of Obstetrics and Gynecology." *Id.* at 21. The physician must also be able to articulate "the change that was performed in their practice and how it affected the way care is delivered." *Id.*

A peer-reviewed study showed that more than 90 percent of emergency physicians who took their maintenance-of-certification examination reported that they either gained medical

knowledge or reinforced knowledge they already had, making them better physicians. Catherine A. Marco, M.D., *The American Board of Emergency Medicine ConCert Examination: Emergency Physicians' Perceptions of Learning and Career Benefits*, Academic Emergency Medicine, vol. 23 (2016) (Exh. A14). Another peer-reviewed study showed that physicians who score high on the maintenance-of-certification examination are approximately 17% more likely to adhere to guidelines of practice than physicians who scored lower. Eric S. Holmboe, M.D., et al., *Association Between Maintenance of Certification Examination Scores and Quality of Care for Medicare Beneficiaries*, reprinted from Archives of Internal Medicine, vol. 168, no. 13 (July 14, 2008) (Exh. A15).

Further, those same factors demonstrate why the basic competency requirement at issue here does not bar *board-eligible* OB/GYNs from performing abortions. Board-eligible OB/GYNs have recently completed a four-year specialized residency in obstetrics and gynecology. Aultman Decl. (Exh. G6). Board-eligible OB/GYNs are on a professional trajectory that will result in board certification. *Id.* If a physician falls from this trajectory by failing to become certified within eight years of becoming board eligible, he or she loses eligibility for certification. *Regaining Eligibility for OB GYN Certification*, at 1, available at https://www.abog.org/about-abog/policies/regaining-eligibility-for-initial-certification (accessed July 5, 2019) (Exh. A20). After that point, board eligibility may be regained only by completing a new OB/GYN residency. *Id.* at 2

Therefore, requiring physicians to be either on a trajectory to become board certified and then to maintain board certification addresses an observed decline in physician knowledge and skill and ensures that physicians are accountable to their patients and the medical profession for maintaining a high standard of practice over the course of their career.

II.     **Down Syndrome**

A.     **People with Down syndrome lead fulfilling and productive lives.**

Down syndrome, or Trisomy 21, occurs when a person has an extra chromosome. Most people have 46 chromosomes, but those with Down Syndrome have an extra copy of chromosome 21. *Facts about Down Syndrome*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/ncbddd/birthdefects/downsyndrome.html (accessed July 5, 2019) (Exh. B10); Harrison Decl. (Exh. G7). People with Down syndrome usually have "mild developmental disabilities" and can have other medical problems, such as heart or endocrine issues. Harrison Decl. (Exh. G7); Fernandes Decl., ¶ 3 (Exh. B11). But medical and educational advances, along with other increased support, have dramatically improved their quality of life. *Health and Medical Issues*, Down Syndrome Education International, available at https://www.down-syndrome.org/en-us/about-down-syndrome/health (accessed July 5, 2019) (Exh. B12); *For New Parents: General*, Down's Syndrome Ass'n, available at https://www.downs-syndrome.org.uk/for- new-parents/faqs/general/ (accessed July 5, 2019) (Exh. B13) (text expandable by clicking online); Harrison Decl. (Exh. G7).

In particular, advances in health care have extended the average life expectancy for children born with Down syndrome from nine years (in the 1930s) to over 60 years today. A. Lee et al., *Ethical Public Health: More than Just Numbers*, 144 Public Health A1, A1 (2017) (Exh. B14); Harrison Decl. (Exh. G7). Indeed, most individuals who have Down syndrome today lead happy and fulfilling lives. In a survey of 284 people with Down syndrome, 99% felt happy with their lives, 97% liked who they were, and 86% said they could make friends easily. Harrison Decl. (Exh. G7); Brian G. Skotko, et al., *Self-Perceptions from People with Down Syndrome*, 155 Am. J. Med. Genetics 2360, 2360 (2011) (Exh. B3). Siblings of persons with Down syndrome confirm this finding: "The vast majority of brothers and sisters describe their

relationship with their sibling with D[own] S[yndrome] as positive and enhancing." Fernandes Decl., ¶ 15 (Exh. B11); Harrison Decl. (Exh. G7).

Parents of children with Down syndrome talk of their children's value and contributions to family life and society. One parent said her son "laughs, plays, walks, eats, signs and loves fiercely!" Kuhns Decl., ¶ 5 (Exh. B15). A different parent stated "that all children have varying challenges and none is immune from maladies, disease, disorders or addictions," but "we live among a diverse population and we are better for it. Getting to know people with Down syndrome teaches us that they have gifts too and the world is a better place with them in our lives." Keough Decl., ¶¶ 5, 7 (Exh. B18). People with Down syndrome can live independently, have gainful employment, and enjoy active social lives. *For New Parents: General*, Down's Syndrome Ass'n, (Exh. B13). A mother said that her 19-year-old daughter with Down syndrome helped her with a "site installation for a webpage" and that they plan "to start a greeting card business" together. Scheid Decl., ¶¶ 11-12 (Exh. B16). Another said that her 23-year-old son completed job training through his high school, finished an internship, and has been working at the zoo since 2016. Gill Decl., ¶¶ 1, 5 (Exh. B17).

**B.     People with Down syndrome and other disabilities have suffered shameful— and often lethal—discrimination for much of American history.**

In the nineteenth and twentieth centuries, overt discrimination against individuals with disabilities was widespread. Many cities and towns had ordinances restricting individuals with physical or mental challenges from even appearing in public places. *Tennessee v. Lane*, 541 U.S. 509, 534-35 (2004) (Souter, J., concurring); *see* Susan M. Schweik, *The Ugly Laws: Disability in Public* 1-2 (2009). For example, a Chicago ordinance enacted in 1881 prohibited anyone deemed "diseased, maimed, mutilated, or in any way deformed, so as to be an unsightly or disgusting object" from being in the "public view." Schweik, *The Ugly Laws*, at 1-2. During this period in

history, laws "indiscriminately require[d] institutionalization, and prohibit[ed] certain individuals with disabilities from marrying, from voting, from attending public schools, and even from appearing in public." *Id.* at 534. "One administrative action along these lines was judicially sustained in part as a justified precaution against the very sight of a child with cerebral palsy, lest he produce a depressing and nauseating effect upon others." *Id.* at 535 (quotation and alteration omitted). One researcher has observed that "it was probably more the norm than the exception for th[ese] law[s] to show up on the code books of American cities sometime in nineteenth or very early twentieth century." *Id.* at 3.

The same discriminatory impulse that animated laws banning people with disabilities from public view also sparked the horrific practice of forced sterilization. In the early twentieth century, more than 70,000 "feeble-minded" individuals were forcibly sterilized. *The Supreme Court Ruling that Led to 70,000 Forced Sterilizations*, NPR (Mar. 7, 2016), available at http://www.npr.org/sections/health-shots/2016/03/07/469478098/the-supreme-court-ruling-that-led-to-70-000-forced-sterilizations (accessed July 5, 2019) (Exh. B4); Lisa Ko, *Unwanted Sterilization and Eugenics Programs in the United States*, PBS (Jan. 29, 2016), available at http://www.pbs.org/independentlens/blog/unwanted-sterilization-and-eugenics-programs-in-the-united-states/ (accessed July 5, 2019) (Exh. B5).

At the time, 23 States—nearly half the Nation—authorized forced sterilization of people with disabilities. Robert J. Cynkar, Buck v. Bell*: "Felt Necessities" v. Fundamental Values?*, 81 Colum. L. Rev. 1418, 1433 & n.76 (1981) (Exh. B29). Many of those who suffered forced sterilization also endured incarceration in institutions for the mentally ill. *Lane*, 541 U.S. at 534-35 (Souter, J., concurring).

Pseudoscientific theories of eugenics motivated the forced-sterilization laws. Eugenics, a theory which many influential Americans promoted, advocated for "improving humanity's genetic stock." Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 2, 57 (2016). Eugenics "permeated the popular culture," with "mass-market magazines urg[ing] their readers to do their part to breed superior human beings." *Id.* at 3. Its wide acceptance is hard to fathom today. For example, "New York's American Museum of Natural History hosted the Second International Eugenics Congress—*and the U.S. State Department sent out the invitations*." *Id.* (emphasis added). During that conference, the museum's president implored attendees to "enlighten the government" about the "multiplication of worthless members of society." *Id.* at 3-4. And at least 376 American universities taught courses on the topic. *Id.* at 4. Overall, "[e]ugenics was ubiquitous during the first three decades of the twentieth century. Hundreds and probably thousands of scholars and scientists . . . proudly claimed to be eugenicists." Thomas C. Leonard, *Illiberal Reformers: Race, Eugenics & American Economics in the Progressive Era* 190 (2016). These influential individuals "convinced governments to regulate," among other things, "reproduction . . . in the name of eugenics." *Id.*

Eugenics also took hold in the judiciary. The federal courts did nothing to stop the forced sterilization of people with disabilities. The Supreme Court itself notoriously approved of one "feeble minded" woman's forced sterilization, while eugenically denigrating her as "the probable potential parent of socially inadequate offspring." *Buck v. Bell*, 274 U.S. 200, 207 (1927) (quotation omitted). Over a lonely dissent, eight justices agreed: "It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind." *Id.*

Justice Holmes embodied American eugenic thought in, arguably, the six most chilling words the Court has ever pronounced: "Three generations of imbeciles are enough." *Id.*

C.      **America has progressed from discriminating against people with disabilities to protecting them.**

Since Justice Holmes's day, Americans have made remarkable strides towards equality for people with disabilities. Indeed, even before his opinion in *Buck v. Bell*, disability rights had begun to emerge into public consciousness with the return of disabled American World War I veterans. To help meet those soldiers' needs, Congress passed the Vocational Rehabilitation Act of 1918, which provided federal funds for the vocational training of disabled veterans. Pub. L. No. 65-178, 40 Stat. 617 (1918).

Congress redoubled its efforts throughout the following decades. In 1935, it enacted the Social Security Act, which extended permanent federal assistance for vocational training and rehabilitation to nonveterans. Pub. L. No. 74-271, § 531, 49 Stat. 620, 633-34 (1935). Then, in 1965, Congress added Title XIX to that Act, creating Medicaid funding for people with disabilities. Pub. L. No. 89-97, tit. XIX, 79 Stat. 286, 343 (1965). Around the same time, Congress began to take steps to ensure people with disabilities better access to public buildings and accommodations. The Architectural Barriers Act of 1968 required certain buildings constructed using federal funds to be made accessible to them. Pub. L. No. 90-480, 82 Stat. 718 (1968) (42 U.S.C. § 4151 et seq.). By 1973, 49 states had adopted similar legislation. *Disability History Timeline*, National Consortium on Leadership and Disability for Youth (2007), available at http://www.ncld-youth.info/Downloads/disability_history_timeline.pdf (accessed July 5, 2019) (Exh. B20). Congress then expanded the protections for people with disabilities by enacting the Air Carriers Access Act, which prohibited airlines from discriminating against passengers with disabilities. Pub. L. No. 99-435, 100 Stat. 1080 (1986).

In addition to providing access to public accommodations, new legislation sought to protect people with disabilities from discrimination. The Rehabilitation Act, passed in 1973, became the first non-discrimination law to protect those with disabilities. Pub. L. No. 93-112, 87 Stat. 355 (1973). It outlawed discrimination on the basis of disability by federal agencies, public universities, and other entities receiving federal funding. Likewise, the Education for Handicapped Children Act of 1975 (later renamed the Individuals with Disabilities in Education Act) ensured free, public education for all children with disabilities. Pub. L. No. 94-142, 89 Stat. 773 (1975). And in 1986, Congress enacted the Protection and Advocacy for Individuals with Mental Illness Act "to assist States to establish and operate a protection and advocacy system for individuals with mental illness." 42 U.S.C. § 10801(b)(2). Two years later, Congress passed the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988), which prohibited discriminatory practices against people with disabilities in the housing market; and the Technology-Related Assistance for Individuals with Disabilities Act of 1988, Pub. L. No. 100-407, 102 Stat. 1044 (1988), which increased their access to technology.

Despite this progress, some vestiges remained of the laws that had prohibited people with disabilities from appearing in public. These antiquated laws were repealed around this time. Schweik, *The Ugly Laws*, at 6.

The twentieth-century movement towards greater inclusion of people with disabilities culminated in the 1990s. In 1990, responding to growing societal disdain for discrimination against, or even uncaring neglect of, people with disabilities, Congress passed the most comprehensive disability non-discrimination legislation to date, the Americans with Disabilities Act (ADA). The ADA prohibited discrimination in employment, public services, public accommodations, and telecommunications. *See* 42 U.S.C. §§ 12211-12213. Finally, in 1999,

Congress supplemented the gains made by the ADA with the Ticket to Work and Work Incentives Improvement Act, which expanded Medicaid benefits to include people with disabilities who are employed. Pub. L. No. 106-170, 113 Stat. 1860 (1999).

For its part, Arkansas law also explicitly protects people with disabilities from discrimination. The Arkansas Civil Rights Act of 1993 provides that "be[ing] free from discrimination because of . . . any sensory, mental, or physical disability is recognized as and declared to be a civil right." Ark. Code Ann. § 16-123-107(a). For those with disabilities, one of the most basic rights protected is the right to a workplace free from discrimination. Ark. Code Ann. § 16-123-102(5). Indeed, the desire to protect and accommodate individuals with disabilities pervades Arkansas law. The express policy of the State of Arkansas is to provide accommodations to people with disabilities in public infrastructure and public amenities. Ark. Code Ann. § 20-14-301. In addition, since 1955, Arkansas law has codified the policy of providing rehabilitative services and training to individuals with disabilities. Ark. Code Ann. § 20-79-202(a). The stated goal of this policy is to welcome individuals with disabilities to live as part of the larger community. *Id.*

Like these past legislative advances, Arkansas's Eugenics Ban reflects America's growing societal commitment to value everyone, regardless of disability.

> **D.    Despite American society's progress, the medical profession's promotion of eugenic abortions demonstrates its prejudice against people with Down syndrome.**

The medical profession displays a shocking, systemic prejudice favoring eugenic abortion of children with Down syndrome. And that prejudice has had an effect. A recent systematic review of 24 studies from clinical sites in the United States revealed that *between 61% and 93% of* women abort their unborn children when Trisomy 21 is discovered on a prenatal test. Jaime L. Natili, et al., *Prenatal Diagnosis of Down Syndrome: A Systematic Review of Termination Rates*,

Prenatal Diagnosis Vol. 32 (2012) (Exh. B37); Harrison Decl. (Exh. G7); *see* Sullivan Decl., ¶ 8 (Exh. B30). The cumulative impact of abortions "over the past several years has been to reduce the Down Syndrome community by 30%." Sullivan Decl., ¶ 10 (Exh. B30).

In medicine, there is a disturbing degree of factual distortion concerning Down syndrome, leading to the senseless eradication of unborn children suspected to have the condition. Studies suggest that pregnant women often do not receive accurate and objective information about Down syndrome. In one German study, 25% of women stated that they opted for prenatal testing because their physician wanted it; 36% thought that it was an almost mandatory part of routine maternal care; and 16% had either not given consent for the test or could not remember giving consent. Dagmar Schmitz et al., *An Offer You Can't Refuse? Ethical Implications of Non-Invasive Prenatal Diagnosis*, 10 Nature Reviews Genetics 515, 515 (2009) (B35).

The medical profession's bias against people with Down syndrome manifests itself in many ways.[2] One way is that doctors often put an overly negative spin on a Down syndrome diagnosis that is divorced from the reality of the lives lived by people with Down syndrome— and unsupported by solid data.[3] For instance, a 2012 report noted that some "[g]enetic counselors were more likely to emphasize the clinical information and negative aspects of the diagnosis." Sullivan Decl., ¶ 16 (Exh. B30). Likewise, a 2011 medical paper reported that "genetic counselors . . . are known to have a more negative perspective on disabilities than individuals

---

[2] *See* Sullivan Decl., ¶ 15 (Exh. B30) ("[O]vert or subtle bias or coercion of the medical profession related to abortions after a diagnosis of Down syndrome is a serious problem."); Treptow Decl., ¶ 6 (Exh. B31) ("Accruing data shows moderate to strong bias against children and adults with T21 . . . . Even health care professionals show bias against persons with T21 and others with intellectual disability, as well as disability generally.").

[3] *See* Treptow Decl., ¶ 6 (Exh. B31) ("Parents are often told about their infant's T21(DS) diagnosis in a cautionary way even though such pessimism does not match what persons with T21 and their families think, or fit emerging data on the capabilities of these babies."); Fernandes Decl., ¶¶ 2, 7 (Exh. B11) ("The availability of non-invasive screening is now placed into the context of an empirically-known, implicit-bias among many genetic counselors.").

whose lives are directly affected by them and these attitudes may affect their description of

disabling conditions in a prenatal setting." Fernandes Decl., ¶ 7 (Exh. B11) (quotation omitted).

Similarly, a 2009 study noted that mothers who "received a prenatal diagnosis of D[own]

S[yndrome] and chose to continue their pregnancies . . . indicated that their physicians often

provided incomplete, inaccurate, and, sometimes, offensive information about D[own]

S[yndrome]." Brian G. Skotko, *With New Prenatal Testing, Will Babies with Down Syndrome*

*Slowly Disappear?*, Arch Dis Child, vol. 94, no. 11 (Nov. 2009), at 823, 825 (Exh. B6). Still

another study reported that 63.31% of physicians support abortion as a "treatment option" for

non-lethal fetal abnormalities. Denis Cavanaugh et al., *Changing Attitudes of American*

*OB/GYNs on Legal Abortion*, 20 Female Patient 48, 49 (1995) (Exh. B33). The slanted

information that doctors give to families facing a Down syndrome diagnosis demonstrates the

medical profession's prejudice against the children that are subject to such a diagnosis.

 Besides attempting to guide families towards eugenic abortions through biased

information, a significant minority of doctors admitted to outright pressuring those families into

abortion.  Ten percent of physicians tasked with telling pregnant women about an unborn child's

Down syndrome diagnosis self-report that they "urge" women to abort these babies. Skotko,

*With New Prenatal Testing, Will Babies with Down Syndrome Slowly Disappear?* (Exh. B6).

Thirteen percent admitted that "they 'emphasize' the negative aspects of D[own] S[yndrome] so

that parents would favor termination." Brian G. Skotko, *Prenatally Diagnosed Down Syndrome:*

*Mothers Who Continued Their Pregnancies Evaluate Their Health Care Providers*, 192 Am. J.

Ob. & Gyn. 670, 670-71 (2005) (Exh. B34); Skotko, *With New Prenatal Testing, Will Babies*

*with Down Syndrome Slowly Disappear?*, at 823, 825 (Exh. B6). The research noted that health

care providers have historically operated under the assumption that if a woman consents to

prenatal screening or diagnosing, she must believe that having a child with Down Syndrome would be an undesired outcome and wish to terminate her pregnancy if such a diagnosis were made prenatally.

If doctors themselves admit that they often *pressure* women into aborting babies diagnosed with Down syndrome, it should be no surprise that those women often report feeling "bullied" into aborting their unborn children. Moon Decl., ¶ 8 (Exh. B7); *see* Mazelin Decl., ¶ 9 (Exh. B8) (stating that after Mazelin and her husband told their doctor they "would never choose to terminate" their baby even if the baby had a disability, "[t]he doctor became quite irritated . . . and stormed out of the room"). A 2013 study reported that many parents of children with Down syndrome had experienced "pressure to terminate the pregnancy." Nelson Goff et al., *Receiving the Initial Down Syndrome Diagnosis: A Comparison of Prenatal and Postnatal Parent Group Experiences*, 51 Intellectual and Developmental Disabilities 446, 455 (2013) (Exh. B32). The parents in the study "reported a lack of accurate and current information about D[own] S[yndrome] and little to no compassion or support from the medical professionals with whom they interacted." *Id.*

Stories from parents illustrate the data demonstrating the medical profession's pro-eugenic abortion prejudice. One couple stated that after experiencing the joy of a newborn child, doctors noted that the child had characteristics associated with Down syndrome and the couple "could, and probably should, institutionalize" their child because "she would be a drain on [their] family." Keough Decl., ¶ 3 (Exh. B18). During pregnancy for a different child, the couple was "strongly encouraged to consider abortion" because "there was a 1 in 26 chance" of "a severe disability." Keough Decl., ¶¶ 8-9 (Exh. B18). A different mother, after an abnormal ultrasound, said she felt "pressure[d]" to have an abortion. Mazelin Decl., ¶ 16 (Exh. B8). Another said that

she felt the doctors made "a strong unspoken push for us to abort this baby if" there were "signs of T21." Treptow Decl., ¶ 3 (Exh. B31). A physician described a health care co-worker who was "strongly pressur[ed]" to have an abortion after a positive prenatal screen. Fernandes Decl., ¶ 8 (Exh. B11). Finally, another woman said that, after being told that her "baby was at high risk for several genetic problems," doctors "bullied" her and "tried to convince [her] to have an abortion." Moon Decl., ¶¶ 4, 8-9 (Exh. B7). Nevertheless, she gave birth to a genetically normal child. *Id.*, ¶ 15.

> ### E. America's progress notwithstanding, people with Down syndrome around the world continue to face prejudice.

The systemic prejudice displayed by the American medical profession has manifested itself elsewhere in the world. Globally, prejudice against people with Down syndrome remains shockingly widespread and accepted. This prejudice includes, in some cases, even state-sanctioned promotion of eugenic abortions targeting children diagnosed with Down syndrome.

Around the world, eugenic abortion has become a common response to news that an unborn child has Down syndrome. Indeed, the Dutch government, for example, is aggressively marketing non-invasive prenatal testing as a means to "end" Down Syndrome, with that country's National Institute for Public Health funding a television series cruelly named "The Last Downer." Renate Lindeman, *A Moral Duty to Abort*, Huffington Post, Sept. 21, 2017, available at https://www.huffpost.com/entry/a-moral-duty-to-abort_b_59c3a01ae4b0ffc2de db5b3c (accessed July 5, 2019) (Exh. B21). The Dutch Ministry of Health has published a chart depicting Down syndrome as the most "costly" condition to Dutch society. *Id.* As another example, consider Iceland. "Since prenatal screening tests were introduced in Iceland in the early 2000s, the vast majority of women—close to 100 percent—who received a positive test for Down syndrome terminated their pregnancy." Julian Quinones et al., *"What Kind of Society Do*

*You Want to Live In?" Inside the Country Where Down Syndrome is Disappearing*, CBS News (August 14, 2017), available at https://www.cbsnews.com/news/down-syndrome-iceland/ (accessed July 6, 2019) (Exh. B39). Iceland is "close to eradicating Down syndrome births." *Id.* "Other countries aren't lagging too far behind in Down syndrome termination rates." *Id.*

      Elsewhere in the world, the discrimination against people with Down syndrome takes a less obviously deadly form. A study of informational pamphlets from Canadian prenatal screening centers and clinics found that only "2.4% of the extracted sentences were categorized as conveying a positive message about" people with Down syndrome. Karen L. Lawson et al, *The Portrayal of Down Syndrome in Prenatal Screening Information Pamphlets*, 34 J. Obstet. Gynaecol. Can. 760, 762, 764 (2012) (Exh. B25). And the French Broadcasting Council has even banned a video that features children with Down syndrome talking about their happy lives. Elizabeth Koh, *'Dear Future Mom' Ad Banned Because It Could 'Disturb' Women Who Had Abortions*, Miami Herald, Nov. 25, 2016, available at https://www.miamiherald.com/news/nation-world/world/article117012008.html (accessed July 5, 2019) (Exh. B24). Not to be outdone by these foreign powers, California published a 2009 brochure for women with a positive screen for Down syndrome in which that State "described such pregnancies that are continued as 'missed opportunities.'" Linda L. McCabe et al., *Down Syndrome: Coercion and Eugenics*, 13 Genetics in Medicine 708, 709 (2011) (Exh. B23).

      This prejudice against people with Down syndrome has also infected the academy. Oxford professor Richard Dawkins has argued that, after an unborn baby is diagnosed with Down syndrome, her parents have an "an ethical responsibility to 'abort it and try again.'" John Bingham, *Richard Dawkins: 'Immoral' to Allow Down's Syndrome Babies to Be Born*, The Telegraph, Aug. 20, 2014, available at https://www.telegraph.co.uk/news/health/news/

11047072/Richard-Dawkins-immoral-to-allow-Downs-syndrome-babies-to-be-born.html

(accessed July 5, 2019) (Exh. B26). Three other scholars, including Princeton ethicist Peter

Singer, have done Dawkins one better, expressly advocating *infanticide* for children if they are

born with Down syndrome. Alberto Giubilini and Francesca Minerva, *After-birth Abortion: Why*

*Should the Baby Live?*, Journal of Medical Ethics, vol. 39 (2013) (Exh. B27); Sullivan Decl., ¶

23 (Exh. B27). The supposed moral imperative to abort all unborn children diagnosed with

Down syndrome has led one professor of medical ethics to say that parents who decline prenatal

testing "morally" should be held accountable for their choice. Lindeman, *A Moral Duty to Abort*

(Exh. B21).

F.   **Post-*Casey* medical developments have created the novel circumstances in which unborn children suspected to have Down syndrome are targeted for eugenic elimination.**

When *Casey* was decided in 1992, a woman could not at 10 weeks reliably know whether

her child would be born with Down syndrome. Calvin Decl., ¶¶ 13-16 (Exh. B9); Harrison Decl.

(Exh. G7).

In those years it was not practical for the vast majority of pregnant women to test for

disabilities before viability. Harrison Decl. (Exh. G7); Fernandes Decl., ¶¶ 5-6 (Exh. B11).

Eugenic abortions to eliminate unborn children with Down syndrome, therefore, were not

generally possibly. So no State could at that time have conceived of prohibiting such abortions.

But the advent of relatively low-cost pre-viability testing for disabilities has made those tests

widely available.

Over the past decade, technological advances have increased the availability of prenatal

testing that screens for Down Syndrome and other fetal abnormalities. In the past, physicians

offered Down syndrome screening only to pregnant women over the age of 35. Calvin Decl., ¶

18 (Exh. B9). This is due in part to the correlation between Down syndrome and maternal age.

At age 20, the risk of a mother having a baby with Down Syndrome is 1 in 1,667. Calvin Decl., ¶ 17 (Exh. B9). By age 30, the risk increases to 1 in 952 and by age 40 it is 1 in 106. *Id.*

The other reason for limiting testing to women over 35 was the invasiveness of the testing procedures and the risks they posed to both mother and child. Prior to 2011 and the advent of cell-free DNA testing, initial screening tests for Down Syndrome were generally performed between 11 and 14 weeks of pregnancy and included a maternal blood test and an ultrasound. Calvin Decl., ¶ 13 (Exh. B9). These tests, however, screen only for a likelihood of Down syndrome and other fetal abnormalities; they do not enable specific diagnoses. *Id.* at ¶ 12. If a screening test suggests the likelihood of fetal abnormalities, diagnostic tests such as amniocentesis and chorionic villus sampling (CVS) can be performed. *Id.* at ¶ 14. These diagnostic tests, which are generally performed after 14 or 15 weeks of pregnancy, are often more invasive and involve a small risk to the mother and baby, including risk of miscarriage. *Id.* Within the past few years, the use of cell-free DNA testing has altered the landscape for prenatal testing. Cell-free DNA is fetal DNA circulating in the maternal bloodstream. Harrison Decl. (Exh. G7); Calvin Decl., ¶ 15 (Exh. B9).

Cell-free DNA testing can screen for several genetic abnormalities, the most common of which include Down syndrome (Trisomy 21), Edwards syndrome (Trisomy 18), and Patau syndrome (Trisomy 13). George M. Savva, et al., *The Maternal Age-specific Live Birth Prevalence of Trisomies 13 and 18 Compared to Trisomy 21 (Down Syndrome)*, 30 Prenatal Diagnosis 57, 57 (2009) (Exh. B40). The test requires a simple blood draw from the mother and is therefore less invasive than either amniocentesis or CVS and does not pose the same miscarriage risks as those tests. Calvin Decl., ¶ 15 (Exh. B9). Cell-free DNA testing can be done "[t]ypically ten weeks or more into a pregnancy." Sullivan Decl., ¶ 4 (Exh. B30); *see* Calvin

Decl., ¶ 15 (Exh. B9). The screening reportedly carries a "5% false-positive rate for Down syndrome." Sullivan Decl., ¶ 4 (Exh. B30); *see* Harrison Decl. (Exh. G7). Others report that, based on a woman's risk profile, false positives can be as high as one-in-five (or, for mothers under 35, one-in-four), leading some women to abort based on incorrect results. Georgi Boorman, *Women Are Aborting Their Babies Based on Incorrect Prenatal Test Results*, The Federalist, available at https://thefederalist.com/2019/06/11/women-aborting-babies-based-incorrect-prenatal-test-results/ (accessed July 6, 2019) (Exh. B41); *NIPT Outperforms Standard Screening for T21 but False Positive Call for Caution, NEJM Studies Find*, Genome Web, available at https://www.genomeweb.com/reproductive-health/nipt-outperforms-standard-screening-t21-false-positives-call-caution-nejm#.XSDd_2dYaie (accessed July 6, 2019). Indeed, many women rely on these new screening tests to make decisions about abortion.[4] But screening tests reveal only a *possibility* of fetal abnormalities. They do not diagnose any particular conditions.

Women of all ages now access these screening tools once reserved for women over the age of 35. Calvin Decl., ¶ 18 (Exh. B9). Indeed, due to these advances in non-invasive testing, the American Congress of Obstetricians and Gynecologists recommends that *every* pregnant woman undergo testing for Down syndrome regardless of her age. Calvin Decl., ¶ 18 (Exh. B9). Based on recommendations like that, it has become "clear that Down Syndrome, with technology that can detect it with greater accuracy and at an earlier stage, has been specifically selected— apart from other genetic disorders, gender, and the like—for elimination from the genetic pool under eugenical justifications." Fernandes Decl., ¶ 12 (Exh. B11).

---

[4] In a 2014 study of the accuracy of cell-free DNA testing, 6.2% of the women studied chose to terminate their pregnancies without getting confirmatory diagnostic testing when cell-free DNA showed a likelihood of fetal abnormalities. *See* Calvin Decl., ¶ 16 & n.1 (Exh. B9).

And "eugenics" is indeed the proper term. As Justice Thomas has recently observed, "the individualized nature of abortion gives it even more eugenic potential than birth control, which simply reduces the chance of conceiving *any* child." *Box*, 139 S. Ct. at 1790. (Thomas, J., concurring). With regard to Down Syndrome in particular, society is "on the verge of committing many of the same mistakes" of the past. Sullivan Decl., ¶ 14 (Exh. B30).

### G.     The Eugenics Ban narrowly prohibits invidious discrimination.

Plaintiffs challenge the Eugenics Ban, which combats invidious discrimination and protects vulnerable people with Down Syndrome by *very narrowly* prohibiting only abortions performed "with the knowledge that a pregnant woman is seeking an abortion *solely* on the basis of" a test result, diagnosis, or other reason to believe that an unborn child has Down Syndrome."[5]

The Eugenics Ban relates to a mother's ability to terminate her unborn child similarly to the way that the Americans with Disabilities Act (ADA) relates to an employer's ability to terminate an employee. The common-law employment-at-will doctrine permits "an employer [to] fire an employee for good reason, bad reason, or no reason at all." *Cisco v. King*, 90 Ark. App. 307, 314 (2005). But the ADA narrowly prohibits terminations on the basis of an employee's disability. 42 U.S.C. § 12112. Similarly, the Eugenics Ban narrowly prohibits abortions on the basis the child may have Down syndrome. Therefore, the Eugenics Ban is of a piece with the federal and state efforts to eliminate the invidious discrimination based on disability discussed above. "[T]his law and laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics." *Box*, 139 S. Ct. at 1783 (Thomas, J., concurring).

---

[5] Arkansas Act 619 of 2019, at 2, to be codified at Ark. Code Ann. § 20-16-2001 et seq. (Exh. B2) (emphasis added). The law expressly permits abortions in cases of rape or incest as well as those necessary to save the life or preserve the health of the mother, remove a dead unborn child caused by spontaneous abortion, remove an ectopic pregnancy. *Id.* at 2, 3. Eugenics bans similar to Arkansas's are currently in effect in North Dakota, N.D. Cent. Code § 14-02.1-04.1, and Louisiana, La. Rev. Stat. Ann. § 40:1061.1.2.

### III.     The Cherish Act

The vast majority of all the countries on the globe prohibit abortion after 18 weeks' gestation. The Cherish Act, Arkansas Act 493 of 2019, at 1-2 (Exh. C4).[6] Physical and psychological risks of abortion to the mother increase exponentially as gestational age increases. *Id.* at 3. And an abortion at this stage of pregnancy inevitably destroys a child who has taken on "the human form" in all relevant respects. *Gonzales v. Carhart*, 550 U.S. 124, 160 (2007). Indeed, by 18 weeks, an unborn child has quickened, meaning that the mother is sensible of the child's movements within her womb. Harrison Decl. (Exh. G7). The majority of abortion procedures performed after 18 weeks in the United States are D&E dismemberment abortions— which are barbaric, dangerous to the mother, and demeaning to the medical profession.

The Cherish Act is emphatically *not* an "18-week ban." The portion of the Cherish Act that defines "abortion" does not purport to include situations where an abortion is performed to "[i]ncrease the probability of a live birth, "[p]reserve the life or health of the unborn child," "[r]emove a dead unborn child who died in utero as the result of natural causes, accidental trauma, or a criminal assault on the pregnant woman or her unborn child," and other circumstances. *Id.* at 3-4. Further, the statute contains exceptions that allow for an abortion if the pregnancy results from rape or incest. *Id.* at 4. The statute also contains a medical-emergency exception that allows for an abortion "to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life endangering physical condition arising from the pregnancy itself, or when the continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function." *Id.* As such, the Cherish Act is not a ban on previability abortions. Rather, it is a limit

---

[6] The Cherish Act will be codified at Ark. Code Ann. §20-16-2001 et seq.

on some previability abortions between 18 weeks gestational age and viability. Like the previability partial-birth abortion ban that the Court upheld as constitutional in *Gonzales*, the Cherish Act merely regulates but does not prohibit previability abortions. 550 U.S. at 146.

**STANDARD OF REVIEW**

## I.       **Preliminary-Injunction Standard**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, 129-130 (2d ed. 1995)). Generally, whether a preliminary injunction should be granted depends on four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

Where, like here, "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute," a movant must first make a rigorous showing of likelihood of success on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc); *see also Mazurek*, 520 U.S. at 972 (movant must carry a burden greater than that required on summary judgment). That heightened standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Rounds*, 530 F.3d at 732 (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995)). Accordingly, only if a party makes that showing should a court proceed to weigh the other factors. *Id*.

The Plaintiffs cannot carry the heavy burden imposed by this demanding standard.

## II.     Rational-Basis and Undue-Burden Standard on a Facial Challenge

Facial challenges are disfavored because "[i]t is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007). "[I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." *Id*. (quoting *United States v. Raines*, 362 U.S. 17, 21 (1960) (internal quotation marks omitted)). As-applied challenges are preferred because "the nature of the medical risk can be better quantified and balanced than in a facial attack." *Id*. Indeed, "[a]s-applied challenges are the basic building blocks of constitutional adjudication." *Id*. at 168 (quoting Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third–Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000)).

Under well-established Supreme Court precedent, the state may constitutionally regulate abortion so long as it has a rational basis to act and does not impose an undue burden. *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007). Under rational basis review, courts must presume that the law in question is valid and uphold it so long as the law is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The Plaintiffs bear the burden of proving the government's action irrational. *See Mazurek*, 520 U.S. at 971. To prove a legislative act irrational, "the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citation omitted). That a controversy implicates abortion does not alter the analysis because "[n]othing in the Supreme Court's abortion jurisprudence deviates from the essential attributes of the rational basis test, which affirms a vital principle of democratic self-government." *Abbott II*, 748 F.3d at 594.

33

Under *Planned Parenthood v. Casey*, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion" before viability "impose an undue burden" and are unconstitutional. 505 U.S. 833, 878 (1992) (plurality opinion).[7] That analysis "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. Moreover, to prevail on a facial challenge, a plaintiff must, at a minimum, "demonstrat[e] that 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Jegley*, 864 F.3d at 958 (quoting *Casey*, 505 U.S. at 895); *accord Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007) (regulation must be "unconstitutional in a large fraction of relevant cases"). Thus, to preliminarily enjoin an act of the legislature, court must find that it is likely that the "requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas." *Jegley*, 864 F.3d at 960 n.9.

"In determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or imaginary' cases." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-50 (2008). And courts are not permitted to invalidate abortion laws on facial challenges merely because "medical uncertainty" exists. *Gonzales*, 550 U.S. at 163. Indeed, the "'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (citation omitted) (internal quotation

---

[7] *Casey* and its progeny have "no basis in the Constitution." *Gonzales*, 550 U.S. at 169 (Thomas, J., concurring). To preserve that argument (and as an alternative to the argument below), Defendants request this Court hold that "[n]othing in our Federal Constitution deprives the people of this country of the right to determine whether the consequences of abortion to the fetus and to society outweigh the burden of an unwanted pregnancy[.]" Stenberg v. Carhart, 530 U.S. 914, 980 (2000) (Thomas, J., dissenting).

marks omitted) (holding that if enforcing a statute that regulates access to abortion would be unconstitutional in medical emergencies, invalidating the statute entirely is not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief).

ARGUMENT

## I.   Plaintiffs lack standing.

### A.   Plaintiffs lack standing to assert the rights of hypothetical future patients because they have no close relationship and their interests conflict.

Plaintiffs assert facial challenges on behalf of their hypothetical future patients. The Court should dismiss those claims because Plaintiffs lack standing to assert them. A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted) (internal quotation marks omitted). Litigants may assert the rights of third parties only when: (1) the litigant has a "'close' relationship" with the third party; and (2) there is a "hindrance" to the third party's ability to protect his or her own interests. *Id.* at 130.

In *Kowalski*, the Supreme Court held that attorneys did not have third-party standing to assert a constitutional challenge on behalf of hypothetical future clients. *Id.* at 134. In reaching that conclusion, the Court discussed a long line of authorities and observed that third-party standing has been approved only when the litigant asserts the rights of *known* claimants. *Id.* at 131, 134. Third-party standing is not appropriate when the litigant purports to assert the rights of *hypothetical* future claimants because there is "no relationship at all" between them. *Id.*; *but see Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality) (concluding that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2323 (2016), *as revised* (June 27, 2016) (Thomas, J., dissenting) (criticizing *Singleton* as being

35

inconsistent with general standing principles, but noting that the Court apparently "does not

question whether doctors and clinics should be allowed to sue on behalf of Texas women seeking

abortions as a matter of course").

Applying those general standing principles, Plaintiffs lack standing to assert the third-

party rights of their hypothetical future patients. Just like in *Kowalski*, Plaintiffs have "no

relationship at all" with these hypothetical future patients, who do not even exist at present. *See

id.* Nor can they demonstrate a "close relationship" with future abortion patients because they

are challenging laws that were enacted in part to protect the health and safety of those patients

and to promote dignity and respect for the unborn child. Here, Plaintiffs actually seek to

invalidate laws that provide private rights of action *against them* to those patients and others who

*do* have close relationships with those patients (such as the patient's spouse, parents or legal

guardian, or health care provider). This presents a clear conflict of interest between Plaintiffs and

their patients, and third-party standing is forbidden if the interests of the litigant and the third-

party rights-holder are even "potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow*,

542 U.S. 1, 15 (2004); *see also Kowalski,* 543 U.S. at 135 (Thomas, J., concurring) (noting that

third-party standing is disallowed when the litigants "may have very different interests from the

individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*,

854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure that the litigant and the person whose

rights he asserts have interests which are aligned.").

When a state enacts regulations to protect the health and safety of abortion patients and to

promote dignity and respect for the unborn child, the interests of physicians and patients diverge.

Abortion providers will understandably oppose any law that regulates their practice, creates

regulatory requirements, or increase their liability exposure.  An abortion provider cannot claim

to act on behalf of his patients when he sues to invalidate laws designed to protect patients at the provider's expense.  To hold otherwise would be akin to allowing merchants to challenge consumer protection laws by invoking the constitutional rights of their customers, or allowing employers to challenge workplace safety laws by invoking the constitutional rights of their employees.  That is not, and cannot be, the law.

Standing doctrine must also give abortion patients autonomy to decide whether to invoke their constitutional rights against laws that were enacted for their benefit and protection. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978) (noting that one "reason[] for th[e] prudential limitation on standing when rights of third parties are implicated" is "the avoidance of the adjudication of rights which those not before the Court may not wish to assert").  Abortion patients may decide that the assurance these laws provide—of knowing that their abortion will be performed by a competent practitioner, for example —is more valuable than legal claims they could assert against these Acts. Criminal defendants, for example, have a constitutional right to a jury trial, yet they often waive that right in exchange for some non-constitutional entitlement that they value more—such as a reduced charges or a lighter sentence. *See* Frank H. Easterbrook, *Criminal Procedure as a Market System,* 12 J. Legal Stud. 289 (1983).  Abortion patients in Arkansas should have the same freedom to choose between their entitlements—without being told by one abortion provider in Little Rock which set of rights they should prefer.

Here, the Plaintiffs' interest actually conflict with that of their patients. The competency requirement and the Cherish Act both promote a patient's interest in health and safety by ensuring that an abortion practitioner is qualified to provide specialty care and that women are not burdened with the fact that their abortion involved ripping of an unborn child limb-from-limb

until he or she bleeds to death. Similarly, protects not just unborn children and society from the vilest form of invidious discrimination but likewise protects mothers from the documented trauma that can accompany that decision.

In addition to the lack of the requisite "close relationship" to confer third-party standing, Plaintiffs also have failed to allege any facts at all to establish that there is some "hindrance" preventing his future patients' ability to protect their own interests. The Supreme Court has explained that, "[e]ven where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply." *Singleton*, 428 U.S. at 116.  Here, Plaintiffs have alleged no facts to show that "there is some genuine obstacle" that would prevent women from asserting their own rights.  *See id.*  If a future patient of the Plaintiffs is harmed by any of the laws at issue here, she can certainly file her own lawsuit to seek redress. Accordingly, the Court should conclude that Plaintiffs has not met his burden of showing that the second requirement for third-party standing is satisfied, either.

It strains credulity that the Plaintiffs have third-party standing to bring self-serving constitutional claims on behalf of hypothetical patients against a law that protects those patients' own interests. Because neither of the required elements for third-party standing exist in this case—nor could they given the nature of the laws at issue—this Court should dismiss these claims with prejudice.

**B.    Plaintiffs cannot assert third-party rights under 42 U.S.C. § 1983.**

Even if Plaintiffs could somehow avoid the prudential limits on third-party litigation, they *still* cannot assert third-party rights under 42 U.S.C. § 1983 because section 1983 extends only to litigants who assert their *own* rights. *See* 42 U.S.C. § 1983 (providing that every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*" (emphasis added)). The third-party claims may

proceed only under the implied right of action established by the Supremacy Clause, and they cannot serve as a basis for attorneys' fees. *See Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 333 (5th Cir. 2005); *Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 480 F.3d 734 (5th Cir. 2007).

Section 1983 provides that when a person acting under color of state law deprives "any citizen of the United States or other person within the jurisdiction thereof" of constitutional rights, the state officer "shall be liable *to the party injured.*" That section 1983 deploys a definite article ("the party injured," not "a party injured") indicates that its description of the permissible plaintiffs refers back to its earlier description of the "citizen" or "person" who has suffered the deprivation of his rights. In the words of Professor Currie, section 1983 "plainly authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, *and by no one else.* It thus incorporates, *but without exceptions,* the Court's "prudential" principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing,* 1981 Sup. Ct. Rev. 41, 45 (emphasis added). Only the rights-holder may sue as a plaintiff under section 1983; the statutory language does not accommodate lawsuits brought by plaintiffs who seek to vindicate the constitutional rights of third parties.

In *Rizzo v. Goode*, the Supreme Court recognized that liability under section 1983 can attach only to conduct that violates *the complainant's* federally protected rights—and not the rights of non-litigant third parties. 423 U.S. 362 (1976). The *Rizzo* Court explained that "[t]he plain words of the statute impose liability whether in the form of payment of redressive damages or being placed under an injunction *only for* conduct which 'subjects, or causes to be subjected' *the complainant* to a deprivation of a right secured by the Constitution and laws." *Id.* at 370-71 (emphasis added) (citation omitted). And the Eighth Circuit has repeatedly barred litigants from

asserting third-party claims under section 1983. *See, e.g.*, *Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties."); *Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001) ("Under § 1983, state actors who infringe the constitutional rights of an individual are liable "to the party injured."); *Advantage Media, L.L.C. v. City of Eden Prairie,* 456 F.3d 793, 801 (8th Cir. 2006) ("On an overbreadth challenge [plaintiff] would also be barred from collecting § 1983 damages which are available only for violations of a party's own constitutional rights."). The Court cannot allow Hopkins's third-party claims to proceed under section 1983 without contradicting *Rizzo*, *Garrett*, *Andrews*, and *Advantage Media*—not to mention the unambiguous language of section 1983.

Doubtless Plaintiffs will respond by citing cases in which abortion providers successfully asserted third-party claims under section 1983 because the State's lawyers failed to object to this maneuver. *See, e.g.*, *Planned Parenthood of Se. Pennsylvania v. Casey*, 744 F. Supp. 1323, 1325 (E.D. Pa. 1990) (noting that the plaintiff abortion providers challenged Pennsylvania's Abortion Control Act under 42 U.S.C. § 1983, while asserting the third-party rights of women). But when a State's lawyers forfeit this defense by failing to raise it, that case has no precedential value on whether another plaintiff may use section 1983 to assert the rights of non-litigant third parties in a different case. Cases such as *Casey* never discuss this issue because the parties didn't raise it. These types of cases cannot relieve future courts of their obligation to enforce the language of section 1983 when the State's lawyers preserve the issue.  *R.R. Donnelley & Sons Co. v. F.T.C.*, 931 F.2d 430, 433 (7th Cir. 1991) ("Issues . . . lurking in the record but not addressed do not bind the court in later cases.").  That other States have forfeited this contention in past abortion cases does not in any way preclude Arkansas from relying on it here. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996); *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37-38 (1952).

Because Plaintiffs cannot challenge the laws at issue here on behalf of their patients under section 1983, this Court should dismiss their claims with prejudice.

### C.      Plaintiffs lack standing to challenge the laws' private rights of action.

In addition to the foregoing, Plaintiffs also lack standing to challenge the laws' private rights of action because any injury to Plaintiffs is not "fairly traceable" to the Defendants. Where, as here, "a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) (citation omitted) (internal quotation marks omitted). If an act provides for enforcement only through private actions for damages, then a federal court lacks jurisdiction to declare it unconstitutional or to provide any other relief in an action filed against government officials who lack any enforcement authority over it. *Id.* at 958-64.  In *Hutchinson*, the Eighth Circuit held that that the Arkansas Governor and Attorney General were immune from suit challenging the constitutionality of an act when it provided for enforcement only though private actions for damages. *Id.*

The Eighth Circuit's approach is consistent with that taken in other circuits in abortion lawsuits and otherwise. *See, e.g.*, *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999) (concluding that the *Ex Parte Young* exception to the Eleventh Amendment does not apply to abortion providers' challenge to the private civil enforcement provision of a statute regulating abortion); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1152-53 (10th Cir. 2005) (holding that an abortion provider lacked standing to seek injunctive and declaratory relief against public officials in a suit challenging the constitutionality of a statute that imposed tort liability on providers); *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) (per curiam) (en banc) ("[P]laintiffs lack standing to contest the statutes authorizing private rights of action, not only because the

41

defendants cannot cause the plaintiffs injury by enforcing the private-action statutes, but also because any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors."); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (holding that governor and attorney general had Eleventh Amendment immunity, and that providers lacked standing to sue, in suit filed by abortion providers challenging constitutionality of statute making providers liable to patients in tort); *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993) ("A plaintiff challenging the validity of a state statute may bring suit against the official who is charged with the statute's enforcement only if the official has either enforced, or threatened to enforce, the statute against the plaintiffs."); *see also W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1348 (M.D. Ala. 2016) (holding that "the Eleventh Amendment does not apply to abortion providers' challenge to the private civil-enforcement provision of a statute regulating abortion").

Here, none of the laws at issue empower any of the Defendants to bring a private right of action for damages against an abortion provider. Instead, like the act at issue in *Hutchinson*, the challenged provisions of the Acts here provide for enforcement through private actions for damages. Defendants are therefore not the proper parties to sue when claiming that such provisions are unconstitutional. The Court should hold that Plaintiffs lack standing to challenge the laws' private rights of action in this case, and that the Defendants have Eleventh Amendment immunity from suit on these claims.

### D.   PPAEO and LRFP lack standing to challenge the competency requirement because they actually employ qualified practitioners.

PPAEO and LRFP lack standing to challenge the competency requirement because the State of Arkansas has created no legal impediment to their employment of qualified abortion practitioners. PPAEO and LRFP are free to employ practitioners who are board certified or board

eligible in Obstetrics and Gynecology. In fact, PPAEO and LRFP *actually* employ such practitioners. PPAEO-Little Rock employs at least two board-certified OB/GYNs, Janet Cathey and Dudley Rogers. Cathey Decl., ¶¶ 1, 6 (Doc. 2 at 36, 37). LRFP likewise employs at least two board-certified OB/GYNs, Charlie Browne and Frederick Hopkins. Hopkins Decl., ¶ 1 (Doc. 2 at 119). Because PPAEO and LRFP are not prohibited from employing, and actually do employ, qualified abortion practitioners, they have suffered no injury, and this Court should dismiss their claims with prejudice for lack of standing.

**E.**   **Even if the Court concludes that some Plaintiff has standing to bring some claim, the Court should narrowly tailor any potential preliminary injunction.**

Even if the Court concludes that some Plaintiff has standing to bring some claim, any preliminary injunction must be specifically limited to that Plaintiff and those with whom they have a close relationship sufficient to establish standing.  Indeed, a preliminary injunction is an extraordinary and drastic remedy. *Southeast Arkansas Hospice Inc. v. Sebelius*, 1 F.Supp.3d 915, 922 (E.D. Ark. 2014). For this reason, courts are required to narrowly tailor a preliminary injunction to the specific plaintiffs entitled to the maintenance of the status quo. "An overbroad injunction is an abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140-41 (9th Cir. 2009) (citation omitted) (internal quotation marks omitted).

Here, Plaintiffs are suing as individuals, not in a representative capacity. They have not initiated this lawsuit as a representative of any proposed class of plaintiffs, nor have they moved for class certification. Accordingly, a preliminary injunction would only be appropriate with respect to Plaintiffs and their particular patients.  Indeed, both the Eighth Circuit and other circuits have held that, "in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 729 n.1 (9th Cir. 1983); *see id.* at 727 ("[An] injunction must be limited to apply only to the individual plaintiffs

unless the district judge certifies a class of plaintiffs."); *see also Polaski v. Heckler*, 739 F.2d

1320, 1321 (8th Cir. 1984) (discussing preliminary injunction as applied to a certified class of

plaintiffs); *Hollon v. Mathis Independent School District*, 491 F.2d 92, 93 (5th Cir. 1974) ("In

this case, which is not a class action, the injunction against the School District from enforcing its

regulation against anyone other than Hollon reaches further than is necessary . . . ."); *Berger v.

Heckler*, 771 F.2d 1556, 1567 (2d Cir. 1985) (recognizing constraints of a preliminary injunction

include only covering the named plaintiffs in absence of class certification). And district courts

in the Eighth Circuit follow the same rule. *See* Preliminary Injunction Order (Doc. 44) at 16 in

*Planned Parenthood Ark. & Eastern Okla. v. Gillespie*, U.S. District Court, E.D. Arkansas, No.

4:15-cv-00566-KGB (limiting the scope of injunctive relief to only the individual plaintiffs);

*Monahan v. State of Nebraska*, 491 F. Supp. 1074, 1080 (D. Neb. 1980) (rejecting preliminary

injunctive relief to the extent it was "designed to protect those persons whom the plaintiffs wish

to represent through a class action suit" in the absence of class certification), *aff'd in part and

vacated in part by* 645 F.2d 592 (8th Cir. 1981).

Accordingly, to the extent the Court grants any preliminary injunctive relief in this case,

it should limit the scope of that relief to Plaintiffs, their Little Rock facilities, and, if appropriate,

their patients.

II.     **The Plaintiffs are not likely—let alone substantially likely—to succeed on the merits.**

A.     **Arkansas's competency requirement benefits the medical profession,
mothers, and their families without any appreciable burden.**

Arkansas is entitled to ensure that abortion practitioners meet basic competency

requirements, and Arkansas's requirement that providers be board certified or board eligible in

Obstetrics and Gynecology benefits the medical profession, mothers, and vulnerable populations.

It also does so without burdening abortion access. The competency requirement is subject only to

44

rational basis review because it does not impact a woman's right to choose an abortion. The Plaintiffs bear the heavy burden of demonstrating that the requirement is not even rationally related to any state interests by "negat[ing] every conceivable basis which might support it." *Heller*, 509 U.S. at 321. They cannot show that the law is irrational or that it unduly burdens abortion access.

Moreover, even if Casey's undue burden standard applies, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits because they have not shown that the competency "requirement's benefits are *substantially* outweighed by the burdens it imposes on a large fraction of women seeking . . . abortion in Arkansas." *Jegley*, 864 F.3d at 960 n.9 (emphasis added).

This Court should reject the Plaintiffs' substantive-due-process and equal-protection claims and deny their motion for a preliminary injunction.

### 1. Arkansas is entitled to ensure that abortion practitioners meet basic competency requirements.

The Supreme Court has previously sustained abortion competency requirements, like the OB/GYN requirement at issue here.  For instance, *Casey* considered and upheld a provision requiring that a physician provide patients with information relevant to obtaining informed consent. 505 U.S. at 884.  The Court upheld the requirement, finding that—even if there were no articulable benefit—states may enforce such requirements. *Id.* Indeed, as the Court explained, "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, *even if an objective assessment might suggest that those same tasks could be performed by others*." *Id.* at 885 (emphasis added).

In support, *Casey* cited *Williamson v. Lee Optical of Oklahoma Inc.*, a case in which opticians brought a due-process challenge to an Oklahoma law preventing them from fitting or duplicating lenses without a prescription from a specialist ophthalmologist or optometrist. 348 U.S. 483, 486 (1955). The opticians claimed that the state had arbitrarily interfered with their right to do business by requiring a specialist to do the work that they believed they were skilled enough to do. *Id.* The district court declared the law unconstitutional, finding "that through mechanical devices and ordinary skills the optician could take a broken lens or a fragment thereof, measure its power, and reduce it to prescriptive terms." *Id.* In other words, the lower court "rebelled at the notion that a State could require a prescription from an optometrist or ophthalmologist 'to take old lenses and place them in new frames and then fit the completed spectacles to the face of the eyeglass wearer.'" *Id.* But the Supreme Court upheld the requirement on the grounds that, "there can be no doubt that the presence and superintendence of the specialist tend to diminish an evil." *Id.* at 487 (quoting *Roschen v. Ward*, 279 U.S. 337, 339 (1929)). So Arkansas is entitled to ensure that abortion practitioners meet basic competency requirements.

The Plaintiffs assert—ironically, without evidentiary citation—that no scientific evidence was presented to the Arkansas legislature to support competency requirement.  They also claim that a legislator stated that he was not aware of any problem fixed by that requirement. Pl. Br. at 21, 37. Yet as explained more fully in response to the Plaintiffs' equal protection argument below, the legislature is not required to articulate all of its reasons for enacting a statute. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).  Nor is "an isolated statement by an individual legislator . . .  a sufficient basis from which to infer the intent of that entire legislative body."  *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996).  To the contrary, courts are

not—as Plaintiffs suggest—to assume that the legislature's "action is capricious, or that . . . it was not aware of facts which afford reasonable basis for its action." *Lehnhausen*, 410 U.S. at 364-65 (quotation and citation omitted).

Moreover, rejecting an argument nearly identical to the one Plaintiffs make here, the Supreme Court previously concluded that states may prohibit non-physicians from performing abortions. *See Mazurek v. Armstrong*, 520 U.S. 968 (1997). Indeed, as the Court explained there, in reversing a Ninth Circuit conclusion to the contrary based on a claim that the Montana legislature merely acted out of animus toward abortion, the Court's prior case law "left no doubt that, to ensure the safety of the abortion procedure, the States may mandate that only physicians perform abortions." *Id.* at 975 (quoting *Akron*, 462 U. S. at 447 (citing *Roe*, 410 U.S., at 165)); *see also id*. at n.2. Thus, on its face, Plaintiffs argument that states are prohibited from limiting the provision of abortion services to specially trained professionals fails as a matter of law.  And the fact that Arkansas—like other states—has chosen to require board eligibility or certification rather than just a medical license does not change the analysis.  Hence, Plaintiffs cannot demonstrate a likelihood of success.

## 2.      The competency requirement benefits mothers and the medical profession.

"The State . . . has an interest in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). Likewise, the state has a substantial interest in protecting mothers' health and safety and that interest exists throughout pregnancy. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 931 (2000); *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (per curiam); *Casey*, 505 U.S. at 846, 878 (plurality opinion); *Roe v. Wade*, 410 U.S. 113, 150, 163 (1973). The competency requirement plainly furthers the state's compelling interest in protecting maternal

health and reducing adverse clinical outcomes. Lisa K. Sharp, Ph.D, et al., *Specialty Board Certification and Clinical Outcomes: The Missing Link*, Academic Medicine, vol. 77, no. 6 (June 2002) (Exh. A7) (reviewing the medical literature and noting a "significant positive association between certification status and positive clinical outcomes" in many cases). It also benefits the medical profession by ensuring that practitioners are accountable for maintaining professionalism, medical knowledge, judgment, skill, and a commitment to improving the quality of patient care. Indeed, among other things, Arkansas's competency requirement ensures that practitioners are less likely to face professional discipline and are "continuously engaged in self-evaluation and improvement of knowledge and practice performance over the course of a career."  Cassel and Holmboe (Exh. A8) at 297.

Incredibly, Plaintiffs contend that board certification or eligibility in Obstetrics and Gynecology is not relevant to providing abortions.  Rather, they contend that "training, rather than specialty, determines competence" to conduct an abortion, as if this were an either/or proposition. Pl. Br. at 19. But that is false. First, board certification in Obstetrics and Gynecology obviously *requires* training in Obstetrics and Gynecology—including in procedures that are functionally identical to surgical abortions, such as suction dilation and curettage. Aultman Decl. (Exh. G6); *see* Prine Decl., ¶ 17 ("Miscarriage management involves many of the same skills required for abortion providers.").

Second, Plaintiffs' wrongly assert that it is not *necessary* to be a board-certified OB/GYN to competently perform an abortion. But that is like saying that it is not *necessary* to be an FAA-certified pilot to competently fly a commercial 747 airliner. Even if some non-certified pilots could competently do it, it would still be absurd to conclude that the FAA certification requirement is not appropriate. Like commercial pilots, abortion practitioners take others' lives

and health into their hands every time they perform their job. The competency requirement plainly furthers the state's interest in protecting health and safety by requiring that abortion providers be properly credentialed. And Plaintiffs cannot plausibly dispute that benefits the medical profession and patients.

Third, although Plaintiffs tout bare medical licensure as the ideal, Arkansas mothers seeking an abortion—a specialized procedure—deserve better than just a minimally certified medical licensee. The competency requirement ensures that mothers are treated by a practitioner who has met or exceeded all of the rigorous requirements of board certification in obstetrics and gynecology—the specialty that is most relevant to the abortion procedure. Aultman Decl. (Exh. G6). And the Constitution certainly does not foreclose Arkansas from requiring more than minimal, nonspecialized medical training.

Fourth, the requirement that abortion practitioners must be board-certified or -eligible in Obstetrics and Gynecology likewise ensure that physicians have been trained to perform procedures that are functionally identical to surgical abortions, such as suction dilation and curettage. Aultman Decl. (Exh. G6). This is the case regardless of whether a practitioner provides surgical abortion or only medication abortion. Indeed, effectively conceding that Arkansas can impose basic competency requirements on surgical providers, Plaintiffs ultimately resort to claiming that Arkansas's requirement is unnecessary for medication abortion providers. But that argument makes little sense given that medication abortions are both riskier than surgical procedures and that when a mother faces complications, surgical follow-up is likely. *See* Ark. Code Ann. § 20-16-1502(a)(18) ("[m]edical evidence demonstrates that women who use abortion-inducing drugs incur *more complications* than those who have surgical abortions" (emphasis added)). Common complications—which are undoubtedly underreported—include

excessive vaginal blood loss requiring transfusions, severe infections, and other adverse events

that have resulted in at least 1,042 reported hospitalizations and even the deaths of at least 24

mothers. Aultman Decl. (Exh. G6); *Mifepristone U.S. Post-Marketing Adverse Events Summary*

*through 12/31/2018*, available at https://www.fda.gov/media/112118/download (accessed July 1,

2019) (Exh. A16). Additionally, medication abortion is contraindicated in cases of ectopic

pregnancy, and yet at least 97 mothers with ectopic pregnancies are reported to have been

prescribed it, suffering dearly as a result. *Id.*; Aultman Decl. (Exh. G6).

Plaintiffs insinuate that the competency requirement provides no benefit because

practitioners who provide medication abortion are already required to contract with a physician

with hospital admitting privileges. Again, as above, that claim amounts to little more than a

concession that requiring basic competency for surgical abortion providers makes sense in the

absence of similar regulation.   Likewise, even practitioners who intend to provide only

medication abortion should be competent to perform surgical abortions because, as noted,

surgical follow-up is often necessary to deal with complications. An abortion practitioner's

inability to competently handle complications by means of surgical follow-up would amount to

patient abandonment.  And given—as the Plaintiffs argued in *Jegley*—that a contract physician

might be geographically too far away to provide continuity of care, Arkansas is entitled to

require that the abortion practitioners themselves have the relevant specialty competency to

handle such complications. At a minimum, this gives the suffering patient one more option of

where to seek needed care.

Moreover, requiring medication abortion providers to be OB/GYNs brings the

regulations governing those providers closer to existing regulations for hospitals and birthing

centers.  Under Arkansas law, neither hospital pharmaceutical services nor birthing centers may

dispense medication except under the direction of a licensed pharmacist. *See* Ark. Admin. Code 007.05.17-16(E) (hospitals and related institutions); Ark. Admin. Code 007.05.12-11(A)(2) (birthing centers).

Fifth, as set forth more fully above, "[a] comprehensive meta-analysis of the literature on physician capability over the course of a career found a dramatic and significant decline in physician knowledge and compliance with national guidelines for diagnosis and treatment, and in some cases, with actual patient outcomes." Cassel and Holmboe (Exh. A8) at 298. The study reviewed 62 published studies that measured physician knowledge or quality of care in relation to time since medical-school graduation or age. N. Choudry, et al. (Exh. A10) at 261. It noted that "[p]hysicians with more experience are generally believed to have accumulated knowledge and skills during years in practice and therefore to deliver high-quality care." *Id.* at 260. Yet the study demonstrated that this common assumption is often false and documents "an inverse relationship between the number of years that a physician has been in practice and the quality of care that the physician provides." *Id.*  Physicians with more years of practice may not update their "toolkits" regularly, are less likely to adopt newly proven therapies, and may be less receptive to new standards of care and innovations that involve theoretical shifts. *Id.* at 269-70. The competency requirement is a commonsense response to this phenomenon. Cassel and Holmboe (Exh. A8) at 298. As explained above, the "[e]vidence shows that board certified physicians who continue to develop their knowledge and skills through continuing certification better adhere to practice guidelines, improve care processes, and have lower likelihood of disciplinary actions by state medical licensing boards." *ABMS Board Certification Report 2017-2018* (Exh. A11), at 4.

Sixth, the competency provision protects a "particularly vulnerable" population that is "less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 545 (9th Cir. 2004). Indeed, Plaintiffs' own filings demonstrate that the vast majority of their patients are poor. Katz Decl., ¶¶ 15-39 (Doc 2-1 at 167). That means that if they—or their unborn children—are harmed by an ill-trained abortion practitioner they are unlikely to have the financial resources to pay legal fees or to otherwise seek redress for their injuries through the legal system. And Arkansas is certainly entitled to impose specific requirements on abortion practitioners to address the fact that mothers seeking abortions "are . . . less likely to litigate medical malpractice claims." *Tucson Woman's Clinic*, 379 F.3d at 545.

### 3. These benefits show substantial improvement over preexisting law.

To determine whether a challenged regulation furthers the state's interests and benefits patients, courts compare that regulation to preexisting law. *See Jegley*, 864 F.3d at 960 n.9. Due to the competency requirement's lack of any burden on abortion access, Plaintiffs take the extreme position that the competency requirement provides *no* benefits to mothers, and they otherwise ignore the law's benefits to the medical profession, mothers, and their families.

The Plaintiffs cannot deny that Arkansas mothers are being hurt by Arkansas abortion practitioners who do not satisfy the competency requirement. Since 1999 there have been at least 64 calls for an ambulance to Little Rock Family Planning Services at #4 Office Park Drive. Silfies Decl. (Exh. G5). During the 2019 calendar year alone, there have already been three ambulance calls. *Id.* These ambulance calls were on February 1, March 29, and April 5, 2019— all Fridays when Twedten was working at the facility. *Id.* Twedten is neither board-certified, board-eligible, nor an OB/GYN.

Further, the Plaintiffs' claim of absolutely no benefit has been rejected by another court considering testimony from the same expert that the Plaintiffs use here. *Jackson Women's Health Org. v. Currier*, 320 F. Supp. 3d 828, 837 (S.D. Miss. 2018) ("The Court therefore rejects the opinions of Plaintiffs' experts who testified that the ob-gyn requirement provides no benefit to Mississippi women seeking abortions.") (denying the Plaintiffs' motion for a permanent injunction and upholding Mississippi's competency requirement).

Indeed, as that court determined, requiring abortion providers be an OB/GYN is a commonsense improvement on preexisting law that benefits the medical profession, mothers, and the abortion-seeking population in several ways. As set forth above, the competency requirement ensures that mothers are treated by practitioners who:

- are specialists in Obstetrics and Gynecology, the area most relevant to the abortion procedure;

- have received the training in reproductive healthcare necessary to perform an abortion or equivalent procedure.

- are less likely to be subject to discipline by a state medical board;

- have demonstrated a commitment to patients' best interests;

- are held professionally accountable for their behavior;

- are committed to lifelong learning and self-assessment;

- are engaged in meaningful quality-improvement efforts;

- better adhere to practice guidelines;

- are more likely to have better patient outcomes;

- are less likely to suffer from the demonstrated dramatic decline in physician knowledge and practice performance over the course of their career; and

- are less likely to harm poor, vulnerable mothers (and their dependent children).

By contrast, under preexisting law, *nothing* prevented an unscrupulous doctor lacking specialized knowledge, professionalism, or good professional standing from performing abortions on Arkansas mothers. Nothing prevented a radiologist, an ophthalmologist, a proctologist, or any other physician licensed by the State from performing specialized abortion procedures. *See June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 799 (5th Cir. 2018) (noting abortion practitioners who were radiologists and ophthalmologists). Indeed, the Plaintiffs have not identified *any* other legal, medical, or professional requirement that an abortion practitioner had to meet to demonstrate basic competence in performing abortions and potential follow-up treatment.

Instead, mothers were at the mercy of a practitioner's *completely voluntary* efforts to obtain specialized knowledge, to maintain a vital engagement with emerging best practices, to conduct themselves professionally, and to act in their patient's best interests. The competency requirement fills that gap by *mandating* that practitioners possess the ethical and professional character and specialty-specific knowledge that has now become standard among specialists in Obstetrics and Gynecology. So the benefits to the medical profession, mothers, and the abortion-seeking population and their dependent children are substantial.

### 4.      The competency requirement does not burden abortion access.

The competency requirement imposes vanishingly small burdens—if any—and none amounting to a substantial obstacle in a large fraction of cases.

>    i.      *There is no burden because PPAEO and LRFP's operations will continue with qualified practitioners.*

As an initial matter, the Plaintiffs admit that the requirement does not prevent either PPAEO-Little Rock or LRFP from performing abortions.  To the contrary, each of the current Arkansas abortion facilities will continue to operate.  PPAEO-Little Rock employs at least two board-certified OB/GYNs who perform medication abortions, Janet Cathey and Dudley Rogers.

Cathey Decl., ¶¶ 1, 6 (Doc. 2 at 36, 37). The Plaintiffs have not asserted that Cathey or Rogers

will become unable to provide medication abortion—because they cannot. And soon Cathey

plans to begin providing abortions for an *additional* half day every week. Cathey Decl., ¶ 8 (Doc.

2 at 38). There is no burden on abortion access because their operations will continue.

LRFP employs at least two board-certified OB/GYNs, Charlie Browne and Frederick

Hopkins. Hopkins Decl., ¶ 1 (Doc. 2 at 119). Brown "has agreed to provide [abortions] at

LRFP." Williams Decl., ¶ 44 (Doc. 2 at 400). Hopkins, likewise "is willing to continue his

historical practice of traveling to LRFP to provide [abortions]," *Id.*, ¶ 46, and the Plaintiffs have

not asserted that he will become unable to perform abortions. So both Arkansas facilities have

board-certified OB/GYNs who are willing and able to perform abortions. To the contrary, under

the competency provision, *any* physician board certified OB/GYN or anyone eligible for

certification may continue performing abortions, and Plaintiffs offer absolutely no evidence that

they will not do so.  As a result, there is simply no impact on abortion access.

> ii.   *Plaintiffs are not entitled to a preliminary injunction simply because they voluntary opted to limit their training and cap the number of days they work.*

The fact that both PPAEO-Little Rock and LRFP actually have qualified practitioners

shows that any hypothetical impact on abortion access would be due not to the competency

requirement but to *their choice to employ practitioners who limit their own credentials or

availability.*  For instance, some of their practitioners simply choose not to become board

certified. Former PPAEO abortion practitioner Stephanie Ho reports that she chooses not to

become board certified because—for unspecified reasons—doing so is not feasible "at this stage

of [her] career." Ho Decl., ¶¶ 6, 7 (Doc. 2 at 91). LRFP practitioners Thomas Tvedten and

Thomas Horton offer similar non-explanations. Tvedten also claims that he chooses not to

become board certified because—again, for unspecified reasons—it is not feasible "at this stage

of [his] career." Twedten Decl.,, ¶ 23 (Doc. 2 at 376). Although Horton has already completed a

residency in Obstetrics and Gynecology, Horton Decl., ¶ 22 (Doc. 2 at 150). he nonetheless

chooses not to become board certified due to unspecified "personal and financial obligations."

*Id.*, ¶ 23.

      Additionally, other practitioners *are* board certified OB/GYNs but choose to limit their

own availability to perform abortions. PPAEO-Little Rock's board-certified OB/GYN Dudley

Rogers, for example, "is semi-retired and does not provide any medical care elsewhere." Cathey

Decl., ¶ 6 (Doc. 2 at 37). Due "in part" to "health issues that prevent him from providing patient

care for long hours or multiple days a week," *id.*, ¶ 6, he chooses to work only "approximately

*one* day a week." *Id.*, ¶ 6 (emphasis added). Likewise, board-certified OB/GYN Janet Cathey—

who sees patients only *three* days a week—cites her "work as a medical consultant doing Social

Security disability reviews and completing [her] extensive PPAEO administrative

responsibilities" as reasons why she chooses not to perform more abortions. *Id.*, ¶ 7. Cathey does

not say whether it might make more sense for an administrative assistant—rather than a board-

certified OB/GYN—to help with her "extensive administrative responsibilities." *Id.*, ¶ 4. Cathey

prefers to spend her time providing "non-clinical services to [her] transgender patients, including

educational resources and assistance with paperwork required to change their names." *Id.*, ¶ 7.

She believes that "[i]t is essential that [she] continue[s] to provide care for transgender . . .

patients [at PPAEO-Little Rock] because many of them have nowhere else to turn"—even while

acknowledging (two sentences later) that UAMS *also* "maintains a dedicated transgender care

program." *Id.*, ¶ 10. But—even crediting Cathey's concern for her transgender patients—she

does not say whether another person at PPAEO-Little Rock might be able to care for them so she

can find the time to provide more abortions.

Further, board-certified OB/GYN Frederick Hopkins chooses to limit his availability to "once every other month for three to four days." Hopkins Decl., ¶ 1 (Doc. 2 at 119). He "live[s] and work[s] in California," and he is not "willing to quit [his] long-held teaching and clinical practice positions" there. *Id.*, ¶¶ 1, 50.

And finally, board-certified OB/GYN Charlie Browne, citing his "professional and personal obligations in Seattle, and the burden and strain that traveling to Arkansas would impose," chooses not to limit his availability as well. Browne Decl., ¶ 14 (Doc. 2 at 27).

Thus, both facilities have board-certified OB/GYNs capable of performing abortions. If these board-certified OB/GYNs are *unavailable* to do more abortions it is not due to the competency requirement but to these practitioners' *own choice to limit their availability* in favor of other things they consider more important.  That is not a burden of Arkansas's making and cannot be the basis for an undue burden finding.

        *iii.*     *Plaintiffs made no attempt to locate alternative providers.*

Plaintiffs also strain credulity in claiming that they are unable to find other board-certified OB/GYNs. Plaintiffs' own expert was previously testified under oath that *67 to 75 percent* of abortion practitioners in the United States are OB/GYNs. Prine Depo. at 70, 107-08 (Exh. A9) (discussing Prine's expert report submitted in the Mississippi litigation). Arkansas alone currently has 294 board-certified OB/GYNs. *ABMS Board Certification Report 2017-2018* (Exh. A11), at 37. But Plaintiffs are not limited to hiring only current Arkansas OB/GYNs. There are currently over 51,673 board-certified physicians in Obstetrics and Gynecology, *id.* at 31, with 1,000 to 1,500 new physicians gaining board certification every year. *Id.* at 32; *see* Aultman Decl. (Exh. G6). Out-of-state OB/GYNs are equally capable of obtaining an Arkansas medical license, just as the Plaintiff-practitioners here have done.

Plaintiffs make anecdotal references to perceived stigma or harassment of practitioners as potential obstacles to the availability of abortion in the state. But even if perceived stigma or harassment did make it more difficult to hire an abortion practitioner, this would not be a state-created obstacle. *Harris v. McRae*, 448 U.S. 297, 298 (1980) ("Although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation[.]"). And in any case the Plaintiffs' suggestion that stigma and harassment prevents abortion practitioners from working in the state is belied by the Plaintiffs' own evidence that working as an abortion practitioner in Arkansas is, in fact, "very lucrative and gratifying." Exh. 2 to Williams Decl. (Doc. 2 at 405). In "a letter that LRFP sent in early 2015," Williams Decl., ¶ 42 (Doc. 2 at 399), Medical Director Twedten expressed how much he apparently *enjoys* being an abortion practitioner here: "I have found a niche in medicine that has granted me great personal freedom, adulation from my patients, challenge and satisfaction[.]" Exh. 2 to Williams Decl. (Doc. 2 at 406). "Great personal freedom," "adulation," and "satisfaction" are not the terms one who suffers intolerable stigma and harassment would use to speak of his experience.

Twedten's letter further elaborated on how his Little Rock abortion clinic practice has brought him "financial success beyond that available to [him] in [his] regular office based and hospital practice." *Id.* He explained: "When I was working as a contract service abortion provider seen [sic] at most two days a week, I was generating more income from my abortion practice than I was from an Eighty Hour week general practice, plus E.R. duty, plus O.B., plus physician call." *Id.* Further, "[a] doctor working one six or seven hour day a week without call [at LRFP] might expect to make between $150,000 or 200,000 per year or possibly more. *Id.* *Two hundred thousand dollars* (or more!) for working *one six- or seven-hour day a week* shows

that working as an abortion practitioner in Little Rock is a very lucrative practice, indeed. It does not take an expert economist to recognize that, in Twedten's absence, the same market forces that have sustained his practice will quickly and certainly attract a qualified provider of surgical abortion to the state.

Plaintiffs allege that there was no response to a letter that LRFP sent out stating that it was looking for one board-certified OB/GYN to do abortions, part-time, on a contract basis. The letter LRFP purports to have sent out, however, amounts to little more than spam because it contains no information concerning compensation other than it would be "generous and based on number of procedures completed per day." Exh. 1 to Williams Decl. (Doc. 2 at 404). In any case, given Plaintiffs' claims that the competency requirement would have a dire effect on its business, it is telling that LRFP chose to seek only *one part-time practitioner*.

The Plaintiffs' professed inability to hire board-certified OB/GYNs also stands in stark contrast to their manifest connections to sophisticated networks of highly sympathetic and well-connected people and organizations across the nation. Plaintiffs have the assistance, for example, of university and medical-school professors[8] who have, collectively, trained countless OB/GYNs.[9] In addition, the Plaintiffs have the assistance of networks including those of

---

[8] In this lawsuit alone the Plaintiff have the assistance of Sheila Katz, Assistant Professor of Sociology at the University of Houston (Katz Decl., ¶ 9 (Doc. 2 at 165)); Jason Lindo, Professor of Economics at Texas A&M University (Lindo Decl., ¶ 4 (Doc. 2 at 201)); Linda W. Prine, Professor Family Medicine and Community Health at the Icahn School of Medicine at Mt. Sinai (Prine Decl., ¶ 4 (Doc. 2 at 253)); Alison Stuebe, Associate Professor in the Department of Obstetrics and Gynecology and the Department of Maternal and Child Health at the University of North Carolina School of Medicine (Stuebe Decl., ¶ 3 (Doc. 2 at 291)); and Frederick Hopkins, Associate Clinical Professor in the Stanford University School of Medicine's Department of Obstetrics and Gynecology (CV of Frederick Hopkins (Doc. 2 at 138)). In addition, Janet Cathey teaches at the University of Arkansas for Medical Sciences. (Cathey Decl., ¶ 13 (Doc. 2 at 39)).

[9] Prine has "trained *thousands* of clinicians to provide abortion . . . from a number of specialties, including . . . OBGYN." Prine Decl., ¶ 5 (Doc. 2 at 253) (emphasis added). Stuebe has "trained *hundreds* of medical students, residents, and fellows in OBGYN." Stuebe Decl., ¶ 3 (Doc. 2 at 291) (emphasis added). Hopkins presently "train[s] OBGYN residents and fellows in . . . pregnancy terminations," "train[s] post-OBGYN-residency fellows in Family Planning in abortion care," and "also "assist[s] with training for medical students and OBGYN . . . residents who come to the clinic to learn how to provide abortions." Hopkins Decl., ¶¶ 17, 18, 20 (Doc. 2 at 123, 124). In addition, Twedten also "regularly" trains OB/GYN residents. Twedten Decl.,, ¶ 9 (Doc. 2 at 373).

Physicians for Reproductive Health, the National Abortion Federation (which actually has a "program that matches abortion providers with clinics around the country," Ho Decl., ¶ 30 (Doc. 2 at 98); Williams Decl., ¶ 37 (Doc. 2 at 398)), and Planned Parenthood's astonishingly well-funded[10] and ubiquitous affiliates, among others.  Yet while Plaintiffs apparently spent months preparing this lawsuit with the assistance of their large, well-connected network, there is no evidence whatsoever that they made any effort to draw on that network to locate additional qualified abortion providers. And there is little doubt that if Plaintiffs had dedicated even a fraction of the resources that they dedicated to filing this lawsuit to finding additional providers, they could have located additional providers from the enormous pool of eligible candidates.

The Plaintiffs' professed inability to find board-certified OB/GYNs also stands in stark contrast to the fact that other qualified practitioners have *actually* expressed interest in the position. Williams reports that LRFP has been in contact with two unidentified out-of-state physicians who expressed "interest in a position at LRFP," and even PPAEO-Little Rock's board-certified OB/GYN Cathey has responded with interest to LRFP's inquiries. Williams Decl., ¶¶ 37, 42 (Doc. 2 at 398, 399-400). Further, board-certified OB/GYN Paulson is so willing to perform medication abortions at PPAEO-Fayetteville that she has agreed to do so for free. Ho Decl., ¶ 26 (Doc. 2 at 96).

        iv.     *Plaintiffs have not shown a lack of capacity that would burden abortion access.*

But even if the Court were to accept Plaintiffs' wildly implausible protestations that they will be unable to find other board-certified OB/GYNs, they still have not presented evidence that

---

[10] Planned Parenthood's 2017-2018 annual report shows that it has over *2.1 billion dollars* in total assets. During the 2017-2018 fiscal year it received $564.8 million dollars in federal grants and reimbursements and over $630 million in private donations. *Planned Parenthood 2017-2018 annual report*, at 26-29, available at https://www.plannedparenthood.org/uploads/filer_public/80/d7/80d7d7c7-977c-4036-9c61-b3801741b441/190118-annualreport18-p01.pdf (accessed July 15, 2019) (Exh. A19).

access to abortion in Arkansas would be burdened. Plaintiffs malinger in their estimation of just how many abortions LRFP could perform without any other board-certified OB/GYN. Williams claims that "If Dr. Browne and Dr. Hopkins provide care at the [LRFP] clinic under the OBGYN Requirement, they will spend the first of their three days at the clinic satisfying the State-mandated informed consent requirements[.]"[11] But LRFP's board-certified OB/GYNs Browne and Hopkins could perform more surgical abortions by having another person—who under Arkansas law need *not* be a board-certified OB/GYN—handle a patients' initial counseling.

Williams states that LRFP can safely and effectively provide abortions for up to 20-25 mothers a day, and she does not claim that this is a ceiling. Williams Decl., ¶ 17 (Doc. 2 at 392-93). Nevertheless, if Hopkins alone were to provide 25 surgical abortions at LRFP an average of 3.5 days a week every-other month, then he would perform 525 surgical abortions a year (25 abortions x 3.5 days x 6 times = 525 abortions per year). If Hopkins were to work four days every other month—which he sometimes does[12]—this number increases to 600 abortions per year. *But only 397 D&E abortions were performed in the State of Arkansas during the entirety of 2018. Arkansas Department of Health 2018 Vital Statistics on Abortion* (Exh. A17), at 8. So Hopkins alone can easily satisfy the demand for D&E abortion in Arkansas.

The Plaintiffs cannot even bring themselves to claim that their asserted inability to hire board certified OB/GYNs will certainly force any Arkansas abortion facility to shut down. *See,*

___

[11] Williams Decl., ¶ 48 (Doc. 2 at 401). Williams undermines her own credibility by stating that "[u]nder Arkansas law, LRFP cannot charge patients for the initial visit to the clinic." *Id.* But this is absolutely false. If LRFP does not charge patients for the initial visit, that is a consequence of its own choice. *See* Twedten Decl., ¶ 37 (Doc. 2 at 380) (referring to "the day-one services for which LRFP charges no fee"). Arkansas law requires only that a patient not be charged for abortion-related services *until* certain information is provided to her at an initial counseling and a reflection period expires. Ark. Code Ann. § 20-16-1703(d). Williams should know better because this requirement has been the subject of recent litigation. The Arkansas Department of Health issued citations to both LRFP and PPAEO after inspections in January and February 2018 revealed that they were violating the law. The Board of Health upheld the citations on appeal, and PPAEO and LRFP later abandoned their appeal to the circuit court. *Little Rock Family Planning Svcs. v. Ark. Bd. of Health*, Case No. 60CV-18-8090 (Pul. Cty. Cir. Ct.).

[12] *See* Hopkins Decl., ¶ 1 (Doc. 2 at 119) (Hopkins chooses to limit his availability to "once every other month for three *to four* days." (emphasis added)).

*e.g.*, Compl., ¶ 101. But the Plaintiffs do claim that the supposed inability to hire a qualified practitioner is likely to force LRFP to scale back its provision of abortion to the point that it is unable to generate enough revenue to meet its fixed costs. Twedten Decl., ¶ 37 (Doc. 2 at 380).

But there is no *legal* reason why LRFP or any other clinic would have to shut down. Nevertheless, even supposing, for the sake of argument, that the competency requirement did force LRFP to shut down, medication abortion would still be available at PPAEO-Little Rock and they have not claimed—let alone cited any evidence—to demonstrate that facility could not meet in-state demand.  To the contrary, they concede that one provider in a single, three-hour period per week could provide at least 624 abortions per year.  Lindo Decl., ¶ 54 (Doc. 2 at 228). More than that, the Plaintiffs concede that there would "be sufficient capacity in this scenario for women seeking medication abortion." Compl., ¶ 101. Nor have Plaintiffs demonstrated that, even if there were excess demand, nearby facilities in other states or other in-state OBGYNs could not meet it.  Thus, even on Plaintiffs' own theory they have not shown mothers will be denied abortions due to a lack of capacity.

Finally, PPAEO is about to have greatly expanded capacity. PPAEO has announced that it is just about to "open[] a new health center in Little Rock next month to meet growing demand." *Planned Parenthood moving to new facility in Little Rock*, Arkansas Democrat-Gazette (July 16, 2019) (accessed July 16, 2019) (Exh. G9). Plaintiffs have not shown a lack of capacity that would burden abortion access.  Nor do they offer any reason why—in building out their new facility—they could not accommodate surgical procedure.  Thus, their burdens claims simply fail.

v.      *The competency provision does not impact the distance mothers must travel to obtain an abortion.*

If either PPAEO-Little Rock or LRFP were close or become unable to get into, there would be no distance impact whatsoever because they are both located in Little Rock.  Thus, in other words, there would be no increase in the distances that mothers must travel to obtain an abortion and no burden.  *See* Solanky Decl. (Exh. G8).

Further, even if LRFP were to close, aside from PPAEO-Little Rock, medication abortions and late term surgical abortion would still be available in: 1) Memphis, Tennessee (where there are at least two clinics, including a Planned Parenthood, *see Choices Memphis Center for Reproductive Health*, available at https://memphischoices.org/medical-services/abortion-services/surgical-abortion-services/ (accessed July 3, 2019); *Planned Parenthood Memphis Health Center*, available at https://www.plannedparenthood.org/health-center/tennessee/memphis/38112/memphis-health-center-midtown-3348-91550 (accessed July 3, 2019)); 2) Jackson, Mississippi, *see Jackson Women's Health Organization*, available at https://jacksonwomenshealth.com/ (accessed July 3, 2019); 3) Shreveport, Louisiana, *see Hope Medical Group for Women*, available at https://www.hopemedical.com/ (accessed July 3, 2019); 4) Dallas/Fort Worth Texas, where there are at least three clinics, including a Planned Parenthood, *see Southwestern Women's Surgery Center*, available at https://southwesternwomens.com/ (accessed July 3, 2019); *Whole Women's Health of Fort Worth*, available at https://wholewomanshealth.com/clinic/whole-womans-health-of-fort-worth/ (accessed July 3, 2019); *Planned Parenthood Southwest Fort Worth Abortion Services Center*, available at https://www.plannedparenthood.org/health-center/texas/fort-worth/76132/southwest-fort-worth-abortion-services-center-4251-21342 (accessed July 3, 2019).);  5) less than 100 miles

from the Arkansas border in Tulsa, Oklahoma[13] (where a patient may obtain an abortion in a single trip, *see* Okla. Stat. Ann. tit. 63, sec. 1-738.2 (consultation may be by telephone), and there are at least two abortion clinics—including a Planned Parenthood, *see Tulsa Women's Clinic*, available at http://tulsawomensclinic.com/ (accessed July 3, 2019); Planned Parenthood Tulsa Midtown Health Center, available at https://www.plannedparenthood.org/health-center/oklahoma/tulsa/74120/midtown-health-center-family-practice-3480-90740 (accessed July 3, 2019)); and 6) any Arkansas OB/GYN The Plaintiffs have provided no evidence whatsoever that mothers seeking an abortion cannot travel to these other abortion providers. Moreover, commonsense dictates that women in Fayetteville, for example, are *far* more likely to seek an abortion in Tulsa, which is less than 100 miles from Arkansas, as opposed to Little Rock, which is nearly 200 miles away.

This Court should not ignore geographic and economic reality. To the contrary, "the undue-burden standard must be applied at the level of logic, and to the nation as a whole, rather than one state at a time." *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir. 2002) (Easterbrook, J.). Any suggestion that the analysis must exclude out-of-state providers from consideration is "legally nonsensical: No such rule exists." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 461 (5th Cir. 2014) (Garza, J., dissenting). Further, the mere fact that a law "has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Casey*, 505 U.S. at 874; *see Jegley*, 864 F.3d at 960 (focusing on patients who would forgo or postpone). The Sixth Circuit has upheld a regulation that would require mothers to travel *400 miles* further roundtrip to obtain an abortion.

---

[13] Data from the Oklahoma State Department of Health shows a significant increase in the number of Arkansas residents who obtained abortions in Oklahoma from 2017 to 2018. In 2017, 104 Arkansas residents obtained abortions in Oklahoma, Exh. A25 at 20, compared to 134 in 2018. Exh. A26 at 20. That is a 25% increase, compared to a 6.1% total increase in the number of abortions in Oklahoma from 2017 to 2018.

*Women's Professional Corp. v. Baird*, 438 F.3d 595, 606 (6th Cir. 2006).  Thus, Plaintiffs argument that this Court should ignore out-of-state providers or that the distances to those providers are undue fails as a matter of law.

Finally, the Plaintiffs complain that mothers will have to come up with funds to travel. But with no distance impact, no additional funds are needed. And even if funds were needed for travel, this need is mitigated by funds that are made available to patients to cover the cost of abortion. The National Abortion Federation funds abortions of mothers who are at or below 110 percent of the poverty line. Williams Decl., ¶ 23 (Doc 2-1 at 394). In addition, the Arkansas Abortion Support Network has "helped well over 200 women from Arkansas" to pay for abortions." *Women thank a fund that helps Arkansas women get abortions*, Arkansas Times (brackets omitted) (Exh. A18). Other states have similar networks.

> vi.    There is no burden because there is no right to a particular abortion method.

Even in the implausible scenario in which there is no provider of surgical abortion in the state, there is no dispute that medication abortion would still be available. "[T]he Supreme Court has not articulated any rule that would suggest that the right to choose abortion" articulated in *Casey* also "encompasses the right to choose a particular abortion method." *Planned Parenthood of Southwest Ohio Region v. DeWine*, 696 F.3d 490, 514- 15 (6th Cir. 2012); *see also Gonzales*, 550 U.S. at 158 ("*Casey*'s requirement of a health exception" cannot be interpreted so broadly that "it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer"); *Stenberg*, 530 U.S. at 965 (Kennedy, J., dissenting) ("*Casey* made it quite evident, however, that the State has substantial concerns for childbirth and the life of the unborn and may enact laws 'which in no real sense depriv[e] women of the ultimate decision.'" (quoting *Casey*,

505 U.S. at 875)); *cf. Benton v. Kessler*, 505 U.S. 1084, 1085 (1992) (Stevens, J., dissenting)

(arguing the Court should extend *Casey* to encompass that right).

To the contrary, where—as is true here—a regulation leaves patients free to access a

"commonly used and generally accepted [abortion] method," simple "convenience" or

preference does not prevent States "from imposing reasonable regulations." *Gonzales*, 550 U.S.

at 165-66; *see also Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 78-79

(1976) ("[T]he outright legislative proscription of [a particular methodology] fails as a

reasonable regulation for the protection of maternal health. It comes into focus, instead, as an

unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the

vast majority of abortions after the first 12 weeks."). A contrary holding, moreover, would

undermine *Gonzales*' central premise that "[t]he law need not give abortion doctors"—whose

ability to challenge abortion regulations is derivative of their patients' rights—"unfettered

choice" to use particular abortion methodologies. 550 U.S. at 163.

The competency requirement would by no means prohibit surgical abortion. But, even if

it did, at least one court of appeals has rejected the suggestion that effectively barring one

method of abortion is a substantial obstacle merely because some mothers would prefer a

different abortion method. *DeWine*, 696 F.3d at 515-16. As that court explained, even a strong

preference does not establish "a *substantial obstacle* for a large fraction of women in deciding

whether to have an abortion" but merely that they have been denied the heretofore unknown

"right to choose *a particular method* of abortion." *Id.* (emphasis in original); *see also id.* at 516

(the right articulated in *Casey* "protects the 'freedom to decide whether to terminate a pregnancy'

" and does not incorporate a right to select a "preferred method" (quoting *Casey*, 505 U.S. at

874)).  Thus, as medication abortion undisputedly remains available, Plaintiffs' focus on the

supposed inability of mothers to access the same—or their preferred—abortion methodology does not demonstrate a legally cognizable, let alone substantial, burden.

> vii.    *The competency requirement affects only a tiny fraction of Arkansas mothers seeking an abortion, if any.*

To prevail on this facial challenge, the Plaintiffs must, at a minimum, "demonstrat[e] that 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Jegley*, 864 F.3d at 958 (quoting *Casey*, 505 U.S. at 895). This is not a crude balancing test.  Rather, the Court must find that the "requirement's benefits are *substantially* outweighed by the burdens it imposes on a large fraction of women seeking . . . abortion in Arkansas." *Jegley*, 864 F.3d at 960 n.9 (emphasis added). Applying the large-fraction test, the Supreme Court has repeatedly reaffirmed that—even in the abortion context—facial challenges are disfavored and ought not be entertained where a regulation can constitutionally be applied to most patients. *See Gonzales*, 550 U.S. at 167-68 (rejecting facial challenge to methodology ban that could constitutionally be applied in most cases); *cf. Hellerstedt*, 136 S. Ct. at 2316 (district court's conclusion that abortion facilities would have to increase capacity "by a factor of about five" was well supported the evidence); *Casey*, 505 U.S. at 897 (spousal notice requirement would prevent practically all mothers for whom requirement is relevant from obtaining an abortion). Indeed, as-applied challenges remain "the basic building blocks of constitutional adjudication," *Gonzales*, 550 U.S. at 167, and are better suited to cases where a regulation's impact would fall *exclusively* on discrete groups of patients.

Consistent with that standard, "[o]ther circuits that have applied the large-fraction test to facial challenges to abortion regulations have, likewise, only found a large fraction when *practically all* of the affected women would face a substantial obstacle in obtaining an abortion."

*Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 373 (6th Cir. 2006) (collecting cases) (emphasis added). For instance, recognizing that "no circuit has found an abortion restriction to be unconstitutional under *Casey*'s large-fraction test simply because some small percentage of the women actually affected by the restriction were unable to obtain an abortion," the Sixth Circuit and other courts have rejected arguments that estimates like those here required facial relief. *Id.* at 374; *see also A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 699 (7th Cir. 2002) (Coffey, J., concurring) ("[E]ven assuming in the case before us that some number of women will be burdened by the law, it is clear that a law which incidentally prevents 'some' women from obtaining abortions passes constitutional muster."); *Karlin v. Foust*, 188 F.3d 446, 486 (7th Cir. 1999) ("While the evidence proffered by plaintiffs . . . shows that [Wisconsin's] mandatory waiting period would likely make abortions more expensive and more difficult for some Wisconsin women to obtain, we nevertheless must conclude, as did the Court in *Casey*, that plaintiffs have failed to show that the effect of the waiting period would be to prevent a significant number of women from obtaining abortions.").

Applying that standard here, Plaintiffs have not shown that the competency requirement will unduly burden a large fraction of Arkansas women seeking abortion. Indeed, the denominator is all Arkansas women seeking abortions. As explained above, both PPAEO and LRFP's operations will continue with qualified practitioners. Any hypothetical, unproven capacity limitations would be due to the practitioners' own choices to limit their own credentials or availability. There is likewise no distance impact because the two abortion providers are both located in Little Rock, the very center of the State, and even if one closed, that would merely require mothers to obtain an abortion at another facility a few miles away in the same city.

*Abortions will remain available in Arkansas up to 12 weeks LMP*. Up to 12 weeks LMP

(10 weeks PPF) both medication and surgical methods of abortion are generally employed. *See*

*Arkansas Department of Health 2018 Vital Statistics on Abortion* (Exh. A17), at 8. Therefore,

even if LRFP were to cease providing surgical abortion in Arkansas, women would still have

access to medication abortion in Arkansas up to 12 weeks LMP. The Plaintiffs have not supplied

any evidence concerning how many medication abortions they can provide per day. *But see*

Lindo Decl., ¶ 54 (Doc. 2 at 228) (conceding that one provider in a single, three-hour period per

week could provide at least 624 abortions per year); Compl., ¶ 101 (conceding that there would

"be sufficient capacity in this scenario for women seeking medication abortion."). Therefore, the

Plaintiffs have not demonstrated that any mothers would delay or forego an abortion due to any

purported lack of capacity by LRFP and PPAEO-Little Rock to perform medication abortion for

the subset of the women who would be likely to seek an abortion at those facilities before the end

of the twelfth week LMP. *Id.*

   *Abortion will likewise remain available in Arkansas for the remaining weeks 13 to 21*

*LMP.* As explained above, LRFP can safely and effectively provide abortions for up to 20-25

mothers a day, and the Plaintiffs do not claim that this is a ceiling. Williams Decl., ¶ 17 (Doc. 2

at 392-93). Board-certified OB/GYN Hopkins performs abortions at LRFP to "once every other

month for three to four days." Hopkins Decl., ¶ 1 (Doc. 2 at 119). Again, if Hopkins alone

continues his practice of providing 25 surgical abortions at LRFP an average of 3.5 days a week

every-other month, then he will perform 525 surgical abortions a year (25 abortions x 3.5 days x

6 times = 525 abortions per year). Thus, Hopkins alone can easily satisfy the demand for the 397

D&E abortions in Arkansas for weeks 14 to 21 LMP (12 to 19 PPF). *Arkansas Department of*

*Health 2018 Vital Statistics on Abortion* (Exh. A17), at 8. That leaves a margin of 128 extra

abortions that Hopkins can perform per year—which easily satisfies the remaining demand for the 101 abortions performed at week 13 LMP (11 PPF) in Arkansas in 2018. *Id.* In fact, this leaves even a 27-abortion surplus. Again, the Plaintiffs have not demonstrated that any mothers would delay or forego an abortion due to any purported lack of capacity by LRFP to perform abortion for the subset of the women who would be likely to seek an abortion in Arkansas between the thirteenth and twenty-first week LMP.

Finally, PPAEO has announced that it is just about to "open[] a new health center in Little Rock next month to meet growing demand." *Planned Parenthood moving to new facility in Little Rock*, Arkansas Democrat-Gazette (July 16, 2019) (accessed July 16, 2019) (Exh. G9). PPAEO board-certified OB/GYN Cathey is not prevented by the competency requirement from performing either medication or surgical abortions. Again, Plaintiffs have not shown any lack of capacity that would cause mothers to delay or forego an abortion due to Little Rock abortion facilities' lack of capacity.

The numerator of affected mothers is nonexistent. Therefore, there is no undue burden on abortion access, and the Court should deny the Plaintiffs' motion for a preliminary injunction.

     **5.**     **The supposed burdens do not outweigh—let alone substantially outweigh—the benefits of ensuring practitioners are competent.**

As discussed above, Arkansas's requirement will benefit both the medical profession and women seeking abortions by ensuring only those with the specialized training necessary to perform abortions perform them. That requirement likewise will protect—what Plaintiffs themselves concede is—a particularly vulnerable population. Weighed against that interest, Plaintiffs cite no real burden beyond the possibility that some unknown small fraction of mothers might have to travel further to obtain a particular kind of abortion. Thus, Plaintiffs have not shown—and cannot demonstrate—that the competency requirement imposes burdens that

substantially outweigh that provision's benefits and this Court should deny their motion for preliminary or temporary relief.

### 6. The competency requirement does not violate equal protection.

Just as the competency requirement does not violate the Plaintiffs' substantive-due-process rights, so also it does not violate their equal protection rights. This Court should also reject this claim and deny the Plaintiffs' motion for preliminary injunction.

### i. The Plaintiffs' equal-protection claim is subject to ordinary rational basis review.

Legislation is presumed to be valid and will be judicially sustained against a constitutional challenge if the classification drawn by the statute is rationally related to a legitimate state interest. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). Strict judicial scrutiny is triggered only if a statute "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution[.]" *Maher v. Roe*, 432 U.S. 464, 470 (1977); *see also Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999). Where legislation neither invades a fundamental constitutional right nor purposefully operates to the detriment of a suspect class, the only requirement of equal protection is that the legislation be rationally related to a legitimate government interest. *Harris v. McRae*, 448 U.S. 297, 326 (1980). Here, because the competency requirement does not burden a fundamental right or affect a suspect class, the Plaintiffs' challenge is subject to ordinary rational-basis review.

Abortion practitioners and facilities do not have a fundamental right to provide abortion procedures. *Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Dempsey*, 167 F.3d 458, 464 (8th Cir. 1999). Any constitutional right of practitioners or facilities to provide abortion services derives from the purported right to abortion access. *Id.* (citing *Planned Parenthood v.*

*Casey*, 505 U.S. 833, 884–85 (1992); *accord Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 547 (9th Cir. 2004) ("Because the right to perform abortions is derivative of the right of patients to seek abortions, it is not the sort of right that, apart from the rights of patients, would trigger strict scrutiny review."). Neither may abortion practitioners use their patients' right to choose to have an abortion as a means of elevating the standard of review for their own equal protection claim. *See Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984). The competency requirement does not infringe a fundamental right for equal-protection purposes because it violates no constitutionally-protected substantive right. *Harris v. McRae,* 448 U.S. 297, 312, 322 (1980) (concluding that there is no equal protection violation where the Hyde Amendment violated no constitutionally-protected substantive right). The competency requirement, therefore, does not burden any fundamental right of the Plaintiffs.

Plaintiffs lack standing to bring their challenge to the competency requirement on behalf of their hypothetical future patients. But assuming that the Plaintiffs had standing to do this—which they do not—their claim that the competency requirement must be subjected to strict scrutiny still fails as a matter of law because there is no fundamental constitutional right for their patients to access abortion services. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 953 (1992) (Rehnquist, C.J., concurring in the judgment in part and dissenting in part, joined by White, J., Scalia, J., and Thomas, J.) ("The Court in *Roe* went too far when it . . . deemed the right to abortion fundamental."). Legislation affecting physicians and clinics that perform abortions will be found unconstitutional only if it imposes an undue burden on women seeking abortions. *Dempsey*, 167 F.3d at 464; *Casey*, 505 U.S. at 884-85. Here, there is no undue burden because a law that does not prohibit abortion but rather has only an incidental effect on a woman's decision to have an abortion cannot create an undue burden.  *Casey*, 505 U.S. at 874. It

cannot be disputed that the competency requirement does not in any way prohibit abortion, but rather has at most an incidental effect.

Neither abortion practitioners nor their patients are a suspect class under the Equal Protection Clause of the Fourteenth Amendment. Suspect classifications include race, religion, alienage, and national origin. *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). In addition, the U.S. Supreme Court has recognized quasi-suspect classifications based on sex and illegitimacy also receive some degree of heightened scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). But neither abortion providers nor their patients fall into any of these classifications. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("'Women seeking abortion' is not a qualifying class" for equal protection purposes). Even if abortion practitioners were somehow harmed by the competency requirement —which they are not—it would not be appropriate to afford them suspect-class status under the Equal Protection Clause where there are also many legitimate reasons that the State might regulate them. *See Tucson Woman's Clinic*, 379 F.3d at 545.

Further, the State's enacting different regulatory frameworks for different procedures not trigger heightened scrutiny under the Equal Protection Clause. *Crum v. Vincent*, 493 F.3d 988, 994 (8th Cir. 2007) (holding that rational-basis review was proper both where a law requiring revocation of a professional license in certain circumstances did not apply to other professions and where a member of one profession faced a more severe sanction than members of other professions for a similar violation). Classifications that specifically distinguish between abortion providers and other facilities or physicians are subject to rational-basis review. *Tucson Woman's Clinic*, 379 F.3d at 547 (applying rational-basis review to a statute that imposed restrictions on abortion providers but not other physicians who performed equally-risky procedures). "Abortion

is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Harris v. McRae*, 448 U.S. 297, 325 (1980) (holding that the Hyde Amendment's restricting federal reimbursement for certain medically-necessary abortions but not for medically-necessary services generally was appropriately subject to rational-basis review); *see also Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001) (holding that a statute requiring only facilities that perform a certain number of abortions per year to obtain a special license that is potentially subject to revocation is subject to rational-basis review). Abortion clinics may rationally be regulated as a class while other clinics or medical practices are not. *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 159 (4th Cir. 2000) (applying rational-basis review to a statute setting standards for licensing abortion clinics); *Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984) (applying rational-basis review to a statute regulating freestanding surgical outpatient facilities but not the physicians' private offices where abortions are performed). Drawing distinctions between abortion and other procedures is not forbidden. *Bellotti v. Baird*, 428 U.S. 132, 149 (1976); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 79 (1976). Thus, neither abortion practitioners nor their patients are a suspect class under the Equal Protection Clause, and the competency requirement is subject to rational-basis review.

        ii.     *The competency requirement rationally furthers the state's interests in protecting the medical profession, vulnerable groups, and mothers' health and safety.*

The competency requirement will be upheld against an equal protection challenge if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). The U.S. Supreme Court has recognized that state legislatures have "the widest possible latitude within the limits of the Constitution." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)

(quotation and citation omitted). Further, rational-basis review does not require that the challenged legislation is a perfect or exact fit between the means used and the ends sought. *United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007).  "[T]he basis for a reasonable distinction need not apply in every circumstance to be valid." *Walker v. Hartford Life & Accident Ins. Co.*, 831 F.3d 968, 978 (8th Cir. 2016); *see Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 487-88 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional."). The burden is on the plaintiff to negate every conceivable rational basis that might support the legislation. *Lehnhausen*, 410 U.S. at 364.

Here, the Plaintiffs have failed to meet their heavy burden of showing that the competency requirement is irrational by negating every conceivable rational basis that supports the legislation. The Plaintiffs cannot negate the rational bases shown by the State's legitimate interests, set forth more fully above, in protecting the integrity and ethics of the medical profession, in protecting vulnerable groups from abuse, neglect, and mistakes, and in protecting mothers' health and safety.

Courts have recognized that there are conceivable rational bases for ensuring basic provider competency, including "that women who obtain abortion services are less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice." *Tucson Woman's Clinic*, 379 F.3d at 545. Alternatively, "[a] State might look to the history of illegal, unsafe abortions in this country and determine that women seeking abortions are particularly vulnerable to exploitation." *Id.* These rational bases support the competency requirement s as a matter of law.

Based on the alleged comments of a single legislator, the Plaintiffs attempt to argue that the General Assembly was moved to act by the improper motive of prohibiting abortion. But "an

isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body." *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996); *see Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) ("We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text"). Indeed, even if the Plaintiffs could prove that the legislature was motivated by animus toward a class such as abortion practitioners— which they cannot—the Plaintiffs' equal protection claim would still fail because the competency requirement serves purposes that are rationally related to legitimate state interests. *Beach Communications, Inc.*, 508 U.S. at 313.

The Plaintiffs argue that the competency requirement treats abortion differently than other comparable medical procedures. The Plaintiffs falsely contend that abortion is "singled out as highly regulated" in contrast to comparable procedures. Pl. Br. at 16-18. The Plaintiff's "evidence" for this utterly ridiculous claim is a five-bullet-point list of regulations governing abortion clinics and padded, duplicative sets of citations to Arkansas statutes concerning abortion. But—make no mistake—in Arkansas (as in most of America), abortion is subject to *far less* regulatory oversight than other medical procedures. This fact can be appreciated by contrasting the relatively few regulations governing abortion facilities with the *more than 10-times greater volume* of regulations governing the operations of hospitals and health facilities where colonoscopies, tonsillectomies, and plastic surgery—the purportedly "comparable" procedures mentioned by the Plaintiffs, *see* Compl., ¶¶ 37, 77—are performed.

"Safety is not a negligible concern in any field of healthcare. Abortion—which is subject to less regulatory oversight than almost any other area of medicine—bears no exception." *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 923 (7th Cir. 2015) (Manion,

J., dissenting). Indeed, Arkansas has distinct statutory and regulatory schemes governing abortion facilities, on one hand, and hospitals and other health facilities, on the other—and abortion facilities are far less regulated. *Contrast* Ark. Code Ann. § 20-9-201 et seq. (hospitals and health facilities) *with* Ark. Code Ann. § 20-9-302 (abortion facilities); *also contrast* Ark. Admin. Code 007.05.17-1 et seq. (hospitals and health facilities) *with* Ark. Admin. Code § 007.05.2-4 et seq. (abortion facilities).

A recent review of regulations demonstrated that the Arkansas Department of Health's rules regulating abortion facilities contained only 36 pages Exh. D1 (Ark. Admin. Code §§ 007.05.2-1 et seq.). These regulations incorporate by reference eight other sets of regulations, bringing the regulations governing abortion facilities to a grand total of *301 pages*. Exhs. D1 to D6.  And physicians who may occasionally provide abortions are subject to even less regulation. By contrast, the set of Arkansas Department of Health rules regulating hospitals and other health facilities—by itself—contains 407 pages. Exh. F1 (Ark. Admin. Code §§ 007.05.17-1 et seq.). These regulations incorporate by reference at least 19 other sets of regulations, bringing the regulations governing health facilities to a total of *3507 pages*. Exhs. F1 to F18.

Indeed, as just one example of just how lightly regulated abortion is compared to other medical procedures, this Court need only compare outpatient surgical centers with abortion facilities.  Unlike an abortion facility, an outpatient surgical center must either have a transfer agreement with a local hospital or must ensure that every physician performing procedures in the facility has admitting privileges at a local hospital. Ark. Admin. Code § 007.05.17-39(I). An outpatient surgical center is subject to a host of rules regulating surgical services, *id.* § 007.05.17-26, including specific requirements for equipment and supplies. *id.* § 007.05.17-26(B)(2)–(3). An outpatient surgical center is subject to more comprehensive requirements for

sterilization, storage, and testing of surgical instruments. *id.* § 007.05.17-34. An outpatient

surgical center must meet regulations for post-anesthesia care with major requirements for

equipment, education and specific in-services/training. *id.* § 007.05.17-27. At an outpatient

surgical center, pharmaceutical services must be provided under the direction of a licensed

pharmacist. *Id.* § 007.05.17-16(E). Finally, an outpatient surgical center must have a Pharmacy

and Therapeutic committee, *id.* § 007.05.17-16(D); protocols for isolation, *id.* § 007.05.17-

18(A)(2); a designated, qualified Infection Prevention individual, *id.* § 007.05.17-18(A)(4); an

annual facility risk assessment, *id.* § 007.05.17-18(A)(5)(b); and an infection control committee

§ 007.05.17-18(B). Abortion facilities are not subject to these requirements. Even physical

facility requirements for outpatient surgical centers are more comprehensive and specific than for

abortion facilities. *id.* §§ 007.05.17-46, 007.05.17-79.

Further, in addition to the minimal standards established by Arkansas law, the U.S.

Department of Health and Human Services's Centers for Medicare and Medicaid Services

(CMS) establishes conditions of coverage that outpatient surgical centers must meet in order to

begin and continue participating in the Medicare and Medicaid programs. Centers for Medicare

& Medicaid Services, "Conditions for Coverage (CfCs) & Conditions of Participations (CoPs),"

available at https://www.cms.gov/Regulations-and-Guidance/Legislation/CFCsAndCoPs/

index.html (accessed June 30, 2019); Centers for Medicare & Medicaid Services, "Ambulatory

Surgery Centers," available at https://www.cms.gov/Medicare/Provider-Enrollment-and-

Certification/CertificationandComplianc/ASCs.html (accessed June 30, 2019). In addition, CMS

promulgates extensive guidance for inspectors who survey outpatient surgical centers. Centers

for Medicare & Medicaid Services, "State Operations Manual Appendix L - Guidance for

Surveyors: Ambulatory Surgical Centers," CMS Pub. 100-07, App'x L (Rev. 137, Apr. 1, 2015),

available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ som107ap_l_ambulatory.pdf (accessed June 30, 2019). Abortion facilities, by contrast, are not subject to the conditions of compliance that outpatient surgical centers must meet, and there is no federal guidance for surveyors of abortion facilities.

Similarly, as another example, the Arkansas Department of Health also has a unique set of rules regulating freestanding birthing centers. Ark. Code Ann. §§ 20-9-401 to 20-9-405; Ark. Admin. Code § 007.05.12-1 et seq. The regulations contain 73 pages, Exh. E1 (Ark. Admin. Code 007.05.12-1 et seq.), and incorporate by reference at least nine other sets of regulations— bringing the regulations governing birthing centers to a total of 444 pages—*more* than for abortion facilities. Exhs. E1 to E6.  Unlike abortion facilities —which may perform various procedures on any mother—birthing centers are permitted to use only the most low-risk procedures on only the most low-risk mothers.[14]  For example, unlike an abortion facility, a birthing center "shall not provide operative obstetrics, including use of forceps, vacuum extractions, Caesarean sections, or tubal ligations." Ark. Admin. Code 007.05.12-3. A birthing center is also prohibited from (1) administering both general and conductive analgesia or anesthesia, including spinal and epidural analgesia; (2) administering any kind of conscious sedation; (3) performing any kind of operative obstetrics; (4) administering I.V. analgesia; and (5) stimulating or augmenting medical procedures with chemical agents. Ark. Admin. Code § 007.05.12-7(E).  Procedures are limited "to those normally performed during uncomplicated

---

[14] Arkansas law severely restricts the patients that a birthing centers may accept to those mothers with a "[l]ow-risk pregnancy," defined as "a normal uncomplicated pregnancy as determined by a generally accepted course of prenatal care and expectation of a normal uncomplicated birth as defined by reasonable and generally accepted criteria of maternal and fetal health." Ark. Code Ann. § 20-9-401(2). A birthing center must exclude any patient who cannot show evidence of each of the following: (1) a low-risk pregnancy with the expectation of a singleton, vertex, spontaneous vaginal birth at term without complications; (2) adequate prenatal care beginning no later than 28 weeks of pregnancy; (3) continuous prenatal screening; and (4) preparation for out-of-hospital birth and early discharge. Ark. Admin. Code § 007.05.12-9(A). Further, a birthing center is not permitted to accept as a patient any mother who has any of a long list of other conditions. *See* Ark. Admin. Code § 007.05.12-9(A) & (B).

childbirth, such as episiotomy and repair of lacerations." Ark. Admin. Code § 007.05.12-7(C).

Local anesthesia is permitted only for pudendal block and episiotomy.[15] Ark. Admin. Code

§ 007.05.12-7(B).  A birthing center must also be located within 30 minutes of a hospital that

offers obstetric and nursery services and that maintains an on-call team to provide emergency

Caesarian sections and stabilization of infants. Ark. Admin. Code § 007.05.12-4(B); *id.* §

007.05.12-3 (definition of "Free-Standing Birthing Centers").

In contrast to these voluminous restrictions on birthing centers, Arkansas law places

absolutely no restrictions on which mothers abortion facilities may accept as patients. And with

the one exception of prohibiting a procedure in which unborn babies' bodies are literally ripped

limb from limb until they bleed to death, Ark. Code Ann. § 20-16-1803—which this Court

wrongfully enjoined and is likely to be reversed on appeal—Arkansas places no restrictions on

what procedure an abortion practitioner may perform.  Thus, Plaintiffs cannot plausibly claim

that abortion is singled out as highly regulated and their equal protection claim fails as a matter

of law. Therefore, the Court should deny Plaintiffs' motion for a preliminary injunction.

### B.    The Plaintiffs cannot clearly show that the Eugenics Ban is unconstitutional.

*I am a man with Down Syndrome and my life is worth living. Why do I feel the need to make that point? . . . Because there are prenatal screens that will identify Down syndrome in the womb, and we can just terminate those pregnancies. In places as widespread as Iceland, Denmark and South Korea, government officials have proclaimed that these government encouraged terminations will make them "Down syndrome free by 2030." It is hard for me to sit here and say those words. Let's be clear, I completely understand that the people pushing that particular "final solution" are saying that people like me should not exist. They are saying that we have too little value to exist. That view is deeply prejudiced by an outdated idea of life with Down syndrome. Seriously, I have a great life. . . . I don't feel I should have to justify my existence*[.]

—Frank Stephens, Special Olympian and Advocate for Individuals with Disabilities. (*Testimony by Frank Stephens*, House Subcommittee on Labor,

---

[15] Birthing centers cannot provide acute care. *See, e.g.*, Ark. Admin. Code §§ 007.05.12-6(P)(2) & (3) and 007.05.12-9(H).

Health and Human Services, and Education, U.S. House of Representatives 1 (Oct. 25, 2017) (Exh. B1)).

The State of Arkansas agrees with Frank Stephens. His life is valuable, rewarding, and certainly worth living. Arkansas has affirmed the value of Frank's life by enacting the Eugenics Ban.

The Eugenics Ban is unlike most regulations concerning abortion. States have traditionally enacted abortion regulations concerning threats to maternal health and safety. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 876 (1992), *Gonzales v. Carhart*, 550 U.S. 124, 129 (2007). But the Eugenics Ban is also aimed another societal ill: prejudice against the disabled. *See* Ark. Code Ann. § 16-123-107(a) (including individuals with a "physical disability" as a class protected by Arkansas's civil rights laws). The Eugenics Ban achieves this goal by furthering a potent combination of state interests in prohibiting invidious discrimination, protecting the integrity and ethics of the medical profession, protecting the vulnerable community of people with Down Syndrome, and protecting human life.

The Eugenics Ban is a very narrow, commonsense response to the shockingly pervasive systemic discrimination against unborn children with Down syndrome created by the novel, widespread availability of prenatal genetic testing—testing that did not exist when the Supreme Court laid out the *Roe*/*Casey* framework. As explained above, America has a shameful history of discrimination against people with Down syndrome. And even though our Nation has taken great strides in curbing this discrimination, systemic discrimination against people with Down syndrome remains shockingly pervasive in the medical profession. People with Down Syndrome lead fulfilling and productive lives. But doctors pressure women to abort their children when facing a Down syndrome diagnosis. The cumulative effect of eugenic abortions "over the past

several years has been to reduce the Down Syndrome community by 30%." Sullivan Decl., ¶ 10 (Exh. B30).

The Plaintiffs do not dispute that eugenic abortions occur. Just the opposite: *the Plaintiffs admit that eugenic abortions occur in Arkansas*. They allege that "LRFP is aware that some of its patients seek abortions based solely or in part on a prenatal diagnosis of Down syndrome." Compl., ¶ 70.

Arkansas's Eugenics Ban, which seeks to stamp out discriminatory abortions in the State, must satisfy only rational-basis review. As explained more fully below, the rule in *Casey* does not apply to women who welcome pregnancy and childbirth, on one hand, but seek to abort an otherwise-welcome child for discriminatory reasons, on the other. *Cf. Glucksberg*, 521 U.S.721, 728 (1997) (judging a substantive due process claim under rational-basis review because there was no fundamental liberty interest at issue). The Plaintiffs bear the heavy burden of demonstrating that the Eugenics Ban is not even rationally related to any state interests by "negat[ing] every conceivable basis which might support it." *Heller*, 509 U.S. at 321. That is a burden they cannot carry.

Besides their failure to satisfy the rational-basis standard, the Plaintiffs have also failed to show that the Eugenics Ban unduly burdens abortion access. A burden is "undue" if it has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *See Casey*, 505 U.S. at 877. As the Plaintiffs concede, this is not a crude balancing test that adds up the benefits and weighs them against the purported burdens to see which way the scale tips. Rather, for the Plaintiffs to prevail on this facial challenge, the Court must find that the Eugenics Ban's "benefits are *substantially* outweighed by the burdens it imposes on a large fraction of women seeking . . . abortion in Arkansas." *Jegley*, 864 F.3d at 960

n.9 (emphasis added). The Plaintiffs cannot show that they are substantially likely to succeed on merits, and this Court should deny the Plaintiffs' motion for an order preliminarily enjoining the Eugenics Ban.

**1.      There is no right to abort a child solely for discriminatory reasons.**

Arkansas recognizes the reality that new prenatal testing methods are being used for discriminatory purposes. And acting in furtherance of its compelling interest in prohibiting invidious discrimination, Arkansas has narrowly banned eugenic abortions. *See* 42 U.S.C. § 12101(a)(7) ("the National's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals"); *Box*, 139 S. Ct. at 1783 (Thomas, J., concurring) (noting that laws like the Eugenics Ban "promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics"). This Eugenics Ban does not violate any recognized constitutional right because there is no right to abort a child solely for discriminatory reasons.

Neither *Roe* nor *Casey* interpreted the Constitution to require States to allow eugenic abortions. The only right that *Casey* read into the Constitution was a right "to be free from unwarranted governmental intrusion into . . . the decision whether *to bear or beget a child*." *Casey*, 505 U.S. at 875 (quotation omitted) (emphasis added) (citing *Roe v. Wade*, 410 U.S. 113 (1973)). Once a woman has made the binary decision to bear or beget a child, the State's interest in preventing invidious discrimination against an otherwise-welcome child on the basis of a disfavored characteristic, such as disability, becomes compelling. The Eugenics Ban does not interfere with any woman's choice to have a child. It narrowly applies—indeed, it exclusively applies—when the decision to have a child has already been made, when it then kicks in to prohibit an abortion of that child motivated solely by invidious discrimination against children with Down syndrome.

The *Casey* Court did not address—indeed, in light of then-current medical technology, *see supra*, Background, it would have been essentially impossible for the *Casey* Court to have conceived of—a law prohibiting previability, eugenic abortions targeting unborn children with Down syndrome. Given the *Casey* Court's warning that "[n]ot all governmental intrusion is of necessity unwarranted," *id.* at 875, expanding the *Roe/Casey* right to prohibit a law like the Eugenics Ban is unwarranted. The Eugenics Ban is consistent with *Casey*'s general pronouncement that "*Roe* did not declare an unqualified constitutional right to an abortion." *Id.* at 874 (quotation omitted). Developments in medical technology subsequent to *Casey* have given contour to that pronouncement: The right announced in *Roe* and *Casey* does not require a State to stomach the practice of methodically eliminating children with Down syndrome before they are born.

In neither *Roe* nor *Casey*—nor in any other case since—has the Supreme Court ever found a constitutional right for a woman to (1) welcome pregnancy and childbirth, and then (2) abort an otherwise-welcome child solely for discriminatory reasons. *See Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from the denial of rehearing en banc) ("*Casey* did not consider the validity of an anti-eugenics law."); *see also Box*, 139 S. Ct. at 1792 (Thomas, J., concurring) ("Judge Easterbrook was correct. Whatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions."). Rather, *Casey* focused on liberty interests that arise "when the woman confronts the reality that, perhaps despite her attempts to avoid it, she has become pregnant. It was *this* dimension of personal liberty that *Roe* sought to protect[.]" *Casey*, 505 U.S. at 853 (emphasis added). In other words, the purpose of the right recognized in *Casey* and *Roe* is to prevent women from being forced to carry a child

to term even though she does not want a child—not to allow women to abort children solely for discriminatory reasons.

The Plaintiffs admit that eugenic abortions are happening, and they admit that eugenic abortions are happening *in Arkansas*. Faced with that undisputed reality, Arkansas chose to do something about it. The right created by *Roe* and *Casey* does not prohibit Arkansas's response, the Eugenics Ban. Neither case announced a substantive-due-process right for a woman who welcomes pregnancy and childbirth to abort a child solely for discriminatory reasons. *See Roe*, 410 U.S. at 153 ("[A]ppellant and some amici argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree."); *Box*, 139 S. Ct. at 1792 (Thomas, J., concurring) ("Enshrining a constitutional right to an abortion based solely on the . . . disability of an unborn child, as Planned Parenthood advocates, would constitutionalize the views of the 20th-century eugenics movement.").

## 2.    The eugenics ban easily survives scrutiny.

The eugenics ban is subject only to rational basis review because *Casey* does not apply to women who abort an otherwise-welcome child for discriminatory reasons. The Plaintiffs bear the heavy burden of demonstrating that the eugenics ban is not even rationally related to any state interests by "negat[ing] every conceivable basis which might support it." *Heller*, 509 U.S. at 321.

As the discussion thus far has shown, in eugenic abortions, it is not the *child* that is unwanted, but the *disfavored characteristic*. The Eugenics Ban has the benefits of: preventing invidious discrimination against the most vulnerable members of the community; ending the pressure on women to abort wanted children after a Down syndrome diagnosis; and upholding the integrity of the medical profession. As explained above, this combination of benefits arose only in recent years, as low-cost technology has for the first time made invidious discrimination

against unborn children on the basis of Down syndrome not only possible but shockingly pervasive. It has, therefore, not been considered—whether in *Roe*, *Casey*, any other case before the Supreme Court, or even the Eighth Circuit.

Alternatively, if this Court wrongly determines that the undue burden test applies, this Court must compare it to preexisting Arkansas law. *See Jegley*, 864 F.3d at 960 n.9. The Plaintiffs do not deny that the Eugenics Ban creates benefits compared to prior law, nor do they deny that those benefits are weighty. In light of those benefits, the Plaintiffs cannot show that its "benefits are *substantially* outweighed by the burdens it imposes on a large fraction of women seeking . . . abortion in Arkansas." *Jegley*, 864 F.3d at 960 n.9 (emphasis added).

i.      *The Eugenics Ban has many benefits.*

The Eugenics Ban benefits the people of Arkansas by protecting the vulnerable—Arkansans with Down syndrome, whether born or unborn—from the effects of invidious discrimination. Generally speaking, the State has a "compelling interest in combating invidious discrimination." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 n.5 (1988). And as particularly relevant here, the State also "has an interest in protecting vulnerable groups—including . . . disabled persons—from abuse, neglect, and mistakes." *Glucksberg*, 521 U.S. at 731. That interest applies with even greater force to unborn children with disabilities because "abortion is an act rife with the potential for eugenic manipulation." *Box*, 139 S. Ct. at 1783 (Thomas, J., concurring). Indeed, "abortion has proved to be a disturbingly effective tool for implementing the discriminatory preferences that undergird eugenics." *Id.* at 1790; *see Britell v. United States*, 372 F.3d 1370, 1383 (Fed. Cir. 2004) (refusing to hold "that in some circumstances a birth defect or fetal abnormality is so severe as to remove the state's interest in potential human life," and calling such a holding "line-drawing of the most non-judicial and daunting nature").

The Eugenics Ban's benefits are not limited to unborn children with Down syndrome. It also benefits people already born living with Down syndrome. It would devalue the lives of Arkansans currently living with Down syndrome in a number of ways to hold that the U.S. Constitution requires Arkansas to allow abortions based solely on a Down syndrome diagnosis. The prevalence of eugenic abortions communicates to people with Down syndrome the demeaning message that they are not valued as members of society. *See Gonzales*, 550 U.S. at 158 (abortion is "laden with the power to devalue human life"). The Eugenics Ban recognizes that an abortion that denies a child the right to live *solely* on the basis of disability sends the false and harmful message that their lives are not worthy of life. *Cf.* Skotko, et al., *Self-Perceptions from People with Down Syndrome* (Exh. B3) (99% of people with Down syndrome report being happy with their lives). "Laws can and do have a significant effect on attitudes." Fernandes Decl., ¶ 17 (Exh. B11). The Eugenics Ban "protect[s] disabled . . . people from prejudice" by preventing the "negative and inaccurate stereotype[]" of people with Down syndrome—that they would be better off if they had never been born. *Glucksberg*, 521 U.S. at 732.

The prevalence of eugenic abortion has also reduced access to social services for people with Down syndrome. As explained above, the cumulative effect of abortions "over the past several years has been to reduce the number of people with Down syndrome by 30%." Sullivan Decl., ¶ 10 (Exh. B30). This reduction has had "the perverse impact of making fewer and fewer resources available for training and encouragement of people with this genetic marker." Sullivan Decl., ¶ 10 (Exh. B30). Conversely, [t]he more [the] state affirms and values the lives of these individuals from conception, the greater the impetus to refine and improve the support structures which are so crucial to the quality of life of these children and their families." Fernandes Decl., ¶ 17 (Exh. B11). The Eugenics Ban benefits the people of Arkansas by preserving the lives of

unborn children that would be otherwise ended for purely discriminatory reasons and by tangibly demonstrating that the State affirms and values the members of the Down syndrome community.

Pregnant women also benefit from the Eugenics Ban. The evidence already discussed, *see supra,* Background, demonstrates the pressure that women feel to abort their children upon receipt of a Down syndrome diagnosis or indication. Arkansas women describe the pressure they have felt to abort. Judy McGruder, for example, was greater than 20 weeks pregnant when her doctor told her that her baby had a form of Down syndrome and that she should not have children as a result. McGruder Decl. (Exh. H2).

Finally, the Eugenics Ban benefits the medical profession. "There can be no doubt that the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales*, 550 U.S. at 157 (quoting *Glucksberg*, 521 U.S. at 731). As explained more fully above, physicians sometimes inject discriminatory biases into what is already "a difficult and painful moral decision," *Id.* at 159, with "profound and lasting meaning." *Casey*, 505 U.S. at 873. The Eugenics Ban benefits the medical profession by preventing physicians from becoming accustomed to taking life solely on the morally heinous ground that a child has a disability— thereby coarsening the practitioner, the profession, and society as a whole. As explained above, during one of the most "shameful part[s] of America's history," 60 to 70,000 people were forcibly sterilized because they were viewed as "mentally deficient," "feebleminded," or otherwise inferior. *The Supreme Court Ruling that Led to 70,000 Forced Sterilizations*, NPR (Mar. 7, 2016), available at http://www.npr.org/sections/health-shots/2016/03/07/469478098/the-supreme-court-ruling-that-led-to-70-000-forced-sterilizations (accessed July 5, 2019) (Exh. B4); Lisa Ko, *Unwanted Sterilization and Eugenics Programs in the United States*, PBS (Jan. 29,

2016), available at http://www.pbs.org/independentlens/blog/unwanted-sterilization-and-eugenics-programs-in-the-united-states/ (accessed July 5, 2019) (Exh. B5).

The Eugenics Ban benefits all involved by ensuring that America does not return to the days when the law treated the lives of those with disabilities as not worth living. *See Casey*, 505 U.S. at 1114-15 (upholding parental-consent requirement even though it did not serve an interest in safeguarding women's health, protecting potential life, or regulating the medical profession).

      ii.    *Any supposed burdens of the Eugenics Ban do not substantially outweigh its benefits.*

The Plaintiffs do not seriously attempt to show burdens that outweigh the Eugenics Ban's many benefits. Their sole argument is that it violates a purported absolute right to a previability abortion. To the Plaintiffs, *any* prohibition of *even a single* previability abortion is per se unconstitutional. But that cannot be the law, for that would give penumbras greater protection than even the fundamental rights of freedom of speech and assembly. "[E]ven the fundamental rights of the Bill of Rights," the Supreme Court has said, "are not absolute." *Kovacs v. Cooper*, 336 U.S. 77, 85 (1949); *see, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution."). Access to previability abortion is not more protected than the rights protected by the Bill of Rights.

More importantly, the Plaintiffs make no attempt to show that the obvious benefits of the Eugenics Ban "are substantially outweighed by the burdens it imposes on large fraction of women seeking abortion." *Jegley*, 864 F.3d at 960 n.9. They admit that eugenic abortions on the basis of a Down syndrome diagnosis occur in Arkansas. Compl., ¶ 70. But they provide no data from which it could be ascertained how many of those eugenic abortions occur prior to viability.

Worse, the Plaintiffs *do not even allege* that a large fraction of women seeking abortions on the basis of a Down syndrome diagnosis do so prior to viability. *See id.* at 960 (vacate district court's preliminary injunction and remanding for "fact finding concerning the number of women unduly burdened by the [challenged requirement] and [to] determine whether that number constitutes a 'large fraction'").

Any mother who gives birth to a child with Down syndrome can place the child for adoption into a loving home through the State of Arkansas, and under the Safe Haven law can even relinquish a child up to 30 days after birth. Martin Decl. (Exh. G3). Mothers who choose to raise children with Down syndrome also qualify for various forms of assistance from the State of Arkansas. Hayes Decl. (Exh. G4).

Because the Plaintiffs certainly have not clearly shown that that the Eugenics Ban's "benefits are substantially outweighed by the burdens it imposes on a large fraction of women," *id.* at 960 n.9, this Court should deny their motion for a preliminary injunction.

C.   **The Plaintiffs cannot clearly show that the Cherish Act is unconstitutional.**

As explained supra, Background, the Cherish Act is emphatically *not* an "18-week ban." It contains numerous exceptions for rape, incest, medical emergencies, to avoid substantial impairment of a major bodily function, and other situations. As such, the Cherish Act is not a ban on previability abortions. Rather, it is a limit on some previability abortions between 18 weeks gestational age and viability. Like the previability partial-birth abortion ban that the Court upheld as constitutional in *Gonzales*, the Cherish Act merely regulates but does not prohibit previability abortions. 550 U.S. at 146.

1.      **The benefits of the Cherish Act are not substantially outweighed by the burdens it imposes on a large fraction of Arkansas women.**

The Cherish Act does not unduly burden access to abortion. Regulation of death-by-dismemberment abortion of quickened unborn children potentially affects only a very small set of Arkansas women seeking abortions. *Cf. Stenberg v. Carhart*, 530 U.S. 914, 957-58 (2000) (Kennedy, J., dissenting) (emphasizing that abortion cases should use language understandable "for persons for persons not trained in medical terminology"). According to Arkansas Department of Health statistics, only 170, or 5.5%, of 2018 Arkansas abortions were performed at 18 weeks LMP (16 weeks PPF) or greater.[16] *See Arkansas Department of Health 2018 Vital Statistics on Abortion*, at 8, available online at https://www.healthy.arkansas.gov/images/uploads/pdf/2018_ITOP_Reports.pdf (accessed July 3, 2019) (Exh. A17).

The Plaintiffs have come forward with no evidence whatsoever to show how many of these 170 abortions would be unavailable under the Cherish Act. With the denominator of women seeking abortion in Arkansas, even the full 5.5% would amount to only a tiny fraction. But even if the Court were to find that this 5.5% constitutes the denominator, again, the Plaintiffs have come forward with *no evidence whatsoever* to indicate what the numerator would be. The Plaintiffs have not shown that the Cherish Act places a substantial obstacle in the way of a large fraction of women seeking an abortion in Arkansas. Therefore, they have not shown that they are likely to succeed on their claim that the Cherish Act unduly burdens the abortion right.

      i.      *The Cherish Act benefits both the medical profession and Arkansas women by regulating the dismemberment abortion of quickened unborn life.*

Since *Roe* itself the Supreme Court has steadfastly affirmed that States have an "important and legitimate interest in protecting the potentiality of human life." 410 U.S. at 162.

---

[16] LMP is a measure of gestational development from a woman's last menstrual period, and is generally understood to be two weeks greater than the probable post-fertilization (PPF) method of measuring fetal development.

In *Casey*, the Court recognized that States may enact regulations that "express profound respect for the life of the unborn." 505 U.S. at 877. And in *Gonzales* the Court reaffirmed that "[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman." 550 U.S. at 157. The Cherish Act has obvious benefits regarding Arkansas's interest in protecting unborn human life.

In addition to those benefits, the Cherish Act promotes the state's "legitimate interests in *regulating the medical profession* in order to promote respect for life, including life of the unborn." *Id.* at 158 (emphasis added); *cf. id.* ("Congress could . . . conclude that the type of abortion proscribed by the Act requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition."); *Stenberg*, 530 U.S. at 962 (Kennedy, J., dissenting) ("A State may take measures to ensure the medical profession and its members are viewed as healers, sustained by a compassionate and rigorous ethic and cognizant of the dignity and value of human life, even life which cannot survive without the assistance of others."). Arkansas likewise has an interest in protecting women from a "struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know," that the life of "her unborn child, a child assuming the human form," was ended in such a brutal manner as a dismemberment abortion between 18 weeks LMP and viability. *Gonzales*, 550 U.S. at 159-60. The Cherish Act's benefits include those for the medical profession and for Arkansan women themselves.

*First,* consider the benefits for Arkansas's interest in protecting the medical profession. Abortions after 18 weeks are particularly brutal. By the time a child in the womb reaches 18 weeks' gestation, all of the recognizable characteristics of the human body are visible. Harrison Decl. (Exh. G7). The child has head, hands, feet, fingers, toes, face, eyes, ears, and very sensitive

skin. *Id.* His or her nervous system is developed to the point of reacting to light, touch and painful stimuli. *Id.* He or she has kicking and rolling movements that the mother can feel. *Id.* The child has genuinely realized the human form.

The dismemberment-abortion procedure of such a child involves dilating a patient's cervix to permit insertion of medical instruments into the uterus. *Gonzales v. Carhart*, 550 U.S. 124, 135 (2007). Thereafter:

> The doctor, often guided by ultrasound, inserts grasping forceps through the woman's cervix and into the uterus to grab the fetus. The doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart. For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman.

*Id.* at 135. Describing how an unborn child is dismembered during such a procedure, abortion practitioner Leroy Carhart, the plaintiff in *Stenberg v. Carhart*, 530 U.S. 914 (2000), testified:

> Q.     How do you go about dismembering that extremity?
>
> A.     Just traction and rotation, grasping the portion that you can get ahold of which would be usually somewhere up the shaft of the exposed portion of the fetus, pulling down on it through the os [i.e., part of the lower cervix] using the internal os as your counter-traction and rotating to dismember the shoulder or the hip or whatever it would be. Sometimes you will get one leg and you can't get the other leg out.
>
> Q.     In that situation, are you, when you pull on the arm and remove it, is the fetus still alive?
>
> A.     Yes.

Transcript of July 17, 1997, proceedings in *Carhart v. Stenberg*, Case No. 4:97CV3205 (D. Neb.), at 109 (Exh. C1).

The contents of the abdomen and thorax are ripped open, and because an unborn child's head is the largest part, a physician performing a dismemberment abortion has to crush the skull to be able to extract it through the dilated cervix. As the Supreme Court has explained:

> The process of evacuating the fetus piece by piece continues until it has been completely removed. A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes. Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed.

*Gonzales*, 550 U.S. at 135-36. "The fetus, in many cases, dies just as a human adult or child would: It bleeds to death as it is torn limb from limb. The fetus can be alive at the beginning of the dismemberment process and can survive for a time while its limbs are being torn off." *Stenberg v. Carhart*, 530 U.S. 914, 958-59 (2000) (Kennedy, J., dissenting). At the end of the process, "the abortionist is left with a tray full of pieces" of recognizable body parts. *Id.* at 959.

"No one would dispute that, for many, D & E is a procedure itself laden with the power to devalue human life." *Gonzales*, 550 U.S. at 157. Indeed, the violence of dismemberment abortion causes even many physicians to experience significant anguish. An article published in *Advances in Planned Parenthood* by two abortion providers—one of whom had performed more than 650 dismemberment abortions—describes the reactions of clinic staff to "the violence of D & E." Warren M. Hern, M.D., M.P.H., and Billie Corrigan, R.N., M.S., *What About Us? Staff Reactions to D & E*, 15 Advances in Planned Parenthood 3, 5 (1980) (Exh. C2). None of the staff included in the study disapproved of the D&E procedure, but "[t]here was clear agreement that D & E is qualitatively a different procedure, medically and emotionally, than early abortion." *Id.* at 3. "[S]everal thought it was more difficult to rationalize or intellectualize D & E" than other methods. *Id.* at 5. Many staff reported "moral anguish" and "serious emotional reactions" causing physiological symptoms and sleep disturbances as a result of their involvement in D & E abortions involving fetal dismemberment. *Id.* at 3.

Staff with direct physical and visual involvement in the D & E process experienced greater emotional difficulty. *Id.* at 6. The article tells of a laboratory assistant who "began

performing the postoperative tissue examination for the physician"—which involves measuring fetal body parts and checking for completeness. *Id.* "After a time, the laboratory assistant asked to be relieved from examining the tissue . . . . She found herself becoming nauseated during the tissue examination and having disturbing dreams at night." *Id.* Other staff also reported disturbing dreams and a "sense of horror." *Id.* at 5. Some staff "felt that performing D & E must eventually damage the physician psychologically." *Id*.

The authors that article observe that clinic staff found it necessary to use "defense mechanisms" to cope with "the traumatic impact of the destructive part of the operation," including "rationalization," "projection," and "denial" of what is taking place—"sometimes shown by the distance a person keeps from viewing D & E." *Id.* at 7. The authors' frankness is sobering: "We have reached a point in this particular technology where there is no possibility of denying an act of destruction. It is before one's eyes. The sensations of dismemberment flow through the forceps like an electric current." *Id.* Finally, the authors note that that "[f]ailing to recognize the symptoms and signs of this stress may have important consequences for continuation of the service." *Id.* at 6. They observe that the "intense reactions in themselves and in other staff members to D & E" might "determine whether the patient even receives the care she requests." *Id.* at 3. This deep emotional anguish arises from an unavoidable recognition that the fetus shares the postnatal human form, along with the realization of the brutality involved in the act of dismemberment. Thus, the authors conclude that "[s]ome part of our cultural and perhaps even biological heritage recoils at a destructive operation on a form that is similar to our own. . . ." *Id.* at 7.

Similar anguish prompted another physician, George Flesh, to cease doing elective second-trimester abortions, due to the brutality of the dismemberment process. George Flesh,

*Perspective on Human Life: Why I No Longer Do Abortions*, L.A. Times, at 2 (Sept. 12, 1991)

(Exh. C3). Flesh writes, in pertinent part, that:

> I believe that tearing a developed fetus apart, limb by limb, simply at the mother's request is an act of depravity that society should not permit. We cannot afford such a devaluation of human life, nor the desensitization of medical personnel that it requires. This is not based on what the fetus might feel, but on what we should feel in watching an exquisite, partly formed human being dismembered . . . . I wish everybody could witness a second-trimester abortion before developing an opinion about it.

*Id.* at 2.

Just two days before the Plaintiffs filed this action, the New York Times ran an article in which abortion practitioner Christine Henneberg described her work: "We routinely perform procedures well into our patients' second trimester, when the fetus is well-formed and easily recognizable as humanlike, even 'life'-like. Baby-like." Christine Henneberg, *When an Abortion Doctor Becomes a Mother*, New York Times (June 27, 2019) (Exh. C10). She explains:

> There was one time when I almost fell apart: I was in my second trimester, performing a 17-week procedure on a patient. ***The fetus*, which is normally extracted in parts, *came through the cervix intact*. I dropped it in the metal dish *and I saw it move*,** or thought I did. It was all I could do not to run from the procedure room crying.

*Id.* (emphasis added). Dismemberment abortion unquestionably raises serious ethical concerns for the medical profession.

Dismembering a quickened, unborn child is inhuman. That recognition is of a piece with both case law describing execution by dismemberment as "inhuman and barbarous," *Glass v. Louisiana*, 471 U.S. 1080, 1084 (1985), and federal law deeming even the slaughtering of livestock through dismemberment as inhumane and contrary to "the public policy of the United States," 7 U.S.C. § 1902 (identifying two humane methods of slaughter and classifying all others as contrary to public policy).

The Cherish Act's regulation of the medical profession's performance of a particularly barbaric form of abortion is likewise entirely consistent with other state and federal statutes designed to respect unborn life. For instance, at every stage of development, the Arkansas Criminal Code protects unborn children from harm. *See* Ark. Code Ann. § 5-1-102(13)(B)(i)(a)-(b) (extending definition of "person" to include "unborn child in utero at any stage of development" for purposes of homicide provisions); Ark. Code Ann. § 5-13-201(a)(5)-(6) (commission of first degree battery when unborn child sustains serious physical injury after perpetrator purposely seeks to harm unborn child or pregnant woman or knowingly causes physical injury to pregnant woman resulting in serious physical injury to unborn child while committing a felony or Class A misdemeanor); Ark. Code Ann. § 5-2-615 (pregnant mother may justifiably use physical or deadly force to protect herself and her unborn child against unlawful physical or deadly force); *see also* 18 U.S.C. § 1841 (violation of separate, additional offense when death or bodily injury inflicted upon unborn child during commission of specified offenses including, but not limited to: 18 U.S.C. § 1111 (murder); 18 U.S.C. § 1203 (hostage taking); and 18 U.S.C. § 2261 (intrastate domestic violence)). Similarly, under Arkansas's wrongful death statute, a parent may also sue for the death of an unborn child. Ark. Code Ann. § 16-62-102. And the Arkansas Estate Code provides that a deceased viable fetus is a person over whose estate a circuit court has jurisdiction. Ark. Code Ann. § 28-1-118.

Under the same principles that both condemn death-by-dismemberment and recognize the dignity of human life, Arkansas is entitled to determine that a procedure that rips a quickened, unborn child limb-from-limb "requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition" except in the rarest of circumstances. *Gonzales*, 550 U.S. at 158. Indeed, while "for many, D & E is a procedure itself laden with the

power to devalue human life," *id.*, at a minimum, Arkansas is entitled to conclude that a procedure that tears a quickened, unborn child limb-from-limb to cause her death uniquely devalues human life and ought to be prohibited to show proper respect for human life and medical ethics.

Members of the Supreme Court have acknowledged a State's "interest in forbidding medical procedures which, in the State's reasonable determination, might cause the medical profession or society as a whole to become insensitive, even disdainful, to life, including life in the human fetus." *Stenberg*, 530 U.S. at 961 (Kennedy, J., dissenting). The Cherish Act serves that interest in Arkansas. It benefits the medical profession by ensuring that dismemberment abortions of quickened, unborn children are not performed in ways likely to coarsen the medical profession to its brutality.

**Second,** no less than medical professional exposed to gruesome post-18 week abortions, real Arkansas women suffer profound grief and sorrow caused by their decision to have a dismemberment abortion of a quickened, unborn child. One such Arkansas woman—a patient of Little Rock Family Planning Services—had a dismemberment abortion when she was more than 20 weeks pregnant. McGruder Decl. (Exh. H2). She has explained how she first came to realize the horror of the brutal act performed on her unborn child: "Later that day I panicked and called the nurse at the clinic because I stood up and saw more blood than I had ever seen. The nurse's exact words were 'It's ok, it's not just your blood,' meaning that it was the baby's blood." *Id.* She stated, "As a direct result of my abortion, I have struggled with depression, self-hatred, flashbacks, self-destructive behavior, suicidal thoughts, drinking, anxiety, shame, lack of self-worth and regret." *Id.* When she had her abortion, she "had no idea what effects it would have on my family and my marriage." *Id.* She said, "I wish that someone had shown me even a glimpse

of the pain my heart and soul would suffer. A glimpse of what the abortion was going to do to my health, marriage, and children." *Id.* "If only there were a way to convey to a woman the potential of what happens to someone who chooses a mid-term abortion. It changed me forever." *Id.* at 2 ¶ 7. "It has been 19 years since my abortion, and I have sought healing for my loss." *Id.*

This woman actually had a D&E abortion at Little Rock Family Planning after 18 weeks LMP. As her words make clear, dismemberment abortions performed in this state unquestionably cause Arkansas women profound grief and suffering.

The Eighth Circuit has acknowledged the suffering of women like this one. That court has previously recognized that "abortions may cause adverse consequences for the woman's health and well-being," including "mental and emotional torment." *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 775 (8th Cir. 2015). These concerns are magnified in the case of dismemberment abortion of a quickened, unborn child because of the inhumane and barbarous manner in which the child's human form is destroyed. Because it is reasonable to believe that "the standard D & E is in some respects *as brutal, if not more*," than partial-birth abortion, *Gonzales*, 550 U.S. at 1589 (emphasis added), the Cherish Act benefits Arkansas women by preventing them from experiencing such grief and sorrow caused by dismemberment abortion.

> ii.   *The Cherish Act's nonexistent burdens do not substantially outweigh its benefits.*

As explained above, the Plaintiffs have come forward with absolutely no evidence to indicate what fraction, if any, of the 170 women who sought dismemberment abortions after 18 weeks' gestation in 2018 would have been prevented from obtaining one. The only conclusion is that—perhaps due to the numerous exceptions included in the statute—the Cherish Act's burdens are nonexistent.

To preliminarily enjoin the Cherish Act, this Court must find that it is likely that its "benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas." *Jegley*, 864 F.3d at 960 n.9. But that finding is impossible here because there is no evidence of any burden at all. Therefore, the Court should deny the Plaintiffs' motion for preliminary injunction.

> **2.**  **The Cherish Act demonstrates the need to revisit the unworkable and ahistorical viability standard, which undervalues Arkansas's interest in protecting quickened, unborn life.**

To conclude that the benefits of the Cherish Act are substantially outweighed by its burdens, this Court would need to hypothesize those burdens. The Plaintiffs have failed to even allege them. But if the Court decided to rule that the Cherish Act violates the undue-burden standard based on such hypothetical burdens, it should nevertheless refuse to declare the Cherish Act unconstitutional. That is because the Cherish Act demonstrates the need to reconsider *Roe* and *Casey*'s viability standard because it undervalues the State's compelling interest in protecting quickened, unborn life.

In *Casey*, the Supreme Court expressly abandoned *Roe*'s trimester framework because previous cases had "undervalue[d] the State's interest in the potential life within the woman." 505 U.S. at 875 (quotation omitted). The Court recognized that the right set forth in *Roe* is a right only "to be free from unwarranted governmental intrusion into . . . the decision whether to bear or beget a child." *Casey*, 505 U.S. at 875 (quotation omitted)); *see id.* at 874 ("*Roe* did not declare an unqualified constitutional right to an abortion[.]"); *see also Roe*, 410 U.S. at 153 ("[A]ppellant and some amici argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. With this we do not agree."). It further observed that "[n]ot all governmental intrusion is of necessity unwarranted[.]" *Casey*, 505 U.S. at 875 (quotation omitted). In fact, it

acknowledged, *"Roe v. Wade* speaks with clarity in establishing . . . the State's 'important and legitimate interest in potential life.'" *Id.* at 871 (quoting *Roe*, 410 U.S. at 163).

Ultimately, *Roe*'s ungrounded fixation on "viability"—falling somewhere between 20 and 22 weeks—fails to give the State's interest in protecting unborn life its due. *Roe*, 410 U.S. at 163 ("With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability.").

For each of the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction.

### III.   An injunction is not warranted because the Plaintiffs have failed to demonstrate a likelihood of irreparable harm.

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

The Plaintiffs have failed to meet this demanding standard in each instance. First, the competency requirement does not prevent any woman from deciding whether to have an abortion at any stage of pregnancy. It is undisputed that medication and surgical abortion will continue to be available in Arkansas and at other out-of-state providers.  Second, the eugenics ban very narrowly prohibits only abortions that are performed for invidious reasons, and as discussed at-length above, Plaintiffs have no interest in continuing to perform eugenic abortions.  As such, they cannot show irreparable harm. Third, the Cherish Act is not a ban on abortion but merely regulates abortions of unborn children at 18 weeks' gestation. Plaintiffs have provided no evidence whatsoever that any mother would actually be prevented from obtaining an abortion.

By contrast, preliminary relief would irreparably harm society, mothers, and the medical profession.  Moreover, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301 (2012) (Robert, C.J., in chambers).  Indeed, it is beyond dispute that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *accord Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.").  Thus, far from preventing irreparable harm, an injunction would irrevocably alter the *status quo* and harm Arkansas and its citizens.

## IV.    The public interest and balance of the equities weigh decisively against issuing an injunction.

The Plaintiffs also have the burden of proving that "the balance of equities so favors [them] that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc.*, 640 F.2d at 113. Given the public interest in enforcing the law, the Plaintiffs cannot meet this burden.

Plaintiffs' argument that an injunction would merely maintain the status quo is badly mistaken.  The status quo is that duly enacted laws take effect without the intervention of courts, and Plaintiffs' argument ignores this fact.

Similarly, the public interest weighs decisively against preliminary relief since the people of Arkansas have an interest in seeing their laws enforced.  Moreover, there can be little doubt that the public interest weighs in support of protecting patient health and safety from ill-trained abortion practitioners and risky abortion practices, safeguarding medical ethics, and preventing eugenics.  Nor can Plaintiffs plausibly claim those interests are outweighed by the phantom restrictions on abortion access conjured in Plaintiffs' complaint.

## CONCLUSION

For these reasons, Arkansas respectfully requests that the Court deny the Plaintiffs'

motion for a preliminary injunction.

Dated:  July 17, 2019

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

Nicholas J. Bronni (2016097)
  Solicitor General
Vincent M. Wagner (2019071)
  Deputy Solicitor General
Michael A. Cantrell (2012287)
  Assistant Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-2007
(501) 682-8162 (fax)
michael.cantrell@arkansasag.gov

*Counsel for Defendants*