**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

LITTLE ROCK FAMILY PLANNING SERVICES, et al.,

Plaintiffs,

v.

LESLIE RUTLEDGE, in her official capacity as Attorney General of the State of Arkansas, et al.,

Defendants.

CIVIL ACTION

Case No. 4:19-cv-00449-KGB

**SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF THE LRFP PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION[1]

Plaintiffs challenge three restrictions that, if allowed to take effect, would outright ban some women from obtaining pre-viability abortion based on the point in pregnancy at which they are seeking care and their reason for seeking care and would otherwise eliminate abortion care in Arkansas for at least 62 to 70% of women who seek such care in the State. These restrictions are well known by the Court at this point, and have been referred to as the 18-Week Ban, the Reason Ban, and the OBGYN Requirement (the "Three Restrictions").

To preserve the status quo so that they could continue to provide safe and effective abortion care to their patients, Plaintiffs moved for a temporary restraining order ("TRO") and/or a preliminary injunction. This Court granted the motion for a TRO on July 23, 2019. In its opinion, the Court first rejected the State's various claims that Plaintiffs lacked standing to challenge the Three Restrictions and could not bring facial challenges to the Three Restrictions. *See* TRO Op. 65–73. The Court also recognized that, under Supreme Court precedent, the State cannot prohibit any woman from making the decision to terminate her pregnancy prior to viability. *Id.* 73–78. The Court accordingly held that "the undue burden test does not apply to its analysis of" the 18-Week Ban or the Reason Ban because they "prohibit[] pre-viability

[1] Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted. This brief uses the following terminology: (1) Plaintiffs' opening brief in support of their motion for a preliminary injunction or temporary restraining order is "Br."; (2) Plaintiffs' supplemental brief in support of their motion for a preliminary injunction or temporary restraining order is "Supp. Br."; (3) the State's opposition to that motion is "Opp."; (4) Plaintiffs' reply brief in support of their motion for a preliminary injunction or temporary restraining order is "Reply"; (5) the Court's July 23, 2019 decision granting a temporary restraining order is "TRO Op."; (6) the Defendants are referred to as "the State"; and (7) Plaintiffs Little Rock Family Planning ("LRFP") and Dr. Thomas Tvedten are referred to as "Plaintiffs."

abortions" and are thus per se unconstitutional.[2] *Id.* at 82, 90. That the Bans were subject to some exceptions did not change the Court's conclusion. *Id.* at 82, 92.

As to the OBGYN Requirement, the Court evaluated it under the undue burden standard, TRO Op. 94, rejecting the State's arguments, Opp. 44–45, that the OBGYN Requirement is subject to mere rational basis review. That is, the Court considered—as required under Supreme Court precedent—"burdens . . . on abortion access together with the benefits [the requirement at issue] confer[s]." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) ("*WWH*"); *see* TRO Op. 93–95. As part of this analysis, the Court asked whether "there [is a] significant health-related problem" the Requirement "help[s] to cure," and whether it is "more effective than pre-existing [state] law' in furthering defendants' asserted interests." TRO Op. 94 (quoting *WWH*, 136 S. Ct. at 2311, 2314) (most alterations in original).

The Court determined that Plaintiffs were "likely to prevail on their argument that" the OBGYN Requirement does not cure a significant health-related problem and does not advance Arkansas's interests more effectively than preexisting law. *Id.*; *see id.* at 127 ("[T]he Court concludes that, on the record evidence before it at this stage of the proceeding, plaintiffs are likely to prevail on their argument that Act 700 fails to advance those interests more effectively than pre-existing Arkansas law and regulation because Act 700 provides no discernable medical benefit."). In fact, the Court said it was "skeptical" that the OBGYN Requirement "confers any benefit upon Arkansas women in the context of abortion care." *Id.* at 93; *see also id.* at 102 (similar). The Court also found that the Plaintiffs "have made reasonable efforts to comply with the OBGYN requirement" but were unable to do so, *id.* at 142, and declined to consider out-of-

[2] The Court also held that Plaintiffs did not have standing to challenge the Reason Ban as applied to post viability abortions, TRO Op. 87, a finding Plaintiffs do not challenge.

state providers in the undue burden analysis, *id.* at 143–45. Finally, the Court found that the OBGYN Requirement would bar 57 to 66% of all Arkansas women who seek abortions in Arkansas annually from obtaining one. *Id.* at 153. Weighing the benefits and burdens of the OBGYN Requirement, the Court then held that because the OBGYN Requirement "imposes substantial burdens on a large fraction of Arkansas women seeking abortions against a near absence of evidence that the law promotes any state interest or provides any benefits to those women," *id.* at 154–55, it was likely "unconstitutional as it is applied to LRFP, Dr. Tvedten, and their patients," *id.* at 156.

The Court did not rule on Plaintiffs' motion for a preliminary injunction when it granted a TRO. On July 26, 2019, the Court instructed the parties to file any additional briefing on Plaintiffs' request for a preliminary injunction by 5 p.m. CT on July 31, 2019. Dkt. No. 88. This second supplemental brief is filed pursuant to that order.

**ARGUMENT**

Plaintiffs have shown that they are entitled to a preliminary injunction, just as they have already shown (and this Court found) that they were entitled to a TRO. "The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kan. City S. Transp. Co., Inc. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1066 (8th Cir. 1997). In deciding a preliminary-injunction motion, a district court considers four factors: the (1) probability that the movant will succeed on the merits; (2) threat of irreparable harm to the movant; (3) balance of equities; and (4) public interest. *See Grasso Enters., LLC* v. *Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016). These are the same factors the Court applied in considering whether to grant a TRO. TRO Op. 65. For the same reasons the Court held that Plaintiffs were entitled to a temporary restraining order,

Plaintiffs are entitled to a preliminary injunction. Plaintiffs incorporate their prior briefing and declarations in support of their requests for injunctive relief. They write separately to provide additional information on three topics: First, Plaintiffs emphasize that Defendants' use of creative math to neutralize the damaging effect of the OBGYN Requirement is not compelling. Second, Plaintiffs reiterate that LRFP is entitled to facial relief as to the OBGYN Requirement. Third, Plaintiffs note that the State's failure to call Dr. Kathi Aultman—the State's sole declarant attesting to the benefits of the OBGYN Requirement—for live testimony and credibility determinations substantially undermines the State's defense of the statute.

## I. PLAINTIFFS HAVE SHOWN THAT THEY ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR SUBSTANTIVE DUE PROCESS CHALLENGE TO THE OBGYN REQUIREMENT.

### A. The State's Calculations Regarding LRFP's and Dr. Fred Hopkins's Capacity To Provide Abortion Care Are Grossly Overstated And Must Be Rejected.

Plaintiffs showed in their supplemental memorandum of law in support of their Motion for a TRO and/or Preliminary Injunction that if the OBGYN Requirement takes effect, at least *62 to 70%* of women who seek abortion care in Arkansas annually will be unable to obtain the same care in the State that they otherwise would, absent the OBGYN Requirement. *See* Supp. Br. 2. And approximately *88 to 100%* of surgical-abortion patients (which includes *all* women after 10 weeks LMP) would no longer be able to obtain care in Arkansas. *See id.* These estimates are based on projections by Plaintiffs' expert Dr. Jason Lindo, who estimated the availability of abortion care in Arkansas if the OBGYN Requirement takes effect, based on historical demand for abortion and individual Arkansas abortion providers' capacity to provide care.[3] LRFP Clinic Director Lori Williams also testified that the maximum number of abortions that LRFP could

[3] *See generally* Lindo Decl.; *see also* Hearing Tr. 110–124.

provide on a given day is 20 to 25,[4] and explained that, in a given day, LRFP could provide even fewer procedures in later stages of pregnancy.[5]

All three of the State's responses to this striking evidentiary record fail. *First*, the State attempted to show at the hearing that the data on which Dr. Lindo relied shows that Dr. Hopkins actually provided 28 abortions on April 28, 2019,[6] seven more abortions than the maximum of 21-abortions-in-a-day figure on which Dr. Lindo based his capacity calculations.[7] But as explained in the Notice of Correction that Plaintiffs filed the morning after the hearing, Dr. Hopkins actually provided only 14 abortions on April 28, 2019—his April 2018 procedure counts were erroneously doubled due to a Microsoft Excel file-merging error by Plaintiffs' counsel. *See* Dkt. No. 79. Thus, Dr. Lindo's assumption that Dr. Hopkins could provide no more than 21 procedures per day if the OBGYN Requirement takes effect remains accurate (in fact, as Dr. Lindo explained during the hearing, it is conservative, considering that this estimate assumes maximum efficiency in providing care and also considering that LRFP will likely close if the OBGYN Requirement takes effect[8]).

*Second*, the State tried to undermine Ms. Williams' testimony that LRFP can safely provide no more than 25 procedures a day (given current conditions, including staffing levels) by pointing out that the spreadsheet listing LRFP's historical abortion-care data appears to reflect LRFP providing 46 abortions on April 11, 2018.[9] But this too is explained by the April 2018-

---

[4] Hearing Tr. at 79:10–14.

[5] Hearing Tr. at 79:15–21.

[6] Hearing Tr. at 131:20–133:13.

[7] Lindo Decl. at ¶ 49(c).

[8] Hearing Tr. at 116:5–117:14.

[9] Hearing Tr. at 145:8–146:6.

specific merging error described above: LRFP provided only 23 abortions (not 46 abortions) on April 11, 2018, consistent with Ms. Williams' testimony. *See* Dkt. No. 79.

*Third*, the State has provided the Court with creative math showing, it says, that Dr. Fred Hopkins could—on his own—satisfy a substantial portion of the need in Arkansas for access to surgical abortions. *See* Opp. 61. Approximately 70% of Arkansas abortion procedures over the last three years were surgical (2,212), and nearly half of those patients (45%) terminated their pregnancies at or after 10 weeks LMP.[10] In the world according to Defendants, Dr. Hopkins could provide up to 525 surgical abortions per year (rather than the 252 that Dr. Lindo estimates[11]), if Dr. Hopkins provides 25 abortions per day, 3.5 days a week, 6 times a year. *See* Opp. 69–70. This calculation—which *still* falls far short of the 2,212 women in need of surgical care every year—is grossly inflated for multiple reasons. Namely:

- it assumes that LRFP could remain open with Dr. Hopkins as its only provider, which Ms. Williams testified is extremely unlikely[12];

- it assumes that Dr. Hopkins could provide care up to four times a week, but Ms. Williams explained that is not possible, because the 72-hour mandated delay requires LRFP to stagger its patients throughout the week,[13] and Dr. Hopkins needs time to travel from California to Little Rock[14];

- the State ignores that Dr. Hopkins would have to spend one of his three days at the clinic obtaining patient consents, because, as Ms. Williams testified, LRFP could not afford to have a physician on staff for the sole purpose of obtaining consents[15];

- because Dr. Hopkins has never provided more than 21 abortions on a single day at LRFP, it is unreasonable to assume he could do 25 per day safely on a going-forward basis; and

---

[10] Lindo Decl. ¶ 2.

[11] Lindo Decl. ¶ 59.

[12] Hearing Tr. at 92:2–11.

[13] Hearing Tr. at 80:11–17.

[14] Hearing Tr. at 32:4–10.

[15] Hearing Tr. at 91:10–92:1.

- it is unreasonable to assume that all the women who need surgical-abortion care can wait until Dr. Hopkins is in town to obtain that care—doing so would likely be logistically impossible for many women (*see* Br. 3–4, 26, 28–30; Reply 37–38, 44), and delaying procedures until Dr. Hopkins is available would increase health risks to the patients, *see* Br. 30.

### B. Plaintiffs Have Shown That They Are Entitled To Facial Relief.

Plaintiffs may prevail on a facial challenge to an abortion regulation where (as here) they "demonstrat[e] that in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion"—that is, that the "requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking [] abortion in Arkansas." *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 958, 960 n.9 (8th Cir. 2017); *see* TRO Op. 72 (citing cases providing facial relief from abortion regulations); *accord Gonzales v. Carhart*, 550 U.S. 124, 167–68 (2007) (regulation must be "unconstitutional in a large fraction of relevant cases").[16] In assessing whether a regulation unduly burdens access to abortion care for a large fraction of women, the relevant denominator is the number of women for whom the regulation is "an actual rather than an irrelevant restriction." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 895 (1992); *see also* TRO Op. 146; *WWH*, 136 S. Ct. at 2313.[17]

---

[16] The question of as-applied or facial relief relates not to the law's constitutionality, but to the appropriate remedy. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court."). "Large fraction" is the test for facial (and not as-applied) relief. *See Jegley,* 864 F.3d at 959 ("[I]n *order to sustain a facial challenge* . . . the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas"). Moreover, even where plaintiffs bring an as-applied challenge to an abortion statute, "[n]othing prevents this Court from awarding facial relief as the appropriate remedy for [plaintiffs'] as-applied claims." *WWH*, 136 S. Ct. at 2307. Here, Plaintiffs have proven that the OBGYN Requirement's burdens will impose a substantial obstacle on a large fraction of affected women, entitling them to facial relief.

[17] Plaintiffs are entitled to facial relief as to the two Bans because they outright prohibit abortion at a pre-viability point in pregnancy, *see* TRO Op. 81–83, 89–92. Because the Court agreed with that resolution in its prior order, Plaintiffs do not further address this issue in this supplemental brief.

The OBGYN Requirement imposes a substantial obstacle to obtaining abortion care on a large fraction of women to whom the Requirement is relevant: As explained in Plaintiffs' opening brief in support of injunctive relief, at least 62 to 70% of women who seek abortion care in Arkansas on an annual basis will be unable to do so if the OBGYN Requirement goes into effect. Br. 26–27, 41. The outcome would not change if the relevant group were instead "all Arkansas women seeking abortions," TRO Op. 146, rather than all women—residents and non-residents—who seek abortion care in Arkansas; as this Court's ruling makes clear, even then a large fraction of women (57 to 66%) would be barred from obtaining abortion care in Arkansas, *see* TRO Op. 151–53.[18] More than one-half is a large fraction; indeed, it is a majority. *See, e.g.*, *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1462–63 & n.10 (8th Cir. 1995) (finding that plaintiff had "shown that a large fraction of minors seeking pre-viability abortions would be unduly burdened by South Dakota's parental-notice statute, despite its abuse exception," in part because "[r]oughly eighteen per cent. of South Dakota's minors live in single-parent homes" and thus could not "simply notify her other parent"). In short, under any

[18] While this Court concluded that Plaintiffs were likely to prevail on their claim that the OBGYN Requirement unduly burdened care, TRO Op. 153–56, based on the fact that the Requirement would bar 57 to 66% of *Arkansas residents* from obtaining abortion care in Arkansas going forward, *id.* at 151–52, it nevertheless alternatively acknowledged that 62 to 70% of *all* women seeking abortions in Arkansas (including non-residents) would be prevented from obtaining abortions in Arkansas, *id.* at 152, nn. 24, 28. Plaintiffs maintain that both the undue burden test and large fraction calculations should take into account not just women who are state residents but all people (residents and non-residents) seeking abortion care in Arkansas. Failing to include out-of-state women in the analysis would violate the Privileges and Immunities clause, which prohibits discrimination against out-of-state residents in the protection of constitutional rights, *see Doe v. Bolton*, 410 U.S. 179, 200 (1973) (striking down ban on providing abortions to out-of-state residents), and it would under-emphasize the full effect of the challenged restrictions on abortion access in the State. Non-residents who would otherwise seek abortion care in Arkansas will be burdened by the elimination of abortion care in the State, and non-residents' use of Arkansas's abortion services will affect the capacity of LRFP and PPAEO to provide abortion care to residents and non-residents alike. Plaintiffs' position is consistent with *WWH*, where the Supreme Court considered the effect of challenged abortion restrictions on "women seeking abortions in Texas," not just Texas residents. *See WWH*, 136 S. Ct. at 2319.

calculation, Plaintiffs have shown, and this Court has agreed, that the OBGYN Requirement would burden access to abortion care for a large fraction of women to whom it is relevant, therefore entitling Plaintiffs to facial relief. *See* Br. 43–47; Reply 37–47; Lindo Decl.; Lindo Supp. Decl.

Providing facial relief when a challenged abortion restriction affects a large fraction of women makes sense because it is the only way to provide meaningful relief: "The very nature of the rights [plaintiffs] seek to vindicate requires that the decree run to the benefit not only of [plaintiffs] but also for all persons similarly situated." *Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir. 1963) (enjoining state from enforcing any of the challenged segregation laws in general, not just against the plaintiffs); *see also WWH*, 136 S. Ct. at 2318–20 (enjoining restrictions facially even where some providers in the state were not affected). Plaintiffs challenge the OBGYN Requirement because it unconstitutionally restricts access to abortion care in Arkansas. *See* Br. 25–27, 43–47. It is not possible to remedy that wrong without remedying the State's unconstitutional practice of restricting abortion care throughout the State; *capacity* to provide abortion care is necessarily informed by every clinic and provider that might be able to provide such care. *See* TRO Op. 127 (noting that courts must assess abortion restrictions "in light of the realities of abortion care"). And as this Court has already found that the OBGYN Requirement provides no benefits, *id.* at 96–138, there is simply no reason to burden any provider or patient with its arbitrary mandate. Enjoining the OBGYN Requirement as to all applications is also consistent with courts' and public officials' duties to protect the public from enforcement of unconstitutional legislation. *See Inland Steel Co. v. United States*, 306 U.S. 153, 157 (1939) ("[I]t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interest the injunction may affect."); *Soto-Lopez v.*

*N.Y.C. Civil Serv. Comm'n*, 840 F.2d 162, 168 (2d Cir. 1988) ("The availability of such injunctive relief is not limited to class actions. When a state statute has been ruled unconstitutional, state actors have an obligation to desist from enforcing that statute.").

Because Plaintiffs have shown that the OBGYN Requirement would burden access to abortion care for a large fraction of people to whom it is relevant, and because precedent and public policy support the grant of facial relief as to the OBGYN Requirement here, Plaintiffs renew their request to preliminarily enjoin it.

**C. The State's Failure to Call Dr. Kathi Aultman For Live Testimony Further Undermines Its Defense Of The OBGYN Requirement.**

The State's expert Dr. Kathi Aultman is the *only* witness whom the State identified to provide testimony in support of the OBGYN Requirement. As the Court has already observed, Dr. Aultman's experience providing and teaching others to provide abortions pales in comparison to that of Plaintiffs' expert witnesses, Dr. Hopkins and Dr. Linda Prine. *See* TRO Op. 131 (observing "Dr. Aultman appears to have reviewed websites and literature to prepare her declaration, not relied upon her experience"). Nor did Dr. Aultman appear to provide live testimony at the July 22, 2019 hearing. Nor has the State indicated that it would call her in its recently filed request for an additional hearing on Plaintiffs' motion for a preliminary injunction. Dkt. No. 95. Because Plaintiffs had no opportunity to cross examine Dr. Aultman, and the Court is accordingly unable to assess her credibility, her written statements in support of the OBGYN Requirement should be given less weight than those of Plaintiffs' witnesses, who testified live. *See*, *e.g.*, Fed. R. Civ. P. 52; *United States v. Moua*, 895 F.3d 556, 559 (8th Cir. 2018)

("Credibility determinations are uniquely within the province of the trier of fact, and are entitled to special deference").

## CONCLUSION

For the foregoing reasons, and all those described in Plaintiffs' initial and supplemental briefs, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: July 31, 2019

Respectfully submitted,

Leah Godesky*
Kelly Scavone*
Attorneys for Plaintiffs
O'Melveny and Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
lgodesky@omm.com
kscavone@omm.com
Tel: (212) 326-2254
Fax: (212) 326-2061

Kendall Turner*
Attorney for Plaintiffs
O'Melveny and Myers LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300
kendallturner@omm.com

Taylor Simeone*
Attorney for Plaintiffs
O'Melveny and Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
tsimeone@omm.com
(310) 553-6700

Meagan Burrows*
Susan Talcott Camp*
American Civil Liberties Union Foundation
125 Broad St, 18th Floor
New York, NY 10001
mburrows@aclu.org
tcamp@aclu.org
(212) 549-2633
*Attorneys for Plaintiffs LRFP and Dr. Thomas Tvedten*

Maithreyi Ratakonda*
Planned Parenthood Federation of America
123 William St., 9th Fl.
New York, NY 10038
mai.ratakonda@ppfa.org
(212) 261-4405

*Attorney for Plaintiffs PPAEO and Dr. Stephanie Ho*

** Motion for admission pro hac vice granted*

Bettina Brownstein (AR Bar No. 85019)
Bettina E. Brownstein Law Firm
904 West 2nd Street, Suite 2
Little Rock, AR 72201
(501) 920-1764 – Telephone
E-Mail: bettinabrownstein@gmail.com

*On Behalf of the Arkansas Civil Liberties Union Foundation, Inc.*
*Attorney for Plaintiffs*

Rebecca Rhodes Jackson (AR Bar No. 2017079)
904 West 2nd Street
Little Rock, AR 72201
(314) 440-6265 – Telephone
E-Mail: beckywesth@gmail.com

*On Behalf of the Arkansas Civil Liberties Union Foundation, Inc.*
*Attorney for Plaintiffs LFRP and Dr. Thomas Tvedt*