# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**LITTLE ROCK FAMILY**           **PLAINTIFFS**
**PLANNING SERVICES**, *et al.*,

**v.**       **Case No. 4:19-cv-00449-KGB**

**LESLIE RUTLEDGE, in her**
**official capacity as Attorney General**
**of the State of Arkansas**, *et al.*,        **DEFENDANTS**

## PRELIMINARY INJUNCTION

Before the Court is a motion for a temporary restraining order and/or preliminary injunction filed by separate plaintiffs Little Rock Family Planning Services ("LRFP") and Thomas Tvedten, M.D., on behalf of himself and his patients (Dkt. No. 2).[1] The Court held a hearing on July 22, 2019, and entered a temporary restraining order on July 23, 2019 (Dkt. No. 83). In the temporary restraining order, the Court held plaintiffs' request for a preliminary injunction under advisement. For the reasons set forth below, the Court grants plaintiffs' request for a preliminary injunction.

Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of themselves and their patients under the United States Constitution and 42 U.S.C. § 1983 to challenge three Acts passed by the Arkansas General Assembly: (1) Arkansas Act 493 of 2019, which bans abortion "where the pregnancy is determined to be greater than 18 weeks," as measured from the first day of a woman's last menstrual period ("LMP") in nearly all cases ("Act 493"); Arkansas Act 619, which prohibits a physician from intentionally performing or attempting to perform an abortion "with the knowledge" that a pregnant woman is seeking an abortion "solely on the basis" of: a test "indicating" Down syndrome; a prenatal diagnosis of Down syndrome; or "[a]ny other

---

[1] Not all named plaintiffs in this lawsuit join the motion for temporary restraining order and/or preliminary injunction (Dkt. Nos. 2, 32).

reason to believe" the "unborn child" has Down syndrome ("Act 619"); and (3) Arkansas Act 700 of 2019, which provides that "[a] person shall not perform or induce an abortion unless that person is a physician licensed to practice medicine in the state of Arkansas and is board-certified or board-eligible in obstetrics and gynecology." ("Act 700" or the "OBGYN requirement"). This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

## I.    Procedural History

Plaintiffs filed their complaint and motion for a temporary restraining order and/or preliminary injunction on June 26, 2019 (Dkt. Nos. 1, 2). The challenged Acts were to take effect on July 24, 2019. The Court held the hearing on plaintiffs' motion for temporary restraining order and/or preliminary injunction on July 22, 2019 (Dkt. No. 78).

In response to a motion for expedited prehearing discovery filed by defendants, the Court instructed the parties to meet and confer regarding any outstanding discovery requests and to file a joint status report on July 12, 2019 (Dkt. No. 34). On July 10, 2019, plaintiffs filed a supplemental declaration from Jason Lindo, Ph.D., and in response defendants sought to strike the supplemental declaration or to extend the time to respond to the motion for temporary restraining order and/or preliminary injunction (Dkt. Nos. 37, 38). Plaintiffs opposed the motion to strike the supplemental declaration and the request to extend the time to respond to the motion (Dkt. No. 39). The Court denied the motion to strike or request for additional time to respond to the motion, observing in part that any alleged prejudice would be limited and mitigated if the Court "treats plaintiffs' motion as one for temporary restraining order, then such an order—whether granted or denied—would expire 14 days from the date it is entered, and the Court may permit all parties to address further the merits of this expedited matter prior to a hearing on plaintiffs' request for a preliminary injunction." (Dkt. No. 41, at 2).

The parties timely filed their joint status report on July 12, 2019, and reported that they required the Court to resolve three remaining discovery disputes (Dkt. No. 40). In that same status report, the parties represented that certain information would be turned over contingent upon the entry of a protective order that was still being negotiated by the parties. The Court then entered an order denying without prejudice defendants' motion for expedited prehearing discovery, resolving only the three remaining discovery disputes the parties had been unable to resolve at that time (Dkt. No. 42).

On July 18, 2019, defendants filed a renewed motion for expedited prehearing discovery (Dkt. No. 56). In that motion, defendants argued that, because plaintiffs insisted upon an "unreasonably broad definition of 'confidential information,'" the parties could not agree on the terms of a protective order, and therefore defendants had not received agreed-upon discovery (*Id.*, at 1). In response, plaintiffs pointed out that they sent a proposed protective order to defendants on July 10, 2019, but defendants did not respond until July 15, 2019, with a counterproposal (Dkt. No. 60, at 4). Plaintiffs responded on July 16, 2019, rejecting the counterproposal (*Id.*). Defendants did not file a renewed motion until July 18, 2019, after filing a written response to the motion for temporary restraining order and/or preliminary injunction. On July 19, 2019, the Court denied defendants' renewed motion for expedited prehearing discovery and entered a protective order (Dkt. Nos. 69, 70).

On Saturday, July 20, 2019, a day after the deadline for disclosing rebuttal exhibits and witnesses in advance of the July 22, 2019, hearing had elapsed, defendants filed a new declaration that totaled 272 pages, with attachments; plaintiffs also filed a supplemental rebuttal witness list (Dkt. Nos. 73, 74). Then, on Sunday, July 21, 2019, plaintiffs filed a motion to strike certain declarations introduced by defendants, including the declaration filed on Saturday, July 20, 2019

(Dkt. No. 75). Also on Sunday, July 21, 2019, defendants filed a motion to strike certain declarations introduced by plaintiffs and to strike plaintiffs' reply brief (Dkt. No. 76).

The hearing was held on July 22, 2019 (Dkt. No. 84). Plaintiffs called Frederick Hopkins, M.D., Linda Prine, M.D., Lori Williams, Dr. Lindo, and Thomas Tvedten, M.D. Defendants called Janet Cathey, M.D., Tumulesh K.S. Solanky, Ph.D., Donna Harrison, M.D., and Judy McGruder. Plaintiffs recalled Dr. Prine for rebuttal, after which defendants did not cross examine her. Plaintiffs also recalled Dr. Lindo for rebuttal, and likewise defendants did not cross examine him on his rebuttal testimony. Neither party identified additional witnesses they wished to have called. Furthermore, neither party utilized the full time granted by the Court to question the witnesses who appeared at that hearing.

The day after the July 22, 2019, hearing, plaintiffs filed a notice of correction of the record in which they attached a supplemental declaration by Dr. Lindo that corrected duplicate entries within Excel files that had been produced to defendants (Dkt. No. 79, at 1). Defendants then filed a motion to strike this declaration, arguing that the Court should strike the latest declaration and allow defendants further discovery by deposing Dr. Lindo (Dkt. No. 80). The Court denied defendants' motion to strike this declaration and their request to depose Dr. Lindo (Dkt. No. 96).

On July 23, 2019, the Court entered a 14-day temporary restraining order enjoining the enforcement of Acts 493, 619, and 700. On July 25, 2019, defendants filed a motion for expedited preliminary-injunction-proceeding discovery, in which defendants sought the Court's permission to propound discovery requests on plaintiffs regarding Planned Parenthood of Arkansas and Eastern Oklahoma's ("PPAEO") ability to provide abortions in Little Rock, PPAEO's efforts to provide surgical abortions in Arkansas, building requirements applicable to surgical abortions, and data on out-of-state abortion clinics (Dkt. No. 86). Defendants also sought permission to issue a

Federal Rule of Civil Procedure 30(b)(6) deposition notice on PPAEO (*Id.*). Plaintiffs responded to the motion for expedited discovery (Dkt. No. 92), and the Court denied defendants' motion (Dkt. No. 97).

At the hearing, plaintiffs objected to defendants' request to introduce as a hearing exhibit in this matter the entire record from *Planned Parenthood Arkansas and Eastern Oklahoma v. Jegley*, Case No. 4:15-cv-00784-KGB, on the basis that defendants failed to refer to, or move to introduce, any specific portions of that record in response to plaintiffs' motion for temporary restraining order and/or preliminary injunction here. The Court entered a written Order recounting the parties' positions with respect to *Jegley* and the current case, declining defendants' oral motion to incorporate the entire record from *Jegley* into this matter, and directing the parties to cite to specific portions of the *Jegley* record for the Court's consideration in this matter (Dkt. No. 94).

Defendants also requested a second hearing, and the Court denied this request (Dkt. No. 111). The Court noted, in part, that the matters defendants wished to raise at a second hearing were known to defendants at the July 22, 2019, hearing and that the defendants had an opportunity to cross examine plaintiffs' witnesses on these matters at that time (*Id.*). In ruling on plaintiffs' motion for preliminary injunction, the Court has considered the record before it as of August 6, 2019. Further, given the limited nature of a preliminary injunction order, the Court declines to strike the declarations filed by any party and instead will give them the weight to which they are entitled at this stage of the proceedings. *See Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1286-87 (8th Cir. 1974).

## II.    Findings Of Fact

The Court makes the following findings of fact. [2]

1.    Charlie Browne, M.D., a board-certified obstetrician-gynecologist ("OBGYN") offers an affidavit in support of plaintiffs' motion (Dkt. No. 2, at 24-28; Decl. of Charlie Browne, M.D., ¶ 1).  Dr. Browne is a Clinical Assistant Professor at the University of Washington Medical Center, Department of Obstetrics and Gynecology in Seattle, Washington, and Clinical Faculty at Pacific Northwest University College of Osteopathic Medicine in Yakima, Washington (*Id.*).  He is also the Medical Director of All Women's Care in Seattle Washington, the Medical Director of All Women's Health in Tacoma, Washington, and the Director of Second-Trimester Services of Planned Parenthood of Greater Washington & Northern Idaho (*Id.*).  In these positions, Dr. Browne provides abortion care and other gynecological services (*Id.*).

2.    Dr. Browne avers that, based upon his experience and training, a medical provider does not need to be a board-certified or board-eligible OBGYN to have the education, training, and skills necessary to provide safely and competently abortion care (Decl. of Charlie Browne, M.D., ¶ 6).  In his experience, there is no difference in the abilities, qualifications, or skills of non-

---

[2] To the extent the findings of fact in this Order contradict the findings of fact made in the Court's prior Orders, the findings of fact in this Order control.  Further, the Court will address these and additional factual matters in the context of its discussion of the legal issues; in that context, the Court also makes findings of fact.  In making the following findings of fact and conclusions of law, the Court has considered the record as a whole.  The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from those facts.  All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusions of law more appropriately considered a finding of fact shall be so classified.  The Court has considered and weighed all the evidence presented in the record at this stage; the Court has resolved any disputes consistent with the statements in this Order.

OBGYN practitioners and OBGYNs who have received the necessary training to provide abortion care (*Id.*).

3. Dr. Browne further avers that being a board-eligible or board-certified OBGYN does not make an abortion provider any more equipped to handle the "rare complications that may arise from an abortion." (*Id.*, ¶ 7). Dr. Browne explains that "in the rare event of a serious complication, the patient would need to be transferred to a hospital for emergency care, regardless of whether the physician providing abortion care is a board-certified OBGYN." (*Id.*). In his experience, serious complications arising from either medication or surgical abortions are rare (Decl. of Charlie Browne, M.D., ¶ 7).

4. From August 2010 to December 2010, Dr. Browne provided abortion care for LRFP approximately once every four to six weeks for two to three days at a time (*Id.*, ¶ 8). Between 2011 and July 2012, he also provided abortion care at LRFP approximately two to three weeks per year (*Id.*). After 2012, Dr. Browne had to stop providing abortion care at LRFP since it takes him approximately six to seven hours to travel to LRFP from his home and because the time away from his home was disruptive professionally (*Id.*, ¶¶ 9-10).

5. Dr. Browne also avers that providing abortion care at LRFP was difficult and stressful due to harassment he experienced while working at the clinic (Decl. of Charlie Browne, M.D., ¶ 11). Every time Dr. Browne traveled to LRFP, he encountered protestors attempting to block the entrance to LRFP's parking lot (*Id.*). He also states that the harassment and stigma he experienced in Arkansas was "far more prevalent and aggressive than any [he had] experienced as an abortion provider elsewhere." (*Id.*, ¶ 12). For these reasons, Dr. Browne has not returned to LRFP for the past seven years (*Id.*, ¶ 13).

6.     Dr. Browne states that LRFP staff reached out to him in March 2019 to see if he would be willing to provide abortion care at LRFP when the OBGYN requirement is set to take effect (Decl. of Charlie Browne, M.D., ¶ 14).  Dr. Browne has agreed to do so but only for two to three days in July 2019 (*Id*.).  He cannot commit to providing care after that time given his professional and personal obligations in Seattle, Washington (*Id*.).

7.     Janet Cathey, M.D., a board-certified OBGYN licensed to practice medicine in Arkansas and Oklahoma, has presented her declaration in support of plaintiffs' motion (Dkt. No. 2, at 36-41, Decl. of Janet Cathey, M.D.)).  Dr. Cathey avers that she provides medical services, including medication abortion, at PPAEO health center in Little Rock, Arkansas (*Id*., ¶ 1).

8.     In early 2018, Dr. Cathey was asked by PPAEO to provide reproductive health care services at PPAEO's health center in Little Rock ("PPAEO Little Rock"), and in May 2018, she began working at the health center in Little Rock (*Id*., ¶ 3).

9.     At LRFP's Little Rock health center, Dr. Cathey provides family planning services, transgender care, and medication abortions (*Id*., ¶ 4).  She also has administrative responsibilities, including overseeing clinical staff, teaching medical students, and acting as director of Planned Parenthood Great Plains' ("PPGP") transgender care program (Decl. of Janet Cathey, M.D., ¶ 4).  Since she started in this position through April 30, 2019, she has provided 229 medication abortions (*Id*., ¶ 5).

10.     Dr. Cathey is one of only two physicians providing medication abortion at PPAEO's Little Rock health center (*Id*., ¶ 6).  The other physician, Dudley Rodgers, M.D., is a board-certified OBGYN who provides only medication abortions approximately one day per week (*Id*.).  Dr. Rodgers is semi-retired and does not provide medical care anywhere else, due in part to

health issues that prevent him from providing patient care for long hours or multiple days a week (*Id.*).

11. Dr. Cathey currently provides medical care at PPAEO's Little Rock health center three days per week for approximately eight to ten hours a day (Decl. of Janet Cathey, M.D., ¶ 7). She also works as a medical consultant for Social Security disability reviews and completes PPAEO administrative responsibilities two other days per week (*Id.*). Dr. Cathey's administrative responsibilities include providing non-clinical services to her transgender patients, mentoring medical students regarding abortion care, transgender care, and other medical care, including gynecological procedures (*Id.*). Dr. Cathey also avers that she expects her non-clinical responsibilities to increase (*Id.*).

12. Dr. Cathey avers that, during the three days that she provides patient care, her schedule is at capacity (Decl. of Janet Cathey, M.D., ¶ 8). Due to patient demand, Dr. Cathey is planning to add another half day a week to provide patient care, including care to patients seeking medication abortions, transgender care, and family planning (*Id.*). She states that providing care three and a half days per week "is the absolute maximum amount of time" she can devote to patient care (*Id.*).

13. Dr. Cathey also notes that she cannot take on additional hours to provide medical care because of physical limitations resulting from a spinal cord injury she sustained in a 2009 car accident (*Id.*, ¶ 9). Because of her injuries, she originally stopped providing patient care, and though she now practices medicine, she continues to have physical restrictions (Decl. of Janet Cathey, M.D., ¶ 9).

14. Dr. Cathey also avers that she sees a significant number of transgender and family planning patients and that she is the only physician at PPAEO's Little Rock health center who

provides care for these patients (*Id.*, ¶ 10). It is Dr. Cathey's understanding that the only other health center in Arkansas that maintains a dedicated transgender care program is the University of Arkansas for Medical Sciences ("UAMS") clinic, which provides transgender care "only one half day per week." (*Id.*).

15. In sum, due to her other personal and professional responsibilities, Dr. Cathey cannot see any more medication abortion patients other than those she is able to see in three and a half days per week (*Id.*, ¶ 11).

16. Dr. Cathey also avers that, based upon her experience, she does not believe that requiring all abortion providers to be board-certified or board-eligible OBGYNs provides "any benefit whatsoever to patients." (Decl. of Janet Cathey, M.D., ¶ 12). She notes that clinicians from a range of specialties, including family medicine, can become trained to provide abortion care (*Id.*). She maintains that there is nothing about being a board-certified or board-eligible OBGYN that makes a physician better, safer, or more effective at providing abortion care (*Id.*). Dr. Cathey testified at the hearing that, during her time at UAMS, she observed the training of OBGYN residents, and she noted that very few of them received training in abortion care (Dkt. No. 84, at 203:1-2). She also noted that most, but not all, of the OBGYN residents were able to provide miscarriage management by the end of their residency (*Id.*).

17. Dr. Cathey states that many family medicine physicians and other clinicians undergo training to provide safely abortion care (Decl. of Janet Cathey, M.D., ¶ 13). She further states that family medicine medical students are "just as skilled and qualified to provide abortion care as the OBGYN students." (*Id.*, ¶ 14).

18. Dr. Cathey states that "restricting the number of clinicians who can provide abortion in the state to only board-certified or board-eligible OBGYNs will actually *harm* patients,

as it can force patients to unnecessarily delay their access to care or prevent them from obtaining an abortion altogether." (*Id.*, ¶ 15 (emphasis in original)).

19.     Dr. Cathey notes that there are already very few abortion providers in Arkansas, which she attributes to "the intense stigma and harassment that abortion providers face here." (*Id.*, ¶ 16).  When her children were younger and in school, Dr. Cathey did not want to provide abortions because she feared the harassment that her children would likely face (*Id.*).

20.     At the hearing, defendants' counsel asked Dr. Cathey if she would perform an abortion if the woman seeking the abortion indicated that she was seeking an abortion because the fetus was transgendered or based upon the fetus' race (Dkt. No. 84, at 201:1- 202:9).  Defendants did not ask Dr. Cathey about her capacity to provide abortions for PPAEO or about the capacity of PPAEO's new facility in Little Rock.  Defendants did not argue that they did not have enough time to question Dr. Cathey, nor did they ask the Court to direct Dr. Cathey to answer any questions.

21.     Lori Freedman, Ph.D., an associate professor in the Department of Obstetrics, Gynecology and Reproductive Sciences at the University of California, San Francisco, offers her declaration in support of plaintiffs' motion (Dkt. No. 2, at 47-57, Decl. of Lori Freedman, Ph.D.). Dr. Freedman's work focuses on qualitative health research, clinician training and practice, medical ethics in reproductive health, and health care practices of religiously affiliated institutions (*Id.*, ¶ 3).  She has studied barriers to the provision of abortion care (*Id.*).  In particular, she has researched "why doctors with abortion training do not integrate abortion care into their practice post-residency." (*Id.*).

22.     In her opinion, in addition to violence and harassment, the intense stigmatization of abortion providers makes it difficult, if not impossible in certain areas, to find and retain abortion providers (Decl. of Lori Freedman, Ph.D., ¶ 4).

23.     Dr. Freedman explains that "no-abortion" policies in private practice groups, hospital maintenance organization ("HMOs"), and hospitals often prevent physicians from providing abortions (*Id*., ¶ 11). She also states that physicians are often asked to sign contracts stating that they will not provide abortions at the offices of their practice and that they will not provide abortions offsite (*Id*.).

24.     Of five doctors who had been asked to be medical directors at an abortion clinic, four of them told Dr. Freedman that they had declined because their own group practices would not permit it (*Id*.). Additionally, Dr. Freedman states that, in her research, she has encountered situations where senior physicians threatened to ostracize younger physicians who performed abortions (Decl. of Lori Freedman, Ph.D., ¶ 12). She also states that physicians interviewing for post-residency positions have told her that they fear broaching the subject of abortion with potential employers (*Id*.).

25.     Dr. Freedman also avers that physicians who provide abortions frequently lose referrals from medical providers who oppose abortion, thereby placing their practices in jeopardy (*Id*., ¶ 13). Additionally, Dr. Freedman notes that doctors may decline to provide abortions because they worry about losing existing patients who are opposed to abortion (*Id*.).

26.     Furthermore, Dr. Freedman points out that physicians who wish to perform abortions often must choose whether to maintain a general obstetrics and gynecology ("OBGYN") practice or provide abortions, but not both (Decl. of Lori Freedman, Ph.D., ¶ 14).

27.     Dr. Freedman also notes that abortion providers are routinely ostracized in their communities through acts such as being denied membership to social organizations and the bullying of their children at school (*Id.*, ¶ 15).  She also states that physicians cite the effects of picketing by protestors as a reason not to provide abortions (*Id.*).

28.     Dr. Freedman states that violence against abortion providers is an ongoing concern and that, as recently as 2015, there were three murders and nine attempted murders of abortion clinic staff in the United States (*Id.*, ¶ 18 (citing Nat'l Abortion Fed'n, 2017 Violence and Disruption Statistics 6 (2017), *available at* https://prochoice.org/wp-content/uploads/2017-NAF-Violence-and-Disruption-Statistics.pdf)).  She states that the threat of violence "significantly deters many physicians from providing abortion and increases physicians' reluctance to associate themselves with abortion clinics and providers in any way." (Decl. of Lori Freedman, Ph.D., ¶ 19).

29.     Dr. Freedman states that Arkansas "fits the profile of a state hostile to the provision of abortion care where abortion providers are likely to experience the highest levels of stigma and harassment." (*Id.*, ¶ 20).

30.     Dr. Freedman also states that further evidence she has reviewed indicates that abortion providers in Arkansas experience extreme levels of harassment and effects of stigma, including being forced by their partners to choose between private practice and continuing to provide abortion care, being subjected to picketing and harassment, and being unable to attract qualified OBGYNs or other providers to work at their clinics (*Id.*, ¶ 21).

31.     Dr. Freedman avers that abortion providers are less likely to be able to resist the effects of stigma and harassment in Arkansas cities that lack a professional community that normalizes abortion care (*Id.*, ¶ 23).

32.     Stephanie Ho, M.D., a board-certified family medicine physician, offers her declaration in support of plaintiffs' motion (Dkt. No. 2, at 89-103; Decl. of Stephanie A. Ho, M.D.)).

33.     Dr. Ho states that she cannot become a board-certified or board-eligible OBGYN because she did not complete a residency in OBGYN and that she cannot do so now due to the time and resources necessary to conduct a residency at this stage of her career (*Id*., ¶ 7).

34.     Dr. Ho further states that, at the time she submitted her declaration, surgical abortions could not be performed at PPAEO's Fayetteville health center ("PPAEO Fayetteville") because that facility did not meet the state's requirement governing facilities where surgical abortions are performed (*Id*., ¶ 10).

35.     Dr. Ho explains that Arkansas law requires women who seek abortion care to come to the health center to receive certain state-mandated information in person from a physician and then to wait at least 48 hours before having an abortion (*Id*., ¶ 14).

36.     Dr. Ho further explains that a patient seeking medication abortion services must therefore come to the health center for one appointment, and at least 48 hours later, she must return to take a mifepristone pill and be given four misoprostol pills to administer at home (Decl. of Stephanie A. Ho, M.D., ¶ 15).   The patient must also make a follow-up appointment for approximately two weeks later (*Id*.).

37.     Dr. Ho further states that medication abortion is extremely safe and that 97.4% of medication abortion cases are successful under the regimen just described (*Id*., ¶ 16 (citing Daniel Grossman et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstetrics & Gynecology 296, 300 (2011))).

38.     Dr. Ho notes that a woman who takes mifepristone at a PPAEO health center has access to a 24-hour hotline number that she can call with any questions or concerns and that patients are provided with the name and number of a contracted OBGYN physician who has agreed to serve as the collaborative medical doctor to PPAEO abortion providers in Fayetteville and Little Rock (*Id.*, ¶ 17).

39.     Dr. Ho states that most patients who call the hotline "simply need reassurance that their symptoms (like bleeding and cramping) are normal and will subside." (Decl. of Stephanie A. Ho, M.D., ¶ 18).  In the "exceedingly rare case" that the nurse or physician on the hotline believes that immediate medical treatment is necessary, the patient is referred to the nearest emergency room, one of PPAEO's physicians is notified, and health center staff follow up with the patient within 24 hours (*Id.*).

40.     Dr. Ho notes that, during the course of her medical career, she has performed procedures that are much more complicated and have higher complication rates than medication abortion, including:  induced and managed labor, delivery of babies, and tubal ligations (*Id.*, ¶ 20). Dr. Ho also states that the national risk of maternal mortality associated with live birth is approximately fourteen times higher than that associated with induced abortions (*Id.* (citing Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012))).  She also notes that, in Arkansas, the maternal mortality rate is even worse, with Arkansas ranked 44th in the nation for maternal mortality compared to other states in 2018 (*Id.* (citing United Health Foundation, *2018 Health of Women and Children Report* (2018), https://www.americashealthrankings.org/lea rn/reports/2018-health-of-women-and-children-report/state-summaries-arkansas)).

41.    Dr. Ho further states that PPAEO drafted a job opening for a board-certified or board-eligible OBGYN to provide abortion care at the Fayetteville health center (*Id.*, ¶ 23).  This posting was listed on social media, and a letter was sent to all identified OBGYNs in Arkansas (Decl. of Stephanie A. Ho, M.D., ¶ 24).

42.    PPAEO also took out an ad in the Journal of the Arkansas Medical Society seeking a board-certified or board-eligible OBGYN (*Id.*, ¶ 25).   PPAEO staff personally contacted physicians to see if they would provide abortion services (*Id.*).

43.    In May 2019, Kathleen Paulson, M.D., a board-certified OBGYN, contacted PPAEO to state that she would be willing to provide medication abortion at the Fayetteville health center on a volunteer basis if the OBGYN requirement were to go into effect (*Id.*, ¶ 26).

44.    To date, no other OBGYNS have responded to PPAEO's efforts to locate a board-certified or board-eligible OBGYN willing to provide medication abortion at PPAEO's health centers (Decl. of Stephanie A. Ho, M.D., ¶ 29).

45.    Dr. Ho states that she has experienced stigma as an abortion provider in Arkansas, including being informed by a potential employer that the potential employer was not interested in being associated with an abortion provider (*Id.*).

46.    Frederick W. Hopkins, M.D., M.P.H., a board-certified OBGYN, offers his declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 119-136; Decl. of Frederick W. Hopkins, M.D., M.P.H.).

47.    Dr. Hopkins points out that, during his OBGYN residency, he did not receive any formal training in abortion care and that "[a]bortion care is not a requirement to complete an OBGYN residency, and most OBGYN residencies did not provide that training." (*Id.*, ¶ 13).

48.      Dr. Hopkins states that "[l]egal abortion is one of the safest medical procedures in the United States" and that "approximately 1 in 4 women in the U.S. obtains an abortion by the age of 45." (*Id.*, ¶ 21).  As authorities for these statistics, Dr. Hopkins cites the National Academy Consensus Study prepared by the National Academy of Sciences, Engineering, and Medicine and reports by the Guttmacher Institute.  *See* National Academy of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States 2018*, at 11, 74-75, *available at* https://doi.org/10.17226/24950) (hereinafter "National Academy Consensus Study Report");  The Guttmacher Institute, *Induced Abortion in the United States* (January 2011), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf;
The Guttmacher Institute, *Abortion is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 2017), https:www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.  Dr. Hopkins further explains that a "majority of women having abortions in the United States already have one child." (*Id.* (citing The Guttmacher Institute, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* (May 2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014)). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

49.      Dr. Hopkins further states that there are two types of abortions in the United States: medication abortion and surgical abortion (*Id.*, ¶ 23).

50.      Dr. Hopkins also states that, regardless of the method of abortion, "serious complications are extremely rare, occurring in less than 0.5% of all cases." (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 26 (citing Upadhyay, Ushma D., et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics and Gynecology 175 (2015)).

The types of complications that may occur following an abortion include infection, prolonged heavy bleeding, uterine perforation, cervical laceration, and retained tissue (*Id.*, ¶ 27). Dr. Hopkins states that in the "vast majority of cases" such complications can be handled in an outpatient office setting (*Id.*). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

51. Dr. Hopkins also explains that a woman's risk of pregnancy-related death is estimated to be 8.8 per 100,000 live births, whereas less than one woman dies for every 100,000 abortion procedures (*Id.*, ¶ 28 (citing National Academy Consensus Study Report at Table 2-4, 2-24; Zane, S., et al., Obstetrics and Gynecology, *Abortion-related mortality in the United States: 1998-2010*, at 258-65, *available at* http://www.ncbi.nlm.nih.gov/pubmed/26241413; Bartlett, L.A., et al., Obstetrics and Gynecology, *Risk Factors for legal induced abortion-related mortality in the United States*, at 729-37, *available at* https://www.ncbi.nlm.nih.gov/pubmed/15051566)). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

52. Additionally, according to Dr. Hopkins, abortion-related mortality is significantly lower than mortality for other common outpatient procedures, including colonoscopies, plastic surgery, dental procedures, or adult tonsillectomies (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 28 (citing National Academy Consensus Study Report, Table 2-4, 2-24)). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

53. Dr. Hopkins asserts that "no fetus is viable at 18 weeks LMP." (*Id.*, ¶ 29). Instead, he notes that "[i]t is commonly accepted in the field of OBGYN that a normally developing fetus will not attain viability until at least 24 weeks LMP," and he also explains that not all fetuses attain viability even at that stage (*Id.*).

54. Dr. Hopkins states that patients can delay abortions for several reasons, including because they do not realize that they are pregnant until later in their pregnancy, difficulty in obtaining funds for the abortion and related expenses, and Arkansas' mandated waiting period (*Id.*, ¶¶ 30-31).

55. Additionally, Dr. Hopkins explains that some patients seek abortions at or after 18 weeks LMP because they discover a fetal anomaly, some of which cannot be tested for until 18 to 20 weeks LMP (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 32). In other circumstances, the results from prenatal tests performed at 18 to 20 weeks LMP are inconclusive and require referrals to other medical professionals and additional testing, all of which can lead to further delay (*Id.*). Finally, some women seek abortions at or after 18 weeks LMP because they have a medical condition that does not become apparent until that time or an existing medical condition that worsens during the course of pregnancy (*Id.*, ¶ 33).

56. Dr. Hopkins further states that, if Act 493 takes effect, he will be forced to stop providing safe and effective pre-viability abortion care that his patients want and need (*Id.*, ¶ 34). He further states that, as a result of Act 493 taking effect, some of his patients will be forced to delay their abortion care, at risk to their health, while they attempt to obtain an abortion out of state (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 34). He also states that others will be prevented from obtaining an abortion altogether and be forced to carry their pregnancies to term against their will, at the expense of their health (*Id.*).

57. Dr. Hopkins states that, if the OBGYN requirement goes into effect, Dr. Tvedten, Dr. Horton, and Dr. Ho will be unable to provide abortions (*Id.*, ¶ 35).

58. In Dr. Hopkins' experience training non-OBGYNs to provide abortions, "there is no difference in the abilities or skills between non-OBGYN practitioners and OBGYNs who have

received the necessary training." (*Id.*, ¶ 36). Dr. Hopkins points out that the OBGYN requirement would allow a physician with no training in abortion to perform abortions while preventing other qualified clinicians with actual training and competency in abortion from providing such care (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 36). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

59. Dr. Hopkins further states that it is not necessary to be an OBGYN, much less a board-certified or board-eligible OBGYN, to be a competent abortion provider (*Id.*, ¶ 37). According to Dr. Hopkins, the American College of Obstetricians and Gynecologists ("ACOG"), a "highly regarded, reliable, and extensively cited authority in my field," recommends expanding the trained pool of non-OBGYN abortion providers, including family physicians and advanced practice physicians (*Id.* (citing Am. Coll. of Obstetricians and Gynecologists, Committee Op. No. 612 (Nov. 2014), *available at* https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education)). Dr. Hopkins also notes that board-eligibility and board-certification are not required to practice medicine, and he also notes that "[a]t no point in the OBGYN board-eligibility or board-certification process must a physician demonstrate competence in the performance of abortions." (*Id.*, ¶ 35 n.13). Dr. Hopkins also states that studies recognize that non-OBGYNs are just as qualified and skilled in abortion care as OBGYNs (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 37 (citing National Academy Consensus Study Report, at 11, 14, 79, 95)). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

60. Dr. Hopkins states that "[a]ny clinician with adequate training in abortion care can safely and effectively handle" the most common abortion complications, even though such

complications are rare (*Id.*, ¶ 38). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

61.     In the event a significant complication does arise from an abortion, Dr. Hopkins states that an abortion provider would transfer or direct the patient to the nearest hospital to receive the required care (*Id.*, ¶ 39). If the complication is retained tissue following a medication abortion, Dr. Hopkins states that ACOG Practice Bulletin 143 states that the abortion provider should be trained in surgical abortion "or should be able to refer to a clinician trained in surgical abortion." (*Id.* (citing Am. Coll. of Obstetricians and Gynecologists, Practice Bulletin 143 (Mar. 2014), *available at* https://www.acog.org/-/Practice-Bulletins/Committee-on-Practice-Bulletins----Gynecology/Public/pb143.pdf) ("ACOG Practice Bulletin No. 143")). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

62.     Dr. Hopkins travels to Arkansas to provide care at LRFP only approximately once every two months (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 42). When he comes to Arkansas, he does so for "three to four days every other month." (*Id.*, ¶ 44). Since Dr. Hopkins lives in California, each visit to Arkansas requires a day to arrive and to return, so his total duration away from California is five to six days for each visit (*Id.*). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

63.     Due to Arkansas' 48-hour mandated delay for abortion patients, LRFP treats patients only on Wednesdays, Fridays, and Saturdays, so Dr. Hopkins does not see patients for the entire time he is in Arkansas (*Id.*, ¶ 45). Typically, patients will come in one day for the mandated counseling and two days later for the abortion (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 45). At the hearing, Dr. Hopkins testified that other physicians could perform patient counseling, but he also testified that the counseling is one of the reasons he likes seeing patients and that he

does not want to work somewhere where he does not get to provide counseling to patients (Dkt. No. 84, at 47:1-8).

64.     If the 48-hour waiting period is extended to 72-hours, then Dr. Hopkins will attempt to remain in Arkansas for a full five days, versus his regular three to four days (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 47).  But, due to his professional obligations in California, he cannot visit Arkansas more frequently than he currently does (*Id*.).  This is because he holds several clinical and teaching positions in California (*Id*., ¶ 48).  He is unable to give up his current positions and relationships with patients who rely upon him in California (*Id*., ¶ 49).

65.     Additionally, Dr. Hopkins will not relocate to Arkansas because his ability to earn a living in Arkansas would be "extremely uncertain." (*Id*., ¶ 50).  He predicts that, if he moved to Arkansas, then the Arkansas legislature would pass a new law designed to prevent him from providing abortion care (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 50).  Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination. Dr. Hopkins also testified that LRFP has never offered his more money and that, regardless of how much money LRFP might offer him, he could not relocate to Arkansas because that would require him to give up his entire career in California (Dkt. No. 84, at 37:1-10).  Dr. Hopkins specifically stated that he would not be willing to relocate to Arkansas and work at LRFP even if they paid him a million dollars (*Id*., at 37).

66.     Dr. Hopkins also notes that there are usually protestors outside of LRFP (*Id*., ¶ 51). He is personally familiar with other abortion providers who have been murdered and attacked (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 51).  These dangers are "constantly" on Dr. Hopkins' mind when he travels to Arkansas, and this is another reason he cannot move to Arkansas to provide full-time care at LRFP (*Id*.).

67. Thomas Russell Horton, Jr., M.D., a staff physician at LRFP and an abortion care provider in Memphis, Tennessee, offers his declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 145-155; Decl. of Thomas Russell Horton, Jr., M.D.). Dr. Horton did not testify at the July 22, 2019, hearing.

68. Dr. Horton completed his residency in OBGYN, but he is not board-certified or board-eligible in OBGYN (*Id.*, ¶ 5). Dr. Horton will not be able to provide abortion care if the OBGYN requirement goes into effect (*Id.*).

69. Dr. Horton began working as a staff physician with LRFP in February 2010 (*Id.*, ¶ 11). Previously, Dr. Horton had provided abortion care in Tennessee up to approximately 15 weeks LMP, so he received training from Dr. Tvedten for performing surgical abortions up to 21.6 weeks LMP (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 11).

70. As a staff physician for LRFP, Dr. Horton works "one day per week and primarily perform[s] one-day surgical procedures, up to 18 weeks LMP." (*Id.*, ¶ 12). He also performs multi-day procedures up to 21.6 weeks LMP when he works two or more days per week (*Id.*).

71. Dr. Horton has performed thousands of abortions at LRFP "with a very low rate of complications." (*Id.*, ¶ 13).

72. Dr. Horton states that becoming a board-certified OBGYN would not make him any more qualified to perform or to handle appropriately the rare complications that may arise following an abortion (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 18). According to Dr. Horton, "training and competence in abortion procedures is not a requirement for either board certification or board eligibility in OBGYN." (*Id.*). He also notes that abortion care is not a requirement for completing an OBGYN residency and that many OBGYNs never receive any training for providing abortion care (*Id.*).

73.     Dr. Horton further explains that, to become a board-certified or board-eligible OBGYN, a physician must first complete his or her residency in OBGYN and then pass a written examination known as the American Board of Obstetrics and Gynecology ("ABOG") Qualifying Examination (*Id.*, ¶ 19).

74.     After a physician becomes board-eligible, the physician has eight years from the date of completing his or her residency to become board-certified (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 20).  If the physician does not become board-certified within those eight years, the physician loses his or her board-eligible status and must complete, at a minimum, an additional six months of supervised practice and assessment in a hospital associated with an accredited OBGYN residency program before he or she may become eligible for certification again (*Id.*).

75.     Further, to become an ABOG board-certified OBGYN, a physician must:  (1) be board-eligible; (2) satisfy certain prerequisites to becoming a candidate for certification, which includes preparing a comprehensive case list and obtaining unrestricted hospital privileges; and (3) sit for and pass another oral examination (*Id.*, ¶ 21).

76.     Dr. Horton completed his residency in OBGYN and passed the written examination for ABOG in June 2002 and June 2013, but he never obtained the necessary case list that is required to be a candidate for board certification (*Id.*, ¶ 22).  Dr. Horton states that being a board-certified OBGYN is not relevant or necessary to the provision of abortion care, and he also notes that completing the prerequisites for board-certification would have required him to take significant time away from providing care to his patients (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 22).

77.     Since Dr. Horton did not become board-certified within eight years of completing his residency, he is no longer board-eligible; to retain his board eligibility, he would have to complete a minimum of six months of supervised training (*Id.*, ¶ 23).  Dr. Horton states that this

is not a feasible option for him because he cannot leave his practice for the required six months to complete the training (*Id*.). He notes that the required training would provide no medical benefits to his patients (*Id*.).

78. Dr. Horton states that, if the OBGYN requirement goes into effect, he will no longer be able to provide abortion care in Arkansas since he is not and cannot become either a board-certified or board-eligible OBGYN (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 24).

79. Dr. Horton also states that he "regularly" experiences harassment due to his work as an abortion provider (*Id*., ¶ 26). He notes that every day he has worked at LRFP "there have been protestors and picketers attempting to block the entrance to the parking lot." (*Id*.). He further notes that the "protestors often shout at me upon arrival and say things such as: 'Don't kill those babies, Dr. Horton.'" (*Id*.).

80. On June 10, 2009, Dr. Horton was the subject of a bomb threat at the Memphis Center for Reproductive Health ("MCRH") in Memphis, Tennessee (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 27). An individual called MCRH and informed the clinic staff that there was a bomb in Dr. Horton's car (*Id*.). The clinic staff were forced to evacuate the clinic (*Id*.).

81. Dr. Horton's ability to maintain or find a job in private practice have been directly affected by his work as an abortion provider (*Id*., ¶ 28). Around 2004 and 2005 in Memphis, Dr. Horton applied to several jobs as a generalist in private practice, but he did not receive any job offers and was not able to find other work due to his work as an abortion provider (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 28). In 2005, Dr. Horton was in the final round of interviews for a position in private practice in Richmond, Virginia, when he asked the prospective employer if he would be allowed to continue providing abortion care in Memphis while working in private practice; he did not receive a job offer and never heard from that prospective employer again (*Id*.).

In 2005, while working at the Baptist Memorial Hospital-Crittenden in Arkansas, he was approached by one of the labor-and-delivery nurses at the hospital regarding abortion care (*Id.*). Afterward, he was informed that his services were no longer needed at that hospital (*Id.*). He later found out that a different OBGYN resident filled the position Dr. Horton had occupied at that hospital (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 28).

82.     Many of Dr. Horton's patients at LRFP are low-income and have a difficult time paying for an abortion (*Id.*, ¶ 30). His patients may have to borrow money from a friend or a family member for the abortion or to rent a car or pay for a hotel in Little Rock (*Id.*). His patients often delay their care while they raise the necessary funds and make logistical arrangements (*Id.*).

83.     Patients who are poor or low-income usually have jobs in which they do not get vacation or sick time, and it is difficult for such patients to take even a half day off work to be seen at LRFP (*Id.*, ¶ 31). Dr. Horton states that, if such patients must take significant time off to travel out of state for a surgical abortion, they may lose their jobs (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 31). Additionally, patients often have difficulty obtaining child care; Dr. Horton states that on several occasions, patients have brought young children with them to their appointments at LRFP (*Id.*, ¶ 32). He also states that, for women who do not want to or cannot bring their children with them to their appointments, finding child care for a whole day or more to travel out of state would be extremely difficult, if not impossible (*Id.*).

84.     Dr. Horton states that, if the OBGYN requirement goes into effect, then those patients who cannot obtain sufficient funds to travel out of state will be forced to either attempt to self-induce an abortion or carry their pregnancies to term against their will (*Id.*, ¶ 33).

85.     Sheila M. Katz, Ph.D., offers her declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 162-189; Decl. of Sheila M. Katz, Ph.D.). Dr. Katz is an assistant professor of

sociology at the University of Houston, in Houston, Texas (*Id*., ¶ 9). Her research has included qualitative methods and data analysis regarding women's experiences of poverty, and her expertise includes the consequences and social policy determinants of women's poverty nationwide, as well as regional and geographical similarities and differences across the United States (*Id*.).

86. The United States Department of Health and Human Services defines the federal poverty guideline as an income of under $12,490.00 per year for a single person, with $4,420.00 added per year for each additional member of the household (*Id*., ¶ 12).

87. According to 2017 Census Bureau data, Arkansas is the fifth poorest state in the United States, and its official poverty rate was 18.1% statewide (Decl. of Sheila M. Katz, Ph.D., ¶ 14). The poverty rate for women in Arkansas is even higher, at 19.5% (*Id*.).

88. The federal poverty guideline, while widely used, is considered by some to be an inadequate measure of poverty in the United States (*Id*., ¶ 17). Thus, in addition to those who fall below the federal poverty line, most poverty researchers consider individuals and family between 100% and 200% of the federal poverty line to be "low-income." (*Id*., ¶ 18).

89. In Arkansas, 46.8% of families headed by single mothers with dependent children are living at or below 125% of the federal poverty line, and 37.5% are living at less than 100% of the federal poverty line (Decl. of Sheila M. Katz, Ph.D., ¶ 19).

90. Further, many poor individuals are part of the "working poor," which Dr. Katz defines as those working at minimum wage or earning so little that they cannot meet basic needs for themselves or their family (*Id*., ¶ 20). The Bureau of Labor Statistics defines the "working poor [as] people who spent at least 27 weeks in the labor force . . . but whose incomes still fell below the official poverty level." (*Id*.).

91.     According to Dr. Katz, a woman working full-time (40 hours a week) earning minimum wage in Arkansas now has annual earnings of approximately $19,240.00, which is just above the federal poverty threshold if she has one child in her household and below the poverty line if she has more children (*Id.*, ¶ 21).

92.     Dr. Katz states that the fair market rent, as designated by the United States Department of Housing and Urban Development, is $702.00 for a one-bedroom apartment and $831.00 for a two-bedroom apartment in Little Rock, Arkansas (Decl. of Sheila M. Katz, Ph.D., ¶ 22).  If a woman in Little Rock has a full-time job earning the minimum wage, she would pay approximately 44% of her monthly income for a one-bedroom apartment and approximately 52% of her monthly income for a two-bedroom apartment (*Id.*).

93.     In Arkansas, 17.6% of families headed by single mothers are living in "deep poverty," which Dr. Katz characterizes as a household that lives at or below 50% of the federal poverty line (*Id.*, ¶ 24).

94.     In addition, 17 counties in Arkansas suffer from "persistent poverty," which Dr. Katz defines as a county where the poverty rate has been at or above 20% for the past 30 years (*Id.*, ¶ 25).

95.     Dr. Katz explains that Arkansas women living in deep or persistent poverty face the greatest logistical, financial, and psychological hurdles to accessing health care services since they are the least likely to have adequate transportation, childcare, and financial resources and support (Decl. of Sheila M. Katz, Ph.D., ¶ 26).

96.     Over two-thirds of women who obtain abortions in Arkansas already have at least one child (*Id.*, ¶ 27).

97.     Dr. Katz states that it is her understanding that women in and around Little Rock who can now obtain both medication and surgical abortion through 21.6 weeks LMP at LRFP may be forced to travel out of state to obtain that care from the next closest provider (*Id.*, ¶ 28). She states that the next-closest abortion provider is in Memphis, Tennessee, which is an approximately 300-mile round trip journey from Little Rock (*Id.*). Dr. Katz also states that such a journey would have to be made twice, as Tennessee requires "multiple, in person visits to the abortion clinic separated by at least 48 hours before a woman can obtain an abortion (Decl. of Sheila M. Katz, Ph.D., ¶ 28).

98.     Dr. Katz is familiar with the research analyzing the effect of increased travel on women's ability to obtain abortions, and she states that this research shows that increasing the distance that women must travel to access abortion services presents significant logistical and financial hurdles (*Id.*, ¶ 30).

99.     Dr. Katz states that for those women who do not own or have access to vehicles, the only significant intercity transportation between Little Rock and Memphis—other than flying—is a private bus service, such as Greyhound (*Id.*, ¶ 34). A single round-trip Greyhound bus ticket between Little Rock and Memphis costs between $24.00 and $85.00 (*Id.*). If a woman must bring someone to accompany her in the event a sedative is used, this cost doubles (Decl. of Sheila M. Katz, Ph.D., ¶ 34). Further, a woman traveling by private bus may have to pay for the cost of taxi or bus fares to and from the private bus station in both Little Rock and Memphis (*Id.*). Moreover, given Tennessee's 48-hour waiting requirement, either two bus trips would be required, or the woman would have to pay for two nights hotel accommodations in Memphis, which Dr. Katz says cost anywhere from $50.00 to $75.00 per night (*Id.*).

100.    Dr. Katz also points out that many poor and low-income women in Arkansas "likely do not own or have access to cars that are reliable enough to make a trip of the length required." (*Id.*, ¶ 36). Dr. Katz notes that, even if a low-income woman owns a car, it may be shared among adults, and it may not be reliable enough for intercity trips (Decl. of Sheila M. Katz, Ph.D., ¶ 36). Dr. Katz also points out that the cost of gas for round-trip car travel from Little Rock to Memphis is approximately $23.00 (*Id.*, ¶ 37).

101.    Dr. Katz explains that low-wage workers often have no access to paid time off or sick days and that seeking uncompensated time off can be a struggle for low-wage workers who often have less autonomy in setting their work schedules (*Id.*, ¶ 39). Further, low-wage workers often work unpredictable, varied, or evening jobs (*Id.*). Dr. Katz states that the additional time off required by travel may make it difficult for a poor or low-income woman to keep her abortion confidential from her supervisor or other employees (Decl. of Sheila M. Katz, Ph.D., ¶ 39).

102.    Also, Dr. Katz points out that intercity travel for an abortion requires a woman to miss work (*Id.*, ¶ 40). In the event a woman can get time off, she is likely to forego wages in addition to paying for transportation and lodging (*Id.*). At the minimum wage in Arkansas of $9.25, foregoing two eight-hour shifts to travel to and attend abortion counseling and procedure appointments would result in $148.00 in lost wages, which is almost 10% of a woman's monthly income if she works a full-time minimum wage job (*Id.*). These lost wages are on top of the cost of the abortion and other logistical costs (Decl. of Sheila M. Katz, Ph.D., ¶ 40).

103.    Dr. Katz points out that, for those two-thirds of women seeking an abortion who already have a child, they must either pay the cost of an additional round-trip bus ticket for her child or pay the cost of childcare for the entire time she is traveling (*Id.*, ¶ 41 (citing Tara C. Jatlaoui et al., Ctrs. for Disease Control and Prevention, *Abortion Surveillance—United States*

*2015*, 67 MMWR Surveill. Summ. 1, at Table 16 (2018)). Alternatively the woman may be able to leave her child with a trusted family member or friend, though this may require that the woman disclose why she is traveling (*Id.*).

104.    In sum, according to Dr. Katz, the total additional financial burden that a woman in or around Little Rock would have to incur to obtain a surgical abortion if she were forced to travel to Memphis would amount up to approximately $468.00, including lost wages, but not including childcare, food, or the cost of the procedure itself (*Id.*, ¶ 44). For a woman working full-time and making Arkansas minimum wage, this is over a quarter of her monthly salary of $1,603.00 (Decl. of Sheila M. Katz, Ph.D., ¶ 44).

105.    Dr. Katz also points out that a low-income woman may never have traveled outside the metropolitan or rural area where she lives, so even if she is able to gather the money necessary to make the trip, "the social-psychological hurdles of making multiple trips to an unfamiliar city, where she may know no one, may impede her." (*Id.*, ¶ 47). Accordingly to Dr. Katz, many of the women she has spoken to in her research indicate that, if a service is not available in their town or within a reasonable distance, "that service might as well not exist." (*Id.*).

106.    Dr. Katz points out that poor and low-income women attempt to meet unexpected expenses in three ways: (1) by making sacrifices in other areas, such as by not paying rent or utilities, drastically reducing food budgets, or foregoing needed medical care; (2) by borrowing money through payday loans; and (3) by borrowing money from a boyfriend or partner (*Id.*, ¶¶ 50-52). Dr. Katz explains that in her own interviews with poor and low-income women, such women talk about the economic necessity of relying on or returning to an abusive ex-boyfriend to help make ends meet when faced with an unexpected crisis (Decl. of Sheila M. Katz, Ph.D., ¶ 52).

107. Dr. Katz is also familiar with studies analyzing the effect of increased travel on women's ability to obtain abortions (*Id.*, ¶ 54). The "Turnaway Study" found that the most common reason women were delayed in accessing abortion care was because of travel and procedure costs (*Id.*, ¶ 55 (citing Upadhyay, Ushma D., et al., *Denial of abortion because of provider gestational age limits in the United States*, 104.9 Am. J. of Pub. Health 1687, 1697-94 (2014)). Furthermore, that study also cited that women reported that they experienced delay as a result of having to get time off work, finding child care, and not having anyone to travel with them (*Id.*).

108. Another study found that the most common reason for delay was that it took a long time to make abortion care arrangements and that poverty made women twice as likely to be delayed in making the arrangements to seek an abortion (Decl. of Sheila M. Katz, Ph.D., ¶ 56).

109. In the "Shelton Study," researchers concluded that "the farther a woman has to travel to obtain an abortion, the less likely she is to obtain one." (*Id.*, ¶ 57). Furthermore, a recent study of Texas women seeking an abortion after the implementation of a law restricting abortion access documented that women were worried that they would suffer stigma if they utilized their social networks to overcome the barriers of traveling long distances to obtain abortion care (*Id.*, ¶ 58).

110. Jason Lindo, Ph.D., a professor of economics at Texas A&M University, presents his declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 200-237; Decl. of Jason Lindo, Ph.D.). He has been a research associate at the National Bureau of Economic Research ("NBER") since 2014 (*Id.*, ¶ 5). Dr. Lindo testified at the July 22, 2019, hearing.

111. It is Dr. Lindo's understanding that there are three types of abortions currently provided in Arkansas: (1) medication abortions that are available only up to 10 weeks LMP; (2)

aspiration surgical procedures that are available until approximately 13 weeks LMP; and (3) dilation and evacuation ("D&E") surgical procedures, which are performed until 21.6 weeks LMP (*Id.*, ¶ 11).

112.     Dr. Lindo explains that it is his understanding that medication abortions in Arkansas require three trips and that, under a new law set to take effect on July 24, 2019, the mandated delay between the first and second visits will increase to 72 hours (*Id.*, ¶ 12).

113.     As for surgical abortions, Dr. Lindo explains that two trips are required, though a third visit may be necessary for some D&E procedures performed later in the second trimester (Decl. of Jason Lindo, Ph.D., ¶ 13).

114.     Dr. Lindo notes that LRFP is owned and operated by Dr. Tvedten, who provides approximately 61% of the abortion care at LRFP (*Id.*, ¶ 14(a)).  Dr. Horton provides approximately 33% of the clinic's abortion care, and the remaining six percent of the clinic's abortion care has been provided by Dr. Hopkins (*Id.*).  Neither Dr. Tvedten nor Dr. Horton are board-certified or board-eligible OBGYNs (*Id.*).

115.     Dr. Rodgers and Dr. Cathey provide medication abortions at PPAEO's Little Rock health center (Decl. of Jason Lindo, Ph.D., ¶ 14(b)).  Through April 2019, Dr. Cathey has provided 229 medication abortions while Dr. Rodgers has provided 199 medication abortions in the same time (*Id.*).

116.     Between May 1, 2016, and April 30, 2019, LRFP provided 7,010 abortions, including 6,128 (or 87%) to Arkansas residents, 483 (or 7%) to Tennessee residents, and 188 (or 2.7%) to Mississippi residents (Decl. of Jason Lindo, Ph.D., ¶ 15).

117.    Between 2016 and 2019, approximately 75.5% of LRFP's procedures were aspiration abortions (5,291); approximately 19.2% were D&E abortions (1,346), and approximately 5.3% were medication abortions (376) (*Id.*, ¶ 16).[3]

118.    Dr. Lindo analyzed several academic studies published in peer-reviewed journals that have documented that abortion regulations can have impacts on women's ability to access abortion care (*Id.*, ¶ 21).  While there are some differences across these studies in terms of the data that were used and the set of outcomes that were evaluated, all three determined that increases in distance to the nearest clinic caused by regulation-induced clinic closures caused significant reductions in abortions obtained from medical professionals (*Id.*, ¶ 24).

119.    Dr. Lindo also evaluated the effects in Arkansas when the contracted physician requirement eliminated the availability of medication abortion in Arkansas from May 31 through June 18, 2018 (Decl. of Jason Lindo, Ph.D., ¶ 32).  Dr. Lindo concludes that the contracted physician requirement reduced the number of abortions obtained from Arkansas providers by Arkansas residents by 17-27% (*Id.*, ¶ 35).

120.    Dr. Lindo also projects that Dr. Hopkins will likely be able to serve 42 women every other month, an estimate based upon the fact that Dr. Hopkins has served, at most, 21 women in any given day in the last three years (*Id.*, ¶ 49(c)).

121.    Dr. Lindo projects that Dr. Paulson will be able to provide abortions to a maximum of 12 patients per week (*Id.*).

122.    Based upon his past capacity to provide abortions, Dr. Lindo estimates that Dr. Rodgers will be able to provide 480 medication abortions annually (Decl. of Jason Lindo, Ph.D.,

---

[3] As plaintiffs have demonstrated that the Excel files provided to Dr. Lindo did not include the merger error from April 2018, and based upon the Court's review of all record evidence in this case, the Court finds no reason to doubt the numerical estimates provided by Dr. Lindo.

¶ 50 (Table 8)). Furthermore, taking into account that Dr. Cathey intends to add a half day to her provision of abortion care, Dr. Lindo estimates that she will be able to provide 476 medication abortions annually (*Id.*). Testimony consistent with this declaration was offered at the hearing and was subject to cross-examination.

123. Dr. Lindo has examined the likely effects of the OBGYN requirement on Arkansas women's ability to access abortion care (*Id.*, ¶ 41). To do so, Dr. Lindo presents his supplemental declaration (Dkt. No. 37; Supp. Decl. of Jason Lindo, Ph.D.).

124. Dr. Lindo points out that he has learned that, during the week of July 1, 2019, PPAEO stopped providing medication abortions at its Fayetteville health center (*Id.*, ¶ 2). Accordingly, he has evaluated the likely effects of the OBGYN requirement under the current changed circumstances where PPAEO Little Rock and LRFP are the only providers of abortion care in Arkansas (*Id.*).

125. Dr. Lindo evaluates the effects of the OBGYN requirement under these changed circumstances in three different scenarios: (1) no OBGYN requirement; (2) the OBGYN requirement goes into effect and LRFP is forced to close; and (3) the OBGYN requirement goes into effect and LRFP stays open, allowing Dr. Hopkins to provide abortions every other month (*Id.*, ¶ 3).

126. In order to ensure that he does not conflate the effects of PPAEO Fayetteville not offering abortions with the effects of the OBGYN requirement, Dr. Lindo's supplemental declaration focuses upon women who have historically been served by LRFP and PPAEO Little Rock (Supp. Decl. of Jason Lindo, Ph.D., ¶ 8). In particular, his supplemental declaration focuses "on the 2,614 women annually served at these two locations over the past three years." (*Id.*). Thus, according to Dr. Lindo, he is providing a conservative estimate of the effect of the OBGYN

requirement since more than 2,614 women are likely to seek abortions in Little Rock annually, given that medication abortions are no longer available at PPAEO Fayetteville (*Id*.).

127.    Dr. Lindo also explains that, based upon an average from 2016 to 2019, 2,779 Arkansas residents obtain an abortion each year (Decl. of Jason Lindo, Ph.D., ¶ 51).  Dr. Lindo's declaration also states that, based upon a three-year average, 1,927 Arkansas women seek surgical abortions in Arkansas annually (*Id*., ¶ 61).[4]

128.    Dr. Lindo concludes that, of the 2,212 women who annually obtain surgical abortions in Arkansas, none of them will be able to do so if the OBGYN requirement goes into effect and LRFP is forced to close (Supp. Decl. of Jason Lindo, Ph.D., ¶ 10).  Put another way, of the 2,614 women who obtain abortions in Little Rock annually, 2,212 (or 85%) of those women will not be able to obtain the same type of care in Arkansas that they otherwise would, absent the OBGYN requirement (*Id*., ¶ 10).

129.    Dr. Lindo also performed calculations that assume that some women who would have received surgical abortions will substitute for medication abortions.  Dr. Lindo estimates that LRFP and PPAEO Little Rock currently have the capacity to provide up to 4,664 abortions annually and that, if the OBGYN requirement goes into effect and LRFP is forced to close, that number will fall to 956,[5] which is the sum of Dr. Rodgers and Dr. Cathey's total estimated capacity (*Id*., ¶ 11).  Accordingly, 1,658 (or 63%) of the 2,614 women who otherwise would obtain abortion care in Little Rock annually will not be able to access any type of abortion care in Arkansas if the

---

[4]  The Court calculates this sum from Table 11 in Dr. Lindo's declaration.  Dr. Lindo states that 1,134 Arkansans received surgical abortions in Arkansas at less than or equal to 10 weeks LMP and that 793 Arkansas residents obtained surgical abortions in Arkansas at greater than 10 weeks LMP.

[5]  480+476=956.

OBGYN requirement goes into effect and LRFP closes (*Id.*). And 1,658 (or 52%) of the 3,167 women who have historically obtained abortion care in Arkansas annually (including at PPAEO Fayetteville) will not be able to access any type of abortion care in Arkansas (Supp. Decl. of Jason Lindo, Ph.D., ¶ 11).

130.     Dr. Lindo also projects that, if the OBGYN requirement goes into effect and LRFP does not close, the availability of surgical abortions at LRFP will increase from 0 to 252 compared to the scenario where LRFP closes (*Id.*, ¶ 12). Accordingly, in this scenario, all but 252 of the women who would otherwise seek surgical abortions would have no provider in Arkansas (*Id.*, ¶ 13). Typically, 2,212 women have obtained surgical abortions each year in Little Rock (*Id.*, ¶ 12). Testimony consistent with this declaration was offered at the hearing and was subject to cross examination.

131.     As such, according to Dr. Lindo, 1,960 (or 75%) of the 2,614 women who obtain abortions in Little Rock annually will not be able to obtain the same type of care in Arkansas that they would otherwise seek, absent the OBGYN requirement (Supp. Decl. of Jason Lindo, Ph.D., ¶ 13). Additionally, these 1,960 are 62% of the 3,167 women who would historically have obtained abortion care in Arkansas annually (including PPAEO Fayetteville) but who will not be able to obtain the same type of care in Arkansas that they would have, absent the OBGYN requirement (*Id.*).

132.     Dr. Lindo does account for the possibility that PPAEO Little Rock could provide up to 956 medication abortions annually for women who would historically have obtained abortion care in Arkansas. In conjunction with the 252 surgical abortions that LRFP could provide it if remains open despite the OBGYN requirement, this means that 1,406 (or 54%) of the 2,614 women who otherwise would obtain care in Little Rock annually will not be able to access any type of

abortion care in Arkansas (*Id.*, ¶ 14).  Furthermore, 1,406 (or 44%) of the 3,167 women who have historically obtained abortion care in Arkansas annually (including at PPAEO Fayetteville) will not be able to obtain any type of abortion care in Arkansas (*Id.*).

133.    Upon cross examination, Dr. Lindo testified that his conclusions were based upon information provided to him by plaintiffs and that, depending upon the assumptions made, his conclusions could change (Dkt. No. 84, at 144:14-16).  Dr. Lindo also noted during his testimony that the capacity to provide abortions in his calculations are determined by the physicians who can provide abortion care (*Id.*, at 150:1-4).

134.    Kathleen Paulson, M.D., a board-certified OBGYN licensed to practice medicine in Arkansas, offers her declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 248-250; Decl. of Kathleen Paulson, M.D.).  Dr. Paulson provides medical services, including outpatient gynecologic care and women's wellness care, at a medical center in Fayetteville, Arkansas (*Id.*, ¶ 1).

135.    Linda W. Prine, M.D., a board-certified family physician, offers her declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 252-261; Decl. of Linda W. Prine, M.D.).  Dr. Prine is a professor of family medicine and community health at the Icahn School of Medicine at Mount Sinai, and she also holds teaching positions at the Harlem Family Medicine Residency Program and the Mount Sinai Downtown Residency in Urban Family Medicine (*Id.*, ¶ 4).  She also maintains an active medical practice, including as a clinician at Planned Parenthood of New York City (*Id.*).  Dr. Prine has provided medication and surgical abortion care to women up to sixteen weeks LMP, and over the last eighteen years, she has trained thousands of clinicians to provide abortion care (*Id.*, ¶ 5).  She states that those clinicians have come from several specialties,

including family medicine, pediatrics, OBGYN, and internal medicine (Decl. of Linda W. Prine, M.D., ¶ 5). Dr. Prine testified at the July 22, 2019, hearing.

136. Dr. Prine knows of numerous family medicine practitioners who provide abortion care up to 24 weeks or more LMP (*Id.*, ¶ 7). Furthermore, she has trained advanced practice clinicians, such as nurse practitioners, to provide abortion care (*Id.*, ¶ 8). She states that it is well established that advanced practice clinicians can provide surgical abortion as safely and effectively as physicians (*Id.*). Testimony consistent with this declaration was provided at the hearing and was subject to cross examination (Dkt. No. 84, at 51:8-12).

137. Dr. Prine explains that the scope of practice for family medicine practitioners is significantly more complex than abortion care; specifically, she notes that managing a patient's diabetes, heart disease, hypertension, and/or HIV/AIDS, or performing any number of other minor outpatient surgical procedures is more complex than abortion care (Decl. of Linda W. Prine, M.D., ¶ 16). She further notes that family practitioners provide miscarriage management, prenatal care, and delivery to low-risk patients (*Id.*). Dr. Prine states that miscarriage management involves many of the same skills required for abortion providers and that delivery, even to low-risk patients, has a higher complication rate than providing abortions (*Id.*, ¶ 17 (citing Raymond & Grimes, *supra*, at 216-17)).

138. In Dr. Prine's experience, residents from all specialties can become qualified abortion providers (*Id.*, ¶ 20). According to Dr. Prine, one third of abortion providers in this country come from specialties other than OBGYN and that, based upon her experience, there is no difference in the training of an OBGYN resident and other clinicians in these skills (Decl. of Linda W. Prine, M.D., ¶ 20 (citing Katharine O'Connell, et al., *First-Trimester Surgical Abortion Practices: A Survey of National Abortion Federation Members*, 79 Contraception 385 (2009);

Katharine O'Connell, et al., *Second-Trimester Surgical Abortion Practices: A Survey of National Abortion Federation Members*, 78 Contraception 492 (2008))).

139. Dr. Prine points out that ACOG characterizes requirements "that clinic physicians be board certified obstetricians-gynecologists despite the fact that clinicians in many medical specialties can provide safe abortion services" as "medically unnecessary requirements designed to reduce access to abortion." (*Id.*, ¶ 21 (citing Am. Coll. of Obstetricians and Gynecologists, Committee Op. No. 613 (Nov. 2014), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on_health-Care-for-Underserved-Women/Increasing-Access-to-Abortion)). Additionally, the American Academy of Family Physicians ("AAFP") adopted in 2014 a resolution opposing laws that "impose[] on abortion providers unnecessary requirements that infringe on the practice of evidence-based medicine." (*Id.*, ¶ 22 (citing Am. Acad. of Family Physicians, Resolution No. 10001, *Oppose Targeted Regulation Against Abortion Providers (TRAAP laws)* (2014), http://www.aafp.org/about/constit uencies/past-ncsc/2014.html)). Dr. Prine opines that the OBGYN requirement is the type of unnecessary requirement to which the AAFP policy refer, as it restricts access to abortion care with no medical benefit to patients (*Id.*). Dr. Prine also points out that the American Public Health Association likewise recognizes that training, not specialty, determines competence in providing abortion care (*Id.*, ¶ 24 (citing Am. Public Health Ass'n, *Policy Statement: Provision of Abortion Car by Advanced Practice Nurses and Physician Assistants*, https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants)).

140. Dr. Prine cites a comprehensive report by the National Academies of Sciences, Engineering, and Medicine that states that family medicine physicians, among other clinicians, can

"safely and effectively" provide medication and surgical abortions (Decl. of Linda W. Prine, M.D., ¶ 26 (citing National Academy Consensus Study Report, at 14)). This report concluded medication and suction aspiration abortions performed by family medicine physicians had high success rates and that "[a]ll complications were minor and managed effectively at rates similar to those in OB/GYN practices and specialty abortion clinics." (*Id.*, ¶ 27 (citing National Academy Consensus Study Report, at 105)). The report further concluded that "OB/GYNs, family medicine physicians, and other physicians with appropriate training and experience can provide D&E abortions." (*Id.* (citing National Academy Consensus Study Report, at 14)).

141.     Dr. Prine concludes that restricting the provision of abortion care to board-certified or board-eligible OBGYNs is not medically justified and provides no medical benefit (*Id.*, ¶ 29). At the hearing, Dr. Prine testified that the National Academy Consensus Study Report confirmed that competencies do not depend on board certification but rather on the training and experience of the individual physician (Dkt. No. 84, at 62:8-12).

142.     Dr. Prine also submits a supplemental declaration in support of plaintiffs' motion (Dkt. No. 62-1; Supp. Decl. of Linda W. Prine, M.D.). Dr. Prine "strongly disagree[s]" with any contention that abortion creates or causes psychological or emotional problems that do not already exist or would have arisen regardless of the procedure (*Id.*, ¶¶ 2-3). Citing reports from the National Academies of Sciences, Engineering and Medicine, the American Psychological Association ("APA") Task Force on Mental Health and Abortion, and the Academy of Medical Royal Colleges, Dr. Prine states that "the rates of mental health problems for women with an unwanted pregnancy are the same whether they have an abortion or give birth" and that "there is no evidence that abortion gives rise to serious psychological and emotional harms." (*Id.*, ¶ 5 (citing Am. Psychological Ass'n, Task Force on Mental Health and Abortion, *Report of the Task Force*

*on Mental Health and Abortion*, at 7-8 (2008), *available at* http://www.apa.org/pi/wpo/mental-health-abortion-report.pdf)).

143.    Alison Stuebe, M.D., M.Sc., Fellow of the American College of Obstetrics and Gynecology ("F.A.C.O.G."), provides her declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 290-301; Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G.).  Dr. Stuebe is a board-certified maternal-fetal medicine specialist ("MFM") and OBGYN (*Id.*, ¶ 1).  As an MFM, Dr. Stuebe specializes in the management of high-risk pregnancies; MFMs obtain three additional years of fellowship training, beyond the standard residency period for an OBGYN (*Id.*).

144.    Dr. Stuebe is an associate professor in the Department of Obstetrics and Gynecology and the Department of Maternal and Child Health at the University of North Carolina ("UNC") School of Medicine (*Id.*, ¶ 3).  She also serves as the Associate Director for Research and Development at the UNC Center for Maternal and Infant Health (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 3).  Since 2008, Dr. Stuebe has trained hundreds of medical students, residents, and fellows in OBGYN (*Id.*).

145.    Dr. Stuebe also maintains an active clinic practice focusing on care for women with high-risk pregnancies (*Id.*, ¶ 5).  A substantial part of her clinical work consists of conducting ultrasound and prenatal diagnostic tests and counseling women about fetal abnormalities (*Id.*).

146.    Since UNC is a state hospital, Dr. Stuebe cares for patients from a wide range of socioeconomic and cultural backgrounds, including women who are undocumented immigrants without health insurance and women who are UNC employees with private insurance (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 6).

147.     While Dr. Stuebe currently does not provide medication or surgical abortions as part of her clinical practice, she does currently assist women in terminating pregnancies involving fetal anomalies through medical induction of labor at the hospital (*Id.*, ¶ 7).

148.     In her MFM practice, Dr. Stuebe regularly treats and counsels with pregnant women about genetic and other fetal anomalies (*Id.*, ¶ 12).  Because of her education, training, and clinic work, Dr. Stuebe is very familiar with the genetic anomaly Trisomy 21, which is commonly referred to as Down syndrome (*Id.*, ¶¶ 12-13).  While there are various risk factors for Down syndrome, Dr. Stuebe states that there is no way to predict before pregnancy whether a woman will have a fetus with Down syndrome (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 14).

149.     Dr. Stuebe explains that there are a number of screening and diagnostic tests available to determine the presence of certain genetic, chromosomal, and structural anomalies, including Down syndrome (*Id.*, ¶ 17).  Screening tests cannot diagnose any anomaly and only indicate a likelihood or probability that one or more anomalies exist (*Id.*, ¶ 18).  Screening tests usually screen for a range of anomalies at the same time and may indicate a likelihood of more than one anomaly at once (*Id.*).  Diagnostic tests, on the other hand, determine the existence or non-existence of anomalies with near certainty (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 18).

150.     There are multiple Down syndrome screening tests used during pregnancy:  the fetal cell-free DNA test; nuchal translucency and serum-marker screening tests; maternal serum quadruple marker ("Quad Screening") tests; and targeted ultrasound examination (*Id.*, ¶ 22).

151.     Cell-free DNA testing can be performed as early as 10-12 weeks LMP, and results are usually available within 7 days (*Id.*, ¶ 22(a)).  Cell-free DNA tests detect approximately 99% of pregnancies affected with Down syndrome, though false positive results are higher for low-risk

women (*Id.*).  ACOG, therefore, advises that women should not take irreversible action based upon a cell-free DNA test result alone (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 22(a) (citing ACOG Practice Bulletin No. 163)).

152.    If a screening test indicates an increased probability of a fetal genetic condition or aneuploidy, Dr. Stuebe offers a diagnostic test to confirm whether the genetic condition indicated by the screening test is present (*Id.*, ¶ 23).  There are two techniques for obtaining fetal cells for diagnostic testing:  chorionic villus sampling ("CVS") and amniocentesis (*Id.*, ¶ 24).

153.    Dr. Stuebe states that most women do not receive a confirmed diagnosis of Down syndrome until well into the second trimester of pregnancy (*Id.*, ¶ 25).  Further, amniocentesis is more widely available than CVS and cannot be performed until 15 weeks LMP, and test results from amniocentesis are often unavailable until 17 weeks LMP (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 25).  Furthermore, a clinician performing an ultrasound may not be able to detect any associated anatomical abnormalities before approximately 18 weeks LMP (*Id.*).

154.    Dr. Stuebe states that Act 619 will encourage women to withhold screening and diagnostic test results from medical providers the women visit for care, which could have negative consequences for both the clinician-patient relationship and women's health, especially since understanding the meaning and reliability of various screening and diagnostic tests can be difficult (*Id.*, ¶ 29).

155.    Additionally, Dr. Stuebe states that Act 493 will "make it extremely difficult, if not impossible, for women to take the time necessary to confirm a diagnosis of Down syndrome or another fetal anomaly, and make an informed, autonomous decision regarding whether to carry to term or terminate the pregnancy." (*Id.*, ¶ 30).  Specifically, amniocentesis results are unavailable before 16-17 weeks LMP, and targeted ultrasound examinations cannot be performed reliably until

approximately 18 weeks LMP, at the earliest (Decl. of Alison Stuebe, M.D., M.Sc. F.A.C.O.G., ¶ 30). Dr. Stuebe states that Act 493 creates artificial time pressure that could lead women and their families to rush their decision-making process for no medically justified reason (*Id.*).

156. Thomas Tvedten, M.D., the part owner and Medical Director of LRFP, provides his declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 371-384; Decl. of Thomas Tvedten, M.D.). Dr. Tvedten testified at the July 22, 2019, hearing.

157. Dr. Tvedten first began training to provide abortion care in 1985 at Women's Community Health in Little Rock, a clinic that used to provide abortion care in Arkansas (*Id.*, ¶ 5). Dr. Tvedten was trained by an experienced abortion provider and family medicine physician who had been providing abortion care in Arkansas since the 1970s (*Id.*). Dr. Tvedten began by first learning, and then providing, first trimester abortion care (*Id.*, ¶ 6). After speaking to other providers and observing them perform second trimester procedures, Dr. Tvedten expanded the scope of his practice to second trimester procedures, eventually performing procedures up to approximately 21 weeks, 6 days LMP (Decl. of Thomas Tvedten, M.D., ¶ 7). Dr. Tvedten has consistently provided abortion care up to 21.6 weeks LMP for more than 15 years (*Id.*).

158. Starting in 2004, after the Federal Drug Administration ("FDA") approved Mifeprex for combined use with misoprostol for early non-surgical abortion, Dr. Tvedten began providing medication abortion up to 10 weeks LMP (*Id.*, ¶ 8).

159. Dr. Tvedten has also trained numerous providers to provide both medication and surgical abortions (*Id.*, ¶ 9). Family planning and OBGYN residents and medical students regularly come to LRFP to observe Dr. Tvedten performing abortion procedures and to receive training (Decl. of Thomas Tvedten, M.D., ¶ 9). Furthermore, many OBGYNs in Arkansas refer

patients to Dr. Tvedten for abortion care that they are not trained to or are unable to provide (*Id.*, ¶ 10).

160.    Dr. Tvedten states that, while complications arising from either medication or surgical abortion are extremely rare, he is trained to handle effectively and safely any issue that may arise, either by providing the follow-up care himself or by referring his patients to a "tertiary care facility." (*Id.*, ¶ 11).

161.    Dr. Tvedten takes steps to ensure that he is always up to date on the latest advances in abortion care (*Id.*, ¶ 12).  For example, he attends yearly conferences on abortion care to further his education (Decl. of Thomas Tvedten, M.D., ¶ 12).  He also discusses abortion care and complex abortion cases with other providers, including his OBGYN colleagues, and he reads practice bulletins issued by medical authorities such as ACOG (*Id.*).  He also reviews articles published in peer-reviewed medical journals, such as *Obstetrics & Gynecology, Contraception*, the *Journal of the American Medical Association*, and other sources on this topic (*Id.*).

162.    At LRFP, Dr. Tvedten and two other physicians provide surgical abortions up to 21.6 weeks LMP and medication abortions up to 10 weeks LMP (*Id.*, ¶ 15).  LRFP is one of three abortion clinics in Arkansas and is the only one that offers surgical abortions (Decl. of Thomas Tvedten, M.D., ¶ 15).  Accordingly, LRFP is the only option for women seeking abortion care after 10 weeks LMP in Arkansas (*Id.*).

163.    Dr. Tvedten points out that Arkansas law currently requires that LRFP patients who seek an abortion must make at least two-in-person trips to the clinic—first for the state-mandated informed consent process, including a non-directive discussion regarding their options, and the second for additional, non-directive counseling and the abortion itself, after a mandatory delay of at least 48 hours (*Id.*, ¶ 20).  For patients receiving abortion care at 18 to 21.6 weeks LMP, which

is a two-day procedure, that law results in at least three trips (*Id*.). Dr. Tvedten points out that a new law, set to take effect on July 24, 2019, increases the mandatory delay period to at least 72 hours (Decl. of Thomas Tvedten, M.D., ¶ 20 (citing Ark. Act. 801, to be codified at §§ 20-16-1109, -1703(b), -1706)).

164. Dr. Tvedten is not a board-certified or board-eligible OBGYN (*Id*., ¶ 23). He cannot become either because he did not complete an OBGYN residency and cannot feasibly do so now, given "the extraordinary time and resources that would be needed to pursue a new specialty at this stage" of his career (*Id*. (citing Am. Bd. of Obstetrics & Gynecology, *Candidate Requirements & General Details, Becoming an ABOG Registered Residency Graduate*, https://www.abog.org/specialty-certification/general-cert-requirements-and-info#Content_C009_Col00)). If the OBGYN requirement goes into effect, Dr. Tvedten will be forced to stop providing abortion care to his patients or risk incurring significant penalties (*Id*.).

165. Dr. Tvedten also states that the only other physician currently providing abortions at LRFP every week is Dr. Horton, who lives in Memphis, Tennessee, and generally provides care at LRFP approximately one day a week (Decl. of Thomas Tvedten, M.D., ¶ 24).

166. Dr. Tvedten further states that LRFP does not employ on a full-time basis or receive full-time assistance from any physicians who are board-certified or board-eligible OBGYNs (*Id*., ¶ 25). The only board-certified or board-eligible OBGYN who provides care at LRFP is Dr. Hopkins, but he can travel to Arkansas to provide abortion care at LRFP only approximately once every-other month (*Id*., ¶ 26).

167. Dr. Tvedten states that, over the past four years, LRFP has undertaken significant efforts to try to find an OBGYN who would be willing to assist LRFP in continuing to provide abortion care, including by providing abortions at LRFP or on a part-time or full-time basis (*Id*., ¶

27).  These efforts included renewed efforts after the Arkansas legislature passed the OBGYN requirement (Decl. of Thomas Tvedten, M.D., ¶ 27).  Despite their efforts, LRFP has not been able to identify a single board-certified or board-eligible OBGYN provider who can provide full-time or near-full-time care at LRFP (*Id*.).

168.    In Dr. Tvedten's experience, many of the physicians who provide abortion care in Arkansas permanently reside in other states and only travel to Arkansas to provide abortion care because there are no local physicians willing to provide abortion care here (*Id*., ¶ 28).

169.    According to Dr. Tvedten, locally-based physicians who do provide abortion care in Arkansas face stigmatization that may jeopardize their ability to continue to provide other care, retain positions or admitting privileges at hospitals, and protect their families from harassment (*Id*., ¶ 29).

170.    Dr. Tvedten states that one of the Arkansas physicians from whom he first received training in abortion care, Dr. James Guthrie, was forced to abandon his provision of abortion care altogether because of the harassment that he and his family practice partners faced at the hands of the anti-abortion activists who picketed his family practice clinic and the homes of the physicians with whom he shared this practice (Decl. of Thomas Tvedten, M.D., ¶ 30).

171.    Dr. Tvedten agreed to assist Dr. Guthrie in finding a replacement provider, and he eventually stayed on to provide abortion care on a permanent basis (*Id*., ¶ 31).

172.    Dr. Tvedten recalls conversations with his former medical school classmates, and he relates that "they scoffed at the idea of providing abortion care in the state, given the stigma associated with it and the accompanying risk that providing abortion would harm their ability to maintain the private practices and positions at hospitals." (*Id*.).

173. Dr. Tvedten also gave up his family practice in large part because of his knowledge that the political climate and stigma surrounding abortion care would make it extremely difficult, if not impossible, to attract potential partners and patients to a separate practice while he continues to provide abortion care (*Id.*, ¶ 33).

174. Dr. Tvedten states that, just a few years ago, anti-abortion activists found out where his children attend school and distributed flyers at the school grounds with his name, picture, and home address on them, labelling him as "complicit in murder." (Decl. of Thomas Tvedten, M.D., ¶ 34). He and his family have also been subject to picketing at their private residence (*Id.*).

175. Dr. Tvedten has, in recent years, had conversations with local physicians who, despite considering themselves pro-choice and supportive of the full range of reproductive health care, including abortion care, have abandoned any idea of providing abortion care in Arkansas given the stigma associated with it (*Id.*, ¶ 35).

176. Dr. Tvedten states that, due to LRFP's inability to attract another full-time provider who is a board-certified or board-eligible OBGYN, LRFP will almost certainly have to be shut down entirely, absent some unanticipated development (*Id.*, ¶ 36). He also states that, if LRFP remains open due to Dr. Hopkins' provision of care, LRFP would still have to restrict significantly its provision of abortion care (Decl. of Thomas Tvedten, M.D., ¶ 36).

177. Indeed, in Dr. Tvedten's opinion, even if LRFP is not forced to close immediately, if LRFP cannot employ a full-time board-certified or board-eligible OBGYN, then LRFP will be forced to close eventually (*Id.*, ¶ 37).

178. In the event Act 493 takes effect, Dr. Tvedten and other physicians at LRFP will stop performing abortions in cases where the pregnancy is determined to be greater than 18 weeks LMP (*Id.*, ¶ 42).

179.     Dr. Tvedten is aware that some of LRFP's patients seek abortions after receiving a fetal diagnosis, including diagnoses of Down syndrome (*Id.*, ¶ 44).  In order to avoid the penalties set forth in Act 619, Dr. Tvedten states that he and the other physicians at LRFP will have no choice but to stop performing abortions when they have "knowledge" that the woman is seeking the abortion "solely" due to a test result indicating Down syndrome (Decl. of Thomas Tvedten, M.D., ¶ 46).

180.     At the hearing, Dr. Tvedten noted that he has twice been sued for medical malpractice and that both of those cases were settled out of court (Dkt. No. 84, at 173:8-174:11). Dr. Tvedten also noted that his medical license was once suspended for three months in 1983 (*Id.*, at 174:19).

181.     Dr. Tvedten also testified that medical students shadow him and that he has lectured at UAMS (*Id.*, at 176:5-13).

182.     Dr. Tvedten also testified that he is not surprised that LRFP has not been able to find a board-certified or board-eligible physician to work at LRFP (Dkt. No. 84, at 178:13-22).  He testified that the stigma associated with being an abortion provider in Arkansas reaches "way beyond your medical practice . . . ." (*Id.*).

183.     Lori Williams, M.S.N., A.P.R.N., a nurse practitioner and Clinical Director of LRFP, offers her declaration in support of plaintiffs' motion (Dkt. No. 2-1, at 388-403; Decl. of Lori Williams, M.S.N., A.P.R.N.).  Ms. Williams has worked at LRFP since 2004 and has been the Clinical Director since 2007 (*Id.*).  Since 2010, she has been a part owner of LRFP (*Id.*, ¶ 5).

184.     As LRFP's Clinical Director, Ms. Williams is responsible for all aspects of the day-to-day operations, including overseeing patient care in coordination with the physicians and other

health-care professionals, supervising staff, maintaining policies and procedures, and ensuring that LRFP complies with all laws and regulations (*Id.*, ¶ 8).

185. Ms. Williams states that "[a]bortion is one of the safest medical procedures currently available to women in the United States" and that "[i]t is substantially safer than giving birth . . . ." (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 9 (citing National Academy Consensus Study Report, at 74-75)).

186. Ms. Williams states that only three physicians currently provide care at LRFP: Dr. Tvedten, Dr. Horton, and Dr. Hopkins (*Id.*, ¶ 11). She states that all three of these doctors are extremely experienced in abortion care and that they can handle any complications that may arise, including by providing treatment at LRFP and by referring patients to a local hospital when necessary (*Id.*).

187. LRFP offers medication abortion from the point in pregnancy when an intrauterine pregnancy can be confirmed (typically 5-6 weeks LMP) to 10 weeks LMP (*Id.*, ¶ 13). LRFP offers aspiration abortion from approximately 3-4 weeks LMP through approximately 13 weeks LMP and typically performs a D&E procedure beginning around 14 weeks LMP through 21.6 weeks LMP (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 14). Ms. Williams notes that aspiration and D&E abortions do not involve incisions (*Id.*).

188. Ms. Williams states that it is common for a woman who can choose between a medication and surgical abortion to have a strong preference for a surgical abortion (*Id.*, ¶ 15). She states that while there are many reasons for this, "many women prefer the surgical option because it requires fewer visits to the clinic, and thus is associated with a lower burden in terms of funding and time." (*Id.*).

189.     LRFP currently provides patient care three days per week, and to accommodate the 48-hour mandated waiting period, LRFP typically provides care on three staggered days each week (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 17).   She also states that LRFP can safely and effectively "provide abortion care up to approximately 20-25 women each day, depending on the variables associated with the specific patient-care needs presented on any given day." (*Id.*).

190.     LRFP operates with substantial fixed costs each month, the most significant of which is overhead related to LRFP's 13 full-time staff members (*Id.*, ¶ 19).

191.     Ms. Williams states that, in 2018, LRFP provided approximately 170 second trimester abortions after 18 weeks LMP (*Id.*, ¶ 21).

192.     At the hearing, Ms. Williams testified that LRFP has patients who currently receive abortions that would no longer be able to obtain those services with LRFP if Act 493 goes into effect (Dkt. No. 84, at 100:16-18).

193.     Ms. Williams further states that, if Act 493 takes effect, LRFP will stop providing abortions after 18 weeks LMP, and she asserts that this will force women to travel out of state for another abortion care provider (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶¶ 22-23).   Ms. Williams notes that a significant number of LRFP's patients are poor or low income and receive financial assistance to cover part of the costs of their abortion care (*Id.*, ¶ 23).

194.     Ms. Williams also states that, from conversations with patients, she understands that the efforts required to make the necessary plans to come to LRFP cause anxiety and stress, which are exacerbated by travel and logistical arrangements (*Id.*, ¶ 24).   She notes that the need to arrange for time off work on multiple days can be challenging and that many LRFP patients are in low-wage jobs where they are unlikely to receive vacation or sick days (*Id.*).   She notes that her

patients report that they risk their employment and confidentiality by asking for time off (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 24).

195.     Furthermore, based upon her counseling with patients, Ms. Williams knows that making the necessary arrangements and raising funds for travel and other costs associated with coming to LRFP can force patients to delay seeking care (*Id.*, ¶ 25).   She also notes that transportation presents a major challenge in rural Arkansas, as there are few public-transportation options and rural residents often live far away from health-care providers (*Id.*).   According to Ms. Williams, "[n]umerous patients who come to the clinic for abortion care in the second trimester, including after 18 weeks LMP, have conveyed to me during the counseling process that they would have preferred to have obtained an abortion sooner but were delayed due to the logistical challenges described above (*Id.*).

196.     At the hearing, Ms. Williams testified that LRFP knows which of its patients qualify for financial assistance based on income (Dkt. No. 84, at 82:21-23).   According to Ms. Williams, the NAF provides funding to patients who are at 100 or 110% of the federal poverty line and that approximately 30% of LRFP's patients qualify for NAF funding (*Id.*).

197.     Ms. Williams also notes that the risks associated with abortion procedures increase as the pregnancy progresses and that delay may worsen any maternal health conditions associated with the pregnancy (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 26).

198.     Ms. Williams states that she is "aware that some of our patients seek abortions after receiving a fetal diagnosis, including Down syndrome." (*Id.*, ¶ 29).   She notes that while LRFP does 'not require patients . . . to tell us the reason or reasons they are seeking an abortion, patients who are seeking an abortion after a fetal diagnosis usually disclose this fact . . . ." (*Id.*).   She also notes that these patients come to LRFP "from across Arkansas and out-of-state, with many referred

. . . from Maternal Fetal Medicine specialists." (*Id.*). Ms. Williams avers that, if Act 619 goes into effect, the physicians at LRFP will stop performing abortions when they know that a patient is seeking an abortion solely based on a test result indicating Down syndrome, a prenatal diagnosis of Down syndrome, or any other reason to believe that the fetus has Down syndrome (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 31).

199.    Ms. Williams furthers states that, if Act 619 goes into effect, and LRFP is forced to turn away these patients, all these patients will have to seek abortion care out-of-state, as patients do not receive a Down syndrome diagnosis until after 10 weeks LMP and thus cannot seek a medication abortion at another Arkansas provider (*Id.*, ¶ 32). Ms. Williams notes that, by forcing women to travel out-of-state, Act 619 will cause extreme hardship and delay for many of LRFP's patients (*Id.*). She also notes that many of LRFP's patients will be prevented from obtaining an abortion (*Id.*).

200.    Ms. Williams notes that Dr. Hopkins is the only doctor who performs abortion care at LRFP who is a board-certified or board-eligible OBGYN (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶¶ 34-35).

201.    On April 2, 2019, LRFP sent a letter to all OBGYNs listed on the Arkansas medical-board licensure list describing LRFP and soliciting interest in providing care at the clinic (*Id.*, ¶ 36). LRFP received no responses (*Id.*).

202.    This letter states that LRFP is looking for a part-time, board-certified OBGYN to contract with LRFP to provide abortion services (Dkt. No. 2-1, at 404). The letter also states that LRFP sees patients three days a week, malpractice insurance would be paid by LRFP, and that the compensation for services is generous and based upon the number of procedures completed per day (*Id.*).

203.     Furthermore, Ms. Williams has raised the need for a board-certified or board-eligible OBGYN with numerous professionals at the National Abortion Federation ("NAF"), and on April 1, 2019, she submitted a request to a NAF program that matches abortion providers with clinics around the country (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 37).  Through those efforts, LRFP came into contact with two physicians who expressed preliminary interest in a position at LRFP, but neither lives in Arkansas or is licensed to practice in Arkansas (*Id.*).

204.     Ms. Williams also notes that there are protestors outside the clinic nearly every day and that the "harassment and intimidation is immediately apparent to any prospective physician or staff member (*Id.*, ¶ 39).  Furthermore, medical residents who receive abortion training at LRFP "frequently express concern about driving in their own vehicles to the clinic and wearing scrubs that identify them as medical providers." (*Id.*).

205.     Third-party vendors have refused to do business with LRFP because LRFP provides abortion care (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 40).  Ms. Williams relates an instance where an oxygen supplier ceased to do business with LRFP after anti-abortion activists informed the supplier that LRFP provides abortion care (*Id.*).

206.     Anti-abortion activists mailed Ms. Williams' photograph and a letter to 800 of her neighbors and went door-to-door in her neighborhood, informing members of her community that she is involved in abortion care (*Id.*, ¶ 41).

207.     In addition to LRFP's efforts to comply with the OBGYN requirement, LRFP has sent letters to Arkansas OBGYNs on at least two other occasions to solicit interest in assisting LRFP to provide abortion care or in joining the staff in various capacities (*Id.*, ¶ 42).

208.     LRFP sent a letter in early 2015 to all Arkansas OBGYNs listed in the medical-society directory but received no response except from Dr. Cathey (Decl. of Lori Williams,

M.S.N., A.P.R.N., ¶ 42; Dkt. No. 2-1, at 405-06).  LRFP again sent a letter on January 18, 2016, to all Arkansas OBGYNs listed on the medical board licensure list, but they received no response (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 42; Dkt. No. 2-1, at 407).

209.    While Dr. Browne and Dr. Hopkins have agreed to provide limited care at LRFP, LRFP has not identified any board-certified or board-eligible OBGYN who is available to provide care between August 12 and October 20, 2019, the next week that Dr. Hopkins can provide care at LRFP (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 47).

210.    According to Ms. Williams, if Dr. Browne and Dr. Hopkins provide care at LRFP under the OBGYN requirement, they will spend the first of their three days at the clinic satisfying the state-manded informed-consent requirements which will need to occur at least 72 hours before any procedure (*Id.*, ¶ 48).  Dr. Tvedten would not be able to continue working at the clinic only to obtain patient informed consents, as LRFP cannot afford to keep him on staff for such a limited role (*Id.*, ¶ 48).  LRFP cannot charge patients for the initial visit at that visit (*Id.*).  Dr. Browne and Dr. Hopkins would then need to spend their second and third days at LRFP performing procedures (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 48).

211.    Ms. Williams states that LRFP would not be an economically viable medical practice if it were able to provide patient care only three days a week every-other month, or even three days a week every month (*Id.*, ¶ 49).  Even if LRFP could come up with the funds to pay staff to provide care only three days every other or each month, Ms. Williams states that this would keep LRFP from retaining the highly trained and skilled staff that it needs to operate the clinic (*Id.*, ¶ 50).

212.    Plaintiffs present the declaration of Brandon J. Hill, Ph.D., the chief executive officer of PPGP (Dkt. No. 32; Decl. of Brandon J. Hill, Ph.D.).  Dr. Hill states that, due to

increasing problems with a landlord, including managing protester presence in the immediate vicinity of PPAEO Fayetteville's facility and the resultant concerns about patient and staff safety, PPAEO has ceased offering abortions at PPAEO Fayetteville (*Id.*, ¶ 4). Dr. Hill states that an anti-abortion "crisis pregnancy center" organization began parking its van in a lot immediately adjacent to the one used for the PPAEO Fayetteville health center (*Id.*, ¶ 3). Dr. Hill states that "[s]taff and patients were alarmed and distressed by the van's presence, and [they] were also concerned about medically inaccurate information being directed at patients." (*Id.*). Dr. Hill states that they also feared that increased protester visibility could lead to security issues (Decl. of Brandon J. Hill, Ph.D., ¶ 3). Dr. Hill further states that the relocation was necessary given the arson at one of PPGP's Missouri health centers less than six months ago (*Id.*). He also notes that PPAEO Fayetteville's lease expired at the end of July 2019 (*Id.*).

213. Dr. Hill states that PPAEO Fayetteville ceased providing abortions in anticipation of the health center closing so that PPAEO Fayetteville could schedule follow-up visits for all of its medication abortion patients prior to the health center closing (*Id.*, ¶ 4). He also avers that his staff is working diligently to find a new location for PPAEO Fayetteville (Decl. of Brandon J. Hill, Ph.D., ¶ 5). Specifically, he states that, through a realtor, PPGP has contacted dozens of landlords, management companies, and property owners, but they have been unable to confirm a lease that is move-in ready or that would require only minor modifications to meet their needs (*Id.*).

214. Dr. Hill states that there are several "live possibilities" and that he is confident they will be able to secure a location, but he confirms that there "will be a gap in time when [they] are unable to provide services." (*Id.*, ¶ 6).

215. Plaintiffs also present the supplemental declaration of Brandon J. Hill, Ph.D., (Dkt. No. 62, at 1-3; Supp. Decl. of Brandon J. Hill, Ph.D.). Dr. Hill states that PPGP is currently

working to open a new health center in Little Rock in August 2019 (*Id.*, ¶ 2). PPGP is seeking a new location due to size constraints at its current facility, and PPGP has purchased a property for its new facility (*Id.*, ¶ 4). PPGP will not, however, be able to provide surgical abortions at the new facility or provide care for more medication abortion patients due to the "capacities of [its] providers . . . ." (*Id.*, ¶ 6).

216. Plaintiffs also present the affidavit of Christopher Attig, an individual who lives in Little Rock, Arkansas, and who has a son with Down syndrome (Dkt. No. 63; Decl. of Christopher Attig). Mr. Attig opines that Act 619 does "nothing to honor, protect, or help my son and other people diagnosed with Down syndrome." (*Id.*, ¶ 5). Instead, Mr. Attig believes that Act 619 "uses my son and other children diagnosed with Down syndrome as political tools to criminalize and restrict abortion." (*Id.*). He further states that children with Down syndrome require special support that "can be very expensive and difficult to find," and in his opinion "the lack of accessible and affordable medical services and therapies needed to support a child diagnosed with Down syndrome" is one of the factors that influences a woman's decision to abort a pregnancy when Down syndrome is indicated (*Id.*, ¶ 6).

217. Defendants present various declarations from other cases not before the Court. Ms. Ashleigh Moon filed an affidavit in *Planned Parenthood of Indiana and Kentucky, et al. v. Commissioner, Indiana State Department of Health, et al.*, 1:16-cv-763-TWP-DML (S.D. Ind.), and defendants have filed that declaration here (Dkt. No. 45-1, at 53-55). Ms. Moon avers that she had a difficult pregnancy and that she was advised by her physicians to have an abortion and told that her child would suffer from genetic abnormalities (*Id.*, ¶¶ 1-14). Ms. Moon states that her child was born premature, survived, and is "genetically perfect." (*Id.*, ¶¶ 14-15).

218.     Defendants also present the declaration of Michele Mazelin, which was filed in *Planned Parenthood of Indiana and Kentucky, et al. v. Commissioner, Indiana State Department of Health, et al.*, 1:16-cv-763-TWP-DML (S.D. Ind.) (Dkt. No. 45-1, at 57-59). Ms. Mazelin avers that she was pregnant with twins and that she was pressured by a treating physician to have amniocentesis (*Id.*, ¶ 5).

219.     Defendants present the declaration of Steven E. Calvin, M.D., which was filed in *Planned Parenthood of Indiana and Kentucky, et al. v. Commissioner, Indiana State Department of Health, et al.*, 1:16-cv-763-TWP-DML (S.D. Ind.) (Dkt. No. 45-1, at 61-68; Decl. of Steven E Calvin, M.D.). Dr. Calvin avers that women have described to him that they have felt pressure to undergo prenatal screening and to have an abortion if Down syndrome is detected (*Id.*, ¶ 20). Dr. Calvin also states that "[a] fetus at 10 weeks and later has arms, legs, and a head" and is not confusable with medical material that may be the product of surgery (*Id.*, ¶ 26).

220.     Defendants present the affidavit of Ashley K. Fernandes, M.D., Ph.D., which was filed in *Preterm-Cleveland, et al. v. Lance Himes, Director, et al.*, 1:18-cv-109 (S.D. Ohio) (Dkt. No. 45-2, at 2-12; Decl. of Ashley K. Fernandes, M.D., Ph.D.). Dr. Fernandes is a physician who resides and practices medicine in Ohio. Dr. Fernandes avers that genetic counselors and physicians are biased against "unborn persons with DS . . . ." (*Id.*, ¶ 8).

221.     Defendants present the declarations of Kelly Kuhns, Susan Scheid, Susan Gill, and Jaclyn Keough, which were filed in *Preterm-Cleveland, et al. v. Lance Himes, Director, et al.*, 1:18-cv-109 (S.D. Ohio) (Dkt. No. 45-2, at 26-40). Each of these individuals has a child with Down syndrome. These individuals' affidavits appear to indicate that they live in Ohio, though it is not entirely clear where Ms. Scheid, Ms. Gill, and Ms. Keough reside.

222.     Defendants present the declaration of Dennis M. Sullivan, M.D., which was filed in *Preterm-Cleveland, et al. v. Lance Himes, Director, et al.*, 1:18-cv-109 (S.D. Ohio) (Dkt. No. 45-3, at 89-98; Decl. of Dennis M. Sullivan, M.D.).  Dr. Sullivan opines that the medical profession is biased to prefer abortions after a diagnosis of Down syndrome (*Id.*, ¶ 15).  Dr. Sullivan is a professor at Cedarville University, in Cedarville, Ohio (*Id.*, ¶ 1).

223.     Defendants present the declaration of Robin Lynn Treptow, Ph.D., which was filed in *Preterm-Cleveland, et al. v. Lance Himes, Director, et al.*, 1:18-cv-109 (S.D. Ohio) (Dkt. No. 46-1, at 2-4; Decl. of Robin Lynn Treptow, Ph.D.).  Dr. Treptow has a son with Down syndrome, and she states that medical professionals have a bias against individuals with Down syndrome (*Id.*, ¶¶ 2,6).  Dr. Treptow is an adjunct professor in Arlington, Virginia (*Id.*, ¶ 1).

224.     Defendants also present the affidavit of Allan Parker, the president of The Justice Foundation (Dkt. No. 49-1, at 1-3).  Attached to Mr. Parker's declaration are fifteen affidavits from Arkansas women.  Each of these affiants states that she regrets her abortion (Dkt. No. 49-1, at 4-27).  The abortions in question occurred between 1981 and 2003 (*Id.*).

225.     Defendants also present the declaration of Millie Lace, the founder and director of Concepts of Truth, Inc. ("Concepts") an organization based in Wynne, Arkansas, with satellite offices in Ohio and New Jersey (Dkt. No. 49-2; Decl. of Millie Lace).  Ms. Lace avers that Concepts is a non-profit organization that provides counseling for pregnant women (*Id.*, ¶ 3).  Ms. Lace states that she had an abortion in approximately 1979 on the advice of her physician, which caused her both physical and psychological pain (*Id.*, ¶¶ 6, 8).  Ms. Lace further states that "Concepts informs women of the truth that an abortion terminates the life of a whole living human being," and she avers that "[f]ollowing the counseling that Concepts provides, about 85% of all of the women who originally thought they wanted to have an abortion change their minds or

otherwise decide to carry their baby to full term and birth." (*Id.*, ¶ 15). Ms. Lace also states that

Concepts provides counseling to women who have had abortions, and she reports that "between

65% and 75% of the women report that they felt they were misled by the abortion clinic and that

their decisions were uninformed and in many ways pressured or coerced." (*Id.*, ¶ 16).

226. Defendants present the declaration of Mischa Martin, the Director of the Division

of Children and Family Services ("DCFS") at the Arkansas Department of Human Services

("DHS") (Dkt. No. 49-3; Decl. of Mischa Martin). Ms. Martin states that the Arkansas Safe Haven

law allows a mother to give up custody of any baby up to 30 days told at any hospital emergency

room or law enforcement agency without facing prosecution for endangering or abandoning a child

(*Id.*, ¶ 2). Ms. Martin explains that, once a baby is given up under the Safe Have law, DCFS places

the baby with an "adoptive home." (*Id.*, ¶ 5). Ms. Martin further explains the process for screening

prospective adoptive parents (*Id.*, ¶ 8).

227. Defendants also present the affidavit of Kristie Hayes, the Program Administrator

for the Income Support Group within the Arkansas Department of Human Services (Dkt. No. 49-

4; Decl. of Kristie Hayes). Ms. Hayes states that DHS provides "Limited Pregnant Women

Medicaid," "Full Pregnant Women Medicaid," "Unborn Child Medicaid Coverage," and

"Newborn Medicaid." (*Id.*, ¶¶ 2-6). Ms. Hays also explains that the ARKids First Program covers

children in households up to 142% or 211% of the federal poverty level (*Id.*, ¶ 7). Ms. Hayes

states that for families raising a child with Down syndrome, the child is eligible for ARKids and

The Tax Equity and Fiscal Responsibility Act ("TEFRA") Medicaid program (*Id.*, ¶ 9). She also

points out that families with children who have Down syndrome may be eligible for Supplemental

Security Income ("SSI") or Developmental Disabilities Services (Decl. of Kristie Hayes, ¶¶ 10-

11).

228.     Defendants also present the declaration of Mary Silfies (Dkt. No. 49-5, at 1-3; Decl. of Mary Silfies).  She is "part of a sidewalk prayer ministry group that often goes" to LRFP on Wednesdays and Fridays, if LRFP is open (*Id.*, ¶ 1).  She states that every participant "is required to sign a Statement of Peace, outlining the behavior that is expected," and she further states that her group does "not engage in any behavior that would be considered harassing." (*Id.*, ¶¶ 2-3).  Ms. Silfies states that LRFP has installed water sprinklers to discourage her group (*Id.*, ¶ 4).

229.     Ms. Silfies states that "[i]t is not unusual to observe ambulances being called" to LRFP, and she attaches a spreadsheet that she received in response to filing a Freedom of Information Act request with Little Rock's ambulance service (Decl. of Mary Silfies, ¶ 5).  This spreadsheet appears to show 64 instances since 1999 when an ambulance has been called to LRFP's address (Dkt. No. 49-5, at 4-5).  Ms. Silfies states that the three ambulance calls to LRFP in 2019 were all made on days when Dr. Tvedten was working (*Id.*, ¶ 7).  She says that she knows this because she was on the sidewalk when the ambulances were called, she recognizes Dr. Tvedten, and she makes "a personal note of who the abortionist is each time I am there." (*Id.*).

230.     Defendants present the declaration of Kathi Aultman, M.D. (Dkt. No. 49-6, at 1-24; Decl. of Kathi Aultman, M.D.).  Dr. Aultman is a Fellow of the American College of Obstetricians and Gynecologists (*Id.*, ¶ 1).  Dr. Aultman describes the requirements for board certification for OBGYNs, including a four-year specialized residency (*Id.*, ¶ 12).  Dr. Aultman states that "[p]eer-reviewed studies demonstrate that board certified physicians are better doctors." (*Id.*, ¶ 17).  She points to studies that purport to show that board-certified physicians are less likely to be disciplined by state medical boards (*Id.* (citing Rebecca Lipner, et al., *Specialty Certification Status, Performance Ratings, and Disciplinary Actions of Internal Medicine Residents*, 91 Academic Medicine 376 (2016); Michael R. Peabody, et al., *The Relationship Between Board*

*Certification and Disciplinary Actions Against Board-Eligible Family Physicians*, 94 Academic Medicine 847 (2019) (reviewing the likelihood of discipline for board-certified family physicians); Neal D. Kohatsu, et al., *Characteristics Associated With Physician Discipline: A Case-Control Study*, 164 Arch. Internal Medicine 653 (2004))). She also points to studies that show that physicians who have been in practice longer may be more likely to provide poor care (*Id.*, ¶ 19 (citing Niteesh Choudry, et al., *Systematic review: The relationship between clinical experience and quality of health care*, 142 Annals of Internal Medicine 269 (2005))).

231.  Dr. Aultman describes ABOG's "maintenance of certification" ("MOC") process, wherein board-certified physicians engage in continuing professional development (*Id.*, ¶¶ 22-23 (citing Christine K. Cassell, *Professionalism And Accountability: The Role of Specialty Board Certification*, 119 Trans. of the Am. Clinical and Climatological Ass'n 295, 297 (2008))).

232.  Dr. Aultman also states that medication abortions are riskier than aspiration abortions, and she states that "medication abortion patients are likely to require surgical follow-up treatment for retained products or bleeding." (*Id.*, ¶ 27).[6] She also states that all OBGYNs are trained to evacuate the uterus in the first and second trimesters (*Id.*, ¶ 28 (citing Jessica Bienstock, et al., *The Obstetrics and Gynecology Milestone Project* at iv (2015), *available at* http://www.acgme.org/Portals/0/PDFs/Milestones/ObstetricsandGynecologyMilestones.pdf (noting that the milestones discussed are designed as targets, not as requirements, and that the graduation decisions are "the purview of the residency program director"))).

233.  Dr. Aultman opines that "[c]omplications from abortion are significantly under-reported." (*Id.*, ¶ 29). She states that this is because some states do not report their data and because

---

[6]  Dr. Aultman's citation for this proposition is found on a private website that cannot be accessed without a subscription.

"women are often ashamed to tell anyone that they had an abortion . . . ." (*Id.*).  Dr. Aultman also says there is no support for the statement that abortion is less risky than childbirth (*Id.*, ¶ 31 (citing Byron Calhoun, *Systematic Review:  The maternal mortality myth in the context of legalized abortion*, 80 The Linacre Quarterly 264 (2013) (arguing that abortion-related deaths are underreported and positing a connection between abortion and suicide, cancer, and substance abuse))).  She also asserts that the low mortality and morbidity rates for early abortions masks the risk associated with abortions at 21 weeks LMP or greater (*Id.*, ¶¶ 33-34).

234.    Dr. Aultman states that, according to the FDA, there have been 22 deaths "associated with the administration of Mifepristone." (*Id.*, ¶ 46).

235.    Defendants also present the rebuttal declaration of Dr. Aultman (Dkt. No. 73; Rebuttal Decl. of Kathi Aultman, M.D.).  Dr. Aultman has reviewed the "17 affidavits and declarations . . . in the record of this case from women who have been hurt by abortion." (*Id.*, ¶ 3).  Dr. Aultman states that these affidavits and declarations are "consistent with the experiences of the women I have encountered in my work as a physician and advocate for women and their health issues." (*Id.*).

236.    Dr. Aultman relates an incident where she provided gynecologic care to a young woman, and she states that that the young woman claimed that she suffered adverse psychological effects after aborting her pregnancy (*Id.*, ¶ 5).

237.    Dr. Aultman also states that she provided care to a woman who came to see her "for continuous spotting and bleeding several months following an abortion." (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 6).  Dr. Aultman avers that she learned that the young woman "was given vaginal medication" and "was instructed to sit on the toilet and push." (*Id.*).  Ms. Aultman states that she

further learned that the young woman then "delivered a 20+ week baby boy into the toilet" and that the "baby drowned in the toilet water." (*Id*.).

238.    Dr. Aultman claims that there is "no mechanism for recording or reporting" medical or psychological complications of abortions (*Id*., ¶ 7).  She also states that physicians fear being subjected to litigation for delivering babies with congenital abnormalities and that this is why "many young women feel pressure to abort babies with the potential for such abnormalities." (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 8).

239.    Attached to Dr. Aultman's rebuttal declaration is a certified criminal record for Dr. Tvedten in the case of *State v. Thomas Harold Tvedten* (*Id*., ¶ 10).  According to this record, Dr. Tvedten was convicted of second-degree criminal mischief for an event that occurred on May 22, 1987.  At the hearing, Dr. Tvedten testified that this charge was the result of breaking the camera of an individual who was photographing an abortion clinic (Dkt. No. 84, at 175:19-23).

240.    Also attached to Dr. Aultman's rebuttal declaration is a disciplinary report for Dr. Tvedten from the Arkansas State Medical Board (Dkt. No. 73, at 270-72).  Per this report, Dr. Tvedten's medical license was suspended for three months in 1983 and that his Drug Enforcement Agency registration was suspended for fifteen months, ending in 1984.

241.    Defendants present a letter written by Dr. Tvedten to the Arkansas State Medical Board (Dkt. No. 103-1).  In this letter, Dr. Tvedten states that he was pulled over and charged with "Driving Under the Influence of Alcohol." (*Id*., at 1).  He also notes that this is the first such charge that he ever received (*Id*.).  This letter has the year "2008" stamped on it and is addressed to the Arkansas State Medical Board.  The Court finds that this letter has little relevance to any claim or defense in this case given that Dr. Tvedten continues to practice medicine with the apparent approval of the Arkansas State Medical Board.

242.     Defendants also present an incident report in which an individual reported that Dr. Tvedten walked into her office and stated that he was "going to get" the individual's son and that the son was "going to lose something." (*Id.*, at 2).  The incident report is dated April 28, 1998, and there is no record evidence that shows the report ever led to a formal charge against Dr. Tvedten. The Court finds that this incident report has little relevance to any claim or defense in this case given that Dr. Tvedten continues to practice medicine with the apparent approval of the Arkansas State Medical Board.

243.     Dr. Aultman also states that "comparing mortality statistics to maternal mortality statistics is not an apples-to-apples comparison" and that an OBGYN "can handle common complications of abortion that an ordinary licensed physician cannot, such as life threatening hemorrhage or injury to internal organs that might require an abdominal surgery to repair." (Rebuttal Decl. of Kathi Aultman, M.D., ¶¶ 13-14).  The Court also notes that Dr. Aultman did not testify at the July 22, 2019, hearing.

244.     Defendants also present the declaration of Donna J. Harrison, M.D. (Dkt. No. 49-7, at 1-22; Decl. of Donna J. Harrison, M.D.).  Dr. Harrison is certified by the ABOG and is the Executive Director of the American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG") (*Id.*, ¶ 3).

245.     Dr. Harrison explains the efficacy of fetal screening and diagnostic tests.  She explains that, out of 10,000 general population women whose pregnancies are screened using cell-free DNA screening, 30 of those women will test positive for Down syndrome, while in fact only 10 of them are positive for Down syndrome (*Id.*, ¶ 19 (citing Am. Coll. of Obstetricians and Gynecologists, Committee Opinion No. 640 (Sept. 2015), https://www.ncbi.nlm.nih.gov/pubmed

/26287791)).  In a high-risk population, out of 10,000 women tested, 119 of those women will test positive, while in fact only 99 of them are in fact positive for Down syndrome (*Id.*, ¶ 20).

246.    Dr. Harrison further asserts that women who receive a false positive on a screening test "may be pressured to act on the basis of a positive screening test which is wrong." (Decl. of Donna J. Harrison, M.D., ¶ 32).

247.    Dr. Harrison explains that screening tests, the results of which are not available until 12 weeks LMP, "do not answer the question" of whether Down syndrome is indicated (*Id.*, ¶ 34).  Dr. Harrison avers that the diagnostic tests, which occur after a positive screening test, carry risks of complications (*Id.*, ¶¶ 35-37).  Dr. Harrison further avers that amniocentesis "is done around 18-20 weeks." (*Id.*, ¶ 38).  She avers that, at 22 weeks LMP, "[t]he immediate risk of maternal mortality from an abortion at 22 weeks is roughly equal to the risk of death from live birth." (Decl. of Donna J. Harrison, M.D., ¶ 38 (citing L. Bartlett, *Risk factors for legal induced abortion-related mortality in the United States*, 103 Obstetrics & Gynecology 729 (2004) (noting that abortions performed in the second trimester were significantly riskier than first trimester abortions))).

248.    Dr. Harrison further states that "[t]here is also an increased psychological risk for mothers who abort." (*Id.*, ¶ 41 (citing David C. Reardon, *The abortion and mental health controversy:  A comprehensive literature review of common ground agreements, disagreements, actionable recommendations, and research opportunities*, 6 SAGE Open Medicine 1, 8 (2018) (finding that "it is impossible to conduct research in this field in a manner that can definitely identify the extent of any mental illnesses following abortion, much less than the proportion of disorders that can be reliably attributed solely to abortion itself."))).

249.     Dr. Harrison opines that "[t]he grisly reality is that abortion of human beings with Down syndrome is driven by a sector of society that doesn't want disabled people to be part of society." (*Id.*, ¶ 43).

250.     Dr. Harrison further states that "[w]ith specialized medical care some fetuses can survive outside the womb by 22 weeks with survival rates as high as 40% in some medical centers." (*Id.*, ¶ 56).

251.     At the July 22, 2019, hearing, Dr. Harrison testified.  During her testimony, she explained that it has been approximately 20 years since she had a clinical OBGYN practice where she was paid to see and treat patients (Dkt. No. 84, at 240:20-25).  She also testified that it has been a similar amount of time since she performed a gynecological surgery or a dilation and curettage procedure, which is a procedure that is similar to the procedure used in a first trimester abortion (*Id.*, at 238:19-25, 239:1-9).

252.     Dr. Harrison also testified that she was twice sued for medical malpractice when she was a practicing OBGYN and that she is still a board-certified OBGYN (*Id.*, at 240:9).  She also stated that she remains a board-certified OBGYN even though she has not had an active clinical practice for 20 years (*Id.*, at 240:16-20).

253.     When asked if she would provide abortion care in Arkansas, Dr. Harrison testified that, as a board-certified OBGYN, if she were to go back into a surgical practice, she would take additional surgical training (Dkt. No. 84, at 241:9-21).  Specifically, she testified that if she were to go back into surgical practice, she would spend approximately six months updating her skills (*Id.*).

254.     Dr. Harrison also testified that, since 2000, she has focused her professional activities on AAPLOG (*Id.*, at 243:9).  Dr. Harrison testified that it is AAPLOG's position that

elective abortions are not medical care (*Id*., at 244:15-17). She also testified that she is a scholar at the Charlotte Lozier Institute, a part of the Susan B. Anthony List, which she stated is an organization dedicated to electing candidates and pursuing policies that will reduce and end abortion (Dkt. No. 84, at 247:1-7).

255. Dr. Harrison also testified that, in her opinion, ACOG is a pro-abortion organization (*Id*., at 248:13-17).

256. When questioned about testimony she provided in other cases, Dr. Harrison stated that she was unaware that other courts had concluded that her opinions were at odds with scientific evidence (*Id*., at 252:15-16).

257. Defendants also present the supplemental declaration of Dr. Harrison (Dkt. No. 103-5; Supp. Decl. Donna J. Harrison, M.D.). In her supplemental declaration, Dr. Harrison attaches a list of 162 studies which report allegedly report the association between induced abortion and preterm birth in subsequent pregnancies (*Id*., ¶ 3).

258. Defendants also present the declaration of Tumulesh K.S. Solanky, Ph.D. (Dkt. No. 49-8, at 1-25; Decl. of Tumulesh K.S. Solanky, Ph.D.). Dr. Solanky's declaration discusses Dr. Lindo's conclusions and findings, and Dr. Solanky disagrees with Dr. Lindo's projections regarding the likely reduction in abortions resulting from the closing of PPAEO Fayetteville (*Id*., ¶¶ 8-17). Dr. Solanky testified at the July 22, 2019, hearing.

259. Dr. Solanky's declaration does not contest Dr. Lindo's projections of LRFP and PPAEO Little Rock's capacity to provide abortions if the OBGYN requirement goes into effect, but he does state that Dr. Lindo's "supplemental declaration has assumed that the maximum capacity of clinics/physicians is simply the maximum number of abortions performed" and that "[t]his is a rather biased assumption." (*Id*., ¶ 54).

260.     Dr. Solanky does contest Dr. Lindo's estimate of a "17-27%" reduction in abortions due to the cessation of medication abortions in Arkansas in 2018 (*Id.*, ¶ 10). Dr. Solanky asserts that Dr. Lindo incorrectly "assume[s] that if there [was] any reduction in abortions in 2018, then it must have been caused by [the contracted physician requirement]." (*Id.*, ¶ 39).

261.     Dr. Solanky also asserts that "there appears to be no correlation between the numbers of clinics and abortion rates." (*Id.*, ¶ 46).

262.     Dr. Lindo presents a rebuttal declaration to respond to Dr. Solanky's assertions (Dkt. No. 62-2, at 1-6; Rebuttal Decl. of Jason Lindo, Ph.D.). Dr. Lindo takes issue with Dr. Solanky's assertion that Dr. Lindo incorrectly calculates the maximum capacity of abortion providers; according to Dr. Lindo, Dr. Solanky provides no justification for his criticism, and he argues that Dr. Solanky proposes no alternative capacity-calculation methodology or capacity estimates (*Id.*, ¶ 3). Further, Dr. Lindo points out that Dr. Solanky does not respond to the fact that Dr. Lindo's capacity estimates likely overestimate the abortion providers' capacity to provide abortions if the challenged Acts go into effect (*Id.*).

263.     Dr. Lindo also takes issue with defendants' assertion that Dr. Hopkins can conduct 525 surgical abortions annually (*Id.*, ¶ 6). Dr. Lindo points out that it is unlikely that LRFP will remain open if Dr. Hopkins is the only abortion provider, and he also points out that it is highly improbable that Dr. Hopkins could spend three days a week providing abortions, as LRFP cannot afford to hire a physician for the sole purpose of obtaining patient consents (Rebuttal Decl. of Jason Lindo, Ph.D., ¶ 6). Dr. Lindo also points out that D&E abortions are often two-day procedures that are more time-consuming to perform (*Id.*). Dr. Lindo further explains that he understands that LRFP can provide 20-25 abortions a day under current conditions, not in a scenario in which Dr. Hopkins is the only physician providing surgical abortions (*Id.*). Finally,

Dr. Lindo points out that defendants assume that all patients who will need surgical abortion care would be able to obtain that care in the one week when Dr. Hopkins is in Arkansas, which will occur once every two months (*Id.*).

264.    Defendants also present a supplemental declaration from Dr. Solanky (Dkt. No. 103-8; Supp. Decl. of Tumulesh K. S. Solanky).  Dr. Solanky states that he has been provided with the data that Dr. Lindo used to create his estimates (*Id.*, ¶ 1).  Dr. Solanky opines that Dr. Lindo's capacity estimates for LRFP and PPAEO Little Rock do "not take into account the trend of declining number of Arkansas resident abortions." (*Id.*, ¶ 7).  Dr. Solanky further states that abortions decrease by approximately three percent per year (*Id.*).

265.    To determine to state of residence for each abortion performed from 2016 to 2018, Dr. Solanky used the county of residence reported in the spreadsheets; Dr. Solanky notes that, because the names of Arkansas counties are shared by counties in surrounding states, there is the possibility that his estimate of the number of Arkansas resident abortions in 2018 is incorrect (Supp. Decl. of Tumulesh K. S. Solanky, ¶ 10 n.3).  Dr. Solanky notes that the data indicates that PPAEO provided 215 out-of-state abortions and 2,272 Arkansas resident abortions; he also notes that LRFP provided 877 out-of-state abortions and 6,133 Arkansas resident abortions (*Id.*, ¶ 10). Dr. Solanky concluded that these combined data sets show that 8,405 total Arkansas resident abortions occurred and that, if divided by three, the average number of Arkansas resident abortions "comes to 2,802 Arkansas resident abortions per year for the three years." (*Id.*).  Dr. Solanky noted that Dr. Lindo's declaration states that there were 2,779 Arkansas resident abortions on average, and he also notes that he cannot "determine why this discrepancy in Arkansas resident abortion exists." (*Id.*).

266. Dr. Solanky's declaration relied upon data which was filed under seal with the Court (Dkt. No. 105). This data indicates that the vast majority of abortions in Arkansas were conducted by PPAEO and LRFP, though less than half a dozen were performed by others.

267. Defendants also present the declaration of Judy McGruder, who lives in Fort Smith, Arkansas (Dkt. No. 49-10, at 1-3; Decl. of Judy McGruder). Ms. McGruder avers that she aborted a pregnancy in 2000 at LRFP (*Id*., ¶ 4). Ms. McGruder previously received amniocentesis and was informed that her child would have Down syndrome (*Id*., ¶ 3). Ms. McGruder regrets her abortion (*Id*., ¶ 11). Ms. McGruder offered testimony consistent with her affidavit at the July 22, 2019, hearing (Dkt. No. 84, at 273-78).

268. Under Arkansas law, only a physician licensed to practice medicine in the State of Arkansas may provide abortion care. *See* Ark. Code Ann. § 5-61-101(a).

269. The Arkansas Medical Practices Act and Regulations expressly state that "[n]o person shall be granted a license to practice medicine in the State of Arkansas unless he or she . . . is of good moral character and has not been guilty of acts constituting unprofessional conduct . . . ." *See* Ark. Code Ann. § 17-95-403(b).

270. The Arkansas Medical Practices Act and Regulations permit the Arkansas Medical Board to suspend or revoke a license for immoral or unprofessional conduct. Ark. Code Ann. § 17-99-307(2) ("The Arkansas State Medical Board, after due notice and hearing, may revoke, suspend, or refuse to renew any license or permit or place on probation or otherwise reprimand a licensee or permit holder or deny a license to an applicant who . . . is in judgment of the board, guilty of immoral or unprofessional conduct.").

271. The Arkansas Medical Board may refuse to grant, impose certain enumerated penalties, or revoke the medical license of any physician involved in any felony listed under

[Arkansas Code Annotated] § 17-2-102." Ark. Code Ann. § 17-95-409. Arkansas Code Annotated § 17-2-102, which was enacted in 2019, includes a list of 36 categories of felony offenses and specifically provides that convictions in Arkansas, other states, and federal court shall be considered.

272. To maintain an active license to practice medicine in the State of Arkansas, there are continuing medical education requirements that may be enforced through license suspension or revocation. *See* Ark. Code Ann. § 17-80-104 (empowering regulatory boards of the professions or occupations classified by the law of the State of Arkansas as professions of the healing arts and for whom the General Assembly has established regulatory boards empowered to license persons to practice to adopt rules requiring the continuing education of the persons licensed by the board); Ark. Admin. Code 060.00.1-17 (requiring a person who holds an active license to practice medicine in the State of Arkansas shall complete 20 credit hours per year of continuing medical education, stating that "Fifty (50%) percent of said hours shall be in subjects pertaining to the physician's primary area of practice . . . .").

273. Any claim or filing of a lawsuit alleging malpractice against a physician licensed to practice medicine and surgery in the State of Arkansas must be reported to the Arkansas State Medical Board within ten days after receipt or notification or the licensed physician may face discipline up to and including revocation, suspension, or probation or monetary fines. *See* Ark. Code Ann. § 17-95-103; Ark. Admin. Code 060.00.1-23.

274. Arkansas licensed physicians are subject to being audited (Dkt. No. 84, at 15:16-16:5).

275. Any Arkansas physician who performs an abortion must "obtain the correct informed consent from their patients" or risk sanction by the Arkansas Medical Board. Ark.

Admin. Code 060.00.1-26 (describing the consent required and the circumstances under which it is required and permitting the Arkansas Medical Board to revoke or suspend a medical license or impose other sanctions if the Board determines there has been a violation).

276. Any Arkansas physician who provides an abortion-inducing drug for the purpose of inducing an abortion is currently required to report any known adverse events associated with medication abortions. Ark. Code Ann. § 20-16-1505 ("If a physician provides an abortion-inducing drug . . . and if the physician knows that the woman who uses the abortion-inducing drug for the purposes of inducing an abortion experiences an adverse event, the physician shall provide a written report of the adverse event within three (3) days of the event to the United States Food and Drug Administration . . . and to the Arkansas State Medical Board"); *see* Ark. Admin. Code 060.00.1-36 (requiring reporting to the Arkansas State Medical Board in the same circumstances).

277. Additionally, any woman in Arkansas seeking an abortion must be evaluated *via* a medical history, a physical examination, counseling, and laboratory tests. *See* Ark. Admin. Code 007.05.2-8(A).

278. Arkansas abortion facilities shall have written procedures for emergency transfer of a patient to an acute care facility. *See* Ark. Admin. Code 007.05.2-8(B). Arkansas general abortion facilities, which provide surgical abortions or both medication and surgical abortions, shall be within 30 minutes of a hospital which provides gynecological or surgical services. *See* Ark. Admin. Code 007.05.2-4(C); Ark. Admin. Code 007-05-2.3(J) (defining general abortion facility). Arkansas abortion facilities providing abortions must have various medical devices available to assist in the event of complications. *See* Ark. Admin. Code 007.05.2-8(C), (E). Finally, Arkansas abortion facilities must have a certain number of qualified personnel available to provide direct patient care. *See* Ark. Admin. Code 007.05.2-7.

279.    Arkansas abortion facilities must satisfy a variety of ongoing obligations to educate staff about best practices to assess their own services.  *See* Ark. Admin. Code 007.05.2-10; 007.05.2-5; 007.05-6(F),(G); 007.05.2-7(D).

280.    Furthermore, "[e]ach induced termination of pregnancy which occurs in [Arkansas] regardless of the length of gestation shall be reported to the [Division of Vital Records] within five (5) days by the person in charge of the institute in which the induced termination of pregnancy was performed."  Ark. Code Ann. § 20-18-603(b)(1).  If "the induced termination of pregnancy was performed outside an institution, the attending physician shall prepare and file the report."  Ark. Code Ann. § 20-18-603(b)(2).

281.    The Court held a hearing on plaintiff's motion for temporary restraining order and/or preliminary injunction on July 22, 2019 (Dkt. No. 78).  At the hearing, plaintiffs called five witnesses:  Dr. Hopkins, Dr. Prine, Ms. Williams, Dr. Lindo, and Dr. Tvedten.  Defendants called four witnesses:  Dr. Cathey, Dr. Harrison, Dr. Solanky, and Ms. McGruder.

### III.    Conclusions Of Law

When determining whether to grant a motion for a preliminary injunction, this Court considers:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir. 1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."

*Id.* "Although no single factor is determinative when balancing the equities," a lack of irreparable harm is sufficient ground for denying a temporary restraining order. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992).

The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary injunction. *See Dataphase*, 640 F.2d at 113. Under *Dataphase*, no one factor is determinative. *Id.* The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process. Those laws are entitled to a "higher degree of deference." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008). In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Id.*

## A. Analysis Of Standing

Defendants challenge plaintiffs' standing. For the reasons discussed below, the Court concludes that, based upon the record evidence before the Court at this stage of the proceeding, plaintiffs generally have standing on behalf of themselves and their patients, with the exception of standing to challenge the application of Act 619 to post-viability abortions.

### 1. Article III Standing

To establish Article III standing, a plaintiff must satisfy three requirements: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]

result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted).

Defendants assert that plaintiffs cannot assert facial challenges on behalf of their "hypothetical future patients." (Dkt. No. 103, at 68). Under a long-established rule, however, it is "appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton v. Wulff*, 428 U.S. 106, 118 (1976); *see Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2296 (2016) (deciding physicians' and clinics' 42 U.S.C. § 1983 action against abortion restrictions on behalf of themselves and their patients). There are many cases recognizing that an abortion provider may sue to enjoin, as violations of the United States Constitution or federal law through 42 U.S.C. § 1983, state laws that restrict abortion. "These cases emphasize not the harm to the abortion clinic of making abortions very difficult to obtain legally, though that might be an alternative ground for recognizing a clinic's standing, but rather 'the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy,' as a result of which 'the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients.'" *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 910 (7th Cir. 2015) (quoting *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013)).

Further, the United States Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), that abortion doctors have first-party standing to challenge laws limiting abortion when, as in *Doe* and the current case, the doctors are subject to penalties for violation of the laws. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 903-04, 909 (1992) (plurality opinion);

*Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Schimel*, 806 F.3d at 911.

Defendants point to *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), and assert that this case stands for the proposition that third-party standing has been approved only when the litigant asserts rights of known claimants, not hypothetical ones. This argument is unconvincing, as *Kowalski* cites *Doe* and explicitly distinguishes third-party standing in the abortion context. 543 U.S. at 130.

Defendants also assert that plaintiffs' lack standing because "there is a clear conflict between Plaintiffs and their patients . . . ." (Dkt. No. 103, at 32). Defendants claim that this presents a conflict of interest between providers and patients which precludes third-party standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004); *see also Kowalski*, 543 U.S. at 135 (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure . . . that the litigant and the person whose rights he asserts have interests which are aligned.").

This argument could be made with respect to any abortion regulation that purports to advance a valid state interest, but courts have repeatedly allowed abortion providers to challenge such laws, determining that the providers' and women's interests are aligned and not adverse. *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 627 n.5 (1979) (holding that a physician plaintiff had standing to raise his minor patients' claims to determine whether a parental consent law should be upheld to protect the alleged vulnerability of minors); *Charles v. Carey*, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (rejecting the state's claim of conflict of interest in a challenge to a counseling law designed to "protect women from abusive medical practices"). This argument has not defeated a providers' standing to challenge contraception restrictions. *See Carey v. Population Servs. Int'l*, 431 U.S.

678, 683-84, 690 (1977) (granting third-party standing where the government defended a contraception restriction based on its interest in protecting health); *Eisenstadt v. Baird*, 405 U.S. 438, 445-46, 450 (1972) (allowing a plaintiff to raise the rights of others seeking contraception where the government defended a restriction as "regulating the distribution of potentially harmful articles").

Furthermore, to the extent there is record evidence in this case that women who have had abortions regret those abortions or felt pressured into obtaining an abortion, although the Court is sympathetic, the Court is unconvinced that such record evidence demonstrates a conflict of interest between physicians and patients. Arkansas currently mandates pre-abortion counseling with informed consent, Ark. Admin. Code § 007.05.2-7 ("prior to the abortion, the patient shall be counseled regarding the abortion procedure, alternatives to abortion, informed consent, medical risks associated with the procedure, potential post-abortion complications, community resources and family planning" and "documentation of counseling shall be included in the patient's medical record . . . ."), and imposes a 48-hour, soon to be 72-hour,[7] waiting period between an initial consultation and an abortion. To the extent there is record evidence that women who have had abortions experience regret or felt pressured into obtaining an abortion, that record evidence demonstrates the women describe pressure from sources that are not abortion providers, including but not limited to family members, spouses, and personal circumstances, and that evidence spans

---

[7] On April 20, 2019, Arkansas enacted a new law requiring a 72-hour waiting period between a woman's consultation with a doctor concerning a possible abortion and any abortion procedure, except where it "will cause substantial and irreversible impairment of a major bodily function." 2019 Ark. Acts 801, to be codified at Ark. Code Ann. §§ 20-16-1109, -1703(b), -1706. This law goes into effect on July 24, 2019. There is no record evidence that any party has challenged this new law.

a significant time period during which laws and regulations governing abortion care in Arkansas were different from the current laws and regulations.

Defendants maintain that, because there is no allegation of a "hinderance" preventing plaintiffs' patients from bringing their own suits, plaintiffs lack standing. This argument fails because the Supreme Court in *Singleton* states that the "hindrance" prong of the third-party standing doctrine is satisfied in abortion cases. 428 U.S. at 117.

At this stage, defendants also argue that LRFP specifically lacks standing to challenge Act 700's OBGYN requirement because it creates "no legal impediment to [its] employment of qualified abortion practitioners." (Dkt. No. 103, at 37). The Court is unconvinced by this argument: the Supreme Court in *Hellerstedt* allowed clinics to challenge a surgical-center requirement where the cost of complying with that requirement was $1.5 to $3 million per clinic. *Hellerstedt*, 136 S. Ct. at 2302-03. That LRFP employs abortion providers who would otherwise meet Act 700's OBGYN requirement does not bar standing; instead, that fact is taken into account in this Court's analysis of the burden of Act 700 under the *Hellerstedt* test.

With respect to defendants' argument that plaintiffs have not made sufficient efforts to comply with the OBGYN requirement, defendants are essentially arguing that the alleged constitutional injury to women seeking abortions in Arkansas—that in a large fraction of the cases in which Act 700's OBGYN requirement is relevant, it will purportedly operate as a substantial obstacle to a woman's choice to undergo an abortion—is not caused by defendants, but by plaintiffs. To establish standing, the injury must be "fairly traceable" to the defendant's conduct. *Lexmark Intern., Inc. v. Static Control Components*, 572 U.S. 118, 125 (2014). The record evidence at this stage indicates that plaintiffs have attempted to comply with the OBGYN requirement and have in fact been able to find some board-certified OBGYNs to provide some

abortion care in Arkansas. Some record evidence also shows, however, that those board-certified OBGYNs cannot provide enough abortion care to satisfy the need for abortion care under the relevant inquiry. The Court is satisfied at this stage of the proceedings based on the record evidence before it that Act 700's OBGYN requirement—and not plaintiffs' failure to attempt to comply with Act 700's OBGYN requirement—is the proximate cause of the alleged harm. Accordingly, the Court finds that the record evidence at this stage of the proceeding demonstrates that plaintiffs' injuries are "fairly traceable" to Act 700's OBGYN requirement and that plaintiffs have Article III standing.

The Court does conclude that, based on this record evidence, for purposes of challenging Act 619, because post-viability abortions are not performed in Arkansas currently, plaintiffs lack standing to challenge Act 619 as applied to post-viability abortions on the record currently before the Court. Therefore, the Court need not examine whether Act 619 is constitutional as applied to post-viability abortions at this stage of the proceedings. For these reasons, the Court restricts its examination of Act 619 as applied to the types of pre-viability abortions the record evidence indicates are performed in Arkansas.

## 2.      42 U.S.C. § 1983 Standing

Defendants also contend that plaintiffs cannot assert third-party rights under 42 U.S.C. § 1983 because, defendants claim, § 1983 extends only to litigants who assert their *own* rights. There is no language in the statute that supports this argument. *See* 42 U.S.C. § 1983 (providing in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."). This Court agrees with the reasoning of the Seventh Circuit Court of Appeals on this point and rejects defendants' argument regarding standing under § 1983. *See Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 794-95 (7th Cir. 2013) ("*Van Hollen III*"). The Supreme Court has repeatedly allowed abortion providers to raise the rights of their patients in cases brought under § 1983, and this Court will do the same. *See*, *e.g.*, *Hellerstedt*, 136 S. Ct. 2292; *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 324-25 (2006) (noting that plaintiffs raised patients' claims in suit under 42 U.S.C. § 1983); *Bellotti*, 428 U.S. at 136 (same).

### 3.    Standing To Challenge Acts' Private Rights Of Action

Defendants also contend that plaintiffs lack standing to challenge the Acts' "private rights of action because any injury to Plaintiffs is not 'fairly traceable' to the Defendants." (Dkt. No. 103, at 35). Acts 493 and 619 both contain private rights of action that allow women who have obtained abortions to bring actions against an abortion provider. *See* Act 493, § 1, to be codified at Ark. Code Ann. § 20-16-2006(d); Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2005(b)(1). Specifically, defendants argue that, since these Acts provide for "enforcement only through private actions for damages," this Court lacks jurisdiction over any claim against governmental actors who have no authority to enforce the private rights of action in the Acts.

The Court concludes that plaintiffs do have standing to challenge the Acts because each of the challenged Acts provide for criminal prosecution, civil penalties, and professional sanctions enforceable by the State. *See* Act 493, § 1, to be codified at Ark. Code Ann. § 20-16-2006(a)-(e); Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2005(a)-(d); Act 700, § 1, to be codified at Ark. Code Ann. § 20-16-605(b). The case cited by defendants, *Digital Recognition Network, Inc.*

*v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015), is inapposite to the present matter because there the attorney general and governor lacked authority to enforce the challenged statute. 803 F.3d at 958. Here, the challenged Acts do grant the State authority to impose criminal, civil, and professional sanctions upon abortion providers. *See*, *e.g.*, *Casey*, 505 U.S. at 887-88 (majority opinion) (noting, as to spousal notification law the Court struck down, that "[a] physician who performs an abortion" for a married woman without spousal notice "will have his or her license revoked, and is liable to the husband for damages"). The private rights of action present in the challenged Acts do not deprive this Court of jurisdiction to address the constitutionality of the Acts.

### B. Facial Versus As-Applied Challenges

Constitutional challenges to these Acts may be deemed "facial" or "as-applied" challenges. Facial challenges to statutes affecting abortions may succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017) ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id.* at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas."); *see also Planned Parenthood Minn., N.D., S.D. v.*

*Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 662 F.3d 1072 (8th Cir. 2011) and *in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012); *see also Rounds*, 530 F.3d at 733 n.8 ("*Rounds* cases"). In *Gonzales*, the Supreme Court stated that, while the plaintiffs had failed to satisfy the "large fraction" test under *Casey* and were not entitled to facial relief, the challenged law would be open "to a proper as-applied challenge in a discrete case." 550 U.S. at 168.

Having recognized this distinction in the types of challenges that may be brought, the Court also notes that the distinction between facial and as-applied challenges is not always apparent. *See Hellerstedt*, 136 S. Ct. at 2307 ("Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims."); *see also* Richard R. Fallon, Jr., *Fact and Fiction about Facial Challenges*, 99 Cal. L. Rev. 915, 922 (2011). For the reasons set forth below, at this stage of the proceeding and on the record evidence before it, the Court concludes that plaintiffs are likely to prevail on the merits of their claims that they are entitled to facial relief against Acts 493, 619, and 700.

### C.    Law Directed At Pre-Viability Abortions

"[I]t is a constitutional liberty of the woman to have some freedom to terminate her pregnancy." *Casey*, 505 U.S. at 869. This right is grounded in the right to privacy rooted in the Fourteenth Amendment's concept of personal liberty, which was found to be "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153 (1973). This right is not "unqualified" and is balanced "against important state interests in regulation," eventually drawing a line between a woman's privacy right and the State's interest in protecting the potential life of a fetus at viability. *Roe*, 410 U.S. at 154. Part of *Roe*'s

essential holding is "a recognition of the right of the woman to choose to terminate a pregnancy before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. "A State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879.

> The Supreme Court in *Gonzales* acknowledged that:
>
> [T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, [and this premise] cannot be set at naught by interpreting *Casey's* requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer. Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.

550 U.S. at 158. The Court acknowledges that the state may, in a valid exercise of its police power, regulate abortion. The state's police power is, however, limited where a protected liberty interest is at stake. *Casey*, 505 U.S. at 851 (majority opinion). "The State's interest in regulating abortion previability is considerably weaker than postviability." *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (citing *Casey*, 505 U.S. at 870 (majority opinion)).

Although some argued that the Supreme Court's decision in *Gonzales*, in which the Court chose to "assume" *Casey*'s principles for purposes of its opinion, may have signaled the Court's willingness to reevaluate abortion jurisprudence, *see Gonzales*, 550 U.S. at 145-46, more recently, in *Hellerstedt*, the Supreme Court observed that viability is the "relevant point at which a State may begin limiting women's access to abortion for reasons unrelated to maternal health." 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 878 (plurality opinion)). The Court acknowledges that the state can impose regulations aimed at ensuring a thoughtful and informed choice, but only if such

regulations do not unduly burden the right to choose. *Casey*, 505 U.S. at 872. Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state).

The Eighth Circuit Court of Appeals has previously examined arguments and record evidence related to viability and the State's ability to restrict abortion before viability. *See Edwards v. Beck*, 786 F.3d 1113, 1119 (8th Cir. 2015) (per curiam); *MKB Management Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015). The court explained that prohibitions on abortions pre-viability, even when they contain limited exceptions, are *per se* unconstitutional under binding Supreme Court precedent. *Edwards*, 786 F.3d at 1117; *MKB Mgmt.*, 795 F.3d at 771. In *Edwards*, the court invalidated a prior Arkansas law that prohibited nearly all abortions starting at 12 weeks LMP, explaining that "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Edwards*, 786 F.3d at 1117 (quoting *Casey*, 505 U.S. at 879).

In *MKB Management*, the court like the Supreme Court in *Gonzales* assumed the principles of *Casey*, which this Court cites. *MKB Mgmt.*, 795 F.3d at 772 (quoting *Gonzales*, 550 U.S. at 146 (alteration in original) (citations omitted) (quoting *Casey*, 505 U.S. at 879, 878, and 877 (plurality opinion)). Further, the *MKB Management* court acknowledged that, just as the court is bound by the Supreme Court's assumption of the principles announced in *Casey*, the court is also bound by the Supreme Court's "statement that viability is the time 'when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.'" *MKB Mgmt.*,

795 F.3d at 772-73 (quoting and citing *Colautti v. Franklin*, 439 U.S. 379, 388 (1979)); *see also Casey*, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb").  Further, this Court observes that the Supreme Court has expressly determined that a state may not "proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus.  Viability is the critical point." *Colautti*, 439 U.S. at 388-89.

The Eighth Circuit does not stand alone in following controlling Supreme Court precedent when it comes to prohibitions on pre-viability abortions.  Laws that restrict pre-viability abortions have consistently been deemed unconstitutional in courts across the United States.  *See Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, 265 F. Supp. 3d 859, 866 (S.D. Ind. 2017), *aff'd sub nom.* 888 F.3d 300 (7th Cir. 2018), *reh'g en banc granted, judgment vacated*, 727 F. App'x 208 (7th Cir. 2018), *vacated*, 917 F.3d 532 (7th Cir. 2018), *and cert. granted in part, judgment rev'd on other grounds sub nom. Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 139 S. Ct. 1780 (2019) (holding state law unconstitutional because it prohibited abortions prior to viability if the abortion was sought for a particular purpose, including solely because of the sex of the fetus, solely because the fetus has been diagnosed with or has a potential diagnosis of any other disability, or solely because of the race, color, national origin, or ancestry of the fetus); *MKB Mgmt.*, 795 F. 3d at 744; *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (holding state law unconstitutional because it prohibited abortions 20 or more

weeks postfertilization, regardless of fetus attaining viability); *Isaacson*, 716 F.3d at 1217 (same); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (striking down ban on most common procedure used to provide abortion in the second trimester); *Jane L. v. Bangerter*, 102 F.3d 1112, 1114, 1117-18 (10th Cir. 1996) (holding state law unconstitutional because it prohibited abortions 20 or more weeks gestational age); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (holding state law unconstitutional because it prohibited all abortions with few exceptions); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368-69 (9th Cir. 1992) (same); *Jackson Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549 (S.D. Miss. May 24, 2019) (preliminarily enjoining ban on abortion starting when cardiac activity is detectable), *appeal docketed*, Case No. 19-60455 (5th Cir. June 24, 2019); *EMW Women's Surgical Ctr. v. Meier*, 373 F. Supp. 3d 807 (W.D. Ky. May 10, 2019) (holding state law unconstitutional that required performance of a fetal-demise procedure prior to evacuation phase of a dilation and evacuation abortion procedure), *appeal docketed*, Case No. 19-5516 (6th Cir. May 15, 2019); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630-32 (M.D. N.C. 2019) (holding state law unconstitutional when it prohibited most abortions after 20 weeks of pregnancy), *appeal docketed*, Case No. 19-1685 (4th Cir. June 26, 2019); *Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 540 (S.D. Miss. 2018) (holding state law unconstitutional because it prohibited abortions after 15 weeks gestation except in medical emergency or in case of severe fetal abnormality), *appeal docketed*, Case No. 18-60868 (5th Cir. Dec. 17, 2018); *Preterm-Cleveland v. Hines*, 294 F. Supp. 3d 746, 755 (S.D. Ohio 2018), *appeal argued* Case No. 18-3329 (6th Cir. Jan. 30, 2019) (granting preliminary injunction motion regarding constitutionality of state law prohibiting abortions based off fetal indication of Down syndrome), *appeal docketed*, Case No. 18-3329 (6th Cir. April 12, 2018).

Based on record evidence, "[i]t is commonly accepted in the field of OBGYN that a normally developing fetus will not attain viability until at least 24 weeks LMP. However, not all fetuses attain viability even at that stage, due to a variety of factors, such as renal agenesis (absence of kidneys), anencephaly (profound neural tube defect), and hydrocephaly (where the skull is filled with fluid)." (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 29); *see also Casey*, 505 U.S. at 860 (viability is weeks after 18 weeks). Defendants at this stage have come forward with no reliable, generally accepted medical or scientific record evidence to refute this. At this stage of the proceeding, defendants point this Court to no record evidence directed to the issue of viability. The Court acknowledges its review of the first declaration of Dr. Harrison, the Executive Director of AAPLOG, submitted by defendants. She avers that only with specialized care can some fetus survive outside of the womb by 22 weeks, and even then the survival rate is only "as high as 40% in some medical centers." (Decl. of Donna J. Harrison, M.D., ¶ 56). Dr. Harrison cites no source material or scientific studies in support of this assertion at this stage of the litigation. Even if the Court were willing to reconsider established precedent on fetal viability, it would not do so on this record at this stage of the proceeding.

Based on record evidence, only the following types of abortion care are available in Arkansas currently: medication abortions which are available only up to 10 weeks LMP; aspiration surgical procedures, performed until approximately 13 weeks LMP; and D&E surgical procedures, which are performed until 21.6 weeks LMP (Decl. of Jason Lindo, Ph.D. ¶ 11). As a result, the Court determines that Acts 493 and 619 implicate this analysis of laws directed at pre-viability abortions.

## 1.     Analysis Of Act 493

Act 493 of 2019 amends Arkansas Code Title 20, Chapter 15 to add an additional Subchapter 20 that bans abortion "if the probable gestational age of the unborn human being is determined to be greater than 18 weeks," as measured from the first day of a woman's last menstrual period in nearly all cases ("Act 493").  *See* Act 493, to be codified at Ark. Code Ann. § 20-16-2004(b).   Act 493 specifically prohibits a person from "intentionally or knowingly" performing, inducing, or attempting to perform or induce an abortion, if the probable gestational age is determined "to be greater than eighteen (18) weeks' gestation," as measured "from the first day of the last menstrual period of the pregnant woman."  Ark. Code Ann. §§ 20-16-2004(b); 20-16-2003(9).

Act 493 includes two exceptions:  (1) in the case of a "medical emergency," narrowly defined as "a condition that, on the basis of the physician's good faith clinical judgment, necessitates an abortion to preserve the life of the pregnant woman whose life is endangered by a physical [condition] . . . or when the condition of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function," Arkansas Code Annotated §§ 20-16-2004(b); 20-16-2003(6), (7); and (2) where the pregnancy is the result of rape or incest, as defined by Arkansas Code, Arkansas Code Annotated § 20-16-2004(b).

A violation of Act 493 constitutes a Class D felony, which is punishable by up to six years in prison and a fine of up to $10,000.00.  Ark. Code Ann. §§ 5-4-201, -401, 20-16-2006(a)(1).  Any physician who violates Act 493 also is subject to mandatory license suspension or revocation by the Arkansas State Medical Board.  Ark. Code Ann. § 20-16-2006(b).

For the following reasons, the Court concludes that, at this stage of the proceedings and on the record evidence currently before the Court, plaintiffs are likely to prevail on their argument

that Act 493 unconstitutionally restricts pre-viability abortions and, therefore, is facially unconstitutional.

### a.    Act 493:  Analysis Of State's Asserted Interest

As part of evaluating the benefits of a regulation, this Court must evaluate the Arkansas legislature's findings when enacting the regulation.  The Arkansas legislature, when enacting Act 493, included legislative findings and intent (Dkt. No. 2-1, at 6-9).

In *Hellerstedt*, the Supreme Court clarified that arguments "that legislatures, and not courts, must resolve questions of medical uncertainty is also inconsistent with this Court's case law."  136 S. Ct. at 2310.  Instead, the Supreme Court, "when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings."  *Id*.  The Supreme Court, citing its *Casey*, 505 U.S. 833, and *Gonzales*, 550 U.S. 124, decisions, reaffirmed that a court reviews legislative fact finding under a "deferential standard" but "must not 'place dispositive weight'" on those findings.  *Hellerstedt*, 136 S. Ct. at 2310 (citing and quoting *Gonzales*, 550 U.S. at 165).  The Court stated that the "*Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.*" *Id.* (emphasis in original) (quoting *Gonzales*, 550 U.S. at 165).  Where record evidence contradicts some legislative findings, uncritical deference to the legislative factual findings is inappropriate.  *Id.*

The Arkansas legislature made several legislative findings when enacting Act 493; the Court examines them to determine whether they conflict with the Court's findings.  The Court has given the legislature's findings careful consideration.  Here, based on the record evidence presented, binding legal precedent, and the Supreme Court's *Hellerstedt* majority opinion, the Court determines that plaintiffs are likely to prevail on their argument that deference to the

Arkansas legislature's factual findings would be inappropriate. Specifically, to the extent the State recites findings regarding prenatal development of a fetus, those findings contradict binding Supreme Court precedent with respect to how viability is to be determined as explained in this Order. *See* Act 493, § 1, to be codified at Ark. Code Ann. § 20-16-2002 (a)(2)(A) to (F) (reciting purported milestones in fetal development that do not equate with viability as defined by the Eighth Circuit and Supreme Court). Because the legislative findings and any asserted State interest consistent with those findings are inconsistent with binding legal precedent related to this Court's examination of abortion laws and viability, and because at this stage of the proceeding the Court concludes that there is no competent record evidence presented by defendants to permit this Court to re-evaluate this precedent, the Court finds that plaintiffs are likely to prevail on their argument that this Court should reject the Arkansas legislature's findings and the State's asserted interest on this basis as unconstitutional. *MKB Mgmt.*, 795 F.3d at 773 (quoting and citing *Colautti*, 439 U.S. at 388; *see also Casey,* 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb")); (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 29; Decl. of Donna J. Harrison, M.D., ¶ 56).

To the extent the State recites legislative findings purportedly drawn from *Casey* and *Roe*, plaintiffs are likely to prevail on the argument that those findings fail to account for controlling Eighth Circuit and Supreme Court precedent as related to pre-viability abortion prohibitions. *See* Act 493, § 1, to be codified at Ark. Code Ann. § 20-16-2002(a)(3) (reciting purported holdings from *Casey* and *Roe* that disregard binding precedent related to pre-viability abortions).

To the extent the State recites legislative findings that call into question the safety of abortion, these findings at this stage of the litigation and on the record evidence currently before the Court appear to be simply "incorrect." *Gonzales*, 550 U.S. at 165. The evidence in this case, which is examined in more detail in subsequent sections of this Order, and in the prior cases cited by this Court including *Hellerstedt*, makes clear, at least at this stage of the proceeding, that plaintiffs are likely to prevail on their argument that the procedures are remarkably safe. On these matters, deference to the Arkansas legislature's factual findings would be inappropriate. *Gonzales*, 550 U.S. at 165. Having resolved this, the Court turns to analyze the constitutionality of Act 493.

### b.     Act 493:  Analysis Of Claimed Burden

Because Act 493 prohibits nearly all abortions before viability, despite its limited exceptions, plaintiffs are likely to prevail on their argument that Act 493 is facially unconstitutional under controlling precedent. *Edwards*, 786 F.3d at 1117; *MKB Mgmt.*, 795 F.3d at 771. It is the view of the Court that the undue burden test does not apply to its analysis of Act 493. Plaintiffs are likely to prevail on their argument that Act 493 prohibits pre-viability abortions past 18 weeks LMP, which the Supreme Court has clearly held is a prohibition that cannot be imposed by the State. *Casey*, 505 U.S. at 879. This Court is not alone in refusing to apply the undue burden standard when presented with state laws that unconditionally eliminate the right to abort a nonviable fetus for a defined class of women. *See Isaacson*, 716 F.3d 1225 (finding undue burden analysis to "have no place where" state is "forbidding certain women from choosing pre-viability abortions").

The narrow exceptions to Act 493 do not change the constitutional analysis or this Court's determination at this stage of the proceeding. *See*, *e.g.*, *Casey*, 505 U.S. at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman

from making the ultimate decision to terminate her pregnancy before viability."); *Edwards*, 786 F.3d at 1117 (same); *Isaacson*, 716 F.3d at 1227-28 (holding that "while a health exception is necessary to save an otherwise constitutional post-viability abortion ban from challenge, it cannot save an unconstitutional prohibition on the exercise of a woman's right to choose to terminate her pregnancy before viability.").[8]

For all of these reasons, the Court grants plaintiffs' motion for preliminary injunction and enjoins Act 493 at this stage of the proceeding as facially unconstitutional.

## 2. Analysis Of Act 619

Act 619 amends Arkansas Code Title 20, Chapter 16 to add an additional Subchapter 20 that prohibits a physician from intentionally performing or attempting to perform an abortion "with the knowledge" that a pregnant woman is seeking an abortion "solely on the basis" of: (1) a test "indicating" Down syndrome; (2) a prenatal diagnosis of Down syndrome; or (3) "[a]ny other reason to believe" the "unborn child" has Down syndrome. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003.

Act 619 defines "unborn child" as "offspring of human beings form conception until birth." Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2002(4). Ark. Code Ann. § 60-16-2002(4). The Court will use this term when discussing Act 619. However, because this definition is inconsistent with binding legal precedent related to this Court's examination of abortion laws and viability, and because there is no competent record evidence presented by defendants at this stage of the proceeding to permit this Court to re-evaluate this precedent, the Court concludes that plaintiffs are likely to prevail on their argument that the Arkansas legislature's definition is

---

[8] In this Court's temporary restraining order, although the Court determined *Hellerstedt* did not apply to this type of pre-viability restriction, the Court engaged in that alternative analysis. The Court declines to do so now and has made no factual findings on this record doing so.

unconstitutional. *MKB Mgmt.*, 795 F.3d at 772-73 (quoting and citing *Colautti*, 439 U.S. at 388); *see also Casey*, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb"). Further, Act 619's prohibition applies to all abortions throughout the period of pregnancy, both pre-viability and post-viability, with the legislature including a severability provision. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003(c).

The Act requires physicians, prior to performing the abortion, to ask the pregnant woman if she is aware of any test results, prenatal diagnosis, or any other evidence that the unborn child may have Down syndrome. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003(b)(1). If the pregnant woman knows of such evidence, the physician who is performing the abortion must inform the woman of the prohibition of abortions solely on the basis of Down syndrome and request the woman's medical records to determine the possibility of any previous abortions relevant to evidence of a possible Down syndrome diagnosis. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003(b)(2)(A)-(B). After request of the medical records, the physician is prohibited from performing the abortion for fourteen days. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003(b)(3).

Act 619 exempts a physician if he or she acts to: (1) necessarily save the life or preserve the health of the "unborn child" or pregnant woman, Act 619, § 1, to be codified at Arkansas Code Annotated § 20-16-2002(1)(B)(i); (2) remove a dead "unborn child" caused by spontaneous abortion or ectopic pregnancy, Ark. Code Ann. § 20-16-2002(1)(B)(ii); or (3) when the pregnancy

resulted from rape or incest, *id.* § 20-16-2003(d). Violation of Act 619 constitutes a Class D felony, which is punishable by up to six years in prison and a fine up to $10,000.00. Ark. Code Ann. §§ 5-4-201,-401; Act 619, § 1, to be codified at § 20-16-2004. In addition, Act 619 requires that the Arkansas State Medical Board revoke the license of a physician who violates its mandate, Act 619, § 20-16-2005(c), and makes that physician liable in a civil action for actual and punitive damages to "any woman who receives an abortion in violation of [Act 619] . . . , the parent or legal guardian of the woman if the woman is an [unemancipated] minor, or the legal guardian of the woman if the woman has been adjudicated incompetent," Arkansas Code Annotated § 20-16-2004(b)(1)-(2).

Act 619 exempts women from having abortions in violation of the Act from criminal prosecution and civil liability. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2006(a). Specifically, in criminal proceedings, the woman who receives or attempts to receive an abortion in violation of the Act "is entitled to all rights, protections, and notifications afforded to crime victims." Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2006(b). Further, in civil proceedings, "the anonymity of the woman who receives or attempts to receive the abortion in violation of this subchapter shall be preserved from public disclosure unless she gives her consent to disclosure." Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2006(c).

For the following reasons, the Court concludes that, on the record evidence at this stage of the litigation, plaintiffs are likely to prevail on their argument that Act 619 unconstitutionally restricts pre-viability abortions and, therefore, is facially unconstitutional.

### a. Act 619: Severability

The prohibition in Act 619 applies to nearly all abortions with limited exceptions throughout the period of pregnancy, both pre-viability and post-viability, with the legislature

including a severability provision. Act 619, § 1, to be codified at Ark. Code Ann. § 20-16-2003(c). When confronting a constitutional flaw in a statute, a federal court must "try not to nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329. It is preferable "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Id.* (citations omitted). Severability is a matter of state law. *See Russell v. Burris*, 146 F.3d 563, 573 (8th Cir. 1998). Under Arkansas law, "an act may be unconstitutional in part and yet be valid as to the remainder." *Ex Parte Levy*, 163 S.W.2d 529 (1942). In determining whether a constitutionally invalid portion of a legislative enactment is fatal to the entire legislation, the Supreme Court of Arkansas looks to "(1) whether a single purpose is meant to be accomplished by the act; and (2) whether the sections of the act are interrelated and dependent upon each other." *U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349, 357 (1994). Applying this standard, the Court satisfies itself that, under the law, an examination of Act 619 with respect to pre-viability and post-viability abortion would be warranted.

Based on record evidence, however, only the following types of abortion care are available in Arkansas currently: medication abortions which are available only up to 10 weeks LMP, aspiration surgical procedures, performed until approximately 13 weeks LMP, and dilation and evacuation D&E surgical procedures, which are performed until 21.6 weeks LMP (Decl. of Jason Lindo, Ph.D. ¶ 11).

Furthermore, based on record evidence, "[i]t is commonly accepted in the field of OBGYN that a normally developing fetus will not attain viability until at least 24 weeks LMP. However, not all fetuses attain viability even at that stage, due to a variety of factors, such as renal agenesis (absence of kidneys), anencephaly (profound neural tube defect), and hydrocephaly (where the skull is filled with fluid)." (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 29). Even Dr.

Harrison, the Executive Director of AAPLOG, avers that only with specialized care can some fetus survive outside of the womb by 22 weeks, and even then the survival rate is only "as high as 40% in some medical centers." (Decl. of Donna J. Harrison, M.D., ¶ 56). Dr. Harrison cites no source material or scientific studies in support of this assertion at this stage of the litigation.[9]

### b. Act 619: Analysis of State's Asserted Interest

In this case, the Arkansas legislature made no findings regarding an identified set of perceived problems with the current method of care for abortion patients that Act 619 is intended to address. There is no record evidence of the number of women who receive a fetal diagnosis of Down syndrome and then opt to abort or carry a pregnancy to term in Arkansas. There is no record evidence of the number of children born in Arkansas over time with Down syndrome. Further, the Arkansas legislature made no findings that Act 619 would solve such problems or do much to solve such problems, if such problems even existed. *See Casey*, 505 U.S. at 845-46 (majority opinion).

The Court acknowledges that defendants have included record evidence of women who have had abortions claiming to regret those abortions or claiming to have felt pressured into obtaining an abortion, specifically in circumstances involving alleged diagnosis of Down syndrome (*see* Dkt. No. 49-1, at 4-27; Decl. of Judy McGruder, ¶ 11). However, current law makes clear that, before viability, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 845-46; *see MKB Mgmt.*, 795 F.3d at 772.

---

[9] As discussed previously in the section on Article III standing, since the record evidence shows that post-viability abortions are not performed in Arkansas, the Court will not examine whether Act 619 is constitutional as applied to post-viability abortions at this stage of the proceedings. Plaintiffs do not challenge this determination (Dkt. No. 104, at 3 n.2).

Currently, with respect to abortion providers like plaintiffs, Arkansas mandates pre-abortion counseling with informed consent, Ark. Admin. Code § 007.05.2-7 ("prior to the abortion, the patient shall be counseled regarding the abortion procedure, alternatives to abortion, informed consent, medical risks associated with the procedure, potential post-abortion complications, community resources and family planning" and "documentation of counseling shall be included in the patient's medical record . . . ."), and imposes a 48-hour, soon to be 72-hour,[10] waiting period between an initial consultation and an abortion. However, undisputed record evidence confirms that abortion providers like plaintiffs typically do not provide the genetic testing or counseling with respect to Down syndrome that the Arkansas legislature intends to address with Act 619 (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 29).

Record evidence demonstrates that other medical providers, usually a woman's family practice doctor or treating OBGYN, provide genetic testing and initial counseling and then refer a woman to a genetic counselor or maternal-fetal specialist for further testing or counseling based on the circumstances (*Id.*, ¶ 29). As an initial matter, there is no record evidence that genetic tests during pregnancy are mandatory in Arkansas. Further, there is no record evidence that Arkansas has taken steps to regulate the speech of relevant medical providers on this issue to ensure a thoughtful and informed choice and to advance the State's asserted interest. Instead, the Arkansas legislature moved to prohibit abortion on this basis with Act 619.

---

[10] On April 20, 2019, Arkansas enacted a new law requiring a 72-hour waiting period between a woman's consultation with a doctor concerning a possible abortion and any abortion procedure, except where it "will cause substantial and irreversible impairment of a major bodily function." 2019 Ark. Acts 801, to be codified at Ark. Code Ann. §§ 20-16-1109, -1703(b), -1706. This law goes into effect on July 24, 2019. There is no record evidence that any party has challenged this new law.

To the extent the Arkansas legislature intends to move the point of viability to conception through Act 619, this effort is inconsistent with binding legal precedent related to this Court's examination of abortion laws and viability, and because there is no competent record evidence at this stage of the litigation presented by defendants to permit this Court to re-evaluate this precedent, the Court determines that plaintiffs are likely to prevail on their argument that the Arkansas legislature's effort to move the point of viability to conception through Act 619 is unconstitutional. *MKB Mgmt.*, 795 F.3d at 772-73 (quoting and citing *Colautti*, 439 U.S. at 388); *see Casey*, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb").

Based on this, the Court concludes that, at this stage of the proceeding and on the record evidence before it, plaintiffs are likely to prevail on their argument that Act 619 impacts pre-viability abortions when the State's interests are not strong enough to support a prohibition of abortion.

### c.    Act 619:  Analysis of Claimed Burdens

Recently, two courts have considered provisions similar, although not identical to, Act 619. In *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health*, 888 F.3d 300, 306 (7th Cir. 2018), *reh'g en banc granted, judgment vacated*, 727 F. App'x 208 (7th Cir. 2018), *vacated*, 917 F.3d 532 (7th Cir. 2018), *and cert. granted in part, judgment rev'd on other grounds sub nom. Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 139 S. Ct. 1780 (2019), the Seventh Circuit held unconstitutional a law prohibiting abortion because the law prohibited abortions prior to viability if the abortion was sought for a

particular purpose, including solely because of the sex of the fetus, solely because the fetus has been diagnosed or has a potential diagnosis of any other disability, or solely because of the race, color, national origin, or ancestry of the fetus. In *Preterm-Cleveland*, 294 F. Supp. at 755, the district court enjoined a law that prohibited abortions sought in whole or in part on the basis of a Down syndrome diagnosis.

Act 619 as applied to pre-viability abortions performed in Arkansas attempts to accomplish what the Supreme Court has held impermissible. Plaintiffs are likely to prevail on their argument that Act 619 is unconstitutional on its face as applied to pre-viability abortions performed in Arkansas because it clearly violates well-established Eighth Circuit and Supreme Court precedent holding that a woman may terminate her pregnancy prior to viability, and that the State may not prohibit a woman from exercising that right solely upon the basis on which a woman makes her decision. *See Casey*, 505 U.S. at 870. Before viability, "the State's interests are not strong enough to support a prohibition of abortion." *Planned Parenthood of Indiana & Kentucky, Inc.*, 265 F. Supp. 3d at 867 (quoting *Casey*, 505 U.S. at 869 ("[a]t a later point in fetal development,"—namely viability—"the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.")). It is the view of the Court that the undue burden test does not apply to its analysis of Act 619. Act 619 prohibits abortions prior to viability if the abortion is sought solely based on some indication, whether by diagnosis or any reason to believe, the fetus has Down syndrome. Act 619, § 1, to be codified at § 20-16-2003. Based on the record evidence before the Court at this stage of the proceeding, plaintiffs are likely to prevail on their argument that the Act is an absolute prohibition on certain abortions prior to viability which the Supreme Court has clearly held cannot be imposed by the State. *Casey*, 505 U.S. at 879 (plurality opinion). This Court is not alone in refusing to apply the undue burden standard when presented with state

laws that unconditionally eliminate the right to abort a nonviable fetus for a defined class of women. *See Isaacson*, 716 F.3d at 1225 (finding undue burden analysis to "have no place where state is forbidding women from choosing pre-viability abortions"); *Himes*, 294 F. Supp. 3d at 754 (finding state law prohibiting pre-viability abortions based on Down syndrome diagnosis unconstitutional infringement rather than appropriate law to apply undue burden test).

The narrow exceptions to Act 619 do not change the constitutional analysis or this Court's determination at this stage of the proceeding. *See*, *e.g.*, *Casey*, 505 U.S. at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); *Edwards*, 786 F.3d at 1117 (same); *Isaacson*, 716 F.3d at 1227-28 (holding that "while a health exception is necessary to save an otherwise constitutional post-viability abortion ban from challenge, it cannot save an unconstitutional prohibition on the exercise of a woman's right to choose to terminate her pregnancy before viability.").[11]

For all of these reasons, the Court grants plaintiffs' motion for preliminary injunction and enjoins Act 619 at this stage as facially unconstitutional.

### D. Analysis Of Act 700

Act 700 of 2019, Ark. Code Ann. § 20-16-605, provides that "[a] person shall not perform or induce an abortion unless that person is a physician licensed to practice medicine in the State of Arkansas and is board-certified or board-eligible in obstetrics and gynecology." Ark. Code Ann. § 20-16-605(a).[12] Act 700 makes a violation of this requirement a Class D felony and subjects the

---

[11] In this Court's temporary restraining order, although the Court determined *Hellerstedt* did not apply to this type of pre-viability restriction, the Court engaged in that alternative analysis. The Court declines to do so now and has made no factual findings on this record doing so.

[12] Further, Section 2 of Act 700 purports to alter the definition of "viable fetus" to: "'Viability' means the state of fetal development when, in the judgment of the physician based on

person to revocation, suspension, or nonrenewal of the professional license of an abortion facility or physician. Ark. Code Ann. § 20-16-605(b). A Class D felony in Arkansas is punishable by up to six years in prison and a fine of up to $10,000.00. Ark. Code Ann. §§ 5-4-201, -401.

Before the enactment of Act 700, the law in Arkansas already required that only a physician licensed to practice medicine in the State of Arkansas may provide abortion care. Ark. Code Ann. § 5-61-101(a). As a result, plaintiffs challenge that portion of Act 700 that requires the physician to also be board-certified or board-eligible in OBGYN. Ark. Code Ann. § 20-16-605(a).

For the reasons discussed below, at this stage of the proceeding and based upon the record evidence before it, the Court finds that plaintiffs have demonstrated that they are likely to prevail in showing that Act 700's OBGYN agreement confers little, if any, benefit upon women in the context of abortion care in Arkansas. Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment. *Casey*, 505 U.S. at 846 (majority opinion). The United States Supreme Court, when recognizing this right, stated:

> We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and

---

the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable likelihood of sustained survival of the unborn child outside the body of the mother, with or without artificial life support." Ark. Code Ann. § 20-16-702(3). This language comports with controlling Eighth Circuit and Supreme Court precedent with respect to "viability." *See MKB Mgmt.*, 795 F.3d at 772-73 (quoting and citing *Colautti*, 439 U.S. 388; *see also Casey*, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); *Roe*, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb")). Plaintiffs do not purport to challenge this portion of Act 700.

the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.

In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.

*Roe*, 410 U.S. at 116.

Unless and until *Roe* is overruled by the United States Supreme Court, to determine whether a state statute is unconstitutional and violates substantive due process rights in this context, the Court applies the "undue burden" standard developed in *Casey*, 505 U.S. at 876-79 (plurality opinion), and *Hellerstedt*, 136 S. Ct. at 2309-11. This Court is bound to follow Eighth Circuit and Supreme Court precedent.

This Court acknowledges the appeal of defendants' "commonsense argument" that board-certification or board-eligibility in OBGYN must confer some benefit upon women seeking abortions in Arkansas. After a critical examination of the record evidence to date, the Court ultimately rejects that argument at least at this preliminary stage of the litigation and determines that plaintiffs are likely to prevail on their argument that "there [is] no significant health-related problem" Act 700 "help[s] to cure"; nor is it "more effective than pre-existing [state] law" in furthering defendants' asserted interests. *Hellerstedt*, 136 S. Ct. at 2311, 2314.

This finding, by itself, may be enough to conclude that the OBGYN requirement unduly burdens the right to an abortion. *See Jackson Women's Health Organization v. Currier*, 320 F. Supp. 3d 828, 841 n.9 (S.D. Miss. 2018) ("*Jackson IV*"). The Court notes, however, that the Eighth Circuit's decision in *Jegley*, 864 F.3d at 958-60, appears to require this Court to weigh benefits and burdens, even in the absence of any record evidence showing benefits caused by Act 700's OBGYN requirement. Furthermore, while Dr. Ho has withdrawn from the motion for temporary restraining order and/or preliminary injunction, the Court will treat the present request for a

preliminary injunction as a facial challenge to the OBGYN requirement's enforcement against all abortion providers in Arkansas, given the record evidence at this stage of the proceedings.

In the sections that follow, the Court applies the undue burden test from *Casey* and *Hellerstedt*. First, the Court examines the benefits, if any, attributable to the OBGYN requirement. Second, the Court examines LRFP and PPAEO Little Rock's attempts to comply with the OBGYN requirement. Third, the Court considers whether the availability of out-of-state abortion clinics is relevant to the undue burden analysis. Fourth, the Court considers the burdens imposed by the OBGYN requirement. Finally, the Court weighs the benefits and burdens of the OBGYN requirement in order to determine if the OBGYN requirement places an unconstitutional "undue burden" on women.

### 1. Act 700: Due Process Claim

The Court first turns to examine the benefits, if any, of Act 700's OBGYN requirement. At the outset of this analysis, the Court acknowledges several matters. First, it is settled law that a state may enact regulations "to foster the health of a woman seeking abortion" or "to further the State's interest in fetal life," provided that those regulations do not impose an "undue burden" on the woman's decision. *Casey*, 505 U.S. at 877-78 (plurality opinion). The relevant question before the Court is whether Act 700's OBGYN requirement provides the asserted benefits *as compared to the prior law*. *See Hellerstedt*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, *compared to the prior law*, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id*. at 2314 ("The record contains nothing to suggest that [the challenged law] *would be more effective than pre-existing Texas law* . . . .") (emphasis added). Therefore, the specific question at this juncture is whether requiring abortion providers in Arkansas to comply with Act 700's OBGYN requirement that the physician providing the abortion be board-

certified or board-eligible in OBGYN furthers a legitimate interest of the state, as compared to Arkansas' pre-existing laws and regulations affecting abortions.

### a. Examining Alleged Health-Related Problems With Medication Or Surgical Abortion In Arkansas

In *Hellerstedt*, the Supreme Court examined a statute that did not set forth any legislative findings. *Id.* at 2310. Specifically, the Supreme Court examined H.B.2's requirement that a "physician performing or inducing an abortion . . . must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that . . . is located not further than 30 miles from the location at which the abortion is performed or induced." 136 S. Ct. at 2310 (citing Tex. Health & Safety Code. Ann. § 171.0031(a)). The prior Texas law required doctors who provided abortions to "have admitting privileges or have a working arrangement with a physician who ha[d] admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." *Id.* (citing 25 Tex. Admin. Code, § 139.56 (2009)); *see* 33 Tex. Reg. 1093 (Dec. 19, 2018) (to be codified at 25 Tex. Admin Code § 139.56).[13] H.B.2 imposed an admitting privileges requirement on physicians performing both medication and surgical abortions.

When considering H.B.2's admitting privileges requirement, defendants argued, and in *Hellerstedt* the Supreme Court recognized, that "[t]he purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure." 136 S. Ct. at 2311. The district court "found that it brought about

---

[13] It is important to note that Texas has a law that prohibits hospitals from discriminating against a physician applying for privileges based on that physician's status as an abortion provider or views as to abortion. *See* Tex. Occ. Code § 103.002(b). This type of statute in effect protects physicians who perform abortions from targeted discrimination when applying for admitting privileges. *See*, *e.g.*, *Whole Woman's Health v. Cole*, 790 F.3d 563, 596 n.44 (5th Cir. 2015); *Abbott II*, 748 F.3d at 598 n.13. As other courts have observed, the situation is different in states without such laws. *See*, *e.g.*, *June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 501 (M.D. La. 2016) ("*Kliebert I*").

no such health-related benefit," determining that "[t]he great weight of the evidence demonstrate[d] that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no death occurring on account of the procedure." *Id.* (citing *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014)). It was on this basis, as noted by the Supreme Court in *Hellerstedt*, that the district court determined "there was no significant health-related problem that the new law helped to cure." *Id.*

According to *Hellerstedt*, this conclusion was based on, among other things:

- "A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications—including those complications requiring hospital admission—was less than one-quarter of 1%."

- "Figures in three peer-reviewed studies showing that the highest complication rate found for the much rarer second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200)."

- "Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic. *Id.*, at 266-267 (citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion)."

- "Expert testimony stating that 'it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization' and 'in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital.'"

- "Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of those complications occur in the days after the abortion, not on the spot."

- "Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as 'abortifacient drugs take time to exert their effects, and thus the abortion itself almost always occurs after the patient has left the abortion facility.'"

- "Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home."

*Hellerstedt*, 136 S. Ct. at 2311 (internal record citations omitted).

The Supreme Court in *Hellerstedt* reviewed medication and surgical abortion statistics and research to reach its conclusion and noted that, "when directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case." *Id*. at 2311-12. The Supreme Court observed: "This answer is consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws." *Id.* at 2312 (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015) ("*Van Hollen IV*"), *aff'd sub nom Schimel*, 806 F.3d 908; *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014 ("*Strange III*")).

The Eighth Circuit has determined that *Hellerstedt* requires the Court to "weigh the state's 'asserted benefits'" on the record before it. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 758 (8th Cir. 2018) (vacating and reversing Missouri district court that relied on *Hellerstedt*'s analysis of the purported benefits of the Texas law without examining record evidence specific as to Missouri). As a result, this Court will examine the record before it. The record evidence before the Court at this stage of the proceeding leads the Court to conclude that plaintiffs are likely to prevail on the argument that there is "no significant health-related problem" intended to be addressed by Act 700. *Hellerstedt*, 136 S. Ct. at 2311.

Plaintiffs present scientific record evidence that is generally accepted in the medical community that "[l]egal abortion is one of the safest medical procedures available in the United

States." (Dkt. No. 4, at 5; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 21; Decl. of Linda W. Prine, M.D., ¶ 26; Decl. of Stephanie Ho, M.D., ¶ 16). This scientific record evidence includes the National Academy Consensus Study Report, prepared by the National Academy of Sciences, Engineering, and Medicine which Congress established to provide objective advice on matters relating to science and technology.[14] The National Academy Consensus Study Report "determined that the risks associated with medication abortion are similar to those associated with over-the-counter anti-inflammatory drugs such as ibuprofen" and that "the risks associated with surgical abortion are extremely low, with the risk of complications being in the 0-to-5% range." (Dkt. No. 4, at 5-6 (citing National Academy Consensus Study Report, at 11, 74-75)). Record evidence supports that legal abortion is significantly safer for a woman than carrying a pregnancy to term and giving birth (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 28; Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 9; *see* National Academy Consensus Study Report, at 75).

Having carefully considered at this preliminary stage the record evidence before it, the Court determines that the record evidence defendants rely on in an effort to refute this is lacking. The Court has examined Dr. Aultman's declarations and the materials she cites.

The defendants also assert that "[a]bortion is a dangerous business" by claiming and citing as support for that proposition that LRFP has called an ambulance for a patient 64 times in 20 years of providing abortion care, claiming "an average of 3.2 calls a year." (Dkt. No. 103, at 1, citing Decl. of Mary Silfies). First, defendants present no record evidence regarding why these ambulances were called to LRFP (Decl. of Mary Silfies, ¶ 5). Instead, defendants cite this number and presumably ask the Court to infer that these calls were for patients and related to abortion care

---

[14] *Our Reputation*, http://www.nationalacademies.org/about/reputation/index.html (last visited August 5, 2019).

or in some way reflect on care purportedly provided by one abortion provider in particular who is neither board-certified, board-eligible, nor an OBGYN—Dr. Tvedten (Dkt. No. 103, at 46). For reasons the Court will explain, the Court declines to make these inferences.

Second, even if this Court were to assume that this total number of ambulance calls relates in some way to abortion patients and the provision of abortion care, this purported complication rate is consistent with what is reflected in the literature that complication rates for abortion care are exceedingly low. Given the number of abortion procedures performed at LRFP each year, even if the Court makes defendants' assumption that the total number of ambulance calls relates in some way to abortion patients and the provision of abortion care, this evidence is consistent with the findings of the Supreme Court in *Hellerstedt* regarding these procedures; it does not refute such evidence. Between May 1, 2016, and April 30, 2019, LRFP provided 7,010 abortions (Decl. of Jason Lindo, Ph.D., ¶ 15), and called an ambulance according to defendants ten times, if defendants' record evidence is accepted at this stage (Dkt. No. 49-5, at 5). That equates to a 0.14%[15] complication rate requiring hospital transfers; this supports and does not detract from the notion that the risks associated with abortion care are extremely low (Dkt. No. 61, at 37).

However, the Court does not have to make assumptions because there is record evidence addressing this point. Ms. Williams testified at the July 22, 2019, hearing that LRFP tracks the number of times each year it transfers a patient to a local hospital for care (Dkt. No. 84, at 85:18-20). Since January 2017, LRFP has transferred a patient to a local hospital for care five times total; three of the entries for this period have no drop off address (*Id.*, at 85:21-86:9). Ms. Williams addressed defendants' assumption regarding the total number of ambulance calls with respect to

---

[15]  10/7,010=0.0014.

the record LRFP maintains (*Id.*, at 86:10-87:11). Ms. Williams was subject to cross examination on this point. Utilizing the record evidence, the Court calculates an even lower rate of 0.07%[16] for complications requiring hospital transfers for this period.

In their most recent filing, plaintiffs give defendants the benefit of the doubt regarding the three ambulance calls listed with no drop off address, acknowledging one of these entries is a duplicate entry for January 2018 (Decl. of Mary Silfies, ¶ 5). Even with this, and even assuming seven ambulance calls during this period, the transfer rate equates to 0.09%[17] which is lower than what the record evidence demonstrates is commonly understood as the rate of complications for abortion care. In fact, all these calculations comport with a determination that the rate of complications requiring hospital transfers for abortions performed at LRFP is lower than what the record evidence demonstrates are the commonly accepted complication rates for abortion care, with "1% to 3%" for minor complications and "one every few hundred" for major complications (Dkt. No. 84, at 18:1-8).

In Dr. Aultman's "rebuttal declaration," she raises issues with respect to Dr. Tvedten's prior conviction for second degree criminal mischief in 1987 and a temporary, brief license suspension and suspension of his ability to prescribe certain medications for a brief period of time in the early 1980s in response to an incident (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 10).[18] The

---

[16] 5/7,010=0.0007.

[17] 7/7,010=0.0009.

[18] In a recent filing, defendants also present a letter from Dr. Tvedten to the Arkansas Medical Board in which he admits to a driving under the influence conviction (Dkt. No. 103-1, at 1). They also present an accusation that Dr. Tvedten threatened an individual in a rental dispute (*Id.*, at 2). Finally, defendants present an undated handwritten note with respect to alleged conduct by Dr. Tvedten (Dkt. No. 103-1, at 3). Plaintiffs object to these documents as not properly authenticated because the documents are unaccompanied by any certification explaining from where the documents were obtained (Dkt. No. 107, at 6 n.6 (citing Fed. R. Evid. 902)). Further,

incident regarding criminal mischief relates to Dr. Tvedten, after requesting that an individual stop photographing without their consent women attempting to enter an abortion clinic, breaking the camera of the individual. Dr. Tvedten was questioned about this at the July 22, 2019, hearing and relayed that he was required to purchase the individual a new camera (Dkt. No. 84, at 175:15-25). As an initial matter, defendants' efforts to cast doubt on Dr. Tvedten's competence as an abortion provider through this type of evidence fall short. There is record evidence that Dr. Tvedten is a competent, highly skilled practitioner who regularly trains others and receives referrals from other medical professionals due to his skilled abortion care (Dkt. No. 84, at 16:12-18; 176:2-17; 177:15-23; 203:15-17; 204:4-5). To the extent defendants attempt to imply that Dr. Tvedten is unfit to practice medicine, the Court notes that Dr. Tvedten remains an Arkansas-licensed physician, subject to all laws and regulations, and defendants have not presented any competent record evidence to support that serious allegation. Further, even if such an implication were warranted, defendants offer no record evidence to explain why Act 700's OBGYN requirement is more effective than pre-existing Arkansas laws and regulations in furthering defendants' asserted interests.

---

plaintiffs point out that defendants redacted the purported complainant's name from the second document, which plaintiffs claim further undermines its probative value.

Although defendants attach these documents to their filing, defendants provide to the Court no affidavit or other record evidence to aid the Court in evaluating the documents. Dr. Tvedten testified at the July 22, 2019, hearing, and defendants had the opportunity to present these documents during his cross examination. Defendants chose not to do so. Two of the documents defendants attach are over ten years old, with one dating from 2008 and the other from 1998, and the third is undated based on this Court's review. There is no indication from these documents what occurred, if anything, as a result of these alleged events in terms of investigations or actions taken by the Arkansas State Medical Board. Moreover, defendants make no argument and offer no record evidence as to why Act 700's OBGYN requirement advances defendants' asserted interests here over the Arkansas State Medical Board's ability to address these incidents and advance defendants' asserted interests. As a result, the Court finds these documents of little probative value.

The Court notes that Dr. Harrison has filed a supplemental declaration in which she cites 162 scientific articles that she claims show a link between prior abortions and "preterm" births (Supp. Decl. Donna J. Harrison, M.D., ¶ 3). The Court examines these articles, *infra*, in this Order. *See* Section III.D.1.c. Dr. Harrison's supplemental declaration and the articles she cites do not support an assertion that legal abortion is an unsafe medical procedure.

Having examined all record evidence at this stage of the proceedings, the Court determines that plaintiffs are likely to prevail on the question of whether legal abortion is one of the safest medical procedures available in the United States and in Arkansas and on the point that Act 700 provides no benefit if intended to address a medical safety problem with legal abortion in Arkansas that on this record does not exist.[19]

---

[19] In its temporary restraining order, this Court observed that this comports with concessions reportedly made by the lead sponsor of Act 700 (Dkt. No. 83, at 101-02). In support of their argument on this point, plaintiffs cited to material not a part of the record evidence (Dkt. No. 4 at 37-38 (citing S.B. 448 Floor Debate; Dkt. No. 4, at 31, n. 94 (quoting S.B. 448 Hearing Testimony)). Plaintiffs have not supplemented the record with this evidence at this stage of the proceeding, and the Court is not aware of the public availability of such evidence. As a result, the Court makes no finding of fact with respect to this.

Regardless, the arguments made by plaintiffs based on this type of evidence were not, and are not, dispositive of the issues with respect to Act 700. Plaintiffs argued that "[t]his rationale is dispositive under Eighth Circuit authority: If a 'requirement serves no purpose other than to make abortions more difficult, it strikes at the heart of a protected right, and is an unconstitutional burden on that right.'" (Dkt. No. 4, at 47 (citing *Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1049 (8th Cir. 1997)). Further, plaintiffs contended that statements by "the sponsors and supporters of the legislation as to its central purpose" may be considered, even if "statements on the floor by legislators are not always the most persuasive indicia of legislative intent." (Dkt. No. 61, at 35 (quoting *United States v. Dean*, 647 F.2d 779, 787 n.15 (8th Cir. 1981); *see also Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 213 (8th Cir. 1982) ("The legislative or administrative history is relevant to the issue of discriminatory intent, especially where, as here, there are contemporary statements of members of the decisionmaking body.")).

Although defendants did not attempt to distinguish *Atchison*, and although these allegations coupled with evidence that Arkansas has enacted more than 25 laws regulating abortion access in the State, including 12 enacted in 2019 alone (Dkt. No. 4, at 28, n.70, n.71), gave the Court pause with respect to the purpose of Act 700, the Court did not find these matters dispositive and examined Act 700 by applying the undue burden analysis from *Hellerstedt*.

### b.     Examining Efforts To Establish A "Floor Of Care"

The Court next turns to examine whether, even if there is no significant health-related problem with legal abortion in the United States or in Arkansas that Act 700 is intended to address, there is nonetheless a benefit from Act 700. The Eighth Circuit in at least one prior decision stemming from a challenge to an Arkansas abortion statute—Section 1504(d) of Arkansas Act 577 requiring that Arkansas abortion facilities providing medication abortions must "have a signed contract with a physician who agrees to handle complications" and who has "active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug," Ark. Code Ann. § 20-16-1504(d)(1),(2) ("Section 1504(d) of Arkansas Act 577")—suggested that this Court should consider whether the statute might be intended to set a "floor of care," such as was present in Texas and examined by the Supreme Court in *Hellerstedt*. *See Jegley*, 864 F.3d at 960 n.9; *see also Comprehensive Health of Planned Parenthood Great Plains*, 903 F.3d at 758 (vacating and remanding, in part, for the district court to consider whether a "hospital relationship requirement" was a valid exercise of Missouri's "inherent 'police power'" or "legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient") (internal citations omitted). The Eighth Circuit suggested that, under the circumstances presented in *Jegley*, a "legal floor" would prevent an abortion provider from, in the future, reducing continuity-of-care practices and thus "would constitute a benefit." 864 F.3d at 960 n.9.

The Court examines cases from other jurisdictions that compare the benefit of an abortion restriction against a purportedly pre-existing "floor of care."[20]

### (i)     Examining Wisconsin Law

In *Schimel*, a case cited by the Supreme Court in *Hellerstedt*, the district court and Seventh Circuit examined a Wisconsin statute that required every doctor who performed abortions to have admitting privileges at a hospital within a 30-mile radius of each clinic at which the doctor performed abortions, with the law being signed on a Friday and compliance required by the following Sunday.  806 F.3d at 911.  The district court granted a temporary restraining order, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 963 F. Supp. 2d 858 (W.D. Wis. 2013) ("*Van Hollen I*"), and a preliminary injunction, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465-WMC, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) ("*Van Hollen II*"). The Seventh Circuit affirmed the entry of the preliminary injunction.  *Van Hollen III*, 738 F.3d at 799.  The district court then conducted a full trial, resulting in the district court imposing a permanent injunction against enforcement of the statute.  Defendants then appealed, arguing that "the statute protects the health of women who experience complications from an abortion." *Schimel*, 806 F.3d at 910.

---

[20] In addition to the cases examined here, the Court also notes that Oklahoma struck down an admitting privileges law.  *Burns v. Cline*, 387 P.3d 348, 354 (Okla. 2016) (holding that, in the light of *Hellerstedt*, Oklahoma's admitting privileges law "creates a constitutionally impermissible hurdle for women who seek lawful abortions.").  Tennessee, after *Hellerstedt*, agreed not to enforce an admitting privileges law that was being challenged.  *See Adams & Boyle P.C., et al. v. Herbert Slaterly, et al.*, Case No. 3:15-cv-00705, Dkt. No. 60, at 2-3 (M.D. Tenn. April 14, 2017) (agreeing to enjoin permanently enforcement of, among other things, an admitting-privileges statute that was "similar to the provision[] struck down in [*Hellerstedt*] . . . .").

On appeal, the Seventh Circuit determined that, for the proposed statute to be justified, there had to be "reason to believe that the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges." *Id.* at 912. The Seventh Circuit affirmed the district court and found that "there is no reason to believe that." *Id.* The Seventh Circuit observed:

> A woman who experiences complications from an abortion (either while still at the clinic where the abortion was performed or at home afterward) will go to the nearest hospital, which will treat her regardless of whether her abortion doctor has admitting privileges. As pointed out in a brief filed by the American College of Obstetricians and Gynecologists, the American Medical Association, and the Wisconsin Medical Society, "it is accepted medical practice for the hospital-based physicians to take over the care of a patient and whether the abortion provider has admitting privileges has no impact on the course of the patient's treatment." As Dr. Serdar Bulum, the expert witness appointed in this case by the district court judge under Fed. R. Evid. 706, testified, the most important factor would not be admitting privileges, but whether there was a transfer agreement between the clinic and the hospital. As we've said, abortion doctors in Wisconsin are *required* to have such transfer agreements . . . . The treating doctor at the hospital probably would want to consult with the doctor who had performed the abortion, but for such a consultation the abortion doctor would not need admitting privileges.

*Schimel*, 806 F.3d at 912 (citing the requirement in Wis. Admin. Code Med. § 11.04(1)(g) for abortion clinics to adopt transfer protocols intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization) (emphasis in original). There is no mention in *Schimel* of any "floor of care" other than the transfer agreement requirement. There is no mention of any admitting privileges requirement, other than the requirement challenged and enjoined by the court.

The *Schimel* Court further concluded based on record evidence presented and cited by the court that "complications from abortion are both rare and rarely dangerous—a fact that further attenuates the need for abortion doctors to have admitting privileges." *Id.* at 912 (citing record

studies and evidence). The court observed that abortion clinics uniquely among outpatient providers of medical services in Wisconsin were required to adopt transfer protocols. *Id.* at 913. The court observed that defendants "presented no other evidence of complications from abortions in Wisconsin that were not handled adequately by the hospitals in the state." *Id.* The court rejected the argument that such admitting privileges within 30 miles of a clinic were required to ensure the "Good Housekeeping Seal of Approval" on doctors. *Schimel*, 806 F.3d at 915. Further, the court rejected the argument that admitting privileges improved continuity-of-care. *Id.* ("But nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion . . . .").

### (ii) Examining Alabama Law

Alabama's statute requiring abortion providers to obtain staff privileges at a local hospital has a long history, which this Court examined in *Jegley*. [21] In *Strange III*, the other case cited by the Supreme Court in *Hellerstedt*, the district court examined an Alabama law requiring "every doctor performing abortions in Alabama to 'have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the facility is located that permit him or her to perform dilation and cutterage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications.'" 33 F. Supp. 3d at 1336. A clinic administrator who knowingly and willfully operated an abortion clinic with doctors who did not

---

[21] Alabama's staff privileges law was declared to restrict unconstitutionally the rights of women seeking abortions in Alabama. *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014) ("*Strange IV*") (supplementing liability opinion with evidentiary findings); *Strange III*, 33 F. Supp. 3d at 1378 (finding that the staffing privileges requirement was unconstitutional as applied to plaintiffs); *Strange II*, 9 F. Supp. 3d at 1276 (summary judgment opinion laying the foundation for the application of the undue-burden test); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013) ("*Strange I*") (temporarily enjoining the enforcement of the staff privileges requirement).

have such privileges faced felony criminal liability, and the State of Alabama could revoke the clinic's license for violations of the law.  *Id.*

Relevant to the issue of an established "floor of care," prior to the challenged law, to be qualified to perform an abortion in Alabama, the physician had to either "have completed a residency or fellowship that included abortion training;" had to "maintain admitting privileges at a United States hospital that allow[ed] her to perform abortions at that hospital;" or had to "provide verification from a disinterested, properly trained physician that she has sufficient skill at performing abortions." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1276 (M.D. Ala. 2014) ("*Strange II*").  The pre-existing regulations in Alabama also included other specific provisions, including requiring the physician to remain at the clinic until the last patient left; providing the patient, after she leaves the clinic, with access to a 24-hour answering service that would immediately refer calls about complications to a qualified nurse, nurse practitioner, physician assistant, or physician; and to record every such call.  *Id.* at 1276.  Further, the law also required that each abortion clinic "have a physician on staff who has admitting privileges at a local hospital or to maintain a written contract with a 'covering physician.'"  *Id.* at 1277.  The then in-effect regulations required the covering physician to "have admitting privileges that permit her to perform 'dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures necessary to treat abortion-related complications' at a hospital within the same metropolitan statistical area as the clinic" and that the affiliated doctor with admitting privileges be available "for 72 hours after the procedure to treat any complications that may arise" when performing abortions.  *Id.*

In *Strange III*, the State argued that the staff-privileges requirement had two "strong justifications," both related to an interest in protecting women's health.  33 F. Supp. 3d at 1341.

First, the State argued the requirement ensured proper care for complications, and second, the State argued the requirement had a secondary benefit of "'credentialing' high quality doctors." *Id*. In regard to continuity-of-care, the district court identified this concept as "the goal of ensuring that a patient receives high-quality care not only during a certain procedure but also after it, including treatment of complications and any necessary follow-up care" but conceded from the evidence "this is a somewhat elusive concept." *Id*. at 1363.

According to the *Strange III* court, three models emerged for ensuring continuity-of-care. There, the court termed these the first model, the second model, and the third model, also referring to the third model as the "country-doctor model." *Id*. at 1364-65. According to the court, the first model relies upon the 24-hour telephone access to a doctor or nurse at the abortion clinic at any time. 33 F. Supp. 3d at 1364. Under this model, the doctor or nurse may give instructions for in-home treatment, schedule the woman for a follow-up visit at the clinic, or, if appropriate, direct the woman to the nearest emergency room to be assessed immediately or treated. *Id*. If a patient needs to be transferred directly to a hospital from the clinic, which the court found is an admittedly rare circumstance, the abortion doctor should communicate with the emergency room doctor to provide continuity-of-care. *Id*. at 1364-65.

Under the second model, there is a covering physician or a doctor with admitting privileges. *Id*. at 1365. The court recognized that the baseline of Alabama's law regulating abortion providers at the time fell under this model. 33 F. Supp. 3d at 1365. Under this model, the doctor who performs the procedure may arrange for a covering doctor to provide follow-up care for any complications that may arise after the procedure. Even under this procedure, however, if it is an urgent situation, the record evidence in *Strange III* established that it was more important for a

patient to go to the nearest emergency room than to be treated by the initial doctor or covering physician. *Id.*

The third model or "country-doctor" approach required the physician who performed the initial procedure to provide consistently most care for complications that may arise, rather than relying on a covering physician, a transfer agreement, or the emergency room. *Id.* A specialist may need to be brought in for certain treatments, but the original doctor would handle nearly all complications. *Id.* The State argued, and the court agreed, that the challenged admitting privileges law fell into this category. 33 F. Supp. 3d at 1365.

Based on the evidence presented, the court determined that the third model advocated by the State fell "outside that range of disagreement" within the medical community regarding the appropriate model of complication care for minor surgeries and medication-based procedures, like early term abortion. *Id.* at 1364. In making this determination, the *Strange III* court recognized this about the nature and treatment of abortion complications:

> Most complications from such [early term] abortions closely resemble the complications from early-term miscarriages. The common complications from miscarriages, as well as medication and early-term surgical abortions, are bleeding, infection, and cramps. These complications sometimes arise because fetal tissue remains in the uterus or because the cervix fails to close fully after the fetal tissue is expelled. The treatment for these complications is the same, regardless of how the pregnancy ended.
>
> In extremely rare instances, other complications may arise which could not occur from a miscarriage. In the case of a medication abortion, an allergic reaction to the abortion drugs was the only possibility suggested by the evidence in this case. For a surgical abortion, it is possible that an instrument may perforate or lacerate the uterus.
>
> Most complications from early-term abortions do not require hospital treatment. Most minor complications which arise *during* the course of an early-term surgical abortion are treated at the abortion clinic before the patient is discharged. Moreover, as discussed above, most complications that arise *after* a patient has been discharged are best treated with over-the-phone instructions, prescription

medication from a pharmacy, or a follow-up visit to the abortion clinic. However, even when hospital care is unnecessary, patients will sometimes seek emergency-room treatment without first contacting the provider. Indeed, in some cases, the woman may not be suffering from any complication at all, but may simply need reassurance.

For the majority of complications which *do* require hospitalization, the appropriate treatment may include intravenous antibiotics or a further dilation and curettage to empty the uterus completely. The staff-privileges provision requires all abortion doctors to have local-hospital privileges that allow them to perform two specific, additional gynecological procedures: hysterectomy and laparotomy. Rare circumstances, such as a suspected uterine perforation, may require a laparotomy or the similar but less invasive laparoscopy, each of which involves examining the uterus or cervix and repairing any damage. In certain other extreme situations, a hysterectomy, or removal of the uterus, may be necessary. It is extremely rare that either a hysterectomy or laparotomy would be necessary following an abortion, even a later-term abortion. Indeed, with approximately 9,000 abortions performed in Alabama each year, in most years not a single early-term abortion in the State would require either procedure.

*Id.* at 1365-66 (emphasis in original).

The *Strange III* court determined that the initial-screening aspect of the credentialing function provided negligible benefit, as compared to Alabama's pre-existing law. 33 F. Supp. 3d at 1373. Further, the court determined that it was "left with the speculative assertion that hospital oversight, through staff privileges, would actually ensure that the physicians and clinics" would provide high-quality care and be an "effective supplement to the Department of Public Health oversight." *Id.* at 1376. The court concluded that, to determine whether a regulatory decision grounded in such speculation would be an acceptable use of the State's police powers, the court was required to engage in the balancing test applied to abortion regulations. *Id.* As a result of engaging in that balancing test, the *Strange III* court concluded that, "[i]n the light of the severity of the obstacles presented by the requirement and the weakness of the State's justifications," the "obstacles imposed by Alabama's staff-privileges requirement are 'more significant than is

warranted by the State's justifications for the regulation.'" *Id.* at 1378.  The case was decided by the Honorable Myron H. Thompson.[22]

Later, in 2015, a licensed abortion clinic and doctor brought a challenge against an Alabama health officer claiming that Alabama's "floor of care" regulation—that to perform abortions a doctor had to have admitting privileges at a local hospital or the clinic had to contract with a covering physician who had such privileges—was unconstitutional as applied to the clinic and doctor.  *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1303, 1303 (M.D. Ala. 2015).  This case also was assigned to Judge Thompson.  The challenged regulation had been in effect since 2007.  *Id.* at 1300.  It would have been superseded by the admitting privileges requirement challenged and struck down by Judge Thompson in *Strange III*.  *Id.* at 1300-01.

Five abortion clinics operated in Alabama at the time of *Williamson*, a case that followed *Strange III*.  Two clinics had physicians on staff who had local admitting privileges, and three operated by having a contract with a covering physician.  Those three clinics that operated by having a contract with a covering physician sued to enjoin the admitting privileges law as applied to the three clinics.  *Id.* at 1301.

Until December 2014, the clinic in Tuscaloosa complied with Alabama's "floor of care" regulation by having a doctor on staff with local admitting privileges.  *Id.*  That doctor retired in December 2014.  *Id.*  The Tuscaloosa clinic hired a replacement doctor, but that doctor lacked local admitting privileges.  120 F. Supp. 3d at 1301.  Further, the Tuscaloosa clinic could not find

---

[22] Defendants appealed Judge Thompson's ruling in *Strange III*.  On July 15, 2016, on the grounds that "Alabama's law is identical in all relevant respects to the law at issue in [*Hellerstedt*]," defendants moved to dismiss the appeal because they no longer had a "good faith argument that the law is constitutional under controlling precedent."  *Planned Parenthood Se., Inc., et al., v. Luther Strange, et al.*, No. 16-11867, at 6 (11th Cir. 2016, July 15, 2016).

a covering physician willing to contract with it. As a result, it brought an as applied challenge to Alabama's "floor of care" regulation. *Id.* at 1301-02.

The Tuscaloosa clinic operated for 20 years, providing reproductive health services, including abortions, birth control, treatment for sexually transmitted infections, pregnancy counseling, and referral for adoption. *Id.* at 1302. By 2013, 40% of all abortions in Alabama took place at the Tuscaloosa clinic, far more than any other clinic in the state. In fact, during that time, the Tuscaloosa clinic performed almost two and a half times more abortions than the next Alabama clinic. *Id.* Further, about 80% of abortion procedures performed there were performed prior to 10 weeks postfertilization, with almost 96% of abortion procedures being performed before 16 weeks postfertilization. About 4% of abortions were performed mid-second trimester. 120 F. Supp. 3d at 1302. It was only one of two clinics in Alabama that performed abortions throughout the first 20 weeks postfertilization, and it provided around 75% of Alabama's mid-second-trimester abortions. *Id.*

During its 20 years of operation, the Tuscaloosa clinic had never been placed on probation, suspended, or revoked for failure to meet any safety regulation. *Id.* Further, during the most recent five-year period, less than one-tenth of 1% of its patients were transferred to a hospital for observation or complication. *Id.* The clinic had never been closed for failing to treat its patients. 120 F. Supp. 3d at 1302.

After its long-time doctor retired, the clinic hired Dr. Parker, a replacement doctor who was board-certified in OBGYN with subspecialty training in family planning, contraception, and abortion. *Id.* at 1303. He had over 20 years of experience in women's health, was on the faculty of Northwestern School of Medicine, and held admitting privileges there. *Id.* He performed abortions in a number of states, including Alabama and Mississippi, and when hired was providing

abortions at the Montgomery clinic. *Id.* This doctor attempted to obtain admitting privileges himself in Tuscaloosa. 120 F. Supp. 3d at 1303. He was unable to do so because the hospital there required him to perform a number of hysterectomies and laparotomies, but according to the court "the reality is that, because Dr. Parker is a full-time abortion provider and because complications from abortions are so rare, he would never be able to do the required amount of procedures." *Id.* The record evidence indicated that, of the estimated 10,000 abortions Dr. Parker performed in the three years prior on women up to 20 weeks postfertilization, only two were transferred to the hospital, and one was transferred for observation only. *Id.* Dr. Parker had never had a patient who needed a hysterectomy from an abortion complication. *Id.*

Dr. Parker made a good faith effort to work with the hospital board, offering to perform the requisite number of procedures on other patients; he could not satisfy the requirement by performing the procedure on his own patients, because his own patients would not need them due to the low complication rate from abortion. 120 F. Supp. 3d at 1303. Record evidence indicated that an agreement appeared to be reached to satisfy the hospital board's requirement in this way, but that agreement never materialized and instead quickly fell apart. *Id.* The hospital board reiterated its demand that Dr. Parker satisfy the required procedures by performing them on his own patients. *Id.* As the court recognized, this was "an impossible task for a full-time abortion provider . . . given the low number of complications from abortion." *Id.*

Dr. Parker and the Tuscaloosa clinic then attempted to contract with a covering physician instead. 120 F. Supp. 3d at 1304. None of the physicians in the area agreed to contract, some citing anti-abortion views or the fear of reputational harm. *Id.* Dr. Parker and the Tuscaloosa clinic then applied for a waiver, citing Dr. Parker's safety record and the clinic's policies and procedures in place if complications were to arise, including a 24-hour hotline and a protocol for

the clinic to communicate with any treating physicians at emergency rooms. *Id.* The request for waiver was denied. *Id.*

The court enjoined enforcement of Alabama's "floor of care" regulation as applied to the Tuscaloosa clinic, concluding that plaintiffs had a substantial likelihood of success on their argument that the Alabama "floor of care" regulation would have imposed an undue burden on a woman's right to choose to have an abortion in violation of the Due Process Clause of the Fourteenth Amendment. 120 F. Supp. 3d at 1306-07. The court first examined the burdens. *Id.* at 1307-12. The court then turned to examine the justifications for the challenged regulation. *Id.* at 1312.

Alabama justified the challenged regulation by claiming that the regulation was "meant to ensure that women who obtain abortions receive adequate complication-related care" and do so "by authorizing two alternative models for continuity of care." *Id.* at 1312. The court then analyzed the three possible models for continuity-of-care first articulated in *Strange III*. *Id.* at 1312-13. Plaintiffs argued that the Tuscaloosa clinic's protocol was sufficient to ensure adequate continuity-of-care and that requiring the clinic to contract with a covering physician would not benefit patient health in any meaningful way. 120 F. Supp. 3d at 1313. Plaintiffs argued this based on Dr. Parker's "extraordinary safety record" and the clinic's emergency-care protocol which it claimed was as effective at ensuring high-quality continuing of care as the covering physician model. *Id.*

The court reaffirmed its determination that "complications from early-term abortions which are the vast majority of the procedures performed at the [Tuscaloosa clinic] are 'vanishingly rare.'" *Id.* at 1314. The court cited statistics that only 0.89% of first trimester abortions cause any complication of any kind and that only 0.05% of first trimester abortions cause a complication that

requires hospital-based care. *Id.* The court concluded that "clinics do not make frequent use of their covering physicians because the procedures they perform are extremely safe and because, where possible, the clinics themselves provide complication care." 120 F. Supp. 3d at 1314 (citing *Strange III*, 33 F. Supp. 3d at 1370 n.23).

Further, the court observed:

> Moreover, when a complication requires hospital admission, the regulation itself does not guarantee that a clinic patient would ever be seen by the covering physician, even if the Center were to contract with one. First, the regulation itself does not actually require a clinic to *make use* of the covering physician in the case of any complication: to comply with the regulation, a clinic need only maintain a contract promising the covering physician's availability. Second, if a patient who experiences complications lives outside the Tuscaloosa area—as do at least some of the Center's patients—the fact that the Center might have a contract with a covering physician who could admit her to the Tuscaloosa hospital is unlikely to affect her complication-related care in any way, as she will (and should) seek emergency care closer to home.

*Id.* (emphasis in original).

In the case of a patient transferred directly from the clinic to the hospital, the clinic was already required to "alert 911 and the hospital to the pending transfer; to provide the hospital's emergency department with necessary information about the patient's case; and to send a copy of the patient's medical records to the hospital along with the patient." *Id.* The emergency room doctor and staff, along with a hospital specialist, might examine the patient. *Id*. at 1314-15. The clinic would "communicate directly with the hospital and Dr. Parker would be available for consultation with the hospital's physicians at any time during the patient's course of treatment." 120 F. Supp. 3d at 1315.

If a contracted physician relationship existed, the court acknowledged the likely scenario that Dr. Parker would contact that contracted doctor at the soonest possible point in the process, that contracted doctor would meet the patient at the hospital to assume care, and that contracted

doctor would in theory have a relationship with Dr. Parker.  *Id.*  Although, as the court observed, because complications from abortion procedures are rare, it is unclear whether Dr. Parker would actually be in regular communication or have a relationship with the contracted physician.  *Id.*

The court also noted that, if there were a contracted physician and if that contracted physician had staff privileges at the hospital nearest to the patient, then Dr. Parker and clinic staff might notify the contracted physician so that she could admit the patient to the hospital herself.  *Id.*  However, as the court determined, nothing in Alabama's regulation required Dr. Parker and the clinic staff to do so.  120 F. Supp. 3d at 1315.

Even if Dr. Parker and the clinic staff notified the contracted physician, the court determined that "there is no guarantee that the covering physician will reach the hospital to admit the patient before the patient is assessed or treated by the emergency-room physicians; that the covering physician will be any more knowledgeable about the patient or her condition than would be the hospital physician; or that the covering physician will be any more qualified to treat the patient than would be the hospital physicians."  *Id.*  Further, the court determined that, because Dr. Parker and clinic staff continue to advocate for the patient directly with the hospital and provide consultation as necessary, the patient has an advocate for her care even after a transfer to the hospital. *Id.*

The court also concluded the clinic's policies ensured that patients received adequate continuity-of-care after discharge from the clinic.  *Id.*  The court determined that the current practice required that Dr. Parker be accessible for at least 72-hours following any procedure.  120 F. Supp. 3d at 1315  "[P]atients are provided 24-hour telephone access to the Center's medical staff."  *Id.*  The court found that the patient could speak to a nurse or to Dr. Parker.  *Id.*  If the patient needed to be assessed immediately, the court noted that the nurse or Dr. Parker could advise

the patient to go to the nearest hospital. *Id.* Further, the nurse or Dr. Parker could call the hospital ahead to provide any pertinent information about the patient or provide his contact information to the patient to provide to the hospital along with the request that the patient ask the hospital to contact Dr. Parker. 120 F. Supp. 3d at 1315. As a result of this benefits analysis, when weighed against the burdens of the regulation, the court enjoined the regulation as applied to Dr. Parker and the Tuscaloosa clinic. *Id.* at 1320.

### (iii)     Examining Louisiana Law

Likewise, in *Kliebert I*, the district court examined Louisiana's Act 620 which required every doctor who performed abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where the abortions were performed. 158 F. Supp. 3d at 484. The district court, given the controlling law of the Fifth Circuit at that time, applied rational basis review to determine whether Act 620 was rationally related to a legitimate state interest. *Id.* at 485.

In *Kliebert I*, doctors performing abortions at Louisiana's abortion clinics could not comply with the admitting privileges law, despite being given time to attempt to do so. *Id.* at 506-07. The court observed that there was no state or federal statute governing the rules for granting or denying hospital admitting privileges in Louisiana and that the process and rules varied from hospital to hospital. *Id.* at 491-92. Further, the court determined there was "no Louisiana statute which prohibits a Louisiana hospital or those individuals charged with credentialing responsibilities from deciding an application for admitting privileges based on the applicant's status as an abortion provider," regardless of the provider's competency. 158 F. Supp. 3d at 495. In addition, Louisiana had no maximum time period within which applications had to be acted upon, so a hospital could

effectively deny an application for admitting privileges by failing to act on it, without expressing the true reasons or any reasons for doing so.  *Id*. at 533.

Based on record evidence, the court determined that Louisiana's abortion providers were not given privileges or given only limited privileges that did not meet the statutory requirement. *See id*. at 489.  The resulting effect was an undue burden on the right of a large fraction of Louisiana women to an abortion, based on the record evidence.  *Id*. at 533.  As a result, the court determined Louisiana's Act 620 was facially unconstitutional.  *Id.*

The Fifth Circuit Court of Appeals granted a stay of the district court's injunction pending appeal.  814 F.3d 319 (5th Cir. 2016).  The Supreme Court vacated the stay entered by the Fifth Circuit, effectively reinstating the district court's injunction.  136 S. Ct. 1354 (2016).  After remand, the district court conducted a bench trial and held that the requirement placed an undue burden on women's due process right to choose an abortion, permanently enjoining enforcement of the active admitting privileges requirement.  250 F. Supp. 3d 27 (M.D. La. 2017).  The Fifth Circuit determined that the admitting privileges requirement did not impose a substantial obstacle in the path of a large fraction of all women seeking abortions in Louisiana.  905 F.3d 787, 815 (5th Cir. 2018).  The Supreme Court stayed the mandate of the Fifth Circuit, pending timely filing and disposition of a petition for a writ of *certiorari*.  139 S. Ct. 663 (2019).  Petitions for writ of *certiorari* have been docketed, but the Supreme Court has not made a determination yet.

### (iv)    Examining Mississippi Law

In *Jackson Women's Health Organization v. Currier*, 878 F. Supp. 2d 714 (S.D. Miss. 2012), ("*Jackson II*"), the district court first examined Mississippi's House Bill 1390 ("H.B. 1390") in a challenge brought by an abortion clinic and physicians associated with it; H.B. 1390 required physicians to have admitting and staff privileges at a local hospital and to be board-

certified in OBGYN. Defendants cite certain of these decisions in its response to plaintiffs' current motion. In *Jackson*, plaintiffs initially sought and obtained a temporary restraining order to block the effective date of H.B. 1390. *Jackson Women's Health Org. v. Currier*, Case No. 3:12-cv-436-DPJ-FKB, 2012 WL 2510953 (S.D. Miss. July 1, 2012) ("*Jackson I*"). Then, the court examined whether to grant a preliminary injunction. 878 F. Supp. 2d at 714. At the time H.B. 1390 was enacted, only one doctor had admitting and staff privileges, and he had a regular, private practice and did not provide the majority of abortions. *Id.* at 715. Instead, the two doctors who provided the majority of the clinic's services did not have admitting or staff privileges, though they had actively been seeking them since the passage of H.B. 1390. *Id.* The district court analyzed the relevant factors for granting injunctive relief, and the district court granted the motion for preliminary injunction in part. The court determined that "if these two doctors stop performing abortions for non-speculative fear of prosecution, it would create an 'undue burden' and irreparable harm." *Id.* at 717-18. The district court permitted H.B. 1390 to take effect but determined that plaintiffs not be subject to the risk of criminal or civil penalties at the time the injunction issued or in the future for operating without the relevant privileges during the administrative process. 878 F. Supp. 2d at 720.

After plaintiffs "unsuccessfully exhausted all available avenues to comply with" H.B. 1390, the State of Mississippi indicated that it would revoke the clinic's license following a hearing. 940 F. Supp. 2d 416, 417 (S.D. Miss. 2013) ("*Jackson III*"), *order clarified*, 2013 WL 12122002 (S.D. Miss. Aug. 13, 2013),[23] *affirmed as modified*, 760 F.3d 448 (5th Cir. 2014). The

---

[23] The district court was asked in a Federal Rule of Civil Procedure 52(b) motion to clarify its preliminary injunction order with respect to a determination regarding whether H.B. 1390 was an "unnecessary" health regulation; the court granted the motion in part to clarify its prior ruling, but as defendants had not argued initially that the regulation was "necessary," the court offered no analysis on that point. 2013 WL 12122002, at *2.

district court observed that, "[a]t all relevant times," the plaintiff clinic "has been the only abortion clinic in the State of Mississippi, and only one of its doctors holds admitting privileges. That doctor ha[d] a separate, private OB/GYN practice and provide[d] only minimal care at the [c]linic. The two doctors providing the vast majority of the [c]linic's abortions lacked admitting or staff privileges when the Act passed." *Id.* at 417-18.

Plaintiffs reported that the two doctors who provided the majority of care at the clinic had applied for privileges at every local hospital. *Id.* at 418. "Two hospitals refused to provide applications, and all others rejected the doctors' applications because they perform[ed] elective abortions." *Id.* As a result, the State of Mississippi intended to close the clinic, according to the district court. *Id.* Plaintiffs requested only that the district court "enjoin all forms of enforcement of the Admitting Privileges Requirement" of H.B. 1390. 940 F. Supp. 2d at 418. The district court granted plaintiffs' motion and enjoined the Admitting Privileges Requirement of H.B. 1390. *Id.* at 424.

The Fifth Circuit affirmed and enjoined the requirement that "[a]ll physicians associated with the abortion facility must have admitting privileges at a local hospital and staff privileges to replace local hospital on-staff physicians." 760 F.3d at 450. Prior to H.B. 1390's enactment, Mississippi law required that "abortion facilities have only a transfer agreement with a local hospital, a written agreement for backup care with a physician with admitting privileges, and at least one affiliated doctor with admitting privileges." *Id.* (citation omitted). Because the record evidence supported that the doctors performing abortions at Mississippi's only abortion clinic in Jackson could not comply with the admitting privileges law, despite being given time to attempt to do so, the record indicated the only abortion clinic in Mississippi would close. *Id.* at 450-53. The district court, and the Fifth Circuit, determined plaintiffs met the undue burden requirement

in the as-applied challenge and enjoined enforcement of the law. *Id*. at 455, 459. According to the Fifth Circuit, both the district court and the Fifth Circuit applied rational basis review to the proposed regulation as then required by controlling Fifth Circuit precedent; the Supreme Court in *Hellerstedt* later rejected that lower level of scrutiny for abortion regulations. 760 F.3d at 455, 459.

In 2018, plaintiffs filed an action seeking an order declaring the OBGYN requirement of H.B. 1390 facially unconstitutional and requesting clarification of the district court's prior order with respect to admitting privileges, seeking to have the district court's injunction applied statewide and not only to plaintiffs. *Jackson IV*, 320 F. Supp. 3d at 832. The district court modified its injunction to reflect that H.B. 1390's admitting privileges requirement was enjoined statewide but denied the request to declare the OBGYN requirement unconstitutional. *Id.* at 841-42. According to the district court,"[t]o make that claim, Plaintiffs must show that the law creates a substantial obstacle to the right to choose for a large fraction of women for whom the law is relevant. Yet since the law was enacted, the number of abortions Plaintiffs perform[ed] ha[d] increased by 17%." *Id.* at 832.

For purposes of this Court's analysis at this stage, the Court focuses on the benefits of the OBGYN requirement the *Jackson IV* district court identified and those it rejected. *Id.* at 837-38. The district court, based on the record evidence before it, determined that defendants had "shown that the ob-gyn requirement provides some benefit to women's health in that it ensures that physicians performing abortions in Mississippi abortion clinics are specialists in women's healthcare who are trained to perform abortions or their equivalents." 320 F. Supp. 3d at 837. However, as the district court explained, that finding alone did not satisfy the *Hellerstedt* inquiry. *Id.* Instead, the district court was required to assess whether "the new law advance[s the state's]

legitimate interest in protecting women's health" "compared to prior law." *Id.* (quoting *Hellerstedt*, 136 S. Ct. at 2311). Further, the district court observed that H.B. 1390 permitted board-eligible physicians to perform abortions, not just board-certified doctors. *Id.*

Having examined those factors, the district court concluded that "the ob-gyn requirement produces no benefit to Mississippi women as compared to prior law." 320 F. Supp. 3d at 838. Specifically, the district court explained that, "[u]nder prior Mississippi law, all physicians associated with an abortion facility must have either 'completed a residency in family medicine, with strong rotation through OB/GYN,' 'completed a residency in obstetrics and gynecology,' or had 'at least one year of postgraduate training in a training facility with an approved residency program and an additional year of obstetrics/gynecology residency.'" *Id.* at 837 (quoting Miss. Code R. § 15-16-1: 44.1.5(24)). Further, based on record evidence "board eligibility requires graduation in good standing from an ob-gyn residency program, but it does not require the experience necessary to sit for the American Board of Obstetrics and Gynecology oral exam or actually passing that exam." *Id.* As a result, the district court determined that defendants failed to explain how these board-eligibility requirements were more effective than pre-existing Mississippi law that already required substantial training in OBGYN. *Id.* (citing *Hellerstedt*, 136 S. Ct. at 2314).

The district court then turned to examine the burdens plaintiffs contended H.B. 1390's OBGYN requirement imposed and rejected plaintiffs' arguments. 320 F. Supp. 3d at 838-840. As a result, as the district court observed, it was "left with a challenged law that provide[d] no demonstrated benefit compared to prior law, but which place[d] no substantial obstacles in the path of a large fraction of women to whom it is relevant." *Id.* at 841 & n.9 (discussing difficulties the

district court observed in applying *Hellerstedt*).  As a result, the district court therefore declined to enjoin Mississippi's OBGYN requirement.  *Id.* at 841-42.

### (v)    Arkansas "Floor of Care" Under Act 700

The Court turns now to examine the concept of a "floor of care" with respect to the challenge to Act 700.  Before the enactment of Act 700, the law in Arkansas already required that only a physician licensed to practice medicine in the State of Arkansas may provide abortion care.  Ark. Code Ann. § 5-61-101(a).

Plaintiffs confirm that their point with respect to Act 700 is that the State *already* has robust and sufficient oversight relating to abortion providers, and there is little difference between the requirements that must be satisfied to maintain an active OBGYN certification and those that apply currently to physicians who practice medicine and provide abortion care in Arkansas.  Requiring abortion providers to be licensed medical doctors in the State of Arkansas ensures regulation of the profession by the Arkansas State Medical Board.  *See* Ark. Admin. Code 0600.00.1-16 ("the Arkansas State Medical Board may revoke or suspend a license if the practitioner is grossly negligent and becomes physically incompetent to practice medicine to such an extent as to endanger the public.").  The Arkansas State Medical Board's "mission is to protect the public and act as [the public's] advocate by effectively regulating the practices of Medical Doctors" and others subject to its rule.  *See* Arkansas State Medical Board, https://www.armedicalboard.org/About.as px (last visited August 5, 2019).  Specifically, the following provisions currently exist in Arkansas law and regulations as relevant here:

- The Arkansas Medical Practices Act and Regulations expressly state that "[n]o person shall be granted a license to practice medicine in the State of Arkansas unless he or she . . . is of good moral character and has not been guilty of acts constituting unprofessional conduct . . . ."  *See* Ark. Code Ann. § 17-95-403(b).

- The Arkansas Medical Practices Act and Regulations permit the Arkansas Medical Board to suspend or revoke a license for immoral or unprofessional conduct. Ark. Code Ann. § 17-99-307(2) ("The Arkansas State Medical Board, after due notice and hearing, may revoke, suspend, or refuse to renew any license or permit or place on probation or otherwise reprimand a licensee or permit holder or deny a license to an applicant who . . . is in judgment of the board, guilty of immoral or unprofessional conduct.").

- The Arkansas Medical Board may refuse to grant, impose certain enumerated penalties, or revoke the medical license of any physician involved in any felony listed under Arkansas Code Annotated § 17-2-102. Ark. Code Ann. § 17-95-409. Arkansas Code Annotated § 17-2-102, which was enacted in 2019, includes a list of 36 categories of felony offenses and specifically provides that convictions in Arkansas, other states, and federal court shall be considered.

- To maintain an active license to practice medicine in the State of Arkansas, there are continuing medical education requirements that may be enforced through license suspension or revocation. *See* Ark. Code Ann. § 17-80-104 (empowering regulatory boards of the professions or occupations classified by the law of the State of Arkansas as professions of the healing arts and for whom the General Assembly has established regulatory boards empowered to license persons to practice to adopt rules requiring the continuing education of the persons licensed by the board); Ark. Admin. Code 060.00.1-17 (requiring a person who holds an active license to practice medicine in the State of Arkansas to complete 20 credit hours per year of continuing medical education, stating that "Fifty (50%) percent of said hours shall be in subjects pertaining to the physician's primary area of practice . . . .").

- Any claim or filing of a lawsuit alleging malpractice against a physician licensed to practice medicine and surgery in the State of Arkansas must be reported to the Arkansas State Medical Board within ten days after receipt or notification or the licensed physician may face discipline up to and including revocation, suspension, or probation or monetary fines. *See* Ark. Code Ann. § 17-95-103; Ark. Admin. Code 060.00.1-23.

- Arkansas licensed physicians are subject to being audited with respect to credentialing (Dkt. No. 84, at 15:16-16:5).

- Any Arkansas physician who performs an abortion must "obtain the correct informed consent from their patients" or risk sanction by the Arkansas Medical Board. Ark. Admin. Code 060.00.1-26 (describing the consent required and the circumstances under which it is required and permitting the Arkansas Medical Board to revoke or suspend a medical license or impose other sanctions if the Board determines there has been a violation).

- Any Arkansas physician who provides an abortion-inducing drug for the purpose of inducing an abortion is currently required to report any known adverse events associated with medication abortions. Ark. Code Ann. § 20-16-1505 ("If a physician provides an abortion-inducing drug . . . and if the physician knows that the woman who uses the abortion-inducing drug for the purposes of inducing an abortion experiences an adverse event, the physician shall provide a written report of the adverse event within three (3) days of the event to the United States Food and Drug Administration . . . and to the Arkansas State Medical Board"); *see also* Ark. Admin. Code 060.00.1-36 (requiring reporting to the Arkansas State Medical Board in the same circumstances).

- Any facility or physician who performs an abortion must report it to the Arkansas Division of Vital Records. Ark. Code Ann. §§ 20-18-603(b)(1), (b)(2).

In addition, in its findings of fact, the Court found that there are pre-existing rules and regulations in Arkansas that currently govern abortion providers. To summarize these findings, by regulation and statute in Arkansas:

- Only a physician licensed to practice medicine in the State of Arkansas may provide abortion care under existing law, *see* Ark. Code Ann. § 5-61-101(a);

- Any woman in Arkansas seeking an abortion must be evaluated *via* a medical history, a physical examination, counseling, and laboratory tests, *see* Ark. Admin. Code 007.05.2-8(A);

- Arkansas abortion facilities shall have written procedures for emergency transfer of a patient to an acute care facility, *see* Ark. Admin. Code 007.05.2-8(B);

- Arkansas general abortion facilities, which provide surgical abortions or both medication and surgical abortions, shall be within 30 minutes of a hospital which provides gynecological or surgical services, *see* Ark. Admin. Code 007.05.2-4(C); Ark. Admin. Code 007.05.2.3(J)(defining general abortion facility);

- Arkansas abortion facilities providing abortions must have various medical devices available to assist in the event of complications, *see* Ark. Admin. Code 007.05.2-8(C), (E);

- Arkansas abortion facilities must have a certain number of qualified personnel available to provide direct patient care, *see* Ark. Admin. Code 007.05.2-7; and

- Arkansas abortion facilities must satisfy a variety of ongoing obligations to educate staff about best practices to assess their own services, *see* Ark. Admin. Code 007.05.1-10; 007.05.2-5; 007.05.2-6(F),(G); 007.05.2-7(D).

- Arkansas abortion facilities are subject to annual, as well as other unannounced, inspections (Dkt. No. 84, at 84:25-85:8).

This list is not exhaustive, given the number of regulations enacted by the State of Arkansas (Dkt. No. 4, at 18).

To the extent it could be argued that Act 700's OBGYN requirement sets a "floor of care" for private abortion providers in Arkansas, the Court observes record evidence makes clear that there are few private abortion providers in Arkansas. Further, current laws and regulations apply to these private abortion providers, too. The State of Arkansas currently requires any physician who performs an abortion, along with being licensed to practice medicine in Arkansas, to "obtain the correct informed consent from their patients" or risk sanction by the Arkansas Medical Board. Ark. Admin. Code 060.00.1-26 (describing the consent required and permitting the Arkansas Medical Board to revoke or suspend a medical license or impose other sanctions if the Board determines there has been a violation). Further, all parties agree that the State of Arkansas currently collects data on abortions provided and that record evidence demonstrates here that LRFP, PPAEO Fayetteville, and PPAEO Little Rock together provided the vast majority of abortion care in the state during 2018, providing nearly all abortions performed in 2018, and fewer than half a dozen abortions were provided in 2018 by others (Dkt. No. 103, at 47 (citing Defendants' Sealed Exhibit 1, filed July 31, 2019)). Arkansas law requires that any facility in which more than 10 abortions are performed each month be licensed as an "abortion facility" and

comply with Arkansas laws and regulations governing abortion care. *See* Ark. Code Ann. § 20-9-302; Ark. Admin. Code 007.05.2-1, *et seq.*

Further, currently Arkansas abortion facilities providing medication abortions must "have a signed contract with a physician who agrees to handle complications" and who has "active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug." Ark. Code Ann. § 20-16-1504(d)(1),(2). Section 1504(d) of Arkansas Act 577 was the subject of a previous constitutional challenge. *See Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, Case No. 4:15-cv-00784-KGB, 2016 WL 6211310 (E.D. Ark. March 14, 2016), *vacated and remanded* 864 F.3d 953 (8th Cir. 2017), *on remand to* 2018 WL 3029104 (E.D. Ark. June 18, 2018) (granting renewed motion for temporary restraining order and enjoining the enforcement of Section 1504(d) of Arkansas Act 577); 2018 WL 3816925 (E.D. Ark. July 2, 2018) (granting renewed motion for preliminary injunction but permitting defendants to enforce Section 1504(d) of Arkansas Act 577 against medication abortion providers subject to the Act only to the extent that abortion providers must make an effort to comply with Section 1504(d) by continuing to seek a contracted physician, preliminarily enjoining defendants from imposing any civil or criminal penalties for continuing to perform medication abortion while abortion providers subject to the Act continue in their efforts to comply with Section 1504(d); and ordering plaintiffs to report to the Court every 30 days on their efforts to comply with Section 1504(d)). In the related *Jegley* case, this Court examined carefully these same types of arguments with respect to Section 1504(d) of Arkansas Act 577 that required only medication abortion providers to contract with an admitting physician.

The Court examined the purported benefit of Section 1504(d) of Arkansas Act 577 and concluded that the contracted physician requirement did little, if anything, to advance Arkansas' interest in protecting women's health. *Jegley*, 2018 WL 3816925, at *45. Then, the Court proceeded to analyze the burdens based on record evidence presented at that stage of the proceedings. *Id.*, at *51-67. Ultimately, the Court concluded in *Jegley* that "plaintiffs demonstrated that Section 1504(d) is facially unconstitutional because it places a 'substantial obstacle to a woman's choice' to terminate a pregnancy before viability in 'a large fraction of the cases in which" it "is relevant.'" *Jegley*, 2018 WL 3815925, at *68-69 (quoting *Hellerstedt*, 136 S. Ct. 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion))). This Court did not alter its analysis of the regulation, nor did the Eighth Circuit review this Court's most recent analysis of the regulation or issue an opinion with respect to the merits of it. Instead, plaintiffs in *Jegley* submitted a status report indicating that they complied, and the parties filed a "Joint Motion to Vacate Preliminary Injunction and Dismiss Appeal," which the Eighth Circuit granted (*Jegley*, Case No. 4:15-cv-00784-KGB, Dkt. No. 171). That is the result of the *Jegley* case, and where the case stands today.

As a result of this outcome in *Jegley*, currently the "floor of care" in Arkansas differs for medication abortion and surgical abortion as a result of Section 1504(d) of Arkansas Act 577. The Arkansas legislature did not add the contracted physician requirement to surgical abortion providers. Instead, the Arkansas legislature enacted Act 700 to require that only physicians who are board-certified or board-eligible OBGYNs perform any abortion—medication or surgical—in Arkansas.

## 2.  Act 700:  Analysis Of Alleged Benefits

Defendants assert three goals are purportedly advanced by Act 700:  (1) protecting mothers' health and safety; (2) protecting the medical profession; and (3) protecting vulnerable groups (Dkt. No. 103, at 70).  Again, the relevant question before the Court is whether Act 700's OBGYN requirement provides the asserted benefits *as compared to the prior law*.  *See Hellerstedt*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, *compared to the prior law*, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id.* at 2314 ("The record contains nothing to suggest that [the challenged law] *would be more effective than pre-existing Texas law . . . .*") (emphasis added).  As a result, the Court analyzes the alleged benefits of Act 700 in comparison to prior Arkansas law and regulation.

Even if this Court were inclined to agree that defendants under the circumstances have presented the interests they identify, the Court concludes that plaintiffs are likely to prevail on their argument that Act 700 fails to advance those interests more effectively than pre-existing Arkansas law and regulation because, based on the record evidence before this Court at this stage of the proceedings, Act 700 provides no discernable benefit in the light of the realities of abortion care, training, and practice in Arkansas and across the county.

For the reasons explained, the Court determines at this stage that plaintiffs are likely to prevail on their argument that legal abortion is one of the safest medical procedures available in the United States and in Arkansas and that Act 700 provides no benefit if intended to address a medical safety problem with legal abortion in Arkansas that, on this record evidence, does not exist.  The Court has already examined the record evidence regarding the safety of, and low complication rates for, legal abortion in Arkansas.  To the extent defendants claim Act 700 protects a woman's health and safety, defendants submit no record evidence to support a claim that a board-

certified or board-eligible OBGYN will provide care that leads to a lower complication rate than other clinicians. Dr. Aultman makes no such claim and cites no such study (*see generally* Decl. of Kathi Aultman, M.D.). In fact, record evidence presented by plaintiffs demonstrates that no peer-reviewed medical literature exists demonstrating that board-eligible or board-certified OBGYNs are more competent to provide abortion care (Dkt. No. 84, 63:6-15 (Dr. Prine's testimony); 28:10-20 (Dr. Hopkins' testimony); Dkt. No. 44-1, at 99 (Dr. Prine deposition testimony) ("There is no evidence that those letters after somebody's name convey any difference in clinical outcomes, there's just not.")).

As an initial matter, there is record evidence that the ACOG has recognized that clinicians from many medical specialties can provide safe abortion care and that requiring board-certification in OBGYN is "medically unnecessary" and "designed to reduce access to abortion." (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 38 n.14; Decl. of Linda W. Prine, M.D., ¶ 21, n.4 (quoting The Am. Coll. of Obstetricians and Gynecologists, *Increasing Access to Abortion* (ACOG Committee Opinion No. 613), *available at* https://www.ncbi.nlm.nih.gov/pubmed/25437742)). The President of the AAFP likewise adopted in 2014 a resolution opposing laws that "impose[d] on abortion providers unnecessary requirements that infringe on the practice of evidence-based medicine." (Decl. of Linda W. Prine, M.D., ¶ 22 (quoting Am. Acad. of Family Physicians, *Resolution No. 10001, Oppose Targeted Regulation Against Abortion Providers (TRAAP laws)*, http://www.aafp.org/about/constituencies/resources/past-ncsc/2014.html)). In November 2014, ACOG's Committee on Health Care for Underserved Women issued a Committee Opinion emphasizing that "[s]afe, legal abortion is a necessary component of women's health care." The Am. Coll. of Obstetricians and Gynecologists, *Increasing Access to Abortion* (ACOG Committee Opinion No. 613), *available at* https://www.ncbi.nlm.nih.gov/pubmed/25437742. Consistent with

that, the Committee Opinion states that ACOG recommends "expand[ing] the pool of first-trimester medication and aspiration abortion providers to appropriately trained and credentialed advanced practice clinicians in accordance with individual state licensing requirements." *Id.*

According to publicly available information, ACOG "is the specialty's premier professional membership organization dedicated to the improvement of women's health. With more than 58,000 members, the College is a 501(c)(6) organization and its activities include producing the College's practice guidelines and other educational material." The Am. Coll. of Obstetricians and Gynecologists, *About Us*, https://www.acog.org/About-ACOG/About-Us (last visited August 5, 2019). According to publicly available information, the AAFP is a national association of family doctors with over 131,400 physician and student members. Am. Acad. of Family Physicians, https://www.aafpcareerlink.org/ (last visited August 5, 2019). In determining whether regulations actually further women's health, the Supreme Court has repeatedly looked at the generally accepted standards for medicine set by the nation's major health organizations. *See*, *e.g.*, *Simopoulos v. Virginia*, 462 U.S. 506, 517 (1983) (considering ACOG and other standards). The positions taken by the ACOG and the AAFP are consistent with other record evidence before this Court at this stage of the proceedings, including record evidence regarding recommendations from the NAF, a professional association of abortion providers and the leading organization offering accredited medical education to healthcare professionals in all aspects of abortion care, and the American Public Health Association (Decl. of Linda W. Prine, M.D., ¶¶ 23, 24).

The Court notes that defendants make no argument in their filings at this stage to refute or undercut these representations regarding the positions taken by the ACOG, the AAFP, or any of the other medical professional associations cited. Dr. Aultman, who offers expert opinions on behalf of defendants in her declaration but who did not testify at the July 22, 2019, hearing, is a

Fellow of the ACOG (Decl. of Kathi Aultman, M.D., ¶ 2). She does not criticize the ACOG in her declaration (*see generally* Decl. of Kathi Aultman, M.D.). The Court acknowledges that Dr. Harrison, who offers expert opinions on behalf defendants in her declaration that seem confined to Act 610 and who did testify at the July 22, 2019, hearing was critical in her hearing testimony of the ACOG (Dkt. No. 84, at 248:6-24). However, defendants cite the Court to no contrary consensus evidence specific to abortion care.

The Court notes that Dr. Harrison has filed a supplemental declaration in which she cites 162 scientific articles that she claims show a link between prior abortions and "preterm" births (Supp. Decl. Donna J. Harrison, M.D., ¶ 3). The Court understands that Dr. Harrison likely did this in response to cross examination regarding a cite she previously included in her declaration in support of this claim (Dkt. No. 84, at 259:10-267:24). First, the Court notes that more than half of these articles now cited by Dr. Harrison were published over 20 years ago. Second, the Court observes that many of the more recent articles focus on populations from other countries. Third, while Dr. Harrison has not pointed the Court to any language in any particular study as supporting her position, the Court observes that a 2015 meta-analysis cited by Dr. Harrison concluded that women with a prior dilatation and curettage ("D&C") procedure are at a greater risk for preterm births in comparison to women without a prior dilation and curettage. M. Lemmers, *et al.*, *Dilatation and curettage increases the risk of subsequent preterm birth: a systematic review and meta-analysis*, 31 Human Reproduction 34, 40 (2016). The same study, however, noted that "[t]here were several possible confounding factors, such as maternal age, smoking status, use of alcohol, BMI, socio-economic status, residence, co-habitation status, inter pregnancy intervals and season of conception" that may not have been controlled for in the analysis. *Id.* Accordingly, this study concluded that a "systematic review demonstrates that D&C for miscarriage or termination

143

of pregnancy [is] *associated* with an increased risk of subsequent preterm birth." *Id*. at 43 (emphasis added). The study also concluded that "[t]he mechanism as to how D&C might increase the risk for preterm birth remains speculative." *Id*. The Court concludes that this study, which reviewed multiple other scientific studies, does not undermine the proof before the Court that abortions are a safe procedure. At most, this study indicates a correlation between certain types of surgical abortions and later preterm births, not any causal relationship between prior abortions and preterm births. Regardless, Dr. Harrison fails to explain how, even if her cited studies show a causal relationship between abortions and preterm births, the board-certified or board-eligible OBGYN requirement would reduce such a risk.

Plaintiffs assert that "[t]raining, rather than specialty, determines competence to provide abortion care . . . ." (Decl. of Linda W. Prine, M.D., ¶¶ 18-20; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶¶ 35-37; Dkt. Nos. 44-1, at 113-14; 84, at 24:19-25:12; 25:19-25; 55:14-22; 56:3-13; 62:8-12; 65:22-25; 66:1-12; 171:10-13; 241:9-21). Record evidence supports plaintiffs' assertion on this point. The record evidence shows that, across the nation, roughly one-third of abortion providers come from specialties other than OBGYN (Decl. of Linda W. Prine, M.D., ¶ 20). Record evidence is that abortion care is safely provided around the country up to at least 22 weeks LMP by non-OBGYN providers; record evidence before the Court is that abortion is only available in Arkansas at LRFP up to 21.6 weeks LMP (Decl. of Linda W. Prine, M.D., ¶ 20; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶¶ 35-37; Dkt. No. 84, at 21:9-22:5). Further, record evidence establishes that medical schools and teaching hospitals around the country routinely use non-OBGYN faculty members to train residents and fellows in the provision of abortion care (Decl. of Linda W. Prine, M.D., ¶ 20; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶¶ 35-37).

None of defendants' expert witnesses refute this record evidence regarding medical schools and teaching hospitals using non-OBGYN faculty members to train residents and fellows in the provision of abortion care. Based on the record evidence at this stage of the proceeding, the two expert witnesses cited by defendants in support of this requirement have no experience in teaching abortion practitioners or training OBGYN residents or fellows themselves. Neither Dr. Aultman—who did not testify at the hearing—nor Dr. Harrison cite to this type of experience (*see* Decl. of Kathi Aultman, M.D.; Rebuttal Decl. of Kathi Aultman, M.D.; Decl. of Donna J. Harrison, M.D.). Instead, Dr. Aultman appears to have reviewed websites and literature to prepare her declaration, rather than relying upon her experience. At this stage of the proceeding, on the record evidence before it, the Court finds this evidence unpersuasive, especially when compared to the testimonies of Dr. Hopkins, Dr. Prine, Dr. Tvedten, and Dr. Cathey with respect to teaching abortion practitioners and training OBGYN residents and fellows (*see* Dkt. No. 84, at 24:15-25; 25:4-12; 25:22-25; 26:5-17; 27:18-25; 50:13-23; 55:17-23; 56:3-7; 57:5; 62:8-12; 66:3-8; 181:10-14; 202:19-24; 203:1-5).

Perhaps more importantly, there is no record evidence that competence in abortion care is a prerequisite for becoming a board-certified or board-eligible OBGYN (Decl. of Linda W. Prine, M.D., ¶ 21, n.4; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶¶ 35-37; Dkt. No. 84, at 24:1-18). Defendants assert that board certification in OBGYN currently "*requires* training" to perform procedures "that are functionally identical to surgical abortions, such as suction dilation and curettage" (Dkt. No. 103, at 7 (citing Decl. of Kathi Aultman, M.D.)). However, the record supports that OBGYN residents can opt out of any abortion training (Decl. of Linda W. Prine, M.D., ¶ 21 n.4; Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 38 n.14; Decl. of Janet Cathey, M.D., ¶ 13), and many board-certified OBGYNs have never even observed an abortion (Decl. of

Linda W. Prine, M.D., 21 n.4; Decl. of Frederick W. Hopkins, M.D., M.P.H., 38 n.14). Training in OBGYN does not entail training to competence in abortion care or training in all aspects of abortion care. Instead, the record evidence is that practitioners must specifically seek out this training. Further, there is no record evidence that OBGYN board certification requires demonstrated skill in providing abortion care, competence in abortion care, or specific continuing education in abortion care. At the hearing, Dr. Hopkins stated that OBGYNs are not necessarily comfortable or competent to provide abortion care (Dkt. No. 84, at 24:19-25:12; 27:16-28:9). Furthermore, the National Academy Consensus Study Report, cited by Dr. Prine, states that "trained physicians, OB/GYNs, family medicine physicians and other physicians and APCs, physician assistants, certified nurse midwives, and nurse practitioners, can provide medication and aspiration abortions safely and effectively." National Academy Consensus Study Report, at 14.

In *Jackson IV*, the district court in Mississippi noted that Mississippi law at that time required that "all physicians associated with an abortion facility must have either 'completed a residency in family medicine, with strong rotation through OB/GYN,' 'completed a residency in obstetrics and gynecology,' or had 'at least one year of postgraduate training in a training facility with an approved residency program and an additional year of obstetrics/gynecology residency.'" 320 F. Supp. 3d at 837 (quoting Miss. Code R. § 15-16-1: 44.1.5(24)). Those requirements seem to be related to and a "better fit" with defendants' asserted interests here than a board-certified or board-eligible OBGYN requirement for all abortion providers, especially considering the record evidence presented.

Defendants cite to a study about the value of board certification generally, but the Court concludes that is of little, if any, value because that study does not focus on abortion care or advance an argument that the board-eligible or board-certified OBGYN requirement improves

patient care in the abortion setting (Dkt. No. 44-1, at 70-80). Defendants also cite to Dr. Prine's testimony that she became board-certified "because it is standard" or "expected in the modern era." (Dkt. No. 103, at 5). Dr. Prine, who provides abortion care, teaches, and trains others to provide abortion care is board-certified in Family Medicine, not OBGYN (Decl. of Linda W. Prine, ¶ 1). Even Dr. Prine could not satisfy Act 700's OBGYN requirement in Arkansas. Defendants fail to explain how her general statement in a deposition given in the context of *Jackson IV* advances defendants' arguments with respect to OBGYN board-certification or board-eligibility and abortion care.

Further, a study about board-certification generally does nothing to address the value of *board-certification eligibility*, which Act 700 permits for abortion providers. Act 700 permits doctors who are merely eligible for OBGYN board certification to provide abortion care, but defendants do not explain how *eligibility* for OBGYN board certification advances defendants' claimed interests over existing Arkansas laws and regulations. The Court also notes that Dr. Horton was board-eligible for approximately eight years, but he never became board-certified because he never obtained the necessary case list. There is record evidence that the necessary case list must come from three broad fields in OBGYN and that the cases have to be handled as an independent provider, not as a junior resident (Dkt. No. 84, at 23:10-25). Dr. Horton states that board eligibility or certification is not relevant to the competent provision of abortion care (Decl. of Thomas Russell Horton, Jr., M.D., ¶ 22).

Defendants claim that Arkansas women "deserve better" than doctors with "just a minimally certified medical license" to perform abortion care (Dkt. No. 103, at 42). Defendants rely on Dr. Aultman's declaration and statements taken from the ABOG website regarding the requirements for board-certification and board-eligible OBGYNs in making these arguments. Dr.

Aultman's declaration does not explain how the OBGYN requirement increases patient safety relative to Arkansas' existing abortion regulations, including the requirement that only Arkansas-licensed physicians may provide abortions. *See* Ark. Code Ann. § 5-61-101(a). Nowhere in the record evidence presented to the Court do defendants explain why Act 700 advances their asserted interests more effectively than pre-existing Arkansas laws and regulations.

For example, Dr. Aultman opines that the OBGYN requirement is associated with benefits to patient care because the certifying examination of the ABOG requires a candidate to demonstrate good moral and ethical character (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 9). The Arkansas Medical Practices Act and Regulations contain such a requirement already, *see* Arkansas Code Annotated § 17-95-403(b), and permit the Arkansas State Medical Board to revoke, suspend, or refuse to renew any license of an individual who, in the judgment of the Board, is guilty of immoral or unprofessional conduct, Arkansas Code Annotated § 17-99-307(2). Dr. Aultman opines that board-certified OBGYNs must disclose "criminal and disciplinary history" to ABOG (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 9). Current Arkansas law permits the Arkansas Medical Board to consider past criminal conduct when granting or revoking medical licenses of physicians. *See* Ark. Code Ann. § 17-95-409. Dr. Aultman opines that board-certified OBGYNs must meet certain continuing-education requirements to remain board-certified (Rebuttal Decl. of Kathi Aultman, M.D., ¶ 22). Under Arkansas law, to maintain an active license to practice medicine in the State of Arkansas, there are continuing medical education requirements that may be enforced through license suspension or revocation. *See* Ark. Admin. Code 060.00.1-17 (requiring a person who holds an active license to practice medicine in the State of Arkansas shall complete 20 credit hours per year of continuing medical education, stating that "Fifty (50%) percent of said hours shall be in subjects pertaining to the physician's primary area of practice . . . ."). There is record

evidence that the credentials of Arkansas physicians can be audited. Defendants make no argument as to why any of these current requirements or any of the other Arkansas laws and regulations is insufficient or why the board-certified or board-eligible OBGYN requirements would be better suited to address defendants' asserted interests in the light of current Arkansas law. Dr. Aultman does not offer such opinions, and defendants submit no other record evidence on this point for the Court's consideration. Instead, defendants rely on decisions from Mississippi and Louisiana to assert the OBGYN requirement does more than pre-existing Arkansas law to further defendants' asserted interests (Dkt. No. 103, at 45-46). Without record evidence specific to Arkansas, defendants' argument is not convincing.

Defendants include record evidence and argument about unqualified providers operating in other states (Dkt. No. 103, at 2, 45-46). There is no record evidence that supports defendants' argument that there are unqualified abortion providers operating in Arkansas. Further, the record evidence is that under Arkansas law and current Arkansas regulation, defendants already have the ability to monitor and take corrective action to address an unqualified provider. Among other requirements in Arkansas, an abortion provider must be a licensed physician in Arkansas, obtain required precise consent from the patient for the procedure, keep a record that consent has been obtained, and report any abortion provided to the State. *See* Ark. Code Ann. § 5-61-101(a); Ark. Code Ann. §§ 20-18-603(b)(1), (b)(2); Ark. Admin. Code 060.00.1-26. Failure to comply with these requirements permits the State to act. Defendants offer no record evidence to explain what Act 700 provides that advances defendants' asserted interests over pre-existing laws and regulations like these in Arkansas.

To the extent defendants assert an interest in benefitting "the medical profession by ensuring that practitioners are accountable" for keeping their professional knowledge and skills up

to date (Dkt. No. 103, at 8-12, 41), the historical overview offered by defendants is not specific to Arkansas licensed medical providers, Arkansas abortion care, or the realities of abortion care training and education currently as evidenced by this record. Act 700 does not encourage physicians to "continue to develop their knowledge and skills," (Dkt. No. 103, at 44), because there is no record evidence of a requirement that an abortion provider continue to develop his or her knowledge or skills with respect to abortion care to maintain OBGYN board certification or board eligibility. Record evidence supports that most aspects of abortion care are not covered by OBGYN board certification or board eligibility training. Record evidence also demonstrates that existing regulations for Arkansas licensed medical providers and Arkansas abortion facilities and their staff implement a floor of care as to these requirements. *See* Ark. Admin. Code 060.00.1-16; 060.00.1-17; 060.00.1-23 (regarding Arkansas licensed medical providers); Ark. Admin. Code 007.05.1-10; 007.05.2-5; 007.05.-6(F),(G); 007.05.2-7(D) (regarding Arkansas abortion facilities). In particular, the Court notes that Arkansas regulations require abortion providers to provide "annual in-service education programs for professional staff" and provide "current nursing literature and reference materials." Ark. Admin. Code. 007.05.2-7(D). Again, defendants present no record evidence as to why any of these current requirements is insufficient or why the board-certified or board-eligible OBGYN requirements would be better suited to address defendants' asserted interests in the light of current Arkansas law.

Further, even if the Court assumes that a board-certified or board-eligible OBGYN will receive training on procedures such as suction dilation and curettage and that such training is correlated to the competent provision of surgical abortions, which is the limited argument defendants make with respect to training correlated to Act 700, there is no record evidence that board-certified or board-eligible OBGYNs with such training will be competent to provide

abortion care; plaintiffs' witnesses uniformly describe the need to seek such training on abortion care outside of and in addition to most residency programs. Also, there is no record evidence that such training is relevant to the provision of medication abortion, which is not analogous to "suction dilation and curettage" identified by defendants.

Defendants argue that medication abortion is more likely to involve complications than surgical abortion (Dkt. No. 103, at 42). To the extent defendants rely on Dr. Aultman's declaration to support this claim, her declaration is a survey of data that is not Arkansas specific and does not clearly indicate the protocol used to administer the medication abortion in the case studies she recites (*see* Decl. of Kathi Aultman, M.D.; Rebuttal Decl. of Kathi Aultman, M.D.). To the extent defendants purport to rely on legislative findings cited in Section 1504(d) of Arkansas Act 577 (*see* Dkt. No. 103, at 42 (citing Arkansas Code Annotated § 20-16-1502(a)(18))), the Court examined and rejected, at least at the temporary restraining order and preliminary injunction stage, those findings in *Jegley*. *See Jegley*, 2018 WL 3816925, at *24-25.

There is record evidence that the National Academy Consensus Study Report "determined that the risks associated with medication abortion are similar to those associated with over-the-counter anti-inflammatory drugs such as ibuprofen" and that "the risks associated with surgical abortion are extremely low, with the risk of complications being in the 0-to-5% range." (National Academy Consensus Study Report at 11, 74-75). Dr. Hopkins presented testimony at the July 22, 2019, hearing with respect to complication rates that does not support defendants' assertions regarding alleged complications, and he was subject to cross examination by defendants on these points (Dkt. No. 84, at 17:13-22:5). Further, there is record evidence regarding how Arkansas abortion providers administer medication abortion, and the effectiveness of such procedures (Decl. of Stephanie A. Ho, M.D., ¶¶ 14-19).

Moreover, Arkansas law requires medication abortion providers to report to the State and to the Arkansas Medical Board any adverse events associated with medication abortions. Ark. Code Ann. § 20-16-1505; Ark. Admin. Code § 060.00.1-36. Defendants offer no such record evidence. This requirement substantially undercuts arguments made by defendants that such complications are underreported; defendants suggest underreporting as a way to explain a lack of evidence of complications (Decl. of Kathi Aultman, M.D., ¶¶ 27, 29). Even if the Court accepts defendants' contentions regarding alleged complications from abortion, defendants do not explain how Act 700 would change that or how Act 700 would address that contention in any more meaningful way than the current Arkansas laws and regulations or the contracted physician requirement for medication abortion providers.

Currently, there is record evidence that plaintiffs comply with the contracted physician requirement for medication abortion providers. At the July 22, 2019, hearing, Dr. Tvedten testified that, although LRFP has "a signed contract with a physician who agrees to handle complications" and who has "active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug," Arkansas Code Annotated § 20-16-1504(d)(1),(2), LRFP has "so far not required her services." (Dkt. No. 84, at 192:20-21). There is no record evidence that any LRFP patient or doctor has called on the contracted physician at any point nor is there any record evidence that the contracted physician has been involved in providing abortion patient care.

Defendants now claim that "even practitioners who intend to provide only medication abortion should be competent to perform surgical abortions because, as noted, surgical follow-up is often necessary to deal with complications." (Dkt. No. 103, at 43). The weight of record evidence at this stage does not support defendants' argument. There is record evidence from the

July 22, 2019, hearing that the most common potential complications with abortion are bleeding, infection, and retained products meaning the abortion is not completed (Dkt. No. 84, at 17:16-23). There is record evidence that minor complications may happen in one to three percent of cases, and those complications usually are managed in the clinic (Dkt. No. 84, at 17:24-18:8). There is record evidence that major complications occur much less frequently, more on the order of one out of every few hundred procedures (*Id.*). Dr. Hopkins states that "[a]ny clinician with adequate training in abortion care can safely and effectively handle" the most common abortion complications, even though such complications are rare (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 38). In the event a significant complication does arise from an abortion, which the record evidence indicates is rare, Dr. Hopkins states that an abortion provider would transfer or direct the patient to the nearest hospital to receive the required care (*Id.*, ¶ 39). If the complication is retained tissue following a medication abortion, Dr. Hopkins states that ACOG Practice Bulletin 143 states that the abortion provider should be trained in surgical abortion "or should be able to refer to a clinician trained in surgical abortion." (*Id.*).

Defendants again claim continuity of care or "patient abandonment," (Dkt. No. 103, at 43), a claim this Court rejected in *Jegley* given current regulations governing abortion providers in Arkansas and the care they are required to provide post-abortion. *See*, *e.g.*, *Jegley*, 2018 WL 3816925 at *39-40; *see also* Ark. Admin. Code 007.05.2-7 (mandating patients have access to 24-hour telephone consultation with either a registered nurse or physician associated with the abortion facility and mandating assessment by a registered nurse for counseling needs post-abortion and specifying written instructions for post-abortion care that shall be given at discharge); Ark. Admin. Code 007.05.2-8 (setting out the method for adopting such instructions for post-abortion care); Ark. Admin. Code 007.05.2-9 (requiring abortion providers to document that each patient has

received these instructions and mandating the Arkansas Department of Health ensure compliance with the regulation). Defendants claim the current contracted physician requirement might result in a contracted physician "geographically too far away to provide continuity of care" as a reason to support Act 700's constitutionality (Dkt. No. 103, at 43). Defendants in fact suggested in questioning that the contracted physician requirement could be met by a physician who resides out of state. *See*, *e.g.*, *Jegley*, 2018 WL 3816925, at *37. The Court cited this as one reason, among many, to reject as medically unnecessary and unconstitutional the current contracted physician requirement for medication abortion providers. *See*, *e.g.*, *id.*, at *37-38.[24]

To the extent defendants contend that the OBGYN requirement brings the regulations governing abortion providers closer to existing regulations for hospitals or birthing centers that are required to administer medication under the supervision of a licensed pharmacist, plaintiffs maintain that Arkansas law already requires abortion providers to dispense medication abortion under the supervision of a licensed pharmacist (Dkt. No. 61, at 32-33 (citing Ark. Admin Code 007.05.2-11(A)(2)). There is no record evidence that OBGYN board certification, or OBGYN board certification eligibility, advances defendants' asserted interest in protecting the health and safety of pregnant women with respect to medication abortion over the existing laws and regulations in Arkansas.

---

[24] Certain arguments made by defendants with respect to the purported ability to comply with Act 700's OBGYN requirement give this Court pause in examining defendants' claimed interest in continuity of care or avoiding patient abandonment. Here, defendants assert that one of the ways in which Arkansas providers could comply with Act 700's OBGYN requirement would be to have someone other than the abortion provider conduct all counseling with the patient (Dkt. No. 84, at 45:5-47:10; 80:18-81:11). Defendants seem to suggest that the abortion provider should provide as many abortion procedures as possible within the working day. This argument from defendants seems at odds with a stated interest in continuity of care or avoiding patient abandonment.

Citing to a "comprehensive meta-analysis of the literature on physician capability over the course of a career," as defendants do in this case, does little to persuade the Court when there is no indication this "meta-analysis" is OBGYN or abortion provider specific and no indication that this evidence relates specifically to Arkansas (Dkt. No. 103, at 8). Further, even Dr. Harrison, who is a board-certified OBGYN and has held such certification continuously since 1993, but who has not practiced medicine in a clinical setting in approximately 20 years,[25] admitted in her testimony on cross examination at the July 22, 2019, hearing that despite her status as a board-certified OBGYN she would not attempt to offer abortion care with her current skill set having not recently provided any care (Dkt. No. 84, at 241:9-21). This type of record evidence from defendants' own expert witness significantly undercuts the argument that Act 700 is a "commonsense" method to increase physician competency as physicians gain more years of practice (Dkt. No. 103, at 43).

Defendants also make an argument that Act 700 imposes specific requirements on abortion providers "to address the fact that mothers seeking abortions 'are less likely to litigate medical malpractice claims.'" (Dkt. No. 103, at 44 (citing *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 545 (9th Cir. 2004)). The record evidence demonstrates that current regulations exist to address the concerns they raise; complaints may be lodged with the Arkansas State Medical Board which has regulatory authority to address such complaints. *See* Ark. Admin. Code 060.00.1-16; 060.00.1-17; 060.00.1-23 (regarding Arkansas licensed medical providers). Even malpractice allegations must be reported to the Arkansas State Medical Board. Any claim or filing of a lawsuit

---

[25] During her hearing testimony on July 22, 2019, Dr. Harrison admitted to typographical errors in the opening paragraphs of her Declaration (Dkt. No. 84, at 239:17-240:9). She completed her residency training in OBGYN between 1986 and 1990, not 2000 (Decl. of Donna J. Harrison, M.D., ¶ 1), and she joined a multispecialty group in an underserved area of Michigan in 1993, not 2003 (*Id.*, ¶ 1; Supp. Decl. Donna J. Harrison, M.D.). She has not been involved directly with patient care since approximately 2000. Dr. Harrison, like Dr. Tvedten, settled out of court two lawsuits alleging medical malpractice while she was engaged in patient care.

alleging malpractice against a physician licensed to practice medicine and surgery in the State of Arkansas must be reported to the Arkansas State Medical Board within ten days after receipt or notification or the licensed physician may face discipline up to and including revocation, suspension, or probation or monetary fines. *See* Ark. Admin. Code 060.00.1-23. To suggest that patients must have a method outside of a malpractice lawsuit to ensure competence as a reason to justify Act 700 overlooks the Arkansas licensure requirement and the role of the Arkansas State Medical Board in that process. Defendants fail to address why current regulations are insufficient or why a board-certified or board-eligible OBGYN requirement better serves these claimed interests.

This type of analysis that the Court engages in here goes directly to the degree to which the restriction is over-inclusive or under-inclusive, *see*, *e.g.*, *Hellerstedt*, 136 S. Ct. at 2315, and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law. *See*, *e.g.*, *Hellerstedt*, 136 S. Ct. at 2311, 2314.

As a result of the foregoing, this Court concludes at this preliminary stage of the litigation that plaintiffs are likely to prevail on their argument that "there [is] no significant health-related problem" Act 700 "help[s] to cure"; nor is it "more effective than pre-existing [state] law" in advancing defendants' asserted interests. *Hellerstedt*, 136 S. Ct. at 2311, 2314.

### 3.    Act 700:  Inability To Comply With the OBGYN Requirement

Before turning to analyze the burdens allegedly imposed by the OBGYN requirement, the Court will first address defendants' argument that any such burdens are the result of plaintiffs' own actions or omissions rather than the OBGYN requirement. *Casey* requires a contextualized inquiry into how an abortion restriction interacts with facts on the ground, not only on the law's

direct effects. 505 U.S. at 887-895 (majority opinion); *see Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014). In *Casey*, the Supreme Court struck down Pennsylvania's husband notification requirement as creating an undue burden, finding that, due to the fact that "millions of women in this country . . . are victims of regular physical and psychological abuse at the hands of their husbands," a "significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." 505 U.S. at 894 (majority opinion). There, the State of Pennsylvania did not cause spousal abuse, but such abuse was the background context against which the Court measured the burdens created by the husband notification provision. Accordingly, at this stage of the litigation, the Court rejects defendants' argument that the Court cannot assess burdens that the State has not directly caused.

Defendants argue that the qualifying OBGYNs who have agreed to provide care at LRFP and PPAEO Little Rock have chosen "to arbitrarily limit the hours they work." (Dkt. No. 103, at 47). They argue also that Dr. Cathey, Dr. Hopkins, and Dr. Browne have limited their own availability, so therefore any burden that accrues to women seeking abortions in Arkansas as a result of the OBGYN requirement is the result of those self-imposed limitations (*Id.*, at 48). Further, defendants claim that plaintiffs made no attempt to locate alternative providers (*Id.*, at 49). Defendants point out that plaintiffs are not limited to board-certified or board-eligible OBGYNs in Arkansas and that there are currently over 51,673 board-certified OBGYNs in the United States who could obtain a medical license in Arkansas (*Id.*). Defendants concede that "Arkansas alone has 294 board-certified physicians in Obstetrics and Gynecology." (*Id.*, at 6). Defendants maintain that any incidents of stigma or harassment relating to abortion care providers are "anecdotal" and, even if such stigma or harassment makes it more difficult for abortion

providers to hire a qualifying practitioner, that this obstacle is not caused by the State (*Id*., at 49). Defendants also point out that Dr. Tvedten's 2015 letter expressed how he finds his practice as "very lucrative and gratifying," and they argue that Dr. Tvedten's letter belies his assertions of "stigma and harassment." (*Id*.). In their earlier response filed in this case, defendants argued that the economic renumeration of acting as an abortion provider "will quickly and certainly attract a qualified provider of surgical abortion to the state." (Dkt. No. 43, at 59).

The weight of the record evidence, at least at this preliminary stage of the litigation, does not support defendants' arguments. Dr. Cathey avers that three and a half days of abortion care per week is the maximum she can provide, given her personal and professional obligations (Decl. of Janet Cathey, M.D., ¶ 8). She is currently providing three days of care a week for eight to ten hours a day, so her alleged availability has *increased* from her current schedule. She alleges that she has a physical injury that continues to produce physical limitations, and she has other professional obligations—including Social Security disability consultations and transgender patients—that prevent her from increasing her provision of abortion care (*Id*.). The record evidence also indicates that Dr. Rodgers is semi-retired due in part to health issues that prevent him from providing patient care for long hours or multiple days a week (*Id*.). The Court finds that these representations are credible and do not represent "self-imposed limitations" but are instead reasonable professional limitations that prevent Dr. Cathey and Dr. Rodgers from providing additional abortion care.

Similarly, the record evidence shows that Dr. Browne and Dr. Hopkins have not self-imposed limitations on their ability to provide abortion care in Little Rock. Dr. Browne lives in the State of Washington and is employed in that state (Decl. of Charlie Browne, M.D., ¶ 1). He previously provided abortion care at LRFP but ceased doing so because the travel time was

disruptive professionally and due to harassment from protestors he suffered while working at LRFP (*Id.*, ¶¶ 9-10). Dr. Browne has agreed to provide abortion care for LRFP but only for two to three days in July 2019 (*Id.*, ¶ 14). He cannot offer more help to LRFP due to his professional and personal obligations in Seattle, Washington (*Id.*). As for Dr. Hopkins, he lives in California and travels to Arkansas to provide abortion care at LRFP approximately once every two months for "three to four days every other month." (Decl. of Frederick W. Hopkins, M.D., M.P.H., ¶ 44). He states that he is unable to visit Arkansas more frequently due to his clinical and teaching positions in California and because of the personal danger he believes exists as a result of providing abortions in Arkansas (*Id.*, ¶¶ 48, 49, 51). Dr. Hopkins testified that "[i]t's not about the money for me" and that he could not move to Arkansas because he would have to give up his entire career (Dkt. No. 84, at 37:2-4). Dr. Hopkins noted that he would not be willing to relocate, even if offered a million dollars by LRFP (*Id.*, 37:6-8). As with Dr. Cathey and Dr. Rodgers, the record evidence here indicates that the limitations preventing Dr. Browne and Dr. Hopkins from providing additional abortion care are not "self-imposed" but instead are the understandable result of the logistical difficulties posed by working in Arkansas while living in California or Washington state. *See*, *e.g.*, *Strange III*, 33 F. Supp. 3d at 1343-47 (declining to assume that physicians who provided abortion in Alabama but who did not reside in Alabama—and who would have had to "sacrifice access to the variety of medical opportunities[] available" and their personal obligations in their home states to move to there—could upturn their lives and existing practices to lessen burdens imposed by the challenged admitting privileges requirement).

The record evidence also belies any claim that plaintiffs did not attempt to contact alternative qualifying providers. Defendants argue that there are 294 board-certified OBGYNs in Arkansas (Dkt. No. 103, at 6). The record evidence indicates that, after Act 700 was passed,

LRFP sent a letter to each board-certified OBGYN listed on the Arkansas Medical Board's licensure list, in which LRFP stated that it was seeking a part-time, board-certified OBGYN to see patients three days a week (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 36). The letter also noted that the compensation was "generous." (*Id*.). Ms. Williams testified that she received no responses to that letter (Dkt. No. 84, at 87:20-21). Additionally, Ms. Williams submitted a request to a national organization that matches abortion providers with clinics, and through these efforts two physicians expressed preliminary interest, though neither was able to accept because they are not licensed to practice medicine in Arkansas (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 37). Ms. Williams testified that she contacted the board-certified and board-eligible OBGYNs who have previously provided abortion care at LRFP (Dkt. No. 84, at 88:12-18). Ms. Williams also posted a job posting *via* the Physicians for Reproductive Health leadership, the Ryan Residency, and the Family Planning Fellowship (*Id*., at 89). Ms. Williams also testified that she has talked at national meetings with other providers (*Id*.). Indeed, Dr. Browne and Dr. Hopkins have agreed to work for LRFP *as a result* of these outreach efforts. Further, as described by Dr. Hopkins, it is understandable that qualifying physicians might have qualms about moving to Arkansas to provide abortion care, given the number of statutes and regulations recently enacted to regulate the provision of abortion care and the uncertainty surrounding the ability of any provider to offer such care in the future. Defendants have presented no record evidence to refute the record evidence which shows LRFP's efforts to comply with Act 700. Based upon this record evidence, the Court concludes that plaintiffs have made reasonable efforts to comply with the OBGYN requirement.

The Court also concludes that the record evidence indicates that the harassment and stigma faced by abortion providers in Arkansas is an obstacle to compliance with the OBGYN requirement. Like the benefit analysis, the rule articulated in *Casey* requires the Court to look to

the context of the OBGYN requirement to assess the burdens imposed. Here, multiple abortion providers have offered record evidence regarding their personal experiences with harassment and stigma in Arkansas: Dr. Browne testified that the harassment and stigma he experienced in Arkansas was "far more prevalent and aggressive" than any other he had experienced (Decl. of Charlie Browne, M.D., ¶ 12). Dr. Horton testified that each day protestors block the entrance to LRFP and that he has been the subject of bomb threats in nearby Memphis, Tennessee (Decl. of Thomas Russell Horton, Jr., M.D., ¶¶ 26-27). Ms. Williams testified that medical students fear to drive their own vehicles or wear clothing identifying themselves as medical professionals when they come to LRFP for medical training (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 39). Ms. Williams also states that anti-abortion advocates have targeted her personally by sending a letter with her name, address, and picture to several hundred of her neighbors (*Id.*, ¶ 41). Dr. Tvedten and Ms. Williams offered testimony consistent with these declarations at the July 22, 2019, hearing. While it is true that defendants have not caused the harassment described in the record, established precedent requires the Court to consider the context of the OBGYN requirement while assessing the burdens imposed by it.

Additionally, the Court is not convinced that Dr. Tvedten's description of the positive aspects of acting as an abortion provider negates the record evidence relating to the harassment and stigma faced by abortion providers. While Dr. Tvedten described the positive aspects of providing abortion care in a letter designed to encourage others to join his practice, the Court does not view these descriptions as minimizing the risks of performing abortion care in Arkansas, which include, as demonstrated by the record evidence, risks to the professional reputation and physical safety of abortion providers.

For all these reasons, the Court finds that, based on the record evidence before it at this stage of the litigation, LRFP and PPAEO Little Rock are likely to prevail on their claim that they are unable to comply with the OBGYN requirement beyond the extent to which they have already done so.

### 4. Act 700: Considering Out-Of-State Doctors And Clinics

In *Jegley*, this Court declined to consider the availability of abortions at out-of-state clinics when determining if the contracted physician requirement imposes an undue burden on women seeking medication abortions in Arkansas. Other federal courts have held that States may not outsource their duty to protect the constitutional rights of their citizens. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014), *cert denied*, 136 S. Ct. 2536 (2016) (holding that the undue-burden analysis "focuses solely on the effects within the regulating state"); *see Schimel*, 806 F.3d at 918 (rejecting argument that the availability of second-trimester abortions in Chicago could justify the closure of Wisconsin's only abortion clinic); *see also Strange III*, 33 F. Supp. 3d at 1360-61 (even if out-of-state providers were considered, 80 mile distance to out-of-state clinic means the "threshold difficulties related to losing an abortion clinic in her home city" still present a burden).

This Court's reluctance to consider out-of-state abortion providers in this analysis finds additional support in *State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938). There, the Supreme Court held that the University of Missouri law school could not deny Lloyd Gaines admission to the school on the basis of his race, even though the University offered him a stipend to use at a law school in an adjacent state. *Id*. at 342. The Supreme Court reasoned that:

> [T]he obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction . . . . That obligation is imposed by the Constitution upon the States severally as governmental entities,— each responsible for its own laws establishing the rights and duties of persons

within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no state can be excused from performance by what another State may do or fail to do. That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system.

*Id.* at 350.

While *Gaines* was an equal protection case—here the Court analyzes a due process claim—the Court finds that its logic applies here. *See Currier*, 760 F.3d 448, 457 (citing *Gaines* for the proposition that Mississippi could not rely upon neighboring states to reduce the undue burden placed on women by abortion restrictions). Further, the text of the Due Process Clause is clear: no "State" shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. This constitutional command is directed at the States, and "no State can be excused from performance by what another state may do or fail to do." *Gaines*, 305 U.S. at 350.

The Court acknowledges that the Supreme Court did not explicitly address whether out-of-state abortion facilities should be considered in the undue burden analysis. *See Hellerstedt*, 136 S. Ct. at 2304. Prior to the Supreme Court's ruling in *Hellerstedt*, the Fifth Circuit reversed the district court's finding that abortion restrictions were unconstitutional as-applied to the El Paso clinic because women in El Paso could and did use abortion providers in nearby New Mexico. Specifically, the Fifth Circuit noted that, if the El Paso clinic closed, there was an abortion facility "approximately twelve miles away in Santa Teresa, New Mexico," and that "independent of the actions of the State," "Texas women regularly *choose to have an abortion in New Mexico*." *See Cole*, 790 F.3d at 596-97 (emphasis in original). Still, rather than upholding the Fifth Circuit's decision, the Supreme Court reversed the Fifth Circuit's decision and found that the same statute at issue in *Cole* was facially unconstitutional because it imposed an undue burden on women seeking abortions in Texas. *Hellerstedt*, 136 S. Ct. at 2318.

Given the legal authorities reviewed by this Court and the possibility that a neighboring state might unilaterally alter access to abortion, the Court declines to consider out-of-state abortion providers in this analysis. Defendants themselves assert that the closest out-of-state abortion providers are found in Memphis, Tennessee; Jackson, Mississippi; Shreveport, Louisiana; Dallas/Fort Worth, Texas; and Tulsa, Oklahoma (Dkt. No. 103, at 58-59). Defendants assert that these providers are found within 150 miles of Arkansas' borders, and Dr. Lindo testified that the Memphis clinic is a 300-mile round trip from Little Rock (Dkt. No. 84, at 163:9-14). This Court infers that, if the availability of an out-of-state abortion provider within 12 miles of the Texas border was not enough in *Hellerstedt* to ameliorate the burdens imposed by Texas' surgical-center requirement, then the distances at issue in this case to out-of-state abortion providers will not relieve any undue burden created by the OBGYN requirement.

### 5. Act 700: Burdens Imposed By The OBGYN Requirement

The Court will first analyze whether the burdens created by the OBGYN requirement entitle plaintiffs to facial relief. Plaintiffs argue that they are entitled to facial relief because, if the OBGYN requirement goes into effect, the number of abortions provided by LRFP and PPAEO Little Rock will be drastically reduced, preventing women who would have otherwise obtained abortions at those facilities from obtaining abortions at all. Plaintiffs may prevail on a facial challenge to an abortion regulation if they "demonstrat[e] that 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Jegley*, 864 F.3d at 958 (citing *Casey*, 505 U.S. at 894-95 (majority opinion)). The Eighth Circuit also articulated the test for facial relief against an abortion restriction as "whether the [OBGYN] requirement's benefits are *substantially* outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas." *Id.* at 960 n.9 (emphasis

added). Furthermore, "[n]othing prevents this Court from awarding facial relief as the appropriate remedy for [plaintiffs'] as-applied claims." *Hellerstedt*, 136 S. Ct. at 2307. There is record evidence that, if the OBGYN requirement goes into effect, LRFP will be forced to offer fewer abortions than they can in the absence of the OBGYN requirement. There is also record evidence that, at this time, PPAEO Fayetteville offers no abortion care, so LRFP and PPAEO Little Rock are the only abortion clinics in the State of Arkansas. There is also record evidence that a very small number (less than half a dozen) of abortions a year are provided by others in Arkansas.[26] In sum, plaintiffs argue that since the OBGYN requirement will reduce the number of abortions that can be provided by LRFP and PPAEO Little Rock, the OBGYN requirement is facially unconstitutional.

To evaluate the burdens imposed by the OBGYN requirement, the Court must first define the group of women whose burdens must be analyzed. *See Hellerstedt*, 136 S. Ct. at 2320 ("[T]he relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'") (quoting *Casey*, 505 U.S. at 895 (majority opinion)). In *Hellerstedt*, the Supreme Court reaffirmed that a law creates an undue burden when it places a "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant." 136 S. Ct. at 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)); *see Jegley*, 864 F.3d at 958 ("[B]ecause the contract-physician requirement only applies to medication-abortion providers, the 'relevant denominator' here is women seeking medication abortions in Arkansas."). In their original brief-in-support of their motion for a temporary restraining order/preliminary injunction, plaintiffs

---

[26] There is no record evidence that this number is expected to increase. The Court also notes that Arkansas requires any facility in which 10 or more abortions are performed per month must be licensed as an "abortion facility" and must comply with the regulations and restrictions governing abortion care. Ark. Code Ann. § 20-9-302; Ark. Admin. Code 007.05.2-1 *et seq.*

appear to argue that the "relevant denominator" in this case is "women who seek abortion care in Arkansas . . . ." (Dkt. No. 4, at 42). Defendants assert that the "relevant denominator" is "all Arkansas women seeking abortions . . . ." (Dkt. No. 103, at 63). Defendants also argue that the Court should not include women who would otherwise seek abortions at PPAEO Fayetteville in the numerator (*Id*.).

At this stage of the proceeding, the Court will consider all women seeking abortions in Arkansas as the "relevant denominator" of the "large fraction" test.[27] There is no support in the precedents for excluding out-of-state residents from the "relevant denominator." *See Hellerstedt*, 136 S. Ct. at 2320 ("Here, as in *Casey*, the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'"); *Jegley*, 864 F.3d at 958 ("[B]ecause the contract-physician requirement only applies to medication-abortion providers, the 'relevant denominator' here is women seeking medication abortions in Arkansas."). This position also finds support under the Privileges and Immunities Clause of the Constitution, which the Supreme Court has held prevents states from restricting abortion access to out-of-state residents. *See Doe*, 410 U.S. at 200 ("Just as the Privileges and Immunity Clause . . . protects persons who enter other States to ply their trade, . . . so must it protect persons who enter Georgia seeking the medical services that are available there."). The Court sees no contradiction in including out-of-state residents in the large fraction calculation and excluding out-of-state clinics from the burden analysis. These holdings derive from two different constitutional sources. In short, the State is barred by the Due Process Clause from denying substantive due process to its citizens and is barred

_____

[27] The Court used Arkansas women seeking abortions as the relevant denominator in its temporary restraining order. After reviewing the parties' briefings and the relevant precedents, the Court is convinced that out-of-state residents should not be excluded from the relevant denominator of the large fraction test.

by the Privileges and Immunities Clause from denying out-of-state residents the same rights afforded to Arkansas citizens.

The Court also declines to exclude those women who would seek abortions from PPAEO Fayetteville from the numerator of the large fraction calculation. As discussed, this Court's analysis must consider the facts on the ground, *Casey*, 505 U.S. at 887-895 (majority opinion), and it is undisputed that PPAEO Fayetteville is not providing abortions. Despite defendants' arguments to the contrary, there is no record evidence that the closure of PPAEO Fayetteville was a "voluntary decision"; instead, the only record evidence before the Court regarding the reasons for the closure of that facility are found in Dr. Hill's declaration, where he averred that PPAEO Fayetteville is currently unable to offer abortion services because security concerns led PPAEO Fayetteville to seek a new location that has not yet materialized (Decl. of Brandon J. Hill, Ph.D., ¶¶ 3-4). Dr. Hill also stated that he is confident that PPAEO Fayetteville will find a new location, but his declaration makes it clear that the cessation of services by PPAEO Fayetteville is a result of anti-abortion security concerns rather than a voluntary decision by PPAEO Fayetteville. Accordingly, to the extent women who seek abortions at PPAEO Fayetteville are included in the denominator of this Court's "large fraction" calculations, they will also be included in the numerator.

The Court next turns to examine the "large fraction" test. The Eighth Circuit has expressed skepticism that 4.8 to 6.0% is sufficient to qualify as a "large fraction." *Jegley*, 864 F.3d at 959 n.8 (citing *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006)). The Eighth Circuit reversed and remanded this Court's prior preliminary injunction in *Jegley*, determining that, "in order to sustain a facial challenge and grant a preliminary injunction," this Court is "required to make a finding that the Act's contract-physician requirement is an undue burden for

a *large fraction of women*" for whom the Act is relevant.  *Id*. at 959 (emphasis added).  The Eighth

Circuit addressed the "large fraction" test articulated in *Casey* in *Planned Parenthood, Sioux Falls*

*Clinic v. Miller*, 63 F.3d 1452, 1462-63 & n.10 (8th Cir. 1995) (Arnold, J.), *cert. denied sub nom*.,

116 S. Ct. 1582 (1996) (finding that plaintiff had "shown that a large fraction of minors seeking

pre-viability abortions would be unduly burdened by South Dakota's parental notice status, despite

its abuse exception," in part because "[r]oughly eighteen per cent. of South Dakota's minors live

in single parent homes" and thus could not "simply notify her other parent").  At least one other

district court has examined the "large fraction" test and undue burden analysis the Eighth Circuit

applied in *Miller*.  *See Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*,

799 F. Supp. 2d 1048 (D. S.D. 2011) (Schreier, J.) (noting that "[i]f the plurality opinion in *Casey*

intended 'large fraction' to mean a majority, it would have said majority" and referencing the 18%

language used by the Eighth Circuit in *Miller*).

The Court now turns to analyze and attempt to quantify, based upon the record evidence at

this stage of the proceedings, the burdens imposed by the OBGYN requirement.

### a.       Act 700:  Effective Ban On Surgical Abortions

First, the Court finds that every Arkansas woman in seeking a surgical abortion in Arkansas

faces a burden due to the OBGYN requirement.  The record evidence indicates that LRFP is the

only abortion provider in the state that currently provides surgical abortions and that, if LRFP is

forced to close as a result of the OBGYN requirement, no other surgical abortion provider will

exist in Arkansas.  The Court also acknowledges record evidence that some women have a strong

preference for surgical abortions "because it requires fewer visits to the clinic, and thus is

associated with a lower burden in terms of funding and time." (Decl. of Lori Williams, M.S.N.,

A.P.R.N., ¶ 15).

Defendants point to a finding by the Sixth Circuit that "the Supreme Court has not articulated any rule that would suggest that the right to choose abortion" articulated in *Casey* "encompasses the right to choose a particular abortion method." *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 514-15 (6th Cir. 2012) (emphasis in original).

The Court acknowledges that, under the holding in *DeWine*, the unavailability of a certain method of abortion does not, by itself, create a substantial obstacle to a woman's right to have an abortion if other methods of pre-viability abortion remain available. Regardless, the Court finds that the record evidence does support an inference that a lack of surgical abortion in Arkansas would present some burden to those women who prefer surgical abortions over medication abortions and for whom surgical abortion maybe a better or the only option for reasons supported by this record. Thus, the Court concludes that, if the OBGYN requirement effectively ends surgical abortions in Arkansas, the OBGYN requirement burdens those women who are seeking surgical abortions in Arkansas. Indeed, given that the record evidence indicates that 2,212 surgical abortions are currently provided by LRFP annually, if each of these abortions is no longer available, then a large fraction of women for whom the OBGYN requirement is relevant will face a substantial obstacle to their right to an abortion.

The Court also acknowledges the record evidence that, in spite of the OBGYN requirement, LRFP may continue to provide surgical abortions. While the parties dispute the number of surgical abortions that LRFP will be able to continue providing—Dr. Lindo asserts that Dr. Hopkins can provide 252 surgical abortions annually, while defendants assert that he can provide up to 525 annually—there is no dispute that the number of surgical abortions provided by LRFP will be less than the 2,212 total surgical abortions currently provided by LRFP or the 1,927 Arkansas women who, on average, received surgical abortions (Decl. of Jason Lindo, Ph.D., ¶ 61).

Even if this burden, by itself, does not render the OBGYN requirement a "'substantial obstacle in the path of a woman's choice' in 'a large fraction of the cases in which' it 'is relevant'" *Hellerstedt*, 136 S. Ct. at 2313 (citing *Casey*, 505 U.S. at 895 (majority opinion)), the Court will not discount it as some evidence of burden. To make the ultimate "substantial obstacle" determination, the burden imposed by the total or partial elimination of surgical abortions "must be taken together with other[]" burdens caused by the OBGYN requirement and weighed against "any health benefit" to determine if an "undue burden" exists. *Id.* at 2313.

### b. Act 700: Reduction In Abortions Due To The OBGYN Requirement

The record evidence before the Court demonstrates that PPAEO Fayetteville is currently not offering abortion care. The record evidence also indicates that, currently, LRFP offers both surgical and medication abortions and that PPAEO Little Rock only offers medication abortions. Dr. Lindo explains that, currently, 3,167 abortions are performed annually in Arkansas, including Arkansas residents and non-residents (Supp. Decl. of Jason Lindo, Ph.D., ¶ 10).[28] Dr. Lindo also explains that the Little Rock clinics perform 2,614 abortions annually, including non-residents (*Id.*, ¶ 8). He also avers that, on average over the past three years, 2,779 Arkansas residents obtain abortions in Arkansas each year (*Id.*, ¶ 51).[29] The record evidence also indicates that, on average,

---

[28] Dr. Solanky argues that Dr. Lindo overestimates the number of abortions that will occur in the future in Arkansas since the number of abortions in Arkansas has decreased by three percent per year, on average. Dr. Solanky has not, however, offered a counter proposal for the number of abortions that will occur annually in Arkansas in the future (*see* Supp. Decl. Tumulesh K. S. Solanky, Ph.D., ¶ 16). Furthermore, Dr. Solanky's declaration states that 9,497 abortions have occurred in Arkansas from May 3, 2016, to May 1, 2019 (*Id.*, ¶ 12 (Table 2)). Divided by three, this equals 3,165. Since Dr. Solanky's data appears nearly identical to Dr. Lindo's and because Dr. Solanky has not proposed an alternative figure, the Court declines to disregard Dr. Lindo's estimate of the total number of abortions that occur annually in Arkansas.

[29] Dr. Solanky estimates that approximately 2,802 Arkansas women seek abortions in Arkansas per year, on average (Supp. Decl. of Tumulesh K. S. Solanky, ¶ 10). Dr. Lindo estimates

1,927 Arkansas women seek surgical abortions in Arkansas annually (*Id.*, ¶ 61). While there is no direct record evidence indicating how many Arkansas women sought medication abortions on average over the past three years, the Court infers that 852[30] Arkansas residents sought medication abortions in Arkansas on average over the past three years.

Plaintiffs have presented record evidence that, if the OBGYN requirement goes into effect, LRFP will either be forced to close or to offer far fewer abortions than it currently does. Specifically, Dr. Lindo avers that, regardless of whether the OBGYN requirement forces LRFP to close, Dr. Rodgers and Dr. Cathey will be able to provide 956 abortions annually at PPAEO Little Rock (*Id.*, ¶ 9). Dr. Lindo estimates Dr. Rodgers' capacity to provide medication abortions based upon the maximum number of abortions he provided in any given month over the past three years. Dr. Lindo estimates Dr. Cathey's capacity similarly and adds 17% to her capacity due to her plan to expand the number of days she provides services from 3 to 3.5 days per week. These estimates are consistent with the record evidence (Decl. of Jason Lindo, Ph.D., ¶ 14(b); Decl. of Janet Cathey, M.D., ¶ 8; Dkt. No. 84, at 204:20-23). Based upon this data, Dr. Lindo estimates that, if the OBGYN requirement goes into effect, Dr. Rodgers can provide 480 medication abortions

---

that 2,779 Arkansas women seek abortions per year (Decl. of Jason Lindo, Ph.D., ¶ 51). Dr. Solanky states that his estimate was derived by viewing county-level data, and he notes that when an abortion is attributed to a county with a name that exists in multiple states, that abortion has been counted as an Arkansas resident abortion (Supp. Decl. of Tumulesh K. S. Solanky, ¶ 10 n.3). This estimate likely inflated Dr. Solanky's estimate of the number of Arkansas resident abortions. Given that Dr. Lindo's estimate is only 23 less than Dr. Solanky's, and given that Dr. Solanky's methodology likely resulted in an inflated estimate, the Court will use Dr. Lindo's estimate in its calculations here. Even if the Court were to use Dr. Solanky's estimated total, the Court's ultimate conclusions would not be affected. Similarly, Dr. Solanky argues that Dr. Lindo's estimate for the number of abortions that occur each year is too high because abortion rates have fallen by approximately three percent per year; again, even if true, such a minor reduction in abortion rates would not change this Court's ultimate conclusions.

[30] 2,779-1,927=852.

annually and that Dr. Cathey can provide 476 medication abortions annually (Decl. of Jason Lindo, Ph.D., ¶ 50). The Court notes that, since these estimates are based upon the maximum number of abortions each of these physicians has provided in the past, these estimates likely overestimate each providers' capacity due to the assumption that each provider will provide abortion care at his or her maximum rate over a sustained period.

If LRFP can remain open with the OBGYN requirement in effect, then Dr. Lindo projects that Dr. Hopkins will be able to provide 252 surgical abortions at LRFP. Dr. Lindo generated this number based upon the fact that, according to Dr. Lindo, the most women that Dr. Hopkins has served in any given day at LRFP since 2017 is 21, and therefore Dr. Hopkins will likely serve 42 women every other month, if he spends a business week at LRFP during which he does informed-consent appointments one day a week and provides abortions the other two days (Decl. of Jason Lindo, Ph.D., ¶ 49). Under Dr. Lindo's projections, these 252[31] annual surgical abortions will be the only abortions available at LRFP (*Id*.).

Defendants argue that Dr. Lindo "wrongly assumes that the maximum number of abortions actually performed in a single day equals the maximum capacity . . . ." (Dkt. No. 103, at 54). This is incorrect: as stated above, Dr. Lindo's projections are based upon the past numbers of abortions provided by the physicians at LRFP and PPAEO Little Rock, and his projections are based upon the providers' histories of providing abortions, not upon the capacity of a given facility. Defendants also point to Dr. Lindo's declaration as proof that "one provider in a single, three-hour period per week could provide at least 624 abortions per year." (*Id*., at 56). But the declaration that defendants are referencing—Dr. Lindo's declaration—is specifically referencing Dr. Paulson's capacity to provide medication abortions at PPAEO Fayetteville, and in that declaration

---

[31] 42*6=252.

Dr. Lindo specifically states that, since he lacks any historical data on Dr. Paulson's capacity to provide medication abortions, he is relying on PPAEO Fayetteville's representation that Dr. Paulson will be able to provide abortions to a maximum of 12 patients each week (Decl. of Jason Lindo, Ph.D., ¶ 49(c)).  Thus, given that this projection is specific to Dr. Paulson's particular situation, the Court declines to assume that all abortion providers could provide up to 624 medication abortions in a given year.

Defendants also argue that plaintiffs have understated Dr. Hopkins' capacity to perform surgical abortions; by defendants' estimate, Dr. Hopkins should be capable of providing 525 surgical abortions annually (Dkt. No. 103, at 64).  To reach this conclusion, defendants point to Ms. Williams' declaration that LRFP can safely and effectively "provide abortion care up to approximately 20-25 women per day . . . ." (Decl. of Lori Williams, M.S.N., A.P.R.N., ¶ 17).  Defendants next argue that, if Dr. Hopkins "continues his practice of providing 25 surgical abortions at LRFP an average of 3.5 days a week every-other month, then he will perform 525 surgical abortions a year (25 abortions x 3.5 days x 6 time = 525 abortions per year)." (*Id*.).[32]  Yet this seemingly simple calculation misrepresents the record:  Ms. Williams testified that Dr.

_____

[32]  At the hearing, defendants presented evidence that the maximum number of daily abortions Dr. Hopkins ever provided at LRFP was 28 in April 2018, not 21.  Under the formulation suggested by defendants above, if Dr. Hopkins were to provide 28 abortions a day for three and a half days every other month, he would perform a total of 588 surgical abortions annually.  The assertion that Dr. Hopkins can perform a total of 28 abortions a day is questionable given the other record evidence currently before the Court.  Even if the Court were to accept it as true, it does not substantially alter the Court's calculations, which are detailed below.  In any event, based upon submissions from the parties, it appears that plaintiffs inadvertently provided defendants with Excel sheets that were merged, resulting in a double count of the number of abortions in April 2018 (Dkt. No. 82).  Plaintiffs have even provided the Court with copies of the Excel sheets provided to Dr. Lindo and to Dr. Solanky, which illustrate the April 2018 error (Dkt. Nos. 99, 100, 101, 102).  In sum, defendants have presented no proof that the Dr. Lindo relied upon erroneous data.

Hopkins has provided only six percent of LRFP's abortion care, and Dr. Lindo used this data to calculate Dr. Hopkins' capacity to provide abortions at 252 per year. Ms. Williams did not aver that Dr. Hopkins currently provides 25 abortions per day. Further, construing Ms. Williams' statement reasonably, the Court understands her position to be that LRFP can currently provide 25 abortions a day based upon its current providers. The Court does not understand her statement to be that one abortion provider can provide 25 abortions a day at LRFP. Additionally, to the extent defendants point to Dr. Lindo's testimony at the hearing regarding Dr. Hopkins' hypothetical capacity to provide abortions, the Court discounts such testimony because *Dr. Hopkins* was available for questioning regarding his availability, and hypothetical questions that directly contradict record evidence regarding Dr. Hopkins' availability are not convincing to this Court. The uncontradicted record evidence is that Dr. Hopkins is only available one week, every other month, to provide abortion care for three to four days during that week.

With these preliminary points addressed, the Court turns to analyze the number of women who record evidence at this preliminary stage indicates plaintiffs likely will be able to demonstrate will be forced to forego an abortion due to the OBGYN requirement. Based upon the record evidence, if the OBGYN requirement goes into effect and LRFP closes, then plaintiffs likely will be able to demonstrate that the only abortions offered in Arkansas will be medication abortions at PPAEO Little Rock, and the record evidence indicates that Dr. Rodgers and Dr. Cathey—the only board-certified OBGYNs providing care at PPAEO Little Rock—can provide up to 956 medication abortions annually (Supp. Decl. of Jason Lindo, Ph.D., ¶ 11). Accordingly, if those 956 medication abortions are the only abortions available in Arkansas, then of the 3,167 women

(including non-residents) who seek abortions in Arkansas annually, 2,211[33] (or 70%[34]) of those women will not be able to receive abortions if LRFP closes.[35]  The Court notes that this calculation assumes without any record evidence presented for the Court's consideration that any woman denied a surgical abortion could instead receive a medication abortion.

Even if the OBGYN requirement does not force LRFP to close entirely, the record evidence at this stage shows that Dr. Hopkins will be the only physician capable of providing abortions at LRFP under the OBGYN requirement.  Further, the record evidence at this stage shows that, based upon his prior ability to provide abortions, Dr. Hopkins will be able to provide only 252 abortions per year at LRFP.  Accordingly, in conjunction with the 956 medication abortions that Dr. Rodgers and Dr. Cathey will be able to provide, the total number of abortions that will be available in Arkansas if LRFP remains open is 1,208[36] with Dr. Hopkins providing abortion care at his current maximum capacity to provide such care.  Accordingly, of the 3,167 women (including non-residents) who annually seek abortions in Arkansas, 1,959[37] (or 62%[38]) of them will not be able to obtain an abortion in Arkansas.[39]

---

[33]  3,167-956=2,211.

[34]  2,211/3,167=70%.

[35]  Alternatively, out of the 2,614 women (including non-residents of Arkansas) who seek abortions in Little Rock annually, 1,658 (2,614-956=1,658) (or 63%) of them will not be able to receive abortions in Arkansas if LRFP closes and PPAEO Little Rock is the only abortion provider left in Arkansas.

[36]  956+252=1,208.

[37]  3,167-1,208=1,959.

[38]  1,959/3,167=62%.

[39]  Alternatively, of the 2,614 women (including non-residents of Arkansas) who annually seek abortions in Little Rock (rather than statewide), 1,406 (2,614-1,208=1,406) (or 54%) of them

While the Court is not convinced that any of the record evidence supports defendants' assertion that Dr. Hopkins can perform 525 surgical abortions a year, the Court will consider this unfounded assertion's effect upon the calculations above. If, as defendants assert, Dr. Hopkins is able to conduct 525 surgical abortions a year, then the total number of abortions available at LRFP and PPAEO Little Rock would be 1,481.[40] Therefore, of the 3,167 women who annually seek abortions in Arkansas, 1,686[41] (or 53%[42]) of them will not be able to obtain an abortion in Arkansas, if the Court accepts defendants' assertions about Dr. Hopkins' capacity.[43]

The Court notes that these estimates assume that every woman who would otherwise have sought an abortion would be able to continue seeking an abortion even if her driving distances increase. In other words, the Court's estimates here assume that increased driving distances would have no effect upon the number of women who will be able to obtain an abortion. Both sides include record evidence on this point, but the Court specifically for purposes of its analysis here makes no findings regarding the number of abortions that will not occur as a result of increased driving distances. As a result of this assumption, the Court's estimates likely *underestimate* the number of women who will be unable to obtain an abortion as a result of the OBGYN requirement.

---

will not be able to obtain an abortion in Arkansas if Dr. Hopkins can provide 252 abortions annually in addition to the 956 abortions provided by PPAEO Little Rock.

[40] 956+525=1,481.

[41] 3,167-1,481=1,686.

[42] 1,695/3,167=53%.

[43] Alternatively, of the 2,614 women who annually seek abortions in Little Rock, 1,133 (or 43%) of them will not be able to obtain an abortion in Arkansas, if the Court accepts defendants' assertion about Dr. Hopkins' capacity.

The Court is also aware of the language in *Casey* stating that "the incidental effect of making it more difficult or more expensive to procure an abortion" is in and of itself not enough to meet the substantial obstacle requirement. 505 U.S. at 874. While lengthy travel "do[es] not always constitute an 'undue burden,'" such travel is a "legitimate burden" that, depending upon the particular facts of the case, can ultimately contribute to a determination that a statute creates an undue burden. *See Schimel*, 806 F.3d at 919 (noting that requiring women to travel 90 miles is a burden on women seeking abortions and a particular burden on low-income women); *Van Hollen III*, 738 F.3d at 796 (noting that a 400 mile trip for two required appointments is a "nontrivial burden on the financially strapped and others who have difficulty traveling long distances to obtain an abortion, such as those who already have children"); *Planned Parenthood of Indiana and Kentucky Inc. v. Commissioner, Indiana State Dep't of Health*, 273 F. Supp. 3d 1013, 1037 (S.D. Ind. 2017) (citing *Hellerstedt*, 136 S. Ct. 2313), *aff'd*, 896 F.3d 809 (7th Cir. 2017), *petition for writ of certiorari filed*, No. 18-1019 (U.S. Feb. 4, 2019). Evidence that increased travel distances lead to decreases in the abortion rate has been accepted by several federal courts. *See Schimel*, 806 F.3d at 919 (noting that "18 to 24 percent of women who would need to travel to Chicago or the surrounding area [from Wisconsin] would be unable to make the trip."); *Strange III*, 33 F. Supp. 3d at 1356-60 (crediting statistical evidence that increased travel distance led to decreased abortion rates, particularly for urban women who are forced to travel more than 50 miles to an abortion clinic); *see also Kliebert II*, 250 F. Supp. 3d at 83 (crediting evidence that "[i]ntercity travel for low-income women presents a number of significant hurdles" and that "with just one or two providers remaining, many more women will be forced to travel significant distances to reach a clinic, which also imposes a substantial burden.").

In sum, using the number of women who seek abortions in Arkansas as the denominator of the large fraction calculation, the record evidence indicates if Act 700's OBGYN requirement goes into effect, that anywhere from 70-53% of women who wish to have an abortion in Arkansas will be unable to obtain an abortion in Arkansas. Per *Hellerstedt*, the Court considers these burdens cumulatively to determine if a large fraction of women seeking abortions in Arkansas face a "substantial obstacle in the path of [their] choice." 136 S. Ct. at 2312, 2313 (noting that different burdens—driving distance and clinic closings—should be considered together). Applying the "large fraction" test from *Hellerstedt*, *Casey*, and *Jegley*, considering all of the burdens presented in the record evidence at this stage of the proceedings and the controlling precedents, the Court finds that, for a large fraction of women for whom the OBGYN requirement is an actual restriction, the OBGYN requirement "places a 'substantial obstacle in the path of a woman's choice.'" *Hellerstedt*, 136 S. Ct. at 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)).

### 6.       Act 700: Weighing The Benefits And Burdens

Having considered separately the benefits and burdens of the OBGYN requirement, the Court must next resolve the ultimate question of whether the OBGYN requirement creates an undue burden. Challenges to statutes affecting abortions may succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *see also Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking

medication abortions in Arkansas."); *id*. at 690 n. 9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas.").

Regarding the benefit of the OBGYN requirement, analyzing the record evidence currently before the Court at this stage of the litigation, and binding and persuasive legal precedents, this Court concludes at this stage that plaintiffs are likely to prevail on their argument that the OBGYN requirement confers little if any benefit on those women who are affected by it and does little to further defendants' asserted interests. *See Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions").

Regarding burdens, considered cumulatively, the record evidence at this stage of the litigation demonstrates that plaintiffs are likely to prevail on the merits of their claim that the OBGYN requirement, given plaintiffs' limited ability to comply with it, substantially burdens a large fraction of women seeking abortions in Arkansas which is the group for whom the law is relevant. *See Casey*, 505 U.S. at 895 (majority opinion) (holding that the undue burden analysis looks "to those for whom [the challenged law] is an actual rather than an irrelevant restriction.").

Weighing the benefits and burdens, given the foregoing evidence in the record currently before the Court at this stage of the litigation and given binding and persuasive legal precedents, the Court determines that Act 700's OBGYN requirement, given plaintiffs' limited ability to comply with it, imposes substantial burdens on a large fraction of women seeking abortions in Arkansas that "substantially outweigh[]" any state interest or any benefits to those women. *Jegley*, 864 F.3d at 960 n.9; *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a

substantial obstacle to women seeking abortions"); *Van Hollen III*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, *even if slight*, to be 'undue' in the sense of disproportionate or gratuitous.") (emphasis added); *West Alabama Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1286 (M.D. Ala. 2017) (noting fetal demise law was passed in pursuit of legitimate goals, but those goals were not sufficient to justify "such a substantial obstacle to the constitutionally protected right to terminate a pregnancy before viability"); *Planned Parenthood of Indiana and Kentucky, Inc.*, 273 F. Supp. at 1039 (noting undue burden where law required ultrasound viewing a day before an abortion rather than the day of the abortion because this change provided little to no benefit when measured against prior law). In other words, the Court concludes that, based upon the limited record before it at this stage of the litigation, plaintiffs are likely to prevail on their argument that requiring abortion providers to be board-certified or board-eligible OBGYNs presents a substantial undue burden for a large fraction of women seeking abortions in Arkansas, with little to no benefit to those women or to defendants' asserted interests.

Plaintiffs have shown that "in a large fraction of the cases in which [the OBGYN requirement] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"). Because Act 700's OBGYN requirement likely does not "confer[] benefits sufficient to justify the burdens upon access [to abortion] that [it] imposes," *Hellerstedt*, 136 S. Ct. at 2301, the Court finds that plaintiffs are likely to prevail on the merits of their due process challenge that Act 700's OBGYN requirement is facially unconstitutional.

### 7.    Act 700:  Equal Protection Challenge

For the reasons discussed elsewhere in this Order, the Court finds that plaintiffs are likely to prevail on their due process claims.  Accordingly, the Court will not, at this time, consider whether plaintiffs are likely to prevail on their claims under the Equal Protection Clause of the Fourteenth Amendment.

### E.    Irreparable Harm

A plaintiff seeking a preliminary injunction must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The deprivation of constitutional rights "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) (same).

Plaintiffs allege that the enactment and enforcement of Acts 493, 619, and 700 will inflict irreparable, tangible injuries on plaintiffs' patients by forcing them to delay access to abortion care or remain pregnant against their will.  Plaintiffs also argue that the abortion providers will suffer irreparable harm to their professional reputations if they are forced to cease providing desired medical services and that LRFP will be irreparably harmed by being forced to close or reduce its hours of operations (Dkt. No. 61, at 52-53).  Defendants argue that the OBGYN requirement does not prevent any woman from deciding whether to have an abortion at any stage of pregnancy and that there is no evidence that Acts 493 or 619 will prevent any women from obtaining an abortion (Dkt. No. 103, at , 84, 95).  Defendants also assert that an injunction would cause irreparable harm to the State if it is not allowed to enforce the duly elected statutes enacted by the Arkansas legislature (*Id.*, at 96).

For now, this Court finds, based on the state of the record before the Court at this stage of the proceeding, that Acts 493, 619, and 700 cause ongoing and imminent irreparable harm to the plaintiffs and their patients. As detailed above, the record at this stage of the proceeding indicates that Acts 493 and 619 unconstitutionally prohibit pre-viability abortions. Additionally, the record at this stage of the proceeding indicates that Act 700's OBGYN requirement imposes an undue burden on the right of women in Arkansas to seek an abortion. The harms to women who are unable to obtain abortion care as a result of Acts 493, 619, and 700 are irreparable. *See Roe*, 410 U.S. at 153 (describing "[s]pecific and direct harm" from forced childbirth). Furthermore, the State has no interest in enforcing laws that are unconstitutional, and therefore, since plaintiffs have demonstrated at least at this preliminary stage and on the record currently before the Court that they are likely to prevail on the issue of whether Acts 493, 619, and 700 are unconstitutional, an injunction preventing the State from enforcing Acts 493, 619, and 700 does not irreparably harm the State. *See Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012). Since the record at this stage of the proceedings indicates that women seeking abortions in Arkansas face an imminent threat to their constitutional rights, the Court concludes that they will suffer irreparable harm without injunctive relief.

### F.     Balance Of Equities And The Public Interest

Plaintiffs argue that they and their patients "unquestionably face far greater irreparable harm if the challenged requirements take effect" than "Defendants face if the laws' enforcement is enjoined . . . ." (Dkt. No. 4, at 65). Plaintiffs point out that if the Court grants injunctive relief, the immediate result will be the maintenance of the status quo, *i.e.*, "the availability of safe and effective abortion care." (*Id.*). Defendants, however, argue that the "status quo is that duly enacted laws take effect without interventions of courts" and that the public interest weighs against

injunctive relief because the public has an interest in seeing the laws enforced and protecting patient health (Dkt. No. 103, at 97).

The Court must examine this case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. The Eighth Circuit has stated that "whether the grant of a preliminary injunction furthers the public interest . . . is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest." *Rounds*, 530 F.3d at 752. After balancing the relative injuries and the equities, while evaluating the limited record before it, the Court finds that the enforcement of Acts 493, 619, and 700 at least at this stage would result in greater irreparable harm to plaintiffs and their patients than to the State. Accordingly, at this stage of the proceeding, the Court finds that the threat of irreparable harm to plaintiffs, and the public interest, outweighs the immediate interests and potential injuries to defendants.

### G.    Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, defendants have neither requested security in the event this Court grants a preliminary injunction nor have they presented any evidence that they will be financially harmed if they are wrongfully enjoined. For these reasons, the Court declines to require security from plaintiffs.

### H.    Scope Of Injunction

The Court notes that in the related case, *Jegley*, the Court's renewed preliminary injunction order required plaintiffs in that case to report to the Court every 30 days on their efforts to comply

with the contracted physician requirement. The Court declines to attach a similar requirement to this preliminary injunction for the following reasons. In *Jegley*, the record evidence at the preliminary injunction stage indicated that the contracted physician requirement conferred little if any benefit to the women who were affected by it. *Jegley*, 2018 WL 3816925, at *68. The record evidence also indicated that a large fraction of women affected by the contracted physician requirement were substantially burdened, *id.*, though the percentage of women affected by the contracted physician requirement as calculated by the Court was smaller than the percentage of women who will not be able to obtain an abortion if the OBGYN requirement takes effect, based on current record evidence. Additionally, this Court found in *Jegley* that it had "lingering questions regarding PPAEO's efforts to comply with the contracted physician requirement . . . ." *Id.* at *49.

Reviewing the record evidence here, unlike in *Jegley* where Arkansas physicians submitted affidavits, defendants present no affidavits from any individual regarding the difference between the requirements to satisfy the board-certified or board-eligible OBGYN requirement of Act 700 and the Arkansas laws and regulations currently in place that apply to Arkansas-licensed physicians who provide abortions. Dr. Aultman and Dr. Harrison's declarations are generalized and provide the Court with no basis to determine how the OBGYN requirement provides any benefits over and above existing law or regulations in Arkansas. Dr. Aultman did not appear at the July 22, 2019, hearing. Indeed, Dr. Harrison's testimony offered at the July 22, 2019, hearing suggests that, as a board-certified OBGYN, she would not feel comfortable providing abortions without at least six months of additional training in abortion care (Dkt. No. 84, at 241:9-21).

Similarly, the record evidence indicates that the effect of the OBGYN requirement will be to reduce significantly the number of abortions that can be provided in Arkansas. Furthermore, as

discussed above, the Court concludes that Dr. Lindo and Dr. Solanky's estimates regarding the number of abortions in Arkansas are not substantively different. Defendants have presented no record evidence that plaintiffs are able to provide more abortions than represented in their testimony or in Dr. Lindo's estimates.

Finally, record evidence shows that plaintiffs have made good faith attempts to comply with the OBGYN requirement and that their attempts have been, in part, successful, as demonstrated by Dr. Cathey's commitment to provide an additional half day of abortion care and Dr. Hopkins and Dr. Browne's agreements to provide increased abortion care in Arkansas. Defendants have presented no record evidence that plaintiffs have somehow misrepresented their attempts to comply with the OBGYN requirement or have somehow failed to pursue diligently additional leads.

For all of these reasons, the Court will not require plaintiffs to attempt to comply with the OBGYN requirement.

## IV.     Conclusion

For the foregoing reasons, the Court determines that plaintiffs have met their initial burden for the issuance of a preliminary injunction. Therefore, the Court grants plaintiffs' request for a preliminary injunction (Dkt. No. 2). The Court hereby orders that defendants, and all those acting in concert with them, including their employees, agents, and successors in office, are preliminarily enjoined from enforcing Act 493 of 2019, Act 619 of 2019, and Act 700 of 2019. Further, defendants are enjoined from failing to notify immediately all state officials responsible for enforcing the requirements of Act 493 of 2019, Act 619 of 2019, and Act 700 of 2019, about the existence and requirements of this preliminary injunction. This preliminary injunction remains in

effect until further order from this Court. No party is barred from seeking modified or additional relief.

The Court enters this Order on Tuesday, August 6, 2019, at 5:00 p.m.

_____
Kristine G. Baker
United States District Judge