# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

LITTLE ROCK FAMILY PLANNING SERVICES and
THOMAS TVEDTEN, M.D., on behalf of
themselves and their patients,

        Plaintiffs,

    v.

LESLIE RUTLEDGE, in her official capacity as
Attorney General of the State of Arkansas;
LARRY JEGLEY, in his official capacity as
Prosecuting Attorney of Pulaski County; MATT
DURRETT, in his official capacity as Prosecuting
Attorney of Washington County; SYLVIA D.
SIMON, M.D., in her official capacity as
Chairman of Arkansas State Medical Board;
ROBERT BREVING JR., M.D., VERYL D. HODGES,
D.O., JOHN H. SCRIBNER, M.D., OMAR T. ATIQ,
M.D., RHYS L. BRANMAN, M.D., RODNEY
GRIFFIN, M.D., MRS. MARIE HOLDER, BRIAN T.
HYATT, M.D., MR. LARRY D. "BUDDY" LOVELL,
TIMOTHY C. PADEN, M.D., DON R. PHILLIPS,
M.D., WILLIAM L. RUTLEDGE, M.D., and DAVID
L. STAGGS, M.D., in their official capacities as
officers and members of the Arkansas State
Medical Board, and NATHANIEL SMITH, M.D.,
M.P.H., in his official capacity as Director and
State Health Officer of the Arkansas Department
of Health,

        Defendants.

CIVIL ACTION

Case No. 4:19-cv-00449-KGB

**FIRST SUPPLEMENTAL COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

Pursuant to Federal Procedure Rule 15(d), Plaintiffs Little Rock Family Planning Services ("LRFP") and Dr. Thomas Tvedten (together, the "Supplemental Complaint Plaintiffs") bring this First Supplemental Complaint, which alleges facts occurring after the original complaint (Dkt. 1) was filed and makes claims against the above-named Defendants that could not have previously been pleaded.

## INTRODUCTION

1.      The Supplemental Complaint Plaintiffs incorporate by reference the allegations contained in paragraphs 11 through 21 and 37 through 61 of the Complaint, Dkt. 1.

2.      Governor Asa Hutchinson has decided to not order Arkansas citizens to stay home during the COVID-19 pandemic.  Many retailers remain open for business.  According to the Governor, many hospitals are "empty," and there is no shortage of the medical professionals on whom we all gratefully depend to fight COVID-19 on the frontlines.  Manufacturing and places of worship remain open, and medical providers around the State are free to exercise their independent professional judgment to provide patients with all surgical and dental care that they determine cannot be safely postponed.  Indeed, orthodontists in Arkansas remain free to schedule visits to adjust wires on patients' braces, and dentists continue to see patients who complain of a cracked tooth.

3.      Nevertheless—and unsurprisingly—the State opportunistically seeks to leverage the instant public-health crisis to continue its unrelenting campaign—which included no fewer than 12 abortion-specific restrictions in 2019 alone, *see* Dkt. 1—to prevent women from exercising their constitutionally protected right to access pre-viability abortion care in Arkansas. *See Roe v. Wade*, 410 U.S. 113, 163–65 (1973).  This time, Arkansas seeks to eliminate patients' right to access surgical-abortion care, i.e., the only type of care available to women who are more

than 10 weeks pregnant, as measured from the date of their last menstrual period ("LMP") (the

"COVID-19 Abortion Ban" or the "Ban").   On the morning of Friday, April 10, the Arkansas

Health Department ("ADH") arrived at the clinic of Plaintiff Little Rock Family Planning

Services ("LRFP") to demand that clinicians cease providing surgical-abortion care to numerous

women who had already assumed the substantial burdens of making an initial trip to the clinic

days before to receive the State's mandated (in-person) "informed-consent" information.

4.      Unless this Court grants the Supplemental Complaint Plaintiffs the relief they

seek, the COVID-19 Abortion Ban will require the Supplemental Complaint Plaintiffs to

continue turning away women seeking time-sensitive and urgent abortion care, including more

than 20 scheduled for care this week who are not candidates for a medication abortion.   As a

result, many women will be forced to delay their access to abortion (thereby—needlessly—

increasing the risk to their health and well-being).   In particular, some will be pushed to a more

complex and lengthier procedure; others whose pregnancies progress to 18 weeks LMP will be

forced to make an additional trip to the clinic (assuming the clinic can see them when it re-

opens); and still others will be pushed past the point in pregnancy where abortion is legal in

Arkansas (21.6 weeks LMP).   Some of the women who are barred from obtaining care under the

COVID-19 Abortion Ban may try to travel in the middle of a pandemic to the next-nearest clinic

currently providing surgical abortions, which for many women will be in Granite City, Illinois—

a *700-mile* roundtrip drive from Little Rock into a State reporting far higher numbers of COVID-

19 infections.   This travel will not only impose enormous logistical and financial burdens, but

also increase patients' risk of exposure to COVID-19 and the risk of infection for other Arkansas

residents upon their return.   But many of LFRP's patients—a substantial portion of which are

poor or low-income—will be unable to make this journey, and will be forced to carry to term and have a child against their will.

5.      Accordingly, to protect themselves and their patients from these constitutional violations and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the COVID-19 Abortion Ban.

## SUPPLEMENTAL FACTUAL ALLEGATIONS

### Abortion In Arkansas

6.      Patients seek abortion for a wide range of personal and complex reasons.  Most people who have abortions already have at least one child, and many have decided they cannot parent another at this stage of their lives.  Some patients have abortions because they conclude that it is not the right time to become a parent, they wish to pursue their education or career, or they lack the desired financial resources or level of partner or familial support or stability.  Other patients seek abortions because existing medical conditions put them at greater-than-average risk of medical complications, because they are in abusive relationships, or because they are pregnant as a result of rape or sexual assault.

7.      Abortions are typically provided in Arkansas using one of two methods: medication abortion or surgical abortion.  Consistent with Arkansas law, LRFP provides (i) medication abortion up to ten weeks (seventy days) LMP, and (ii) surgical abortion up to twenty-one weeks and six days LMP.  Both methods are a safe and effective means of terminating a pregnancy, although some patients have medical or other circumstances that make surgical abortion more appropriate for them.

8.      Medication abortion involves taking a combination of two pills, mifepristone and misoprostol, after which the patient expels the contents of the pregnancy in a manner similar to a miscarriage.  Not all patients, even those who go to LRFP before 10 weeks LMP, are eligible for

medication abortion.  For some patients, like those with anemia, medication abortion is

contraindicated.  In fact, a variety of medical conditions can push women toward surgical

abortion rather than medication abortion.

9.      Despite its name, "surgical" abortion involves no incision or general anesthesia.

There are two types of surgical abortion.  The first is aspiration abortion, in which gentle suction

is used to safely empty the contents of the uterus.  The procedure usually takes approximately 5

to 10 minutes.  Beginning at approximately 14 weeks LMP, abortions generally require a still-

very-safe but more-complex procedure known as dilation and evacuation, or "D&E" abortion,

which requires more procedure and recovery time than the aspiration procedure.  Most D&Es are

one-day procedures, but as pregnancy progresses past 18 weeks, it becomes a two-day procedure

because patients must come into LRFP the day before the procedure to begin the process of

dilating their cervix.  A D&E requires more skill and time, and the cost of abortion care increases

with the progression of a pregnancy.

10.     In 2019, LRFP provided approximately 1,950 abortions.  Of those, approximately

225 were medication abortions and 1,727 were surgical abortions.  From January through March

2020, LRFP provided 526 abortions, of which 478 were surgical procedures.

11.     As this Court recently found, abortion in Arkansas (and in the nation as a whole)

"is one of the safest medical procedures available."  *Little Rock Family Planning*, 397 F. Supp.

3d at 1279.  In particular, major complications—defined as complications requiring hospital

admission, surgery, or blood transfusion—occur in less than one-quarter of one percent (0.23%)

of all abortion cases.  Moreover, as this Court found, "legal abortion is significantly safer for a

woman than carrying a pregnancy to term and giving birth."  *Id.*

12.     In the rare instances when complications from abortion do occur, they can usually

be managed in an outpatient-clinic setting, either at the time of the procedure or during a follow-up visit.

13.     Surgical abortion requires minimal personal protective equipment ("PPE").  For the State-mandated ultrasound before every abortion, LRFP uses only non-sterile gloves.  For surgical abortions, the physician uses sterile gloves (one pair per procedure) and a surgical mask (worn throughout the day); the assistant uses only a surgical mask (also worn throughout the day) and gloves.  When necessary, LRFP uses reusable gowns and eyewear.

14.     Although abortion is a very safe procedure, the associated health risks increase as pregnancy progresses.  Delay may worsen any maternal health conditions that predate the pregnancy or result from the pregnancy.  Delay can likewise push a patient from an aspiration abortion to a more complex and longer D&E or from a one-day procedure to a two-day procedure.  And delay can push a patient beyond the point at which abortion is available in the State (i.e., 21.6 weeks LMP), thereby giving rise to a risk that she will attempt to terminate her pregnancy outside the medical system or be forced to carry to term against her will.

15.     LRFP's patients generally seek abortion as soon as they are able, but many face logistical obstacles that can delay access to abortion care.  Some patients may not discover they are pregnant until later in their pregnancies, while others may experience difficulties navigating the medical system, including finding a provider and scheduling an appointment.  Many of LRFP's patients are struggling financially, and patients need to gather the resources to pay for the procedure and related costs.  They must also figure out transportation to the clinic, arrange for time off work (which is often unpaid, because many patients lack paid time off or sick leave), and, for many of those patients who are mothers already, arrange childcare.  Arkansas's existing legal restrictions increase the challenges facing women who seek care in the State, too.  For

example, Arkansas law mandates that all patients visit the clinic in-person at least 72 hours

before their abortion to receive State-mandated information.  *See* Ark. Code § 20-16-1703.

### LRFP's Initial Response to COVID-19

16.     On March 11, 2020, Governor Asa Hutchinson issued Executive Order 20-03,

declaring a state of emergency in Arkansas due to the outbreak of the COVID-19 virus.  Ten days

later, on March 21, 2020, ADH issued a public statement (the "March 21 Guidance")

recommending that health care facilities and clinicians "prioritize urgent and emergency visits and

procedures now and for the coming several weeks."[1]  The letter's stated goals were to "preserve

staff, personal protective equipment (PPE), and patient care supplies; ensure staff and patient safety;

and expand available hospital capacity during the COVID-19 pandemic."  The ADH stated that

"[p]rocedures … that can be safely postponed shall be rescheduled to an appropriate future date."

The ADH's guidance also provided specific exemptions for "small rural hospitals under 60 beds,"

and clarified that procedures should proceed if there is risk of "progression of staging of a disease or

condition if surgery is not performed."  The ADH reiterated this guidance in another letter issued on

March 30, 2020.

17.     In the meantime, beginning in mid-March, LRFP began to implement measures to

protect its patients and staff.  LRFP determined that it would cease providing basic gynecological

care—i.e., pap smears, STD testing, and contraceptive counseling and services—and that, where

possible and permitted by law, prescriptions would be administered over the phone.  LRFP also

began performing enhanced telephonic and in-person screening of patients for COVID-19

symptoms, and staggering patient appointment times to reduce the number of patients at the facility

at any given time, minimizing possibilities for exposure.

---

[1] Ex. A.

18.     LRFP expanded on and formalized these precautions in its April 2, 2010 COVID-19 Response Protocol (the "LRFP Protocol").  That protocol sets forth detailed information about (1) postponement of LRFP services for which delay would not risk harm to the patient (i.e., certain gynecological care); (2) screening patients for symptoms of infection, both telephonically and on site; (3) staggering appointment times in order to minimize in-person contact and shorten the time patients spend in the clinic; (4) spacing individuals at least 6 feet apart in waiting areas to comply with the State's and CDC's "social distancing" guidelines; (5) limiting visitors and support people by requiring that they sit in cars or return home until patients are ready to be picked up; (6) performing temperature checks on all individuals entering the building (including staff); and (7) enhancing infection control protocols with frequent clinic sanitization and education of patient etiquette.

19.     Given these changes, no more than 6 to 8 patients are in LRFP's waiting room at any given time, and once patients are checked in for care, they are in individual treatment rooms except for the time they spend in recovery, during which they are at least 6 feet apart.

20.     The LRFP Protocol also states that "LRFP is aware of the PPE shortage our healthcare system is currently facing," and "is committed to using only the PPE that is necessary to protect [its] patients and staff."

21.     LRFP is self-sustaining in terms of PPE for the next several months, and has not availed itself of any PPE offered by the State's medical society.

22.     LRFP has no intention of utilizing any State PPE stockpiles or resources, and is prepared to switch to cloth/reusable masks should it become necessary.

23.     At LRFP, the use of N-95 masks, the PPE that appears to be in shortest supply in battling the COVID-19 pandemic, is limited to two staff members who self-sourced their masks and have underlying conditions or live with someone who does.

24.     Likewise, because all LRFP's procedures are performed in its own outpatient facility, LRFP is not using any hospital resources that may be needed for COVID-19 response—no hospital staff or supplies, no hospital beds (let alone ICU beds), and no ventilators.

25.     LRFP is strictly adhering to its Protocol.

**Continued State Action Against LRFP And Its Patients**

26.     On April 1, 2020, representatives from the ADH twice called LRFP to inquire about what the clinic was doing to reduce non-essential services, preserve PPE, and protect against the spread of COVID-19.  On both occasions, LRFP summarized the practices outlined in the LRFP Protocol discussed above.  At no point during either conversation did the ADH representatives suggest that LRFP was not complying with the State's elective-surgery guidance.

27.     On April 3, 2020, the ADH issued a Directive reiterating the goals and instructions from the ADH's March 21 Guidance (the "April 3 Directive").[2]  The April 3 Directive, like the March 21 Guidance before it, was not intended to stop the provision of medical care in the State; rather, it again stated that only "[p]rocedures . . . that can be safely postponed shall be rescheduled to a future date."  It further stated that "urgent" care and "care designated as an exception . . . will continue," with the latter "exception" category including situations in which "there is a risk of . . . progression of staging of a . . . condition if surgery is not performed."

---

[2] Ex. B.

28.     When Governor Hutchinson was asked about the April 3 Directive during an

April 6, 2020 press conference, Defendant State Health Director Dr. Nathaniel Smith explained

that it is "not intended to replace a physician's judgment," and reiterated that the April 3

Directive encompasses only procedures that can "be safely deferred."[3]   At no point during the

conference did the Governor or Dr. Smith suggest that surgical abortion is not permissible under

the April 3 Directive.

29.     On April 4, 2020, Governor Hutchinson issued Executive Order 20-13, declaring

"the entire state an emergency disaster area," and prohibited "gatherings of more than ten (10)

people in any confined indoor or outdoor space . . . until further notice."[4]   The Governor

declined, however, to issue a stay-home order to all Arkansas residents, and continued to permit

"gatherings of ten (10) or more people in . . . parks, trails, athletic fields and courts, parking lots,

golf courses, and driving ranges where social distancing of at least six (6) feet can be easily

maintained."  The Order also does "not apply to businesses, manufacturers, construction

companies, places of worship, the Arkansas General Assembly, municipal or county governing

bodies, or the judiciary," though those entities were also advised to maintain appropriate social-

distancing practices.  Finally, the Order stated that "pursuant to Ark. Code Ann. § 20-7-101,

violation of a directive from the Secretary of Health during this public health emergency is a

misdemeanor offense, and upon conviction thereof is punishable by a fine of not less than one

hundred dollars ($100) nor more than five hundred dollars ($500) or by imprisonment not

exceeding one (1) month, or both."

---

[3] Channel for Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update*, YouTube (Apr. 6, 2020), https://www.youtube.com/watch?v=KS2Kb4V8U3I.

[4] Ex. C.

30.     Protestors appear at LRFP nearly every day that it provides abortion care.

Between April 4 and 10, however, the harassment and intimidation from on-site protestors—who

recklessly fail to exercise proper social distancing—significantly increased.  They summoned

police to the clinic twice.  Since the start of COVID-19 concerns, social-media complaints

against the clinic have likewise increased, including some specifically requesting action by the

Governor and state legislators to stop the provision of abortion care.  For example, on March 29,

2020, state senator Trent Garner announced in a tweet that he had "asked the Governor to [ban

abortions] in Arkansas …. We shouldn't expose women to the risk of the Wuhan COVID-19

virus for an unnecessary elective procedure, and we could save the unborn babies."[5]

31.     On April 7, ADH inspectors performed an unannounced in-person inspection at

LRFP.  At no point during the inspection, which occurred on a day during which both surgical

and medication abortions were provided, did the ADH representatives suggest that LRFP was not

complying with the State's April 3 Directive.

32.     On April 8, 2020, the Governor gave an interview to PBS during which he

discussed Arkansas's "targeted" approach to managing risks relating to COVID-19.[6]  When

asked whether he thinks "that by not requiring or ordering people to stay home, unless they have

to be out, is not putting other people at risk," the Governor responded "No."  He elaborated that

"as long as they do what they're supposed to do, which is social distance, wear a mask when

you're out, this accomplishes the purpose."  The Governor further said that currently in the State,

there are "a lot of hospitals that are empty right now and health care workers that are empty,"

presumably meaning that they are available to provide care.

---

[5] Ex. D.

[6] Ex. E (*available at* https://www.pbs.org/newshour/show/arkansas-gov-asa-hutchinson-on-why-he-hasnt-issued-a-stay-at-home-order.).

33.     On April 9, the Governor and Dr. Smith were asked at a press conference if "elective surgery" is still permitted in the State, and Dr. Smith responded that judgments at surgical centers would be left primarily to the providers.[7]  At no point during the conference did the Governor or Dr. Smith suggest that surgical abortion care is not permissible under the April 3 Directive.

34.     Then, on the morning of April 10, ADH inspectors hand delivered a cease-and-desist order to LRFP (the "C&D Order").[8]   It acknowledged that the April 7 inspection "did not reveal any deficiencies with respect to the rules for abortion facilities in Arkansas," but asserted that LRFP was "in violation of the April 3, 2020 Arkansas Department of Health Directive on Elective Surgeries."  The C&D Order stated that the April 3 Directive "mandates the postponement of all procedures that are not immediately medically necessary during the COVID-19 emergency," and thus, according to ADH, the "prohibition applies to surgical abortions that are not immediately necessary to protect the life or health of the patient."  The C&D Order ordered LRFP to "immediately cease and desist the performance of surgical abortions, except where immediately necessary to protect the life or health of the patient."  The C&D Order also stated that "[a]ny further violations of the April 3 Directive will result in an immediate suspension of [LRFP's] license."  On April 10, LRFP was scheduled to provide surgical-abortion care to 8 patients whom LRFP had to turn away, including one patient at 17 weeks LMP.

35.     Later on April 10, the Governor and Dr. Smith held a press conference regarding COVID-19.  Consistent with Governor Hutchinson's decision that same week to close Arkansas's public schools for the remainder of the school year,  Dr. Smith admitted that he

---

[7] Channel for Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update*, YouTube (Apr. 9, 2020), https://www.youtube.com/watch?v=Kg-qMqmycAM.

[8] Ex. F.

"can't say with certainty" how long the C&D Order against LRFP will be in place.[9]  When a

reporter pressed a question regarding whether the C&D Order means that "some of [the women

who would otherwise visit LRFP] are going to have a baby," the Governor deflected and avoided

the critical inquiry by instead asking, "[i]s there a remote [i.e., telephonic] question"?

36.     Meanwhile, a range of medical services continue at facilities around the State.  To

take just one example, the ADH has expressly permitted orthodontists to continue seeing patients

to adjust their orthodontic wires and appliances, and dentists may treat patients whom complain

of a cracked tooth.[10]  And Arkansas has relaxed telemedicine rules for every medical treatment

except abortion—indeed, even the pre-abortion-care, state-mandated informed-consent process

must still occur in-person.

**Medical Experts Have Determined That Abortion Care Remains Critical And Time-Sensitive, Even During The COVID-19 Pandemic**

37.     The continued provision of abortion care, alongside measures to protect patients

and the public, is consistent with recommendations from leading medical organizations.

a.   The American College of Obstetricians and Gynecologists ("ACOG"), the

American Board of Obstetrics & Gynecology, the American Association of Gynecologic

Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for

Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and

Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine issued

a joint statement on "Abortion Access During the COVID-19 Outbreak," which provides that

"[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures

that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such

---

[9] Channel for Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update*, YouTube (Apr. 10, 2020), https://www.youtube.com/watch?v=X2v1SIesdyc.

[10] Ex. G.

a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[11]

   b.   The Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery" concurs with the American College of Surgeons' recommendation that consideration of whether delay of a surgery during the pandemic is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."[12]

   c.   The American Medical Association ("AMA")—the country's largest medical organization and one of its foremost authorities on medical and public health matters—concurs with this conclusion.  The AMA's March 30, 2020 *Statement on Government Interference in Reproductive Health Care* disapproves of efforts "to ban or dramatically limit women's reproductive health care" during the COVID-19 outbreak by "labeling procedures as 'non-urgent.'"[13]

   d.   On April 4, 2020, the World Health Organization ("WHO") issued a similar statement concluding that "[a]bortion is considered an essential service during the coronavirus pandemic" and that "services related to reproductive health are considered to be part of essential services during the COVID-19 outbreak."[14]

---

[11] Ex. H (*available at* https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.).

[12] Ex. I (*available at* https://www.ascassociation.org/asca/resourcecenter/latestnewsresourcecenter/covid-19/covid-19-guidance.).

[13] Ex. J (*available at* https://www.ama-assn.org/press-center/ama-statements/ama-statement-government-interference-reproductive-health-care.).

[14] Ex. K (a summary of the WHO's statement is accessible at https://dailycaller.com/2020/04/04/who-abortion-essential-coronavirus-covid-19/.).

**Forcing Women To Continue Their Pregnancies Amid COVID-19 Is Harming Patients
And Arkansas's Health Care System**

38.     The COVID-19 pandemic has exacerbated the already-significant obstacles that
women seeking abortion care in Arkansas face.  Many women are unable to seek care at LRFP
before 10 weeks LMP or have disqualifying medical conditions that make them ineligible to
obtain a medication abortion.

39.     Unless the Court enjoins the COVID-19 Abortion Ban, all these women will, at
best, unnecessarily face the risks of continued pregnancy, and—assuming they are ultimately
able to access abortion care—the increased and wholly unnecessary risks associated with delayed
abortion care.  Some will be pushed to the more complex and lengthier procedure necessary after
approximately 13 weeks LMP; others whose pregnancies are pushed past 18 weeks LMP will be
required to make an additional visit to the clinic to obtain the care they need.  All that assumes,
however, that these women will be able to obtain care at LRFP when the COVID-19 Abortion
Ban is lifted; LRFP has limited staff and capacity, and likely will not be able to treat all the
women who would need near-term care after waiting and being delayed for weeks—if not
months.  And given that the public-health crisis is expected to last weeks if not months, many
others will be pushed past the point at which they can obtain an abortion in Arkansas at all.

40.     Those women will have no good options:  The next-nearest clinic providing
surgical abortions is in Shreveport, Alabama (a more than 600-mile roundtrip drive from
Fayetteville, Arkansas), but that clinic provides care only up to 16.6 weeks LMP and is subject to
continuing threats of closure.  Many women will thus be forced to travel to Granite City, Illinois,
which is not only a more-than-700-mile roundtrip drive from Little Rock, but it is—like the
Shreveport clinic—in a state with a far higher incidence of COVID-19.  (Illinois has reported
17,887 cases of COVID-19 and 596 deaths, whereas Arkansas has 1,171 reported cases and 23

14

deaths). And there is no guarantee that the clinic in Granite City will have the capacity to treat women who would have otherwise obtained care in Arkansas.

41. Even if women obtain treatment outside Arkansas, they do so only at a heightened risk of contracting COVID-19 and carrying it back to this State.

42. Many of LFRP's patients will not even be able to make the trip and will instead be forced to carry to term against their will or seek to terminate their pregnancy outside the medical system.

43. Every day that a woman remains pregnant against her will, she not only experiences the emotional and physical consequences detailed above, but also risks contracting the COVID-19 virus, thereby further jeopardizing her ability to visit a clinic and receive time-sensitive care. In addition, the longer a woman remains pregnant—and especially if forced to carry a pregnancy to term—the heavier burden she places on the health care system, the more interactions she must have with a variety of clinicians and staff, and the much greater use of PPE her care requires. There is a 15 to 20 percent risk of miscarriage present in every pregnancy. Complications from miscarriage include infection, hemorrhage, and even death. In about half of miscarriages, women will seek medical attention. Even an uncomplicated pregnancy typically requires a minimum of one prenatal appointment per month, along with additional appointments to complete laboratory tests and ultrasounds. And for a complicated or high-risk pregnancy, the number of visits frequently doubles. Moreover, pregnant women commonly experience shortness of breath, vomiting, and other symptoms that are also common symptoms of COVID-19; appropriate medical care for pregnant patients during the COVID-19 pandemic is therefore even more complicated, and will frequently lead to the isolation and hospitalization—with PPE use—of pregnant patients who could have the infection.

44.    Virtually all births in Arkansas occur in hospitals, and pregnant patients typically present at a hospital one or more times prior to actual delivery.  An uncomplicated birth is attended by at least four clinicians, over a considerable labor period, with significant use of PPE.  A complicated birth involves 6-7 providers with even more PPE.  One-third of pregnancies result in caesarean section, a major abdominal surgery.  And after giving birth, patients remain in the hospital for multiple days.  Throughout labor, delivery, and recovery, patients are having repeated close contact with large numbers of people in the hospital and taking up hospital beds.  Even with this extensive health care before and during delivery, Arkansas has one of the highest rates of maternal mortality in the country.

45.    Banning surgical abortion is thus flatly contradictory to Arkansas's stated objectives in issuing ADH's elective-surgery guidance:  Banning abortion does not preserve PPE, but rather increases the overall need for it.  And it does not reduce, but rather exacerbates, the burden on the healthcare system.  That Arkansas has continued to allow a variety of non-essential activities to continue during the pandemic—including significant retail activity, leisure time on golf courses and driving ranges, and small-group fairs and festivals—while banning all surgical abortion under the pretext that abortion is a non-essential service reveals the COVID-19 Abortion Ban for what it is: part of the State's long-running campaign to severely restrict or outright eliminate women's ability to access constitutionally-guaranteed health care.

46.    Beginning tomorrow, April 14, LRFP has 26 patients scheduled to receive surgical abortion care this week, including: (i) 12 who are more than 10 weeks LMP (i.e., patients who are not candidates for a medication abortion); (ii) 8 who are more than 12 weeks LMP, and will soon require a D&E instead of an aspiration abortion to terminate their pregnancy if their abortion is delayed; and (iii) 3 who are more than 17 weeks LMP, and will soon require a

two-day procedure instead of a one-day procedure, and in short order be past Arkansas's legal

limit for abortion care.

47.     Absent an injunction from this Court, Defendants will seek injunctive relief

against the Supplemental Complaint Plaintiffs to prohibit their provision of any surgical abortion

care during the COVID-19 state of emergency.  Absent an injunction from this Court,

Defendants may also seek to hold the Supplemental Complaint Plaintiffs civilly or criminally

liable for their provision of surgical abortion care to patients during the COVID-19 state of

emergency.  Absent an injunction from this Court, Defendants may also seek to revoke or

suspend Plaintiffs' licenses.

## SUPPLEMENTAL CLAIMS FOR RELIEF

### COUNT I

**(Substantive Due Process)**

48.     The Supplemental Complaint Plaintiffs re-allege and incorporate by reference the

allegations contained in paragraphs 1 through 47 of this First Supplemental Complaint and

paragraphs 11 through 21 and 37 through 61 of the Complaint (Dkt. 1).

49.     Because the COVID-19 Abortion Ban imposes a ban on abortion prior to

viability—and poses significant burdens on women seeking abortion in Arkansas with minimal

or no medical or safety benefit—the Ban violates the Supplemental Complaint Plaintiffs'

patients' right to privacy guaranteed by the Fourteenth Amendment to the United States

Constitution.

### COUNT II

**(Equal Protection)**

50.     The Supplemental Complaint Plaintiffs re-allege and incorporate by reference the

allegations contained in paragraphs 1 through 47 of this First Supplemental Complaint and

paragraphs 11 through 21 and 37 through 61 of the Complaint (Dkt. 1).

51.     The COVID-19 Abortion Ban violates Plaintiffs' and their patients' right to equal

protection of the laws, guaranteed by the Fourteenth Amendment to the U.S. Constitution, by

treating abortion providers and patients seeking abortion differently than other health care

providers and patients, without adequate justification.

## COUNT III

### (Unconstitutional Vagueness)

52.     The Supplemental Complaint Plaintiffs re-allege and incorporate by reference the

allegations contained in paragraphs 1 through 47 of this First Supplemental Complaint and

paragraphs 11 through 21 and 37 through 61 of the Complaint (Dkt. 1).

53.     The COVID-19 Abortion Ban is unconstitutionally vague because it fails to give fair

notice of the conduct prohibited, in violation of the Due Process Clause of the Fourteen

Amendment.  It is impossible to determine what specific medical procedures the Arkansas Health

Department's April 3, 2020 Directive on Elective Surgeries prohibits clinicians from providing their

patients.  Because of the lack of precise standards to judge compliance, Defendants will be free to

interpret these provisions in a discriminatory and inconsistent basis.

## INJUNCTIVE RELIEF

54.     If the COVID-19 Abortion Ban continues to be enforced, the Supplemental

Complaint Plaintiffs and their patients will be subject to irreparable harm for which no adequate

remedy at law exists.

55.     Enforcement of the COVID-19 Abortion Ban will continue to cause irreparable

harm by threatening the Supplemental Complaint Plaintiffs and their staff with substantial criminal

penalties for providing abortion services and risk that their licenses will be suspended or revoked; and by substantially burdening—or preventing altogether—Plaintiffs' patients' access to abortion in Arkansas.

## **REQUEST FOR RELIEF**

WHEREFORE, the Supplemental Complaint Plaintiffs ask this Court:

A.     To immediately issue preliminary and permanent injunctive relief, restraining Defendants, their employees, agents, successors in office, and anyone acting in concert with them, from enforcing the COVID-19 Abortion Ban.

B.     To enter a judgment declaring that the COVID-19 Abortion Ban violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

C.     To enter a judgment declaring that the COVID-19 Abortion Ban violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

D.     To enter a judgment declaring that the COVID-19 Abortion Ban is unconstitutionally vague; and

E.     To grant such other and further relief as the Court deems just and proper.

Dated:  April 13, 2020                              Respectfully submitted,

Leah Godesky*
Christopher Burke**
Attorney for Plaintiffs
O'Melveny and Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
lgodesky@omm.com
Tel:  (212) 326-2254
Fax:  (212) 326-2061

Kendall Turner*
Ashley Robertson**

Maya Zagayer**
Attorneys for Plaintiffs
O'Melveny and Myers LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300
kendallturner@omm.com

*Attorneys for Plaintiffs*

Meagan Burrows*
Ruth E. Harlow**
American Civil Liberties Union
Foundation
125 Broad St, 18th Floor
New York, NY 10001
mburrows@aclu.org
tcamp@aclu.org
(212) 549-2633

*Attorneys for Plaintiffs*

*\* Motion for admission pro hac vice
granted*
*\*\* Motion for admission pro hac vice
pending*

Bettina Brownstein (AR Bar No. 85019)
Bettina E. Brownstein Law Firm
904 West 2nd Street, Suite 2
Little Rock, AR  72201
 (501) 920-1764 – Telephone
E-Mail:  bettinabrownstein@gmail.com

Brooke-Augusta Ware (AR Bar No. 2004091)
Mann & Kemp, PLLC
221 West Second Street, Suite 408
Little Rock, Arkansas 72201
brooke@mannkemp.com

(501) 222-7330

*On Behalf of the Arkansas Civil Liberties Union
Foundation, Inc.*

*Attorney for Plaintiffs*

## VERIFICATION

I, Lori Williams, hereby verify and declare under 28 U.S.C. § 1746 and penalty of perjury that the following is true and correct: (1) I am the Clinical Director of Plaintiff Little Rock Family Planning Services ("LRFP"), (2) I have read the foregoing verified First Supplemental Complaint and know its contents, and (3) the matters therein are true to my own knowledge and belief.

The sources of my knowledge and belief are (1) my participation in this litigation, (2) my years of work as a nurse and LRFP's Clinical Director, (3) information learned from publicly available literature relating to abortion care, and (4) information learned from public reports regarding Arkansas's response to the COVID-19 pandemic.

Dated: 4/12/2020

Lori Williams
LRFP Clinical Director

# EXHIBIT A



# Arkansas Department of Health

4815 West Markham Street ● Little Rock, Arkansas 72205-3867 ● Telephone (501) 661-2000

Governor Asa Hutchinson
Nathaniel Smith, MD, MPH, Secretary of Health

March 21, 2020

In view of the uncertainty and increase in cases of COVID -19 there are increasing concerns of hospital beds availability as well as staff capabilities in hospitals statewide. For this reason, the Arkansas Department of Health is recommending that elective surgery be postponed statewide. The Centers for Disease Control and Prevention (CDC) recommends that healthcare facilities and clinicians should prioritize urgent and emergency visits and procedures now and for the coming several weeks. The following actions can preserve staff, personal protective equipment (PPE), and patient care supplies; ensure staff and patient safety; and expand available hospital capacity during the COVID-19 pandemic.

- Procedures, testing, and office visits that can be safely postponed should be rescheduled to an appropriate future date.
- Routine dental and eyecare visits should be postponed.
- Emergent, urgent and time-sensitive care will continue.

Small rural hospitals under 60 beds and critical access hospitals, though strongly advised to follow this guidance to maximize resources, are excluded from this guidance.

Exceptions to this guidance should be made in the following circumstances:

- If there is a threat to the patient's life if the procedure is not performed.
- If there is a threat of permanent dysfunction of an extremity or organ system if the surgery is not done.
- If there is a risk of metastasis or progression of staging of a disease or condition if surgery is not performed.
- If there is a risk that the patient's condition will rapidly deteriorate if surgery is not done, and there is a threat to life, or to an extremity or organ system, or of permanent dysfunction or disability.

https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html

# EXHIBIT B



# Arkansas Department of Health

4815 West Markham Street ● Little Rock, Arkansas 72205-3867 ● Telephone (501) 661-2000
**Governor Asa Hutchinson**
**Nathaniel Smith, MD, MPH, Secretary of Health**

April 3, 2020
ADH Directive on Elective Surgeries

The Secretary of Health, in consultation with the Governor, has sole authority over all instances of quarantine, isolation, and restrictions on commerce and travel throughout Arkansas, as necessary and appropriate to control disease in the state of Arkansas as authorized by Ark. Code Ann. §20-7-109--110. Based on available scientific evidence, it is necessary and appropriate to take further action to ensure that COVID-19 remains controlled and that residents and visitors in Arkansas remain safe.

Throughout February and March of 2020, the Centers for Disease Control and Prevention (CDC) and the Arkansas Department of Health (ADH) recommended that healthcare facilities and clinicians prioritize urgent and emergency visits and procedures for the coming several weeks. Please see CDC Health Care Facilities Guidance and ADH Health Facilities Guidance.

On March 30, 2020, a guidance letter was sent to all health facilities, including ambulatory surgery centers and abortion facilities. Please see ADH Guidance Letter. In view of the continued uncertainty and increase in cases of COVID-19, there are increasing concerns of staff and medical supplies capabilities in hospitals statewide. The following mandatory actions can preserve staff, personal protective equipment (PPE), and patient care supplies; ensure staff and patient safety; and expand available hospital capacity during the COVID-19 pandemic.

- Procedures, testing, and office visits that can be safely postponed shall be rescheduled to an appropriate future date.
- Routine dental and eye care visits shall be postponed.
- Emergent, urgent and care designated as an exception below will continue.
- Small rural hospitals under 60 beds and critical access hospitals, though strongly advised to follow this directive to maximize resources, are excluded from this directive.

Exceptions to this directive should be made in the following circumstances:

- If there is a threat to the patient's life if the procedure is not performed.
- If there is a threat of permanent dysfunction of an extremity or organ system if the surgery is not done.
- If there is a risk of metastasis or progression of staging of a disease or condition if surgery is not performed.
- If there is a risk that the patient's condition will rapidly deteriorate if surgery is not done, and there is a threat to life or an extremity or organ system or a threat of permanent dysfunction or disability.

# EXHIBIT C

# STATE OF ARKANSAS
## EXECUTIVE DEPARTMENT

# PROCLAMATION

TO ALL TO WHOM THESE PRESENTS COME – GREETINGS:          EO 20 - 13

**EXECUTIVE ORDER TO AMEND EXECUTIVE ORDER 20-03 REGARDING THE PUBLIC HEALTH EMERGENCY CONCERNING COVID-19 FOR THE PURPOSE  OF IMPOSING FURTHER RESTRICTIONS TO PREVENT THE SPREAD OF COVID-19**

WHEREAS:   An outbreak of coronavirus disease 2019 (COVID-19) has spread throughout the world resulting in a global pandemic; and

WHEREAS:   On March 11, 2020, by Executive Order 20-03, an emergency was declared in the state as a result of COVID-19, and that emergency is on-going; and

WHEREAS:   COVID-19 continues to spread throughout the United States and Arkansas; and

WHEREAS:   In response to COVID-19, significant measures have been taken by Executive Order and Directives by the Secretary of Health to limit person-to-person contact, restrict gatherings, and suspend businesses that require significant person-to-person interaction; and

WHEREAS:   On March 26, 2020, by Executive Order 20-10, amending Executive Order 20-03, I declared the entire State of Arkansas a disaster area in which ingress and egress to and from, the movement of persons within, and the occupancy of premises therein, may be controlled, pursuant to Ark. Code Ann. § 12-75-114(e)(7); and

WHEREAS:   Pursuant to Act 96 of 1913, Ark. Code Ann. §§ 20-7-101 et seq., and the rules promulgated therefore, the Secretary of Health has the authority to impose such quarantine restrictions and regulations upon commerce and travel by railway, common carriers or any other means, and upon all individuals as in his judgment may be necessary to prevent the introduction of communicable disease into the State, or from one place to another within the State; and

WHEREAS:   On March 26, 2020, in conjunction with a directive issued by the Secretary of Health, Executive Order 20-10, amending Executive Order 20-03, imposed restrictions on gatherings of ten (10) or more people to limit the spread of COVID-19; and

WHEREAS:   Executive Order 20-10 exempted certain entities from the restrictions on gathering; and

WHEREAS:   I, as Governor, in consultation with the Secretary of Health, have determined that more actions must be taken to protect the people of the State of Arkansas from COVID-19; and

WHEREAS:   All Arkansas citizens must observe proper social distancing, and the Department of Health has issued a directive on proper social distancing protocols for businesses, manufacturers, construction companies, and places of worship; and

WHEREAS:   The State of Arkansas prides itself on being a destination for out-of-state guests who travel here to enjoy all that our state has to offer; however, during this health emergency, all resources must be maintained and

preserved to the greatest extent possible for the health and safety of Arkansas citizens; and

WHEREAS: The Secretary of Health has directed that occupancy of commercial lodgings and short-term rentals shall be limited to authorized guests as set forth in the Secretary's directive; and

WHEREAS: Executive Order 20-03 established that no quarantine regulations of commerce or travel shall be instituted or operated by any place, city, town or county against another place, city, town, or county in this or in any other state except by authority of the Secretary of Health; and

WHEREAS: Reasonable city or county curfews and closures of city or county owned parks and facilities, to prevent the spread of COVID-19, shall not be interpreted as a quarantine regulation of commerce or travel, as long as, they are consistent with this order; and

NOW, THEREFORE, I, Asa Hutchinson, Governor of the State of Arkansas, acting under the authority vested in me by Ark. Code Ann. §§ 12-75-101, *et seq.*, do hereby amend Executive Order 20-03 declaring an emergency in the State of Arkansas. The entire state is impacted by COVID-19, and I am declaring the entire state an emergency disaster area. In conjunction with the Directive of the Secretary of Health, I am ordering the following, effective as of 12:01 a.m. on April 6, 2020 until further notice:

(1)   The Directives of this order shall supersede the directives of Executive Order 20-10; and

(2)   All public and private gatherings of any number of people occurring outside a single household or living unit are subject to the following directives and exceptions:

a.   Due to the high risk of community spread of COVID-19, gatherings of more than ten (10) people in any confined indoor or outdoor space are prohibited until further notice. Gatherings subject to this directive include, without limitation, community, civic, public, leisure, commercial, or sporting events, concerts, conferences, conventions, fundraisers, parades, fairs, and festivals; and

b.   This directive does not apply to gatherings of ten (10) or more people in unenclosed, outdoor spaces such as parks, trails, athletic fields and courts, parking lots, golf courses, and driving ranges where social distancing of at least six (6) feet can be easily maintained; and

c.   This directive does not apply to businesses, manufacturers, construction companies, places of worship, the Arkansas General Assembly, municipal or county governing bodies, or the judiciary; however, these entities are advised to limit person-to-person contact, maintain appropriate social distancing of at least six (6) feet, and adhere to the social distancing protocols mandated by this order; and

d.   The Secretary of Health reserves the right to exercise his authority to prevent the spread of disease in this State if, in his judgment, any of the excluded entities are operating in a manner that is a risk to public health;

(3) All businesses, manufacturers, construction companies, and places of worship shall implement the following social distancing protocols:
   a. Limit the number of people who can enter into the facility at any one time to ensure that people in the facility can easily maintain a minimum six-foot distance from one another;
   b. If lines form at a facility (inside or outside), facilities shall mark off six-foot increments at a minimum, establishing where individuals should stand to maintain adequate social distancing;
   c. Provide hand sanitizer, soap and water, or effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees, and in locations where there is high-frequency employee interaction with members of the public;
   d. Retail businesses shall provide contactless payment systems or provide for disinfecting all payment portals, pens, and styluses after each use;
   e. Regularly disinfect any high-touch surfaces;
   f. Post a sign at the entrance of the facility informing all employees, customers, and congregants that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into one's elbow; not shake hands or engage in any unnecessary physical contact;

(4) Commercial lodgings and short-term rentals, including, but not limited to, hotels, motels, and vacation rentals, shall only permit occupancy for the following authorized guests:
   a. Healthcare professionals;
   b. First responders;
   c. Law enforcement;
   d. State or Federal employees on official business;
   e. National Guard Members on active duty;
   f. Airline crew members;
   g. Patients of hospitals and their families;
   h. Journalists;
   i. Persons unable to return to their home due to COVID-19 travel restrictions;
   j. Arkansas citizens unable to return to their home due to exigent circumstances, such as fire, flood, tornado, or other disaster;
   k. Persons in need of shelter due to domestic violence or homelessness;
   l. Employees of hotels, motels, or other service providers/contractors of a hotel or motel; and
   m. Persons away from their home due to work or work-related travel;

(5) K-12 schools and extracurricular activities, including athletic events and practices, will remain closed for on-site instruction until such time as the Governor and Secretary of Education deem appropriate;

(6) State government employees will continue to conduct business through both remote work and on-site work. On-site government work will be limited to employees that are critical to the necessary function of government during a public health emergency and are required to report to work on site;

(7) Bars, Clubs, and Restaurants shall remain closed for dine-in purposes and remain open for takeaway and delivery only;

(8) Gyms (including fitness centers/clubs, fitness classes, and group fitness studios) and indoor entertainment venues, such as bowling alleys, trampoline parks, and indoor amusement centers, shall remain closed to nonessential functions;

(9) Casinos shall remain closed;

(10) Barbers, Body Art Establishments, Body Art Schools, Cosmetology Establishments and Massage Therapy Clinics/Spas, and Medical Spas shall remain closed;

(11) The directives of the Arkansas Department of Health issued on March 13, 2020, regarding long term health facilities shall remain in effect for the duration of this order;

(12) Cities and counties taking reasonable measures to prevent the spread of COVID-19 by imposing curfews and closing city or county owned parks and facilities shall not be interpreted as a quarantine regulation of commerce or travel. Curfews should not prevent citizens of any age from traveling to and from work, acquiring food or essential goods and services, walking pets, or acquiring exercise outdoors while maintaining social distance of at least six (6) feet;

(13) Executive Orders of the Governor issued pursuant Ark. Code Ann. §§ 12-75-101, *et seq.*, have the force and effect of law. Additionally, pursuant to Ark. Code Ann. § 20-7-101, violation of a directive from the Secretary of Health during this public health emergency is a misdemeanor offense, and upon conviction thereof is punishable by a fine of not less than one hundred dollars ($100) nor more than five hundred dollars ($500) or by imprisonment not exceeding one (1) month, or both. All law enforcement officers within this state shall enforce the directives of this order and those of the Secretary of Health to preserve the health and safety of all Arkansans during this emergency.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Arkansas to be affixed this 4th day of April, in the year of our Lord 2020.



Asa Hutchinson, Governor

# EXHIBIT D



**Trent Garner For Senate**
@Garner4Senate

I asked the Governor to do this in Arkansas last week. We shouldn't expose women to the risk of the Wuhan COVID-19 virus for an unnecessary elective procedure, and we could save the unborn babies lives. #arpx #arleg #ARNews
lifenews.com/2020/03/27/okl…

**Oklahoma Gov Orders Abortion Businesses…**
Add Oklahoma to the list of states where the governor has made it clear that abortion businesses must stop kiling babies in abortions
lifenews.com

♡ 8   9:28 AM · Mar 29, 2020

See Trent Garner For Senate's other Tweets

# EXHIBIT F



# Arkansas Department of Health

4815 West Markham Street • Little Rock, Arkansas 72205-3867 • Telephone (501) 661-2000
Governor Asa Hutchinson
Nathaniel Smith, MD, MPH, Secretary of Health

April 10, 2020

Little Rock Family Planning
4 Office Park Dr.
Little Rock, AR 72211

RE:  Healthcare Facility Complaint Survey
Conducted April 7, 2020

Dear Administrator:

We recently completed an unannounced investigation of your facility following the receipt of a complaint. The investigation was conducted on April 7, 2020, by personnel from Health Facility Services and included a review of medical records and facility staff interviews.

That investigation did not reveal any deficiencies with respect to the rules for abortion facilities in Arkansas.

However, your facility is in violation of the April 3, 2020 Arkansas Department of Health Directive on Elective Surgeries.  That directive was posted on the ADH's website on April 3, 2020, and a copy was mailed to your facility on Monday, April 6, 2020.  The April 3 Directive mandates the postponement of all procedures that are not immediately medically necessary during the COVID-19 emergency.  That prohibition applies to surgical abortions that are not immediately necessary to protect the life or health of the patient.

Your facility was found to be performing surgical abortions that are not immediately necessary to protect the life or health of the patient, and your facility is therefore in violation of the April 3 Directive.  Your facility is required to postpone such procedures until after the COVID-19 emergency has ended and the April 3 Directive is withdrawn.

Accordingly, your facility is ordered to immediately cease and desist the performance of surgical abortions, except where immediately necessary to protect the life or health of the patient.  Any further violations of the April 3 Directive will result in an immediate suspension of your facility's license.

Sincerely,

Becky Bennett

Becky Bennett
Section Chief, Health Facility Services

# EXHIBIT G



# Arkansas Department of Health

4815 West Markham Street ● Little Rock, Arkansas 72205-3867 ● Telephone (501) 661-2000
Governor Asa Hutchinson
Nathaniel Smith, MD, MPH, Secretary of Health

To:   Arkansas Dentists
From:  Dr. Nate Smith, Secretary of Health
Date:   March 23, 2020
Regarding: Directive to Dentists to suspend non-emergent dental care

The Secretary of Health, in consultation with the Governor, has sole authority over all instances of quarantine, isolation, and restrictions on commerce and travel throughout Arkansas, as necessary and appropriate to control disease in the state of Arkansas as authorized by Ark. Code Ann. §20-7-109—110.  Based on available scientific evidence, it is necessary and appropriate to take further action to ensure that COVID-19 remains controlled and that residents and visitors in Arkansas remain safe.

The Secretary of Health, as of March 23, 2020, directs and mandates that all dental practitioners follow the recommendation of the Arkansas State Board of Dental Examiners and the American Dental Association that only urgent and emergent dental care take place, and that **non-emergent dental care be suspended** until further notice.  This directive and mandate is subject to change as the COVID-19 pandemic progresses.


**Urgent dental care treatments**, which should be treated as minimally invasively as possible, include the following:

• Severe dental pain from pulpal inflammation.
• Pericoronitis or third-molar pain.
• Surgical postoperative osteitis or dry socket dressing changes.
• Abscess or localized bacterial infection resulting in localized pain and swelling.
• Tooth fracture resulting in pain or causing soft tissue trauma.
• Dental trauma with avulsion/luxation.
• Dental treatment cementation if the temporary restoration is lost, broken or causing gingival irritation.

**Other emergency dental care** includes extensive caries or defective restorations causing pain; suture removal; denture adjustments on radiation/oncology patients; denture adjustments or repairs when function impeded; replacing temporary filling on endo access openings in patients experiencing pain; and snipping or adjustments of an orthodontic wire or appliances piercing or ulcerating the oral mucosa.

# EXHIBIT H

ACOG

☰ > News Releases > Joint Statement on Abortion Access During the COVID-19 Outbreak

## Categories

Clinical

Medical Education News

Membership and Fellowship

Patient Education

**Practice Management**

Advocacy and Health Policy

Events and Meetings

## Sources

News Releases

President's Blog

Clinical   |   Mar 18, 2020

Share  f  𝕏  ✉

# Joint Statement on Abortion Access During the COVID-19 Outbreak

The American College of Obstetricians and Gynecologists and the American Board of Obstetrics & Gynecology, together with the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine, released the following statement:

"As hospital systems, clinics, and communities prepare to meet anticipated increases in demand for the care of people with COVID-19, strategies to mitigate spread of the virus and to maximize health care resources are evolving. Some health systems, at the guidance of the CDC, are implementing plans to cancel elective and non-urgent procedures to expand hospitals' capacity to provide critical care.

ADVERTISEMENT

"While most abortion care is delivered in outpatient settings, in some cases care may be delivered in hospital-based settings or surgical facilities. To the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure. Abortion is an essential component of comprehensive health care. It is also a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks or potentially make it completely inaccessible. The consequences of being unable to obtain an abortion profoundly impact a person's life, health, and well-being.

"The American College of Obstetricians and Gynecologists and the American Board of Obstetrics & Gynecology, together with the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine, do not support COVID-19 responses that cancel or delay abortion procedures. Community-based and hospital-based clinicians should consider collaboration to ensure abortion access is not compromised during this time."

Topics   Coronavirus   COVID-19   Delivery of health care   Health services accessibility

Induced abortion   Medical societies   Obstetric surgical procedures   Organizations   Virus diseases

Women's health services

## Latest Clinical News

ACOG Releases Updated Guidance on Exercise in Pregnancy and Postpartum, Includes Recommendations for Athletes
Mar 26, 2020

Joint Statement on Elective Surgeries
Mar 16, 2020

ACOG Updates on Novel Coronavirus Disease 2019 (COVID-19)
Mar 6, 2020

ACOG Statement on "Virginity Testing"
Nov 7, 2019

View More



ACOG
The American College of
Obstetricians and Gynecologists

Contact

Work at ACOG

Media Center

Advertising Opportunities

# EXHIBIT I

ⓘ ASCA COVID-19 Resources: Learn More



Contact Us  |  Code of Conduct  |  Home  |  Join  |  Renew  |  Store

Sign in



# COVID-19: Guidance for ASCs on Necessary Surgeries

*Updated March 19, 2020*

In response to government guidance that hospitals and ambulatory surgery centers postpone elective surgeries during the COVID-19 pandemic, the Ambulatory Surgery Center Association (ASCA) has consulted with clinical leaders to solicit recommendations on how and when facilities should proceed with cases that, for clinical reasons, should not be postponed. A surgery may be deemed urgent and necessary if the treating physician decides that a months-long delay would increase the likelihood of significantly worse morbidity or prognosis for the patient.

First and foremost, if a procedure can be safely postponed without additional significant risk to the patient, it should be delayed until after the pandemic. The current and ongoing efforts to isolate our population and create social distancing are essential steps in saving lives by shortening and ultimately ending the COVID-19 pandemic. The health and safety of patients, along with preventing the spread of COVID-19, must be our highest priority. We concur with the American College of Surgeons that "the risk to the patient should include an aggregate assessment of the real risk of proceeding and the real risk of delay, including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."

Physicians should engage with patients and families to make care decisions that minimize potential risks to patients while ensuring they receive necessary care that cannot be safely delayed. Physicians should consider the potential of post-surgical complications that could place stress on the local hospital that may lack capacity for transfers. To that end, facilities should reach out to local hospitals to establish a line of communication that ensures coordination in managing care during the pandemic.

In addition, ASCs should develop explicit controls on how to manage the infection risks of all non-patient visitors (patient caregivers, vendors, contractors, etc.) who present themselves inside the facility and should strictly prohibit all non-essential visitors. Additional social distancing policies should be employed.

Examples of cases that might still need to proceed with surgery at this time include:

- Acute infection
- Acute trauma that would significantly worsen without surgery
- Potential malignancy
- Uncontrollable pain that would otherwise require a hospital admission
- A condition where prognosis would significantly worsen with a delay in treatment

Also, ambulatory surgery centers need to be prepared for the possibility that the pandemic may proceed to a point that strains the system such that hospitals will need to shift necessary surgeries to ASCs and/or ASCs and their resources will be required to serve the communities and the healthcare system in a different capacity. Additional guidance from regulatory agencies should govern those situations.

Finally, facilities need to recognize that the pandemic and its impact could create situations when ASCs may need to temporarily suspend services, such as:

- When a patient, staff or physician who has been in the ASC is suspected or subsequently diagnosed with COVID-19
- When there is a significant shortage of PPE (masks, gowns, gloves, etc.) that prevents safe practice of surgical cases

Clearly, this is an evolving situation and the coming days and weeks will present different challenges for healthcare facilities, such as ASCs, to grapple with as the COVID-19 pandemic runs its course. As they occur, the ambulatory surgery community will continue to work with federal, state and local health policy leaders to protect and preserve the health of the public during this crisis.

Connect with ASCA:

  

# EXHIBIT J



# AMA statement on government interference in reproductive health care

 

**MAR 30, 2020**

**Statement attributed To:**
Patrice A. Harris, M.D., M.A.
President, American Medical Association

"While many physicians and health care workers are on the front lines in the COVID-19 pandemic, it is unfortunate that elected officials in some states are exploiting this moment to ban or dramatically limit women's reproductive health care, labeling procedures as 'non-urgent.'

"The AMA will always defend shared decision making and open conversations between patients and physicians, and fight government intrusion in medical care. At this critical moment and every moment, physicians – not politicians – should be the ones deciding which procedures are urgent-emergent and need to be performed, and which ones can wait, in partnership with our patients."

## Membership Moves Medicine™

- Free access to JAMA Network™ and CME
- Save hundreds on insurance
- Fight for physicians and patient rights

**Join the AMA today**

**Media Contact:**

AMA Media & Editorial
ph: (312) 464-4430
media@ama-assn.org

### About the American Medical Association

The American Medical Association is the physicians' powerful ally in patient care. As the only medical association that convenes 190+ state and specialty medical societies and other critical stakeholders, the AMA represents physicians with a unified voice to all key players in health care.  The AMA leverages its strength by removing the obstacles that interfere with patient care, leading the charge to prevent chronic disease and confront public health crises and, driving the future of medicine to tackle the biggest challenges in health care.

AMA Press Center | Coronavirus (COVID-19) | Female Population Care



**PHYSICIAN HEALTH**

COVID-19 front line: Mount Sinai keeps physician well-being in focus



**PUBLIC HEALTH**

COVID-19: Rebalancing your staff workload to meet care needs



**PHYSICIAN RETIREMENT**

Retired doctors hear COVID-19 battle call, look for ways to help



The AMA promotes the art and science of medicine and the betterment of public health.

AMA Careers
Events
Press Center
AMA Alliance
AMPAC
AMA Foundation

AMA Contact Us
Download AMA Connect app for iPhone or Android

The best in medicine, delivered to your mailbox

Email Address          SUBSCRIBE

☐ I verify that I'm in the U.S. and agree to receive communication from the AMA or third parties on behalf of AMA.

JAMA NETWORK™ | FREIDA™ | AMA ED HUB™ | AMA INSURANCE | AMA JOURNAL OF ETHICS® | CPT® | STORE | AMA CREDENTIALING SERVICES | PHYSICIAN JOB LISTINGS

Terms of Use | Privacy Policy | Code of Conduct | Website Accessibility

Copyright 1995 – 2020 American Medical Association. All rights reserved.

# EXHIBIT K







## World Health Organization: Abortion Is 'Essential' During Coronavirus Pandemic



Abortion is considered an essential service during the coronavirus pandemic, the World Health Organization said in a statement Saturday.

The WHO said in its statement to the Daily Caller News Foundation that "services related to reproductive health are considered to be part of essential services during the COVID-19 outbreak."

"Women's choices and rights to sexual and reproductive health care should be respected, irrespective of whether or not she has a suspected or confirmed COVID-19 infection," WHO said in the statement. RELATED: Top WHO Official Endors Adhanom Ghebreyesus Won Election With China's Help, Now He's Running Interference For China On Coronavirus

The statement also said that "sexual and reproductive health care is integral to universal health coverage and achieving the right to health."



"This includes contraception, quality health care during and after pregnancy and childbirth, and safe abortion to the full extent of the law," the organization added, noting that the WHO provides both global technology and policy guidance to WHO members "on the use of contraception to prevent unintended pregnancy, safe abortion, and treatment of complications from unsafe abortion."

Governors and health departments across the United States have issued decisions on whether or not abortions are considered essential services. Texas, Ohio, Oklahoma, Indiana and Iowa as well as the governor of Mississippi declared abortion non-essential and banned these procedures to preserve PPE for fighting coronavirus. RELATED: WHO Official Defends China, Says Everyone Is 'Over-Focused' On Regime's Coronavirus Numbers:

Meanwhile, Massachusetts, Michigan, Minnesota, Indiana, New Jersey, Illinois, Oregon, Hawaii and Virginia —all states that have banned elective medical procedures — deemed abortions essential during the outbreak.

There have been 1,172,692 cases of the coronavirus worldwide as of Saturday afternoon, and 62,825 people have died from the virus.





### Our Community

